FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 0 6 2023

TAMMY H. DOWNS, CLERK
By: _Kitago_
                    DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**SUTTER & GILLHAM, P.L.L.C.;**
**LUTHER SUTTER; and, LUCIEN GILLHAM**                    **PLAINTIFFS**

**VS.**                    **CASE NO:** 4:23CV-78-BSM

**JUDY SIMMONS HENRY; JACOB FAIR;**
**SCOTT IRBY; WRIGHT, LINDSEY, AND**
**JENNINGS, LLP; TOMMY WILLIAMS;**
**BRYAN ADAMS; ERIC BELL; BRANDON**
**ADAMS; SKYLAR ADAMS; EFREM**
**NEELY; CHRIS BURKS; BRANDON HAUBERT;**
**WH LAW, PLC; AND, JOHN DOES 1-100**                    **DEFENDANTS**

This case assigned to District Judge _Miller_
and to Magistrate Judge _Ray_

## COMPLAINT

COME THE PLAINTIFFS, by and through Counsel, and for this Complaint, each states:

### JURISDICTION

1. Plaintiffs, **LUTHER SUTTER** ("Sutter"), and **LUCIEN GILLHAM** ("Gillham"), are each residents and citizens of Pulaski County, Arkansas, who are associated with **SUTTER & GILLHAM, P.L.L.C.**, ("S&G"), an Arkansas Limited Liability company with its principal place of business in Pulaski County, Arkansas.

2. Defendants are all residents of the State of Arkansas, whether it be Pulaski County, Faulkner County, Jefferson County, or otherwise, who, at all times

1

relevant hereto, were acting under color of law in a conspiracy to deny Plaintiffs the Due Process guaranteed them by the Fifth Amendment, as applied to the States through the Fourteenth Amendment.

3.   This is also an action for tortious interference with contract, malicious prosecution, abuse of process, defamation, barratry, champerty, maintenance, conspiracy, and for denial of each Plaintiff's constitutional rights assured them under the United States Constitution and the Arkansas Constitution.

4.   Each Plaintiff brings this action to redress deprivation of their rights under the First Amendment to the United States Constitution, Fourteenth Amendment to the United States Constitution, and Article II Section 22 of the Arkansas Constitution, as permitted by the Arkansas Civil Rights Act of 1993 (ACRA) and 42 U.S.C. §1983 and 1985.

5.   Since the acts giving rise to this action arose within this Court's District, venue is proper under 28 U.S.C. § 1391(b).

6. This Court has Federal question, subject matter, jurisdiction under 28 U.S.C. §1331, as well as supplemental jurisdiction over Plaintiffs' State claims under 28 U.S.C. §1367.

7.   Federal Courts have jurisdiction over claims here because State judicial proceedings have resulted in deprivations of Federal constitutional rights as long as

the claims are otherwise properly before the Federal Fourts. *Peterson v. Sheran*, 635 F.2d 1335, 1339 (8th Cir. 1980).

## PARTIES

8.    Plaintiffs, **LUCIEN GILLHAM** ("Gillham"), and **LUTHER SUTTER**, ("Sutter"), are lawyers licensed to practice law in the State of Arkansas, who are associated with an Arkansas Professional Limited Liability Company, **SUTTER & GILLHAM, P.L.L.C.**, ("S&G").

9.    **JUDY SIMMONS HENRY,** (Henry, a lawyer defendant), **JACOB FAIR,** (Fair, a lawyer defendant), and **SCOTT IRBY,** (Irby, a lawyer defendant), are lawyers associated with **WRIGHT, LINDSEY, AND JENNINGS, LLP** ("WLJ").

10.    With the exception of **BURKS** and **HAUBERT**, the lawyer Defendants represented **BRYAN ADAMS, BRANDON ADAMS**, and **SKYLAR ADAMS,** ("Adamses"), in the lawsuit attached as ***Exhibit "A".*** Exhibit A is sometimes referred to herein as the "*Baker case*" or the "*Jefferson County case*."

11.    The Lawyers representing the Adamses acted, at all times relevant, with the express permission of the **ADAMSES,** and the express or apparent authority granted them by the Adamses.

12.    **ERIC BELL,** (Bell, a lawyer defendant), is a lawyer employed by the

3

Adamses and their associated companies as a lawyer in their Conway office, who conspired with the Adamses; and, one or more of the Defendants, to deny Plaintiffs their constitutional rights by recruiting his friend, and fellow Defendant, **CHRIS BURKS,** to sue the Plaintiffs frivolously. Defendants, **CHRIS BURKS** and **BRANDON HAUBERT**, each are lawyers, licensed to practice in Arkansas, who agreed to file a frivolous lawsuit against the Plaintiffs, on behalf of **DAVID WESTBROOK, (**"Westbrook"), or free to benefit the **ADAMSES** and **BELL** in return for future support. Burks and Haubert were, and are, employed by **WH LAW, PLC**. At all times relevant, Burks and Haubert were acting in the interest of WH Law, within the scope and authority granted them by WH Law, PLC, an Arkansas limited liability company. So, the actions of **BURKS** and **HAUBERT** should be imputed to **WH LAW, PLC**.

13. **EFREM NEELEY,** (Neeley, a lawyer defendant), is a lawyer licensed to practice law in the State of Arkansas. Neeley was a former law partner of Judge Guynn, a sitting Circuit Judge for Jefferson County, Arkansas, who referred Westbrook, in conjunction with Henry; and, one, or more, of the lawyer Defendants, to **CHRIS BURKS** and **BRANDON HAUBERT** to sue the Plaintiffs to smear the Plaintiffs. Judge Guynn was presiding over the lawsuit attached as Exhibit A.

4

14.  Neeley was hired primarily to be a conduit to Judge Guynn and because he was Judge Guynn's former law partner.  Neely also intentionally mislead David Westbrook into hiring Burks, who then associated **BRANDON HAUBERT**, to file a frivolous counterclaim against the Plaintiffs on February 4, 2020, in Saline County Circuit Court, to cause Plaintiffs to withdraw at hearing in the Jefferson County Circuit Court on February 4, 2020.  **BURKS**, along with **HAUBERT**, coordinated the filing of the Saline County lawsuit in conspiracy with one or more Defendants.

15.  **SKYLAR ADAMS, BRYAN ADAMS, AND BRANDON ADAMS** are residents of Arkansas who retained the defendant lawyers to destroy Sutter and his family for an improper purpose and who has sued Plaintiffs in the frivolous lawsuit attached as ***Exhibit "B."***

16.  **TOMMY WILLIAMS,** (Williams, a lawyer defendant), is a lawyer licensed to practice law in the State of Arkansas, who has stated his intent to destroy Sutter since at least 2019. He is a lawyer associated with Quattlebaum, Grooms, and Tull PLLC ("QGT").

17.  John Does 1-100 are individuals, insurance companies, and entities, presently unknown to the Plaintiff who employed the Defendants and authorized them to engage in an unlawful conspiracy.

5

## GENERAL ALLEGATIONS OF FACT

18.   Every lawyer and judge, including Judge Clark and Judge Guynn, knows, and was taught in law school, that is it immoral to participate in an *ex parte* communication between a lawyer and a judge, where that communication includes discussing a pending case when the judge is presiding over the case and the lawyer represents a party in the case.

19.   *Ex parte* communications about the merits of the Jefferson County case, hereafter discussed in great detail, between Judge Guynn and Neeley took place on more than one occasion.

20.   Other defendants not only were aware the *ex parte* communications were taking place between Judge Guynn and Neeley, they encouraged the communications.

21.   Greg Stephens, ("Stephens"), was the lawyer who filed the lawsuit attached as Exhibit A - the Jefferson County case.    Stephens also was the lawyer for the Estate of Luke Baker, pending before Judge David Clark in Faulkner County. See ***Exhibit D***.

22.   After a hearing, Stephens was also sanctioned by Judge David Clark, shortly after Clark met with Bryan Adams at Adams' office.  After that hearing, the Adamses approached Baker's private investigator, Allen Noble, and threatened

6

him.

23. Upon information and belief, a reasonable inference is that Adams and Clark agreed that Clark, sitting as a judge presiding over the Estate of Luke Baker, would sanction Stephens because of their social relationship.

24. There was substantial evidence that Luke Baker, whose tortious, and possibly criminal, wrongful death was the subject matter of the Jefferson County case, did not commit suicide. So, Stephens brought an action on behalf the Estate of Luke Baker for wrongful death and other torts, and by his family members, individually for torts directly committed against them after the death of Luke Baker, as more particularly set out below.

25. Plaintiffs never represented the Estate.

26. The defendants in the Jefferson County case included Bryan Adams ("Bryan"), Skylar Wilson ("Wilson"), Travis Jones, Carson Cook ("Carson"), Karla Cook ("Ms. Cook"), Todd Ross ("Ross"), Austin Tate ("Young Tate" or "Austin"), John Tate ("the elder Tate"), Mary Tate, and Christie Adams ("Ms. Adams") and they reside in Faulkner County.

27. The Jefferson County case defendant, Brandon Adams, ("Brandon"), owns the real estate which was the location of Luke's wrongful death in Jefferson County, Arkansas. He is also an officer and director of Reliance Health Care, Inc.

7

("Reliance, Inc."), an Arkansas business.

28. Jefferson County case defendants, Prairie Wings South, LLC, ("P.W. South"), and Prairie Wings Lodge, LLC, ("P.W. Lodge"), are Arkansas companies doing business in this State and who own or manage the property known as the Prairie Wings Duck Club, ("The Club"), in Jefferson County where Luke Baker ("Luke") died.

29. Reliance Health Care, Inc., and perhaps a John Doe company, were the employers of Travis Jones at times, as were some of the other defendants, and directed the activities of some of the co-defendants at times relevant hereto.

30. Kerry Baker, surviving father and Administrator, Savannah Baker Case, surviving sister, and Gena Downey Baker, surviving mother, are the immediate familial survivors of Luke, and are all adults. They were each represented by separate counsel in the Jefferson County case.

31. Plaintiffs herein named only represented, for a time, Gena Downey Baker.

32. In the Jefferson County case, the Plaintiffs believed the evidence was sufficient to prove the following:

> a. On October 24, 2015, four friends, Wilson, Austin, Carson, and Luke went on a joint venture, a hunting trip, with drugs and alcohol to the Prairie Wings Duck Club near Altheimer, Arkansas in Jefferson County.

8

b. The joint venturees were invited as guests of their hosts, the owners of the Duck Club, who were Brandon, Bryan, Ross, Whicker, P.W. South LLC, P.W. Lodge LLC, and one or more Doe defendants.

c. These owners of the property control the operations thereon as though the property was solely theirs, despite the fact that base legal title and management of the company rests in the names of P.W. South LLC, managed by P.W. Lodge LLC, which also has a property right therein.

d. Near the end of the evening on October 24, 2015, around 10:30 p.m., give or take a few minutes, there was evidence of an altercation or event, between Wilson and Luke wherein a physical confrontation and struggle ensued, resulting in the death of Luke by gunshot wound to the head.

e. Luke did not commit suicide.

f. Death was instantaneous or within seconds.

g. Whether anyone other than Wilson actually visually witnessed the event is known only to Wilson, Carson, and young Tate.

h. Whether Carson heard the shot, or was in the room also, is known only to him and Wilson.

i. Austin claims the shot woke him but that he thought someone was test firing a blank powder cartridge and so he did not respond until summoned by Carson and Wilson.

j. The evidence of this event was in the exclusive control of these persons and the death could not have ordinarily occurred without tortious, negligent or criminal action since Luke did not commit suicide.

k. Austin admitted Luke was not depressed. All who knew him knew he was not depressed, and Austin has stated Luke was not suicidal that evening or at any other time.

l. False rumors of depression have been circulated by other Jefferson County case defendants.

m. Upon recognizing that Luke was dead, there was no rushed effort to contact authorities, call 911, or get help for Luke.

n. It was over 30 minutes before any such action was taken.

o. Carson insisted upon action by the three surviving friends to protect himself and his family as partners in the duck hunt.

p. Wilson demanded adherence to his version of events that the wound was self-inflicted, which was a lie to prevent an investigation, arrest, or prosecution, for the felonies being committed.

q. Given what Wilson had just done, and the resulting condition of Luke, and the continued presence of a gun, there was no resistance by the young Tate to the demands to cover up any evidence that would implicate any of the defendants, and there was no mood to dissent.

r. At some point between Luke's death and 11:15 p.m., the Jefferson County case Defendants may have removed the murder weapon and replaced it with Luke's gun, which had been in the bedroom hanging on the bed post.

s. This fraudulent behavior is a felony crime and constitutes an overt act by Wilson, Carson, and young Tate, thereby forming a conspiracy by the three at that time. Others joined in the conspiracy later in the evening.

t. The three surviving friends over the next hours contacted directly or indirectly, through intermediaries, and by various available means, Jefferson County case co-defendants, Bryan, Karla Cook ("Ms. Cook"), Christie Adams ("Ms. Adams"), Jones, Mary Tate, John Tate ("the elder Tate"), Brandon, Ross, Whicker, and others.

u. Such contacts began before any action to summon authorities to the scene.

v. The purpose of those contacts was to enlist persons in the conspiracy to cover up the crimes committed before police authorities could investigate, which they did.

w. Whicker, Bryan, Brandon, Ross, P.W. South, P.W. Lodge, and Doe defendants, or at least one of them acting for them all, gave instructions as to what actions should be taken to protect the Jefferson County case co-defendants from liability.

x. Wilson, Austin and Carson followed the instructions they were given.

y. One of the Adams Jefferson County case defendants, in his role as an executive of Reliance, Inc. and on behalf of Reliance, Inc., contacted Travis Jones, an employee of Reliance, Inc., an agent of Bryan personally, supplier of things illegal, and all around "fixer", to speed to the scene and protect the interests of the other defendants, and also himself, by removing evidence, destroying evidence, stealing evidence, absconding with evidence, and helping to mislead authorities, prevent detection of what had actually transpired, and to hide evidence of the drugs that were supplied by him or other defendants, and to dispose of other contraband.

z. The other defendants either knew about the post-death conspiracy, fully agreed with it, or when learning about it, joined in and cooperated with it completely.

aa. Reliance, Inc. is responsible for the acts of Jones, Bryan, Brandon or other agents that were used on behalf of Reliance.

bb. The activities of the Club were for the benefit and entertainment of Reliance and its associates and guests, and the costs thereof constituted a deduction on the tax returns of Reliance, Inc.

cc. The actions taken by the conspirators were, among other things, spoilation, false reporting to authorities, compounding, hindering, aiding, abetting, obstructing, theft, and other criminal offenses, all of which went undetected due to a lack of truth or any renunciations by any of the Jefferson County case co-defendant conspirators, whether

real persons or companies.

dd. The crimes committed from the moment Luke was killed through the present date, and the names of the various Jefferson County case defendants who likely participated in the commission of those crimes are as follows:

i. Manslaughter (reckless homicide) or more (Skylar Wilson);

ii. False Report (Skylar Wilson) (A.C.A. § 5-54-122(c)(1)(D) for lying to authorities "to conceal his own criminal activity";

iii. Hindering (Bryan Adams, Carson Cook, young Tate, the elder Tate, Karla Cook, Travis Jones, Mary Tate, and others) (A.C.A. § 5-54-105) in that with purpose to hinder a prosecution of Skylar Wilson for a homicide for felony they hindered by (i) concealing, altering, suppressing facts or things relevant to the investigation, or (ii) supplying false information to law enforcement (§105(a)(6)); or (iii) providing erroneous facts, documents, or instrumentalities (as in a fake gun) to distract or inhibit the true course of the investigation (§105(a)(7));

iv. Compounding (Travis Jones, Reliance, Bryan) (A.C.A. § 5-54-107) by Travis accepting or agreeing to accept a benefit and for the other two providing or agreeing to provide same in return for silence about a crime;

v. Delivery (several defendants including Jones, Reliance, Bryan, Wilson, Carson) (A.C.A. § 5-64-438);

vi. Conspiracy to Commit or Aid any Class C Felony listed herein (all defendants including Christie Adams) for agreeing at least one of them will, commit or aid in a felony or its planning or commission, and commit an

overt act (A.C.A. § 5-3-401);

vii. Aiding or being an Accomplice to any of these listed offenses, or any other felony, felony conspiracy (all defendants) (A.C.A. § 5-2-403) by advising, encouraging, failing to prevent, or attempting to aid in the planning or commission thereof;

viii. Illegally moving or handling of a body (A.C.A. § 5-60-101 provides that a person commits a class C felony if he, except as authorized by law, removes a corpse) (Wilson, Austin, Carson, et al).

ee. What is sure is that wholesale sanitizing of the scene, prior to arrival of the team of crime scene investigators occurred.

ff. Contraband was destroyed, removed, stolen, or hidden to avoid detection of the truth.

gg. Lies were told to authorities and others to conceal the truth that this was a homicide.

hh. All Jefferson County case co-defendants were generally aware of the actions of each other, did not object, leave the conspiracy, or cure the damage.

ii. The deputy coroner and sheriff's investigator were intentionally misled, and some degree of "persuasion" took place by one or more of the Jefferson County case defendants to convince others, some perhaps reluctantly, to go along.

jj. The Jefferson County case defendants whose overt acts in furtherance of the conspiracy involved lying to authorities would be Wilson, Carson, young Tate, Bryan, Ms. Cook, and Doe.

kk. When many associates of the Jefferson County case defendants in the 2-3 days after the homicide complained of the incredulity of the Russian Roulette story, the Jefferson County case defendants, to keep the conspiracy going, created an alternate false story that Jefferson

County case defendants felt would quiet these objections among associates.

ll. This second false story that was circulated among the Jefferson County case defendants was that Wilson and Luke were at the card table playing a game with Wilson's gun and that Wilson accidentally shot Luke, and that due to fear that no one would believe this, the suicide story was concocted.

mm. This story circulated at parties and among Reliance employees and associates with the explanation that the suicide story was necessary to prevent Wilson from being "ruined" for what was just an accident.

nn. The Jefferson County case defendants whose overt conspiratorial acts involved knowingly lying about the cause of death or helping others to lie includes every Jefferson County case defendant except possibly P.W. Lodge, P.W. South, Ross, Whicker, elder Tate, and Mary Tate.

oo. These six Jefferson County case defendants, except perhaps Ross, committed overt acts toward helping the "clean up", and thereby destroying evidence, in aid of the conspiracy.

pp. Ross became aware of the false stories, and as owner of the premises had an affirmative duty to disclose what he knew.

qq. Luke's body was removed from the scene, over thirty minutes after death, illegally, and by instruction and intention.

rr. None of the conspirators ever notified authorities, even during a sixteen-minute 911 phone call, that Luke was dead.

ss. The body was taken to a hospital 20 miles away to divert the investigators to an emergency room instead of the Club.

tt. The gates to the Club were locked by Wilson, Carson, and young Tate upon instruction by an owner to prevent entry by the authorities.

uu. The failure to send the body to the crime lab for autopsy was outrageously accomplished by the conspirators by lying to the deceased's father Kerry Baker, and pressuring him to refrain from asking for an autopsy, so the decision not to have one could be blamed on him, when the decision was not his to make by law, especially under the devastatingly grave circumstances.

vv. The hospital ER doctor was coerced into signing the death certificate in an attempt by the conspirator Jefferson County case co-defendants to obviate the autopsy requirement of the law that applies to coroner cases.

ww. The chief coroner, the Sheriff, and the ranking Major were not fully informed until the body was cleaned, in the morgue, and after evidence was destroyed.

xx. The Jefferson County case co-defendants divided their labor, some acting at the hospital, some contacting law enforcement, others instructing witnesses, and others cleaning and removing evidence from the scene, the body, the hospital, and elsewhere.

yy. The Jefferson County case defendants know where the actual weapon is and still they remain silent.

zz. Illegal substances and guns were supplied by Jefferson County case defendants Wilson, Carson, Bryan, Reliance, Inc., Travis Jones, and by the owners of the property by their agent(s), Reliance agents other than Jones, and one or more Doe defendants, either directly, as agents, or indirectly by their agent(s).

aaa. The Jefferson County case Defendants' undertook spoliation of evidence, of the homicide itself, of the drinking and drugging attendant thereto, and of all actions taken by them.

bbb. The Jefferson County case defendants conspired and hid evidence because they knew they were guilty.

ccc. The illegal substances and items provided by some of the conspirators did foreseeably result in the intoxication of Wilson, who

15

had a mental condition, and a propensity towards violence, especially when intoxicated. which was known to all Jefferson County case defendants.

ddd. The drugs also impaired Carson and young Tate from protecting Luke from Wilson, who was unable alone to protect himself from the stronger and violent Wilson.

eee. It was determined the gunshot wound was a "distant" wound as that term is used by medical examiners and excludes close up or contact wound scenarios, such as the death by suicide Russian roulette lie told by Wilson to authorities.

fff. Wilson's statements to authorities on October 24, 2015 and later were false, and intentionally so, further implicating the spoliation inference of liability from the disposing of the real weapon.

ggg. Some of the Jefferson County case defendants were, upon information and belief, involved to some degree in the illegal supplying of drugs, alcohol, and other substances or items to those present at the Duck Club on October 24, 2015 and at times prior thereto.

hhh. Those implicated in this include Travis Jones, Wilson, Carson Cook, the club owners, Reliance, Inc. which supplied the finances for the illegal substances and subsidized the activities at the Club, and Doe defendant delivering substances to the lodge, and any Jefferson County case defendant who controlled the premises who supplied, or arranged, or allowed the supply thereof to the hunters.

iii. Law enforcement reports after the event, attributed by the Sheriff's office to information provided by the Jefferson County case defendants themselves, indicated an evening of drugging, drinking, and partying was involved in the resulting death.

33.  In a grave miscarriage of justice, Defendants herein unconstitutionally,

and corruptly, procured an Order of the Jefferson County Circuit Court, entered on

June 22, 2021, sanctioning the Plaintiffs and dismissing the Jefferson County case with prejudice. See Order in docket number 35CV-18-1077. "***Exhibit C***", attached hereto. That case has been appealed as docket number CV-22-102, currently in the Arkansas Court of Appeals.

## **FACTS ESTABLISHING LIABILITY TO PLAINTIFFS**

34.   In November of 2018, the Jefferson County Coroner decided that Baker's death certificate should be amended, since there was evidence that he clearly had not committed suicide. [2]

35.   In December of 2018, Stephens asked Sutter to enter his appearance in the Jefferson County case as conflict counsel for Gina Baker, a statutory beneficiary under the Arkansas wrongful death statute.

36.   Sutter agreed to appear for that limited purpose, so Sutter entered his appearance in December of 2018.

37.   Shortly thereafter, Williams approached Sutter and said that the Adamses would destroy Sutter if he didn't withdraw. Sutter was not intimidated and ignored this threat.

38.   Over time, the threat became real, with the lawyer defendants assisting the Adamses in a campaign to deny Plaintiff his State and Federal constitutional

---

[2] Indeed, Sutter eventually developed corroborating evidence that Baker did **not** commit suicide. See Affidavit of Sperry attached as ***Exhibit "L."*** Defendants slandered, and continued to slander, Plaintiffs with their allegations of misconduct, which caused Plaintiffs to lose business and reputation.

rights.

39. The first indication of the efforts to come to destroy Sutter was Henry's false allegation that Sutter assaulted her.

40. Henry has a well-earned reputation for abusive litigation tactics, some examples being false allegations against other lawyers like Stephen Quattlebaum.

41. With the approval of Bell and the Adamses, Henry's and Williams' first step was to hire Efrem Neeley, (Neeley), a lawyer who conveniently was formerly a law partner with Judge Guynn.

42. Judge Guynn did not hear Neeley's cases because of this relationship.

43. Neeley was hired for the specific purpose of influencing Judge Guynn and because he was black.

44. Although Judge Guynn had recused on every other case in which Neeley appeared, Neeley appeared as counsel of record in the Jefferson County case nonetheless.

45. Neeley has no significant experience prosecuting complex civil cases such as the case in Exhibit A.

46. Plaintiffs trusted Judge Guynn to be impartial, so Sutter recommended to his client that any conflict caused by Neeley's entry into the case be waived. That was a mistake.

47. Neeley's appearance in the case was another substantial step in a

18

conspiracy to deny Plaintiffs, the Nobles, and Stephens their constitutional rights.

48.   Neeley was hired simply to provide a conduit of information between himself and Judge Guynn and because Neeley was black.

49.   Neeley and Guynn met after hours at Neeley's law office during the pendency of the Jefferson County litigation.

50.   Neeley was paid tens of thousands of dollars by the Adamses.

51.   Neeley was hired on the recommendation of WLJ.

52.   During the course of the Baker case, Neeley and Judge Guynn communicated about the case *ex parte*.

53.   The Adamses also communicated directly with sitting, and long-time friend, Circuit Judge David Clark, in Faulkner County, Arkansas.   Clark visited with the Adamses regularly, but he failed to disclose this fact to the parties in the Probate.

54.   The Adamses and Bell knew what the respective judges would do on several occasions before that of the Plaintiffs and their client, Gina Baker.

55.   On occasion, Judge Guynn discussed the case with Neeley, at Neeley's office, after hours, and Neeley then would contact Eric Bell, or the Adamses, to report what the Judge's decisions would be.

56.   The lawyer defendants would then craft their representation of the Adamses based upon the "inside" information they had but that Plaintiffs and their

clients did not.

57.  Bell, Henry, Neeley, and Williams then recruited other lawyers like BURKS, who then associated BRANDON HAUBERT, to make spurious allegations against the Plaintiffs, thereby committing barratry, champerty, and maintenance.

58.  Henry then used the Westbook Counterclaim that, falsely alleged that Plaintiffs had "sold out" a client, David Westbrook, to bribe the Jefferson County Coroner to change the manner of death in the Luke Baker death certificate to create a conflict for the Plaintiffs.  Her false representations to the Court are attached as ***Exhibit "M."***

59.  Henry intentionally failed to disclose to the Court that Defendants had encouraged, aided, and abetted the filing of the false Westbrook Counterclaim. Thus, the Westbrook allegation was an intentional attempt to create a conflict for the Plaintiffs, after one or more Defendants discovered the Westbrook case had been settled.

60.  Henry failed to disclose that Efrem Neely, acting with the approval of Henry and Williams, approached David Westbrook, after he settled his case, and falsely suggested to Westbrook that Plaintiffs had sold him out.

61.  Henry failed to disclose that Efrem Neely, acting with the approval of Henry and Williams, arranged a meeting with Williams, or the WLJ lawyers, at the

offices of WLJ.

62. Henry failed to disclose that at that meeting, Efrem Neely, acting with the approval of Henry and Williams, then convinced Westbrook to contact Chris Burks, whom had been recruited by Bell at the requests of the other Defendants, for the purpose of filing a frivolous suit against the Plaintiffs for free.

63. Then, Henry and Williams convinced other lawyers to sign pleadings that accused Plaintiffs of heinous activities to fabricate a basis for the Faulkner County litigation, Exhibit M, for example. Although these other lawyers declined to sign the frivolous Faulkner County Complaint, they did sign the Motion attached as Exhibit "D." The Motion was not served on the Plaintiffs, even though Plaintiffs had a clearly established right to Due Process. Defendants violated Plaintiffs' right to Due Process. One egregious example is Irby, a lawyer employed by WLJ and a former law clerk to a Federal judge and clearly was well versed in Due Process rights.

64. A hearing was held, at which none of the Plaintiffs were present. See Transcript attached hereto as ***Exhibit "E."*** The transcript reveals that, acting at the Defendants' insistence, Judge Guynn entered an Order under Ark. R. Civ. P. 11 and 37 sanctioning the Plaintiffs without ever having given Plaintiffs notice.

65. The Bakers' lawyers, Eric Buchanan and Marion Humphrey, did not introduce a single piece of evidence at the hearing. As a result, these attorneys

21

were not sued by the ADAMSES, even though they approved and executed the joint decisions made by all counsel in the Baker litigation.

66.   Henry drafted the Order, but her draft sets forth reasoning for the decision which differs in important ways from what Judge Guynn actually ruled from the bench.   Judge Guynn signed the Order anyway.

67.   As soon as Sutter found out about Judge Guynn's Sanctions Order, he filed a Motion to Intervene, attached as ***Exhibit "F."*** The Defendants then filed a Response, attached as ***Exhibit "G."*** Sutter then filed a Reply, attached as ***Exhibit "H."***

68.   Any reasonable and honest judge, as well as all the lawyers involved, would give lawyers like the Plaintiffs notice and a meaningful opportunity to be heard, but not a single lawyer representing the Bakers objected to the absence of Sutter and Gillham. Why? Because the Defendants achieved their goal - INTIMIDATION! All of these actions were intended to deny Plaintiffs' Due Process and their First Amendment rights to access to Courts.   Defendants abused the judicial process and interfered with Plaintiffs' contract rights.   The result would have been different had BURKS and HAUBERT not filed the frivolous lawsuit, and such filing was a substantial step in the conspiracy.

69.   Upon information and belief, in furtherance of the illegal conspiracy between the Defendants, acting under the influence of Neely and to further Neely's

financial interests. Judge Guynn then denied Sutter's Motion to Intervene at the Adamses', Bell's, and Neely's request, just as he had denied the Bakers' absolute right to nonsuit the case under Ark. R. Civ. P. 41, multiple times. The Order sanctioning the Plaintiffs sets forth no reason for the decision and was drafted by Henry. The Order denying intervention was a further denial of Plaintiff's Due Process rights.

70. Using the unconditional Order, Williams, Ed Lowther, Fair, Henry, Irby and the Adamses then caused to be filed Exhibit B is sometimes referred to as the Faulkner County case and a frivolous Complaint with the Arkansas Committee on Professional Conduct. Indeed, in response to a Motion to Disqualify him in the Faulkner County litigation, Neeley stated, "By virtue of Rule 11, plaintiffs' attorneys have already affirmed that they believe the allegations of the first amended complaint to be true. If required to testify, plaintiffs' attorneys would support those allegations and plaintiffs' claims." But Neeley will also testify, "You should tell Mr. Sutter that I have nothing bad to say about him. I think he's a great attorney, I just think this was a bad situation he was in." How can this be?

71. Defendants will argue in the Faulkner County case that Plaintiffs should be collaterally estopped from relitigating most issues, even though Plaintiffs have never had the opportunity to present uncontroverted evidence that they did not engage in improper conduct. Indeed, the issue of whether Plaintiffs breached

their duty to Westbrook has already been litigated. See ***Exhibit "I."*** Plaintiffs were obviously successful because BURKS, in association with HAUBERT, filed the lawsuit at the request of his friend, Eric Bell, for free at the request of the Adams, with the advice and consent of Williams and Henry, without a factual basis so that Plaintiffs could not defend themselves in the Jefferson County proceedings.

72.   Bell, acting through Neeley, had referred David Westbrook to Chris BURKS, who, along with HAUBERT, then sued Plaintiffs for malpractice and breach of fiduciary duty without a factual basis for free, even though there was no reasonable basis in fact or law for the lawsuit.

73.   The WLJ Defendants then caused the allegations of that lawsuit to be publicized throughout the State, through Arkansas Business and others.

74.   Arkansas Business is a publication that has an established business relationship with WLJ.   Plaintiffs have none.

75.   Upon information and belief, Henry, and perhaps others, influenced Arkansas Business to run a slanted story in an attempt to destroy each Plaintiff's reputations.

76.   Then, Ed Lowther, Williams, Fair, Henry, and Irby filed the frivolous Faulkner County lawsuit attached, going so far as defaming Sutter's son, Jacob Sutter, accusing him of conspiring to suborn perjury.

77.   Jacob had only flown a jet to pick up independent counsel to assure

24

ethical and proper conduct in the Baker case. Jacob also ran a slide show during

the taking of the Coroner's deposition in the Baker case.

78.    To further add insult, Henry sent a FOIA request to Jacob's law school,

which the law school allegedly lost. Upon information and belief, Henry and other

Defendants obtained information about Jacob protected by FERPA.

79.    Jacob Sutter has been forced to disclose the lawsuit against his father,

Exhibit B, to the Arkansas Supreme Court and its committee, which could, but

hopefully won't, delay his licensure.

80.    The reference to Jacob in Exhibit B was gratuitous and outrageous,

designed to anger Sutter.

81.    Despite warnings, WLJ and its lawyers continue to falsely accuse

Sutter of unethical conduct in order to force him to withdraw. *Cheatwood v. Horan*

is an example. In that case, Michele Browning falsely accused Sutter of unethical

conduct. This allegation then forced Sutter to withdraw, and then a defense verdict

was rendered. As a result of each Defendant's actions, Plaintiffs have lost millions

of dollars in fees, as well as incurred attorneys' fees and costs.

## COUNT I-RETALIATION

82.    Each Plaintiff realleges the foregoing as if fully set out herein.

83.    Each Plaintiff had a clearly established right to freedom of speech and

access to Courts under the 1st Amendment and to remonstrate under the Arkansas

Constitution, as well as to participate in an investigation designed to determine whether a homicide occurred.

84. The issue of whether Luke Baker committed suicide, or was murdered, is an issue of public concern, as well as whether there was public corruption in Jefferson County. If Luke Baker was murdered, covering that up involved both state action and some of the defendants participating in and inducing that state action.

85. Defendants deprived each Plaintiff of their constitutional rights without Due Process by obtaining an Order designed to smear the Plaintiffs.

86. The actions undertaken by the Defendants would chill a reasonable person of ordinary firmness.

87. By virtue of the facts alleged herein, each Plaintiff has lost wages, lost fringe benefits, lost fees, and incurred other damages in an amount to be proven at trial.

88. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages in their respective individual capacities.

## COUNT II-CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS

89. Plaintiffs reallege the foregoing in support of their claims under the ACRA and 42 USC §1983 as if fully set out herein.

90. Plaintiffs were hired under a contingency fee contract in the Baker

case, and Plaintiffs were assigned the right to collect attorneys' fees.  Plaintiffs had a property right in this contract.

91.   In the absence of the conspiracy, Plaintiffs would have prevailed for their client, as would have the Estate of Luke Baker.

92.   Upon their Entry of Appearance, Plaintiffs acquired a statutory lien under Arkansas law.   Judge Guynn's Order deprived Plaintiffs of that lien.

93.   "[I]n any §1983 action the initial inquiry must focus on whether the two essential elements to a §1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities, secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

94.   Plaintiffs had a liberty and property interest in their reputation and law license which Defendants intentionally damaged without Due Process.

95.   Defendants all acted under color of law.

96.   To act "under color of" State law for §1983 purpose does not require that the defendant be an officer of the State. It is enough that Defendants were willful participants in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under

color' of law for purposes of § 1983 actions.

97.    The Order attached as ***Exhibit "J"*** executed and entered by Judge Guynn was the product of a corrupt conspiracy involving the illegal influence of Judge Guynn, as well as another Judge in Faulkner County.

98.    The lawyer Defendants approved and submitted an Order to Judge Guynn they knew was void for lack of Due Process and was false, even though the issues had been determined by the Circuit Court of Saline County.

99.    Judge Guynn denied Sutter's Motion to Intervene because he was corruptly influenced by Neely. There is substantial evidence Luke Baker did not commit suicide, but the Judge had been influenced by Neeley (who was doing so at the behest of the other lawyer defendants) to render an unjust decision at the behest of the Adamses and Bell.

100.    Here, the private parties conspiring with the judge were acting under color of state law.

101.    Private parties who corruptly conspire with a judge, in connection with such conduct, are thus acting under color of State law within the meaning of § 1983. *Dennis v. Sparks*, 449 U.S. 24, 27-29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

102.    An attorney who participates in corrupt proceedings by continuing to practice in front of a judge who is known to have preordained an outcome in the attorney's favor serves only to compound the corruption. *DuBose v. Kelly*, 187

F.3d 999, 1003 (8th Cir. 1999).

103. For purposes of determining the liability of private parties, it does not matter whether the State official is motivated by avarice or favoritism. Given Judge Guynn's failure to disclose his wife's employment in the Lee Davis case described as ***Exhibit "K,"*** Plaintiffs allege avarice.

104. Each Defendant was a willful participant in the corrupt conspiracy which resulted in the Order Judge Guynn gladly signed and entered to bring the conspiracy to a final success.

105. All defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding," and provided facts which would establish a "meeting of the minds." *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981).

106. The Due Process Clause of the Fourteenth Amendment "requires that action by a state through any of its agencies must be consistent with the fundamental principles of liberty and justice which lie at the base of our civil and political institutions, which not infrequently are designated as 'the law of the land.' " *Buchalter v. New York*, 319 U.S. 427, 429, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943) (quoting *Herbert v. Louisiana*, 272 U.S. 312, 316-17, 47 S.Ct. 103, 71 l.Ed. 270 (1926)).

107. Judge Guynn's Order was not consistent with the law of the land.

108. In his argument before the Supreme Court in the Dartmouth College

Case, Daniel Webster gave what is perhaps the most often quoted definition of the phrase "law of the land." *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 4 Wheat. 518 (1819). "By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial." *Id.* In this case, many hearings were meaningless and the resulting judgments predetermined.

109.   An attorney who participates in corrupt proceedings by continuing to practice in front of a judge who is known to have preordained an outcome in the attorney's favor serves only to compound the corruption.

110.   Each of the ADAMSES' attorneys knew that Neeley had specifically being hired to provide a conduit between Judge Guynn and the Defendants, since he had no significant experience in complex litigation. Indeed, the Adamses and Bell, with Williams' and Henry's approval, specifically hired Neeley to provide the conduit between Judge Guynn and the Defendants.

111.   Due process requires at a minimum that a person be given notice and a reasonable opportunity for a hearing before he or she is deprived of property by state action. *State of Wash. v. Thompson*, 339 Ark. 417, 6 S.W.3d 82 (1999).

112.   The United States Supreme Court has recognized that "the requirements of procedural due process must be met before a State can exclude a person from practicing law." *Wilner v. Comm. on Character and Fitness*, 373 U.S.

96, 102, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

113.   Attorneys are licensed by the State to practice their profession. One who practices his profession has a property interest in that pursuit which may not be taken from him or her at the whim of the government without due process. *State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816 (1987).

114.   The practice of law is a privilege and not a right, but one cannot summarily restrict a lawyer's ability to exercise the privilege. *Donovan v. Sup. Ct. Comm. on Prof'l Conduct*, 375 Ark. 350, 290 S.W.3d 599 (2009).

115.   Here, Judge Guynn's Order was procured by a corrupt conspiracy, and without Due Process and it stigmatized Plaintiffs in Jefferson County, causing them to lose business, fees, and costs.

116.   One example is Lee Davis. Dr. Davis fired the Plaintiffs because of Judge Guynn's Order. See Exhibit K.

117.   Upon information and belief, WLJ, and one or more of its lawyers, filed a frivolous Complaint against the Plaintiffs with the Committee on Professional Conduct, using the Order at issue as a basis. As a result, Plaintiffs have been unable to apply to practice their profession in other States.

118.   In this case, each lawyer approving the corrupt Order knew that there was no factual basis for the Order and intended that the Order be the basis to collaterally estop the Plaintiffs from litigating the matter in Faulkner County and to

provide a basis for the Committee on Professional Conduct to file a cat's paw Complaint against the Plaintiffs. The Adamses and Bell then caused Westbrook to retain Chris Burks, a local lawyer, to file a frivolous Counterclaim in the Saline County litigation, which was ultimately dismissed with prejudice.

119.   By virtue of the facts alleged herein, each Plaintiff has lost wages, lost fringe benefits, lost fees, incurred attorneys' fees, incurred litigation costs, and incurred other damages in an amount to be proven at trial. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT III-DEFAMATION

120.   Plaintiff, S&G, and Lucien Gillham, reallege against all Defendants the foregoing as if it were fully set out herein.

121.   Each Defendant abused the process by procuring the Order without granting Plaintiffs Due Process.  Each action was done to defame Plaintiffs and deny them a jury trial in conspiracy with the other Defendants.

122.   Defendants made defamatory statements outside the pleadings in order to destroy S&G.

123.   S&G and Gillham have each lost reputation and lost business as a result of Defendants' defamatory statements.

124.   Plaintiffs, S&G and Gillham, sue for defamation resulting from

Defendants knowingly making false statements about their character and ethics.

125.    By virtue of the facts alleged herein, S&G and Gillham, have each lost wages, lost fringe benefits, lost fees, incurred fees and costs, incurred attorneys' fees, incurred litigation costs, and incurred other damages in an amount to be proven at trial.

126.    Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT IV-INTERFERENCE WITH CONTRACTS

127.    Each Plaintiff realleges the foregoing against Williams, Henry, WLJ, and the Adamses, as if it were fully set out herein.

128.    Defendants Henry and Williams, acting within the scope of the authority granted them by the Adamses and WLJ, embarked on a calculated course of action designed to destroy the Plaintiffs and interfere with their contracts and business expectancies.

129.    One example is Lee Davis. Dr. Davis fired the Plaintiffs without cause because of the Order filed in this matter and the defamatory statements outside the pleadings. There are many others.

130. By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, incurred attorneys' fees, incurred litigation costs, lost fees and profits, and incurred other damages in an amount to be proven at trial.

131.  Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT V-ABUSE OF PROCESS/MALICIOUS PROSECUTION

132.  Even though the ADAMSES actions, on their face, appear to be in proper form, the procedures they used to accomplish an ulterior purpose for which those procedures were not designed - the procurement of an order which is false and in violation of Due Process.   As a part of this abuse, Burks was then encouraged and requested, by one or more of his co-Defendants, to file a frivolous counterclaim in Saline County against the Plaintiffs on 2/4/2020 without probable cause.   The Counterclaim BURKS and HAUBERT filed was dismissed with prejudice, but the abuse of process occurred through the issuance of sanctions Order.

133.  The judicial process was turned upside down by Defendants with HAUBERT and BURKS' filing of the Saline County Counterclaim in 2020 and Guynn's corrupt Order in 2022.   Instead of using the process for that which it was designed - seeking truth - the judicial process was used to suppress the truth and to ensure the wealthy and powerful are above the law.

134.  Acting in conspiracy with another, the judicial process was used by Defendants to both coerce and extort the Plaintiffs as shown by the facts pleaded above.

135.   Defendants abused process for the express purpose of damaging Plaintiffs concerning reputation in their profession and personally.

136.   By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost fees and profits, incurred attorneys' fees, incurred litigation costs and incurred other damages in an amount to be proven at trial.

137.   Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT VI-CIVIL CONSPIRACY/BARRATRY

138.   Plaintiffs bring this count against all Defendants because the facts set forth in paragraphs 18-81 show that two or more of the Defendants entered into agreements that included the following purposes: (1) obtain a result in the Baker litigation which protected any of the defendants from monetary or reputation damages; (2) obtain a result falsely determining Luke Baker committed suicide; (3) engage in barratry, champerty, and maintenance, and (4) destroy Sutter and anyone associated with him by filing frivolous pleadings maliciously.

139.   At various times between August of 2019, the Adamses, Williams, Henry, WLJ, Bell, Neeley, Haubert, and Burks advised, procured, encouraged and stirred up David Westbrook who was at such time, and who remains, a pauper and in indigent circumstances, to commence and prosecute an action for legal malpractice and breach of fiduciary of duty as described in Exhibit I against

Plaintiffs.

140   In so doing. the Adamses. Williams. Henry. WLJ. Bell. Neeley. and Burk maliciously intended to injure. harass. and damage Plaintiffs. and to put Plaintiffs to great vexation and expense. unlawfully. maliciously. and without reasonable or probable cause, and without having any interest in the suit against Plaintiffs.

141.   By and through defendant's above-mentioned advice, procurement, instigation, encouragement, and stirring up of Westbrook, Westbrook commenced and prosecuted the action described in Exhibit I against Plaintiffs, without reasonable or probable cause.

142.   Plaintiffs appeared in the above-mentioned action, denied the allegations of the complaint and any liability as alleged in the complaint, and employed an attorney, Richard Glassman whose office is located in Memphis Tennessee to defend the action.

143.   As described in Exhibit I proceedings were had in the action and a judgment was duly made and entered granting summary judgment against Westbrook and is now final. A copy of the Judgment is attached to this Complaint, marked Exhibit I and incorporated by reference.

144.   By reason of defendant's acts, advice, procurement, instigation, and stirring up of Westbrook to prosecute the above-mentioned action against Plaintiffs

without probable cause, Plaintiffs were put to great trouble, vexation, and expense in the defense of the action and was obliged to pay thousands of dollars for the defense and cost of the action.

145. By reason of the poverty and indigence of Westbrook, each Plaintiff was, and is, unable to obtain satisfaction from for the costs of suit so adjudged against such party and such costs remain wholly unpaid and unsatisfied.

146. Two or more of the defendants used their agreements to undertake actions which to the casual observer would appear lawful on their face, but those actions were actually oppressive and grossly immoral.

147. The actions of two or more of the defendants used their agreements to undertake actions were in, in actuality, unlawful, oppressive and immoral. Eventually, in February of 2020, Burks and Haubert filed a frivolous lawsuit against Sutter so that Judy Henry could make these allegations in the Jefferson County Circuit Court and in the Faulkner County Circuit Court. So, Sutter was forced to withdraw from Jefferson County case.

148. The actions of the Defendants, acting in concert to achieve the result they sought, which was a suppression of justice and the truth about the Luke Baker murder, was a civil conspiracy which purposely injured Plaintiffs, and others.

149. By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost fees and profits, incurred attorneys' fees, incurred litigation

costs and incurred other damages in an amount to be proven at trial.

150. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## COUNT VII-CIVIL FELONY TORT

151. Plaintiffs bring this count against all Defendants because the facts set forth I paragraphs 18-81 show that two or more of the Defendants entered into agreements to bribe or illegally influence a state judicial officer, so a claim is brought under ACA 16-118-107.

152. Defendants aided or abetted a felony, the bribery or illegal influence of a state judicial officer. The actions of the Defendants, acting in concert to achieve the result they sought, which was a suppression of justice and the truth about the Luke Baker murder, was a civil conspiracy which purposely injured Plaintiffs, and others.

153. By virtue of the facts alleged herein, Plaintiffs have lost wages, lost fringe benefits, lost fees and profits, incurred attorneys' fees, incurred litigation costs and incurred other damages in an amount to be proven at trial.

154. Each Defendant's actions have been so egregious so as to warrant the imposition of punitive damages.

## DEMAND FOR TRIAL BY JURY

155. Plaintiffs demand trial by jury on all issues so triable.

**WHEREFORE,** Plaintiffs each pray for appropriate compensatory damages, nominal damages, and punitive damages against each of the named Defendants in the maximum constitutional amount, for a trial by jury, for a Declaratory Judgment that each of the Defendants, individually and as a group or groups, engaged in a corrupt conspiracy in an attempt to suppress the truth that Luke Baker did not kill himself, for reasonable attorneys' fees, for costs and for all other proper relief.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law
1501 N. Pierce, Ste. 105
Little Rock, AR 72207
501-315-1910 Office
501-315-1916 Facsimile

By:  /s/ Luther Oneal Sutter
Luther Oneal Sutter, Ark. Bar No. 95031
Luther.sutterlaw@gmail.com

By:  /s/ Lucien R. Gillham
Lucien R. Gillham, Esq. ARBN 99-199
lucien.gillham@gmail.com

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
5 DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                          PLAINTIFFS

V.                        CASE NO. 35CU-18-1077

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE ADAMS,
MARY TATE, RELIANCE HEALTH CARE INC,
BRANDON ADAMS, TODD ROSS, JOE WICKER                        DEFENDANTS

## COMPLAINT

### INTRODUCTION

This lawsuit is a cause of action against the defendants for wrongful death, intentional

infliction of emotional distress, civil liability for harmful acts committed during commission of a

felony, premises liability, negligence, social host liability, conversion of evidence and property

belonging to plaintiff, Luke Baker, and other torts as more particularly set out in the following

allegations. Liability herein is for direct action, through agents, or vicarious as joint partner

venturees, or by conspiracy. This action is brought by the Estate of Luke Baker, and by his

family members individually for torts directly committed against them after the death of Luke

Baker as more particularly set out below. All defendants are not alleged to have participated in

every act of tort herein described, but the proof will show the degree of participation for each.

### JURISDICTIONAL ALLEGATIONS

1. The death of Luke Baker occurred on the evening of October 24, 2015 in Jefferson

   County, Arkansas at the Prairie Wings Duck Club where he was a guest of the

   defendants who owned, directly or indirectly, said property, and Skylar Wilson, co-

   host, who had also invited him there. Present at the time of the death were Skylar

FILED IN MY OFFICE AND SUMMONS
ISSUED AT 4:01 O'CLOCK PM  Wilson, Carson Cook, and Austin Tate. The actions of one or more of the defendants
10-23-2018          DATE
LAFAYETTE WOODS, SR., CLERK

1


EXHIBIT
A

led to the death of Luke Baker.  Immediately after Luke's death, a combination among some of the defendants by conduct or agreement occured in Jefferson County, Faulkner County, and perhaps other locations within the State of Arkansas and overt acts were committed in Jefferson County and elsewhere in furthermore of that combination, and acts in furtherance thereof constituted torts in themselves under several different legal theories outlined below, and other defendants may have joined therein later.

2. The defendants Bryan Adams, Skylar Wilson (who may go by the name Skylar Adams at times), Travis Jones (who may go by the name Travis Jefferson at times), Carson Cook, Karla Cook, Todd Ross, Austin Tate, John Tate, Mary Tate, and Christie Adams reside in Faulkner County.  The defendant Brandon Adams resides in Arkansas and owns the subject location in Jefferson County, Arkansas.  Joe Wicker resides and owns land in Jefferson County, Arkansas.  Prairie Wings South, LLC and Prairie Wings Lodge, LLC are Arkansas companies doing business in this state and own or manage the property known as the Prairie Wings Duck Club in Jefferson County.  Reliance Health Care, Inc. and perhaps a John Doe company or other defendants were the employers of Travis Jones at times and directed his activities at times relevant hereto, and thereby are principals to his agency and responsible for any actions taken by him in furtherance of orders by them or by executives of any defendant company, which included actions taken in furtherance of the combined effort outlined herein.  All defendants who are not natural persons do business in this state and in Jefferson County and Faulkner County, Arkansas.

3. The John Doe Company is an as yet unidentified company or companies who directed its employees in furtherance of the combination or conspiracy as either an employer or principal of defendant(s) or owner. John or Jane Doe, a natural person (or persons), is an agent of or co-conspirator with others herein and responsible for acts taken relative to this cause of action as either principal, agent, or owner.  Both sets of defendants will be identified after discovery but could not as yet be determined due to obfuscation of other defendants and spoliation of evidence. Upon information and belief said defendants were in some manner responsible for the events herein and the resulting

damages and each are aware of the involvement of each other herein. Heritage Center or Heritage Square may or may not be such a company.

4.  The plaintiffs are all residents of Faulkner County, Arkansas. Kerry Baker, surviving father and Administrator, Savannah Baker Case, surviving sister, and Gena Downey Baker, surviving mother, are the immediate familial survivors of Luke Baker, and are all adults.

5.  This Court has personal jurisdiction of all parties hereto, as well as subject matter jurisdiction over this matter. This county is the focal point of most of the acts complained of, and pursuant to law, venue lies herein. At all times herein the defendants were agents of their co-defendants in regard to all acts committed.

## FACTUAL BACKGROUND

6.  On October 24, 2015, four friends, Skylar Wilson, Austin Tate, Carson Cook, and Luke Baker went on a joint venture, a hunting trip, to the Prairie Wings Duck Club near Altheimer, Arkansas in Jefferson County. The joint venturees were invited guests of their hosts, the owners of the Duck Club, who were Brandon Adams, Bryan Adams, Todd Ross, and Joe Wicker. These four owners of the property control all operations thereon as though the property was solely theirs, despite the fact that bare legal title and management of the company rests in the names of Prairie Wings South LLC and Prairie Wings Lodge LLC.

7.  Near the end of the evening on October 24, 2015 around 10:30 p.m., give or take 15 minutes, there was an event, while Skylar Wilson and Luke Baker were in the same room resulting in the death of Luke Baker by gunshot wound to the head. Death was instantaneous or within seconds. Whether anyone still living other than Skylar Wilson witnessed the event is known only to Wilson, Cook, or young Tate.

8.  Immediately upon recognizing that Luke was dead, there was no effort to contact authorities, or call 911, or get help for Luke for some period of time. Cook or Wilson insisted upon action by the three surviving friends to protect themselves first, ahead of their duty to Luke or his family as partners in the hunting outing. Wilson created a version of events that the wound was self-inflicted. There was apparently no resistance by Mr. Cook or young Tate to this version. Both claimed they were asleep at the moment of the shooting. It is believed that then began a cover up of any

3

evidence that might have implicated any of the defendants, in any way, or cause them to be investigated.

9. Upon information and belief, the three surviving friends called, in various order, directly or indirectly, through intermediary, by various available means, co-defendants Bryan Adams, Karla Cook, Christie Adams, Mary Tate, John Tate, and indirectly Brandon Adams, Todd Ross, maybe Joe Wicker, and others possibly, with such contacts ensuing before any action to summon authorities to the scene. The owners, or at least one of them acting for them all, gave instructions as to what action should be taken to protect the interests of co-defendants. The three surviving who were at the scene, followed the instructions they were given, and therein took overt acts in concert, and in full agreement and in furtherance of the plan, both tacit and explicit, both understood and acknowledged by word or conduct, both implied and inferred, thereby forming an agreement or conspiracy among all defendants to protect their own interests, above all else, including their duty to obey the law or discharge their respective duties of care and conduct.

10. One of the Adams defendants, and possibly other defendants, contacted Travis Jones, an employee, agent, supplier of things illegal to supply, and all around fixer, to speed to the scene and protect the interests of the other defendants, and also himself, by removing evidence, destroying evidence, and acting to mislead authorities and prevent detection of all of what had actually transpired, and to hide evidence of the drugs that were supplied by one or more defendants, and of other contraband. The other defendants either knew about the post-death conspiracy, fully agreed with it, or when learning about it, joined in and cooperated with it. As such, all defendants are agents of each other as co-conspirators as defined by law. The actions taken by the defendants resulted in spoliation, false reporting to authorities, compounding, hindering, aiding, abetting, obstructing, and other criminal offenses which went undetected due to a lack of any renunciations by any of the co-defendants, whether real persons or companies.

11. The specific acts are numerous, and the identities of which co-defendants committed which overt acts, here or there, is difficult to determine; but what is sure is that wholesale sanitizing of the scene, prior to arrival of the team of crime scene

investigators, occurred. Contraband was destroyed, removed, stolen, or hidden to avoid detection. Lies were told to authorities and others to conceal the truth. All co-defendants were generally aware of the actions of each other, did not object, leave the conspiracy, or cure the damage. The deputy coroner and sheriff's investigator were intentionally misled, and some degree of persuasion took place by at least some of the defendants to convince others to accept the suicide story being proffered.

12. Luke's body was removed from the scene, over thirty minutes after death, illegally, and by instruction and intention. None of the conspirators ever notified authorities, even during a sixteen-minute phone call, that Luke was dead, until an hour after his death upon arrival with the body in Pine Bluff at the hospital. If they had, they would have been ordered not to move or disturb the body, which they very much wanted to relocate in order to prevent a crime scene investigation at the club which would have revealed facts and evidence which the conspiracy was formed to hide. For this reason, the body was taken long after death to a hospital 20 miles away to relocate the investigators to the hospital emergency room instead of the Club. The gates to the Club were locked by Wilson, Carson Cook, and young Tate to prevent entry by the authorities or anyone.

13. These actions prevented any real investigation, led to the failure to follow normal investigative protocol, failure to follow normal coroner's procedure, all because they relied upon false information from Wilson and others in furtherance of the conspiracy. The failure to send the body to the crime lab for autopsy was accomplished by the conspirators by misleading authorities and the deceased's father, Kerry Baker, to pressure him to refrain from demanding an autopsy, so the decision not to have one could be blamed on him, when the decision was not his to make, especially under the devastatingly grave circumstances.

14. The relocation of the body caused the hospital ER doctor to sign the death certificate which could have been an attempt by the conspirator co-defendants to obviate the autopsy requirement.

15. The co-defendants divided their labor with some acting at the hospital, some in contacting law enforcement, and others by instructing witnesses, and others by

cleaning or removing evidence from the scene, the body, the gun, the hospital, and elsewhere.

16. The conspiracy remains to this day, and will until dismantled or renounced.

17. More specific allegations and the connection to each tort violation follow below.

<u>Factual Allegations Common to All Counts</u>

18. Luke Baker died at the Prairie Wings Duck Club on October 24, 2015 within a few minutes of 10:30 p.m. in Jefferson County. The identified actors in this event are Skylar Wilson and others acting together who offer a scenario where Luke Baker died as a result of his own action while evidence indicates he died of a non-self-inflicted gunshot wound as a direct and proximate result of acts by others that were at least negligent, constituting a wrongful death as defined by A.C.A. 16-62-102 (2016) which statute is incorporated herein by reference.

19. Luke Baker did not commit suicide, accidental or otherwise, although the defendants could be liable nonetheless if he had under certain circumstances. Therefore, pursuant to the doctrine of res ipsa loquitur and assuming the only eye witness to the death was Skylar Wilson, such death would not have occurred but for the acts of Wilson or one or more of the defendants which were negligent or greater, and therefore one or more defendants are responsible for the wrongful death absent presenting proof to overcome the presumption of the doctrine of res ipsa loquitur.

20. Wilson has given various accounts including suicide by close contact wound to the head, death by a game of solitaire Russian roulette, death by accidental dropping of the gun by either Luke or by Wilson himself, and another version where Wilson may not have witnessed the event at all. The results of the belated private autopsy and investigation by the State Crime Lab, the Jefferson County Sheriff, and the Coroner's Office, when complete, will refute any of these versions told by Wilson at various times. As of now, these investigations remain open and Plaintiffs have been unable to as of yet get the final crime lab report or the investigative files of authorities.

21. Plaintiffs believe upon information that Wilson, young Tate, Carson Cook, and Luke Baker were joking with each other around 10:15 p.m. Wilson was the brunt of much of the joking about various aspects of his social life. Luke was one of those teasing

6

Wilson. At some point, with the other two survivors either witnessing, or asleep, depending upon the proof, actions ensued which resulted in Luke being shot fatally.

22. The conduct by Wilson or other defendants, negligent, reckless, grossly negligent, or worse are a proximate cause of the gunshot wound, and thereby, Luke's death.

23. Even in the event of an accidental death, whether by accidental homicide, or otherwise for that matter, the three at the scene, young Tate, Carson Cook, and Wilson were also liable for the wrongful death due to both consuming and providing illegal drugs and alcohol to each other while on a joint venture hunting trip, such that each owed a common duty of reasonable care to the others, which they all three breached under the circumstances, which led to the intoxication of all three, diminished judgment, dangerous behavior, for which all are responsible as agents of each other. The drugs they consumed were illegal, all three were under the age of 21 so the alcohol was also illegal, such that any defendant who was a supplier thereof is responsible for attendant damage proximately caused. These illegal substances were believed to have been supplied by one or more defendants or by their agent, possibly Travis Jones or one or more of the owners. All defendants were negligent, or worse, in promoting, providing, and accommodating, or by eventually covering up the underage illegal substance abuse by those possessing deadly weapons, some of which weapons were the property of the defendants supplying the substances. Liability follows under the applicable statutory and case law.

24. The landowners, Prairie Wings South, LLC, Prairie Wings Lodge, LLC, Ross, Brandon Adams, Joe Wicker, and Bryan Adams, and Doe defendants, are liable to invitees or licensees for the dangerous conditions they created or allowed on their property, and the Recreational Land Use Statute does not shield their liability due to their gross negligence or illegal behavior. In the event the Recreational Use Statute applies, even non-licensees are owed a duty by landowners or hosts to refrain from grossly negligent or illegal behavior, so defendants are nonetheless jointly liable for damages that were proximately caused by them or their agents.

25. Evidence of defendants' liability can be inferred from their spoliation of evidence, of the circumstances of the death itself, of the drinking and drugging attendant thereto,

and from all actions taken in concert by the defendants, by the Res Ipsa Loquitur
doctrine, and by common sense, circumstantial evidence, and more.

26. As a direct, and proximate result of defendants' actions and omissions, plaintiff Luke
Baker died.  As a further proximate result, Luke's estate and heirs, plaintiffs herein,
have been deprived of the presence, kindness, love, companionship, care, protection,
advice, assistance, and support they would have otherwise enjoyed, or the comfort of a
male offspring line to continue the family name.  They have been severely damaged in
an amount to be established according to proof and according to law.  The estate has
incurred expenses as a result as well due to the death of Luke Baker.  In addition to
liability for wrongful death to the estate and heirs through the Administrator,
defendants are also directly liable to the three individual plaintiffs directly for torts
directly against them committed after Luke's death.

27. Plaintiffs request and demand judgment as set forth below.

28. All paragraphs in the Complaint are incorporated into each individual Count in this
Complaint by reference as if set out specifically therein.

<u>COUNT ONE – WRONGFUL DEATH</u>

<u>Skylar Wilson or Others</u>

29. Skylar Wilson allegedly witnessed the death of Luke Baker on October 24, 2015.
Whether anyone else was in the same room with them is yet to be determined.  The
circumstances of Luke's death indicate he did not die freely of his own hand, leaving
the only conclusion that he did so at the hands of or due to the negligence of another or
others.  Such a death could not have occurred but for the negligence or wrongful act of
others.

30. The doctrine of Res Ipsa Loquitur applies to the circumstances of this case to apply the
presumption of negligence or more upon those responsible and shifts the burden of
production to defendant Wilson or other defendants to overcome or rebut said
presumption.

31. The gunshot wound is believed to be a distant wound as that term is used by medical
examiners to exclude close or contact scenarios, and to indicate a distance of two feet
or more, possibly much more.  This means that Skylar Wilson's statements to

8

authorities on October 24, 2015 and later were false, further implicating the inference of liability due to spoliation and res ipsa application. To the extent others were involved in the acts, they too would be liable.

<u>Suppliers of Illegal Substances or Dangerous Conditions</u>

32. Several of the defendants, upon information and belief, were involved in some degree in the illegal supplying of drugs, alcohol, and other substances to those present at the duck club on October 24, 2015. Those implicated in this are Travis Jones, Wilson, young Tate, Carson Cook, one or more owners, any Doe defendant delivering any substances to the lodge, and any defendant who controlled the premises who supplied, or arranged, or allowed the supply thereof to the hunters, who knew or should have known that the result would be the dangerous scenario of underage substance abuse and intoxication by 20-year-olds possessing firearms in a remote, isolated, and inaccessible location where the events that occurred were foreseeable and proximately caused by this negligence. Any defendant so involved is liable for wrongful death as well, regardless of the specific manner of death so long as it was proximity caused by drug or alcohol intoxication facilitated by said defendants.

33. Law enforcement reports after the event, attributed to information provided by the defendants themselves, indicated an evening of drugging, drinking, and partying was involved in the resulting death.

34. As such, the defendants so involved are jointly and severally liable for wrongful death damages caused by their acts or omissions.

35. All other paragraphs in the Complaint are herein incorporated.

<u>COUNT TWO-PREMISES LIABILITY</u>

36. The defendants who are owners or persons in control of the premises or hosting the guests at the duck club owed a duty of reasonable care to their guests.

37. Whether the guests were invitees, licensees, non-licensee guests under the recreational use statute, or even trespassers, there is some degree of care owed to each of these four classes of persons who are present on the property of another.

38. Regardless of which status of the above four is imputed to Luke Baker, the duty of care imposed upon the responsible defendants was violated, and breach of the applicable duty of care proximately caused his death. This Count Two incorporates

the allegations above, as well as those following, to establish the breach of duty of care, and liability to those defendants responsible for the conduct or omissions at the club and lodge. It is unclear as to all of the defendants responsible, but since guests were sometimes charged a fee to use the club, were often supplied with liquor, and the club was used to entertain business associates of the companies who are defendants, and used for entertainment expenses, any of the defendants are potentially liable, subject to proof.

COUNT THREE-HOST LIABILITY

39. Illegal intoxicating substances were supplied to underage guests by the hosts of the club or lodge on the date in question. To the extent that intoxication of anyone, including the deceased himself, was a proximate and foreseeable result of Luke's death, those supplying intoxicating substances would be liable for the damage resulting therefrom.

40. Liability ensues to any defendant herein acting as a social host who provides alcoholic beverages or drugs to a person who cannot lawfully possess them; and there is no immunity from civil liability under the clear negative implication of A.C.A. 16-126-106 (1999). To the extent there exists a cause of action under Arkansas law under any statutory provision or case law, (be it Act 1596 (1999), civil liability for felony acts or otherwise) in addition to a cause of action for negligence already stated in Count One, this Count is in addition to that; and the allegations herein shall also apply to the other counts, and vice versa.

41. Arkansas law would allow social host liability under general negligence for providing alcohol (or drugs) to those who cannot "lawfully possess" same, A.C.A. 16-126-106, and comments thereto. This Act allows damage awards to an intoxicated person as well if underage, especially for drugs.

42. Even if a separate cause for social host liability, or for recovery in general negligence under Count One, is not applicable in this case, the possibility that such an action could, under certain circumstances be brought, is relevant to the defendants' state of mind and potential motive to spoliate or conspire.

10

## COUNT FOUR

43. Pursuant to A.C.A. 16-118-107, any plaintiff herein damaged by reason of conduct, of one or more defendants herein, that would constitute a felony under Arkansas law, may recover damages caused or based on that conduct. Even defendants who are not responsible for Luke's death may be responsible under this Count based upon their own conduct aiding any crime, if their conduct in connection therewith damages a plaintiff, under Arkansas law.

44. The acts committed relevant to this Count include but are not limited to actions which would be proven by a preponderance to constitute:

    a. Negligent Homicide or more (Title 5, Chapter 10).

    b. False Report (A.C.A. 5-54-122(c)(1)(D)).

    c. Hindering (A.C.A. 5-54-105).

    d. Compounding (A.C.A. 5-54-107).

    e. Theft (if more than $200 by some defendants).

    f. Delivery (A.C.A. 5-64-438).

    g. Conspiracy to Commit any Class C Felony (A.C.A. 5-3-401).

    h. Aiding or an Accomplice to any of the above, or any other felony (A.C.A. 5-2-403).

45. If any of the above conduct occurred and caused damage to any plaintiffs, including any of the three surviving family members individually, liability would ensue, apart from any liability for wrongful death, in that it falsely portrayed and alleged Luke as a suicide victim, knowingly asserted, when it was known this would damage the survivors financially, emotionally, health-wise, and otherwise, all of which was foreseeable and proximately caused by such conduct.

46. Liability under this Count allows for attorneys' fees and costs herein.

47. The exact criminal provisions violated by each defendant will be subject to proof.

## COUNT FIVE

### Intentional Infliction of Emotional Distress

48. All other paragraphs herein are incorporated in this Count.

11

49. The actions of the defendants at the time of Luke's death and after, which would have constituted slander if he had survived, and which were done to falsely label Luke as a suicide victim, to protect the other defendants from threats of liability, loss of reputation, loss of advantage or opportunity, loss of social position, and other things desirable, led to actions individually and in concert by defendants which knowingly inflicted emotional distress and mental anguish upon the three living plaintiffs, and this was done intentionally by defendants to protect themselves, without legal right or purpose, was likely directed by an agent in charge, as the primary control person, and fueled by selfish personal concerns and a total disregard for those damaged and with total disregard for the value of human life, specifically, Luke Baker's. This was accomplished by falsification, misrepresentation, spoliation, and other wrongful acts.

50. As such the plaintiffs are entitled to recover damages for the distress intentionally inflicted, regardless of the verdict on other Counts.

## DAMAGES

51. Plaintiffs are entitled to damages for pain and suffering, grief, emotional distress, loss of all the things Luke would have provided including but not limited to support, love, advice, companionship, and all things referred to above previously stated in this Complaint. Plaintiffs are entitled to recover damages personally and as heirs as stated above, and all plaintiffs are entitled to recover any direct financial loss or expense to which they were put as a result of defendants' conduct, and for costs and attorneys fees as allowed by law, plus interest and any other recovery allowed by law, that may be proved, inferred, presumed, or established. Plaintiffs also claim that punitive damages should be awarded against any defendant against whom the proof may show acted intentionally and in willful disregard of the rights of others, and such that damage ensued by such willful conduct, and causing punitive damages to be necessary to punish and deter such actions by tortfeasors acting willfully.

52. Trial by jury is respectfully demanded.

12

Wherefore, premises considered, the Plaintiffs pray for relief as stated above, for damages, punitive damages, costs, attorneys' fees and all other appropriate relief to which they may be entitled as to each defendant who may be found liable on any count herein.

Respectfully submitted,

Greg Stephens, Attorney (AR 85-153)
P.O. Box 1048 (mailing)
1422 Caldwell- Suite J (office)
Conway, AR 72034
Ph. 501-339-5388 (office)
318-453-9707 (cell)
501-615-8388 fax
gregstephens80@aol.com
Attorney for Estate and Kerry Baker

_____
Date: October 24, 2018

And

Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205
501-801-7612
501-801-7613 (fax)
marionhumphreysr@gmail.com
Attorney for Gena Baker and
Savannah Case
AR Bar No. 80066

_____
Date: October 24, 2018

13

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Apr-13  11:47:03
23CV-21-403
C20D03 : 102 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
_____ DIVISION

BRYAN ADAMS; BRANDON ADAMS; AND
SKYLAR WILSON                                          **PLAINTIFFS**

VS.                            CASE NO _____

LUTHER SUTTER; LUCIEN GILLHAM;
SUTTER & GILLHAM, PLLC;
KENNETH GREGORY STEPHENS;
K. GREGORY STEPHENS P.A.;
KERRY BAKER, INDIVIDUALLY;
KERRY BAKER, AS ADMINISTRATOR
OF THE ESTATES OF JAMES LUKE BAKER;
SAVANNAH BAKER CASE;
GENA DOWNEY BAKER; MICHAEL NOBLE;
ALLEN NOBLE; NOBLE INVESTIGATIONS, INC.;
DENVER ROLLER, INC. D/B/A ROLLER-MCNUTT FUNERAL HOME;
AND CHAD KELLEY, IN HIS CAPACITY
AS JEFFERSON COUNTY CORONER
AND INDIVIDUALLY                                       **DEFENDANTS**

### COMPLAINT

Plaintiffs Bryan Adams, Brandon Adams, and Skylar Wilson, for their

complaint against defendants, state:

### PARTIES, VENUE, AND JURISDICTION

1.      Plaintiff Bryan Adams is an individual residing in Faulkner County,

Arkansas.

2.      Plaintiff Brandon Adams is an individual residing in Washington

County, Arkansas.

2282717-v1



3.    Plaintiff Skylar Wilson is an individual residing in Faulkner County, Arkansas.

4.    Upon information and belief, defendant Luther Sutter is an individual residing in Saline County, Arkansas.

5.    Upon information and belief, defendant Lucien Gillham is an individual residing in Saline County, Arkansas.

6.    Upon information and belief, defendant Sutter & Gillham, PLLC is a professional limited liability company doing business in Saline County, Arkansas.

7.    Upon information and belief, defendant Kenneth Gregory Stephens is an individual residing in Faulkner County, Arkansas.

8.    Upon information and belief, defendant Kenneth Gregory Stephens P.A. is a for profit corporation doing business in Faulkner County, Arkansas.

9.    Upon information and belief, defendant Kerry Baker is an individual residing in Faulkner County, Arkansas.

10.    Upon information and belief, defendant Kerry Baker is the duly appointed administrator of the Estates of James Luke Baker.

11.    Upon information and belief, defendant Savannah Baker Case is an individual residing in Faulkner County, Arkansas.

12.    Upon information and belief, defendant Gena Downey Baker is an individual residing in Faulkner County, Arkansas.

13.    Upon information and belief, defendant Michael Noble is an individual residing in Faulkner County, Arkansas.

2

14.    Upon information and belief, defendant Allen Noble is an individual residing in Faulkner County, Arkansas.

15.    Upon information and belief, defendant Noble Investigations, Inc. is a for profit corporation doing business in Faulkner County, Arkansas.

16.    Upon information and belief, defendant Denver Roller, Inc. d/b/a Roller-McNutt Funeral home, is a for profit corporation doing business in Faulkner County, Arkansas.

17.    Upon information and belief, defendant Chad Kelley is an individual residing in Jefferson County, Arkansas, and the publicly elected coroner of Jefferson County, Arkansas.

18.    This Court has jurisdiction over the subject matter of this litigation and the parties to this lawsuit.

19.    Venue is proper in this Court pursuant to Ark. Code Ann. § 16-60-101.

20.    Bryan Adams, Brandon Adams and Skylar Wilson are hereby sometime referred to collectively as the "Adams Plaintiffs" in connection with this Faulkner County case, or as "Jeff Co Defendants" as part of the named defendants in a Jefferson County Lawsuit, *Kerry Baker et al vs Bryan Adams, et al,* case no. 35CV-18-1077 ("Jeff Co Lawsuit").

21.    Defendants Luther Sutter, Lucien Gillham, Sutter & Gillham, PLLC, Kenneth Gregory Stephens, Gregory Stephens P.A., Kerry Baker, individually and as the administrator of the Estate of James Luke Baker, Savannah Baker Case, Gena Downey Baker, Michael Noble, Allen Noble and Noble Investigations, Inc. and

Chad Kelley, individually and in his capacity as Jefferson County Coroner, are sometimes collectively referred to herein as "Abuse of Process Defendants" or "Defendants".

22.     Defendants Kerry Baker, individually and as the administrator of the Estate of James Luke Baker, Savannah Baker Case, Gena Downey Baker are sometimes collectively referred to herein as "Jeff Co Plaintiffs" or "Baker Family".

23.     Defendants Luther Sutter, Lucien Gillham, Sutter & Gillham, PLLC, Kenneth Gregory Stephens, and Gregory Stephens P.A., are sometimes collectively referred to herein as "Jeff Co Attorneys".

24.     Defendants Michael Noble, Allen Noble and Noble Investigation Inc. are sometimes collectively referred to herein as "Noble Defendants".

25.     Defendants the Baker Family, Jeff Co Attorneys, Noble Defendants, and Roller are sometimes collectively referred to herein as "Exhumation Defendants".

## FACTUAL BACKGROUND

26.     During the day of October 24, 2015, four close friends, all 20 at the time, Luke Baker ("Luke"), Carson Cook ("Carson"), Austin Tate ("Austin"), and Skylar Wilson ("Skylar") went to a hunting lodge called the Prairie Wings Duck Lodge in Altheimer, Arkansas ("Prairie Wings" or "Lodge").

27.     Luke was invited to bow hunt for deer at Prairie Wings.

28.     Unbeknownst to the owners of the Lodge or Skylar, Kerry Baker ("Kerry") gave permission for his son, Luke, to take one of Luke's many guns—a

4

Taurus 0.38 Special Ultra Lite revolver that Kerry had recently purchased—and ammunition with him to the Lodge.

29.    Luke had been to Prairie Wings on previous occasions, and Kerry was always comfortable with Luke going because Kerry has known Skylar's father, Bryan Adams ("Bryan"), for more than 40 years.

30.    Late on the night of October 24, Luke was injured as a result of an accidental self-inflicted gunshot wound to the head.

31.    Skylar, Carson, and Austin jointly decided to take Luke immediately to the closest hospital—Jefferson Regional Medical Center ("JRMC")—to try and save Luke.

32.    On the way to JRMC, the boys called 911 to report the accident and advise of their rush to JRMC. The boys followed the directions of the 911 operator while the operator was trying to arrange for an ambulance to meet them in transit, which did not occur.

33.    At 11:50 p.m., Luke was pronounced dead at JRMC.

34.    At that time, Bryan and his wife/Skylar's mother, Christy Adams, were over 230 miles away in Fayetteville, Arkansas for the weekend, along with Skylar's uncle, Brandon Adams ("Brandon"). Bryan contacted a pilot in Conway, Arkansas, and requested a flight from Fayetteville to Pine Bluff where he landed and went to JRMC to meet his son Skylar. Bryan did not go to the Lodge at any time on October 25, 2018.

5

35.    Brandon remained in Fayetteville and did not travel to Pine Bluff or the Lodge at any time on October 25, 2015.

36.    On October 24, 2015, Jefferson County Deputy Coroner Kimberly Phillips was on call that night for the Coroner's office and was called to JRMC. Investigator Kaleisha Wise and Deputy Terry Wingard, both of the Jefferson County Sheriff's Office also arrived at JRMC. Investigator Wise took photographs of Luke's body, his possessions and the vehicle that transported Luke to JRMC. Investigator Wise, the emergency room physician, Deputy Wingard and Deputy Coroner Phillips examined Luke's body. A true and correct copy of the Jefferson County Sheriff file containing 77 grainy photographs, 4 to a page, report of Wise, report of Deputy Coroner Phillips, and others is attached and incorporated herein by reference. (**Exhibit 1**, Jefferson County Sheriff's Office file produced to Jeff Co Defendants)[1].

37.    As a result of her investigation, Investigator Wise reported that she, "Observed burn marks from what appeared to be gun powder residue on the right side of Baker's head." Investigator Wise also reported that she "noticed a faint straight line on Baker's right hand and a groove impression on Baker's right thumb." She also reported that she "did not notice any signs of a struggle or any defensive wounds on [Luke] Baker's body." *Id.*

---

[1] The 77 grainy/blurry paper photographs were received in the Sheriff's file and are **Exhibit 54.** These photographs are removed from **Exhibit 1** as duplicative.

6

38.     After examination of Luke, Deputy Coroner Phillips reported as follows:

> Upon my arrival I observed a GSW to the right temple w/ stippling around it. On his right hand a faint straight line was observed on his index finger and a groove on his thumb. After speaking to the decedent's father I notified the funeral home.

*Id.*

39.     Upon arriving at JRMC, Kerry was informed of Luke's death. He spoke with Deputy Coroner Phillips and decided not to send Luke's body to the Arkansas State Crime Lab for an autopsy. Instead, he directed that Luke's body be sent to defendant Roller-McNutt Funeral Home in Conway, Arkansas ("Roller"). *Id.*

40.     A Sheriff's Deputy left JRMC and traveled to the Lodge where a deputy took 35 mm photographs inside and outside the Lodge and secured Luke's gun.  *Id.*

41.     Shortly thereafter, the Jefferson County Sherriff's Office released the Lodge.

42.     Bryan, Christy, and Skylar, and others left JRMC in the early morning hours of October 25 and drove to their homes in Conway, Arkansas.

43.     Sometime later on Monday, October 26, 2015, Jefferson County Coroner Chad Kelley ("Kelley" or "Coroner Kelley") called Sgt. Mickey Buffkin of the CID of Jefferson County Sheriff's Office and asked whether Sgt. Buffkin was satisfied with the investigation that had occurred. In response, Sgt. Buffkin stated that he was satisfied per Kelley. Sgt. Buffkin also informed Kelley that Deputy Coroner Phillips had drawn fluids from Luke's body after confirming they were in

7

the morgue refrigerator. A true and correct copy of the original version of the Jefferson County Coroner file as produced to Jeff Co Defendants by Kelley is attached and incorporated herein by reference. (**Exhibit 2**, Jefferson County Coroner file produced to Jeff Co Defendants).

44.     The original death certificate confirmed the cause of death was a gunshot wound to the head. A true and correct copy of the original death certificate is attached and incorporated herein by reference. (**Exhibit 3**, Original Death Certificate).

## THE PROBATE ESTATE PROCEEDINGS IN FAULKNER COUNTY

45.     On January 19, 2016, Kerry petitioned the Faulkner County Circuit Court to open a probate estate for Luke and sought appointment as special administrator, Case No. PR-2016-37 ("First Probate Case"). A true and correct copy of the Faulkner County First Probate Case docket sheet, petition, order appointing Kerry and order authorizing settlement are attached and incorporated herein by reference collectively as **Exhibit 4**. In the petition, Kerry stated "James Luke Baker was killed by an **accidental gun shot wound** which occurred on or about October 24, 2015." (emphasis supplied). *Id.* Kerry was appointed special administrator and received accidental death benefits from the Baker Family's homeowner's insurance policy as a result of Kerry's petition and representations to the Court. *Id.* As of the filing of this complaint this First Probate Case remains open. *Id.*

46.     Over two years later, on September 6, 2018, Kerry, through attorney Kenneth Greg Stephens and K. Gregory Stephens, PA (collectively, "Stephens"), filed a new and separate petition to probate the Estate of James Luke Baker (the "Second Estate"), in Faulkner County Circuit Court, Case No. 23PR-18-562 (the "Second Probate Case"). A true and correct copy of the Faulkner County Second Probate Case docket sheet, petition, and order appointing Kerry are attached and incorporated herein by reference collectively as **Exhibit 5.**

47.     In this Second Probate Case, Kerry was appointed as the personal administrator of the Second Estate on September 13, 2018. *Id.*

48.     The petition in the Second Probate Case lists Luke's heirs as Kerry, Gena Downey ("Gena"), and Savannah Baker Case ("Savannah"), and disclosed that Luke owned no real property, had an undetermined amount of personal property and had no debts. *Id.*

49.     Adams Plaintiffs were not creditors of the Second Estate. Adams Plaintiffs were non-parties, had no known claim against the Second Estate, and possessed no information that would assist Kerry, as the administrator, in distributing the assets of the Second Estate.

50.     On September 18, 2018, despite the Adams Plaintiffs having no relationship to the Second Estate, Stephens issued various subpoenas and notices of depositions to Bryan, Skylar, Travis Jones, Carson, his mother Karla Cook, Austin, and his father John Tate. He also issued a subpoena for Brandon, and attempted unsuccessfully to serve it. True and correct copies of all of these subpoenas and

notices of deposition issued in the Second Probate Estate are collectively attached and incorporated herein by reference as **Exhibit 6**.

51.     During their attempts to serve the subpoenas on behalf of the Second Estate, individuals were threatened and harassed by process servers/investigators.

52.     Also on September 18, 2018, Stephens, for the Second Estate,  issued subpoenas duces tecum to New Cingular Wireless PCS, LLC a/k/a New AT&T Wireless PCS, LLC a/k/a ATT Wireless a/k/a AT&T Mobility ("AT&T") and Verizon Wireless (VAW), LLC ("Verizon") seeking to obtain cell phone records for sixteen (16) phone numbers, including the personal cell phone records of Adams Plaintiffs. True and correct copies of the subpoenas are collectively attached and incorporated herein by reference as **Exhibit 7**.

53.     Adams Plaintiffs were forced to spend time and money to defend themselves against these wrongfully issued individual and records subpoenas.

54.     Bryan and Skylar each filed motions to quash the subpoenas and notices of depositions and the Adams Plaintiffs separately filed motions to quash the subpoenas to AT&T and Verizon.  True and correct copies of these motions to quash are collectively attached and incorporated herein by reference as **Exhibit 8**, ("Motions to Quash").

55.     Before the Court could set and conduct a hearing on the Motions to Quash, Kerry, the Second Estate, and Stephens proceeded with a deposition of Karla Cook, one of the Jeff Co Defendants, on September 27, 2018, despite written notice that none of the deponents noticed in the Second Probate Case for depositions

10

2282717-v1

would appear until a hearing had been conducted on their Motions to Quash. The requisite notice had not been provided to anyone of the intent to take Ms. Cook's deposition which was a basis to quash her notice and subpoena. Kerry, Second Estate, and Stephens pressed forward, refusing to cancel Ms. Cooks' deposition, despite the lack of notice and pending motion. At the deposition, in an attempt to annoy, oppress, intimidate, coerce or otherwise harass Adams Plaintiffs, their counsel, and any witness, or whoever might appear for the Adams Plaintiffs, and to leverage the Adams Plaintiffs into a settlement, the Noble Defendants were present, and at least one of them was visibly armed. One of them sat right next to counsel for Adams Plaintiffs and one sat at the end of the table to the right of counsel for Adams Plaintiffs. Having armed investigators present for a civil deposition of Ms. Cook being defended by a female attorney after the Adams Plaintiffs advised no witness would appear with counsel was an abuse of the deposition process designed for an improper purpose.

56.    The Court held a hearing on the Motions to Quash on October 9, 2018, and at the conclusion of the hearing, the Court granted the Motions and entered an order quashing all of the subpoenas issued to individuals, including the ones served on Adams Plaintiffs and Karla Cook. A true and correct copy of the Order dated October 24, 2018, is attached and incorporated herein by reference as **Exhibit 9,** ("Order Quashing Subpoenas").

57.    The Motions to Quash were granted, among other reasons, because the discovery requested by Kerry, Second Estate, and Stephens was not in any way relevant to the Second Probate Case or otherwise proper.

58.    The Order Quashing Subpoenas discusses the alleged purpose of the requested discovery in the Second Probate Case as argued at the hearing by Kerry, the Estate, and Stephens. Specifically, paragraph 3 of the Order Quashing Subpoenas found as follows:

> The Estate's argument was that in order to serve the Movants in the future with process, it needed the full legal names, domiciliary physical addresses and current cell phone numbers of all Movants, and a reasonably clear, current and accurate color photo of Skylar Wilson and Travis Jones. The Movants opposed allowing the Estate to conduct discovery in the probate estate for the same reasons asserted in the Motions to Quash the Individual Subpoenas and Briefs and in the Motions to Quash Subpoena to AT&T and Verizon and Briefs. The Court inquired of counsel for Movants whether they were willing to accept service of a summons and complaint for their current clients if the Estate files a separate civil action against some or all of them, and counsel for Movants, Marcus Vaden and Judy Simmons Henry agreed they would. The Court declined to grant the Estate's proposed request that the Court require the Movants to answer the first two interrogatories set forth in the Estate's Response.

*Id.*

59.    The opening of the Second Probate Case was an improper invocation and use of judicial processes because the First Probate Case remained open. Upon information and belief, Kerry, Second Estate and Stephens opened the Second Probate Case to conceal from the Adams Plaintiffs that in the First Probate Case they had settled with an insurance carrier and received accidental death benefit

12

payment for the death of Luke based on representations under oath to the Court and world that Luke's death was the result of an accident. Upon information and belief, some or all of the Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and also insulate the Jeff Co Plaintiffs from adverse rulings.

    60.    The *issuance of process* by Kerry, Second Estate and Stephens against the Adams Plaintiffs in Second Probate Estate was for an improper use of the judicial processes. *Id.* Upon information and belief, some or all of the Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

    61.    The *service of process* by Kerry, Second Estate and Stephens on the Adams Plaintiffs in the Second Probate Estate was for an improper use of the judicial processes. *Id.* Upon information and belief, at least some of the Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

    62.    By issuing process to seek the phone records of Adams Plaintiffs and others, Kerry, Second Estate, and Stephens engaged in a fishing expedition as pretext to filing a civil complaint against Adams Plaintiffs. *Id.* Upon information and belief, Abuse of Process Defendants were aware of the actions being taken by

13

Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

63.    AT&T and Verizon were asked to produce phone records and information without a complaint or any claims pending against Adams Plaintiffs. Upon information and belief, Abuse of Process Defendants were aware of the actions being taken by Kerry, Second Estate, and Stephens, and intended to benefit themselves and all of the Jeff Co Plaintiffs and Jeff Co Attorneys and insulate the Jeff Co Plaintiffs from adverse rulings.

64.    All of the preceding judicial processes were an abuse of process by and for the benefit of everyone involved because the processes involved the issuances of subpoenas, notices and/or processes for improper purposes, including but not limited to seeking information without a complaint or claim pending, were designed to annoy, embarrass, oppress, or otherwise harass Adams Plaintiffs and attempt to leverage them into a settlement, were not relevant to the Second Probate Case and were the initial attempts to bludgeon the credibility of Adams Plaintiffs for use in a prospective wrongful death lawsuit against Adams Plaintiffs and others. *Id.*

### SANCTIONS ENTERED IN FAULKNER COUNTY AGAINST STEPHENS

65.    On November 29, 2018, over a month after the Faulkner County Probate Court entered its Order Quashing Subpoenas, and after the Estate had filed a maligning and baseless Jeff Co Lawsuit against Adams Plaintiffs and others, the Estate and Stephens filed a motion for sanctions ("Motion for Sanctions") in the

14

Second Probate Case seeking to hold Skylar in contempt related to the subpoena issued to him that had already been quashed. The Estate argued that the Court should impose sanctions against Skylar for allegedly lying to the Court and his counsel about not being served with the quashed subpoena issued to him. A true and correct copy of the Motion for Sanctions is attached and incorporated herein by reference as **Exhibit 10.**

66.     Specifically, the Estate alleged that it properly served **Skylar** with a subpoena on September 21, 2018. Skylar filed a response ("Response") to the Motion for Sanctions denying that any sanctions against him were proper, and requested an evidentiary hearing and for the Court to use its inherent authority to issue sanctions against the Estate and its counsel. A true and correct copy of the Response to Motion for Sanctions is attached and incorporated herein by reference as **Exhibit 11.**

67.     On February 11, 2019, the Faulkner County Circuit Court held a hearing on the Estate's Motion for Sanctions against Skylar and his response.

68.     Marion A. Humphrey, another of the attorneys representing some of the Jeff Co Plaintiffs, and Gillham appeared at the hearing in support of an effort to sanction Skylar. At the outset of the hearing, the Judge warned everyone that he was going to award fees if he was forced to waste time on the Motion for Sanctions. The Estate proceeded with the Motion for Sanctions.

69.     The Court verbally denied the Motion for Sanctions, awarded attorneys' fees and costs to Skylar and then issued a letter to address certain

15

aspects of the ruling that were not addressed from the bench.  On March 15, 2019,

the Court issued an order denying the Motion for Sanctions ("Order 1").  A true and

correct copy of Order 1 is attached and incorporated herein by reference as **Exhibit**

**12**.

    70.    By subsequent order entered on July 26, 2019 ("Order 2"), the Court

made several additional findings relevant to this case.  A true and correct copy of

Order 2 is attached and incorporated herein by reference as **Exhibit 13.**

Specifically, the Court made the following findings in Order 2:

- The Court finds that the Motion for Sanctions had nothing to do with the need for an estate to be opened or an administration of the Estate. (Paragraph ¶ 7);

- The Court finds that the filing of the Motion for Sanctions was an improper attempt to engage in an improper fishing expedition to file a wrongful death lawsuit [which they did]. (Paragraph ¶ 8);

- Subpoenas duces tecums were issued to Skylar, his family and friends, and to two telephone service providers by the Estate, commanding them under the authority of the courts to appear and answer questions and produce documents.  The Estate indicated that it had other subpoenas issued but not yet served on others.  The Court finds that such tactics related to the Estate Discovery are not justified in our judicial system.  At the first hearing this Court conducted on all of the individuals' motions to quash the Estate Discovery, the Estate informed the Court that it only needed one question to be answered, "What is the address of the individuals who had been subpoenaed."  This would provide the Estate with a proper address to have them served with the Estate's complaint in the Jefferson Circuit Action.  Rather than going forward with the depositions and answering the now one question of the Estate, all individuals already subpoenaed agreed through their attorneys that they could be served through with the Jefferson Circuit Court complaint by and through their attorneys.  This was more of a benefit to the Estate than having an address for each individual as service could be perfected with ease.  By separate order, this Court granted Skylar and the other individuals' motions to quash the Estate Discovery. (Paragraph ¶ 9);

16

- After the first hearing and rulings on the motions to quash, counsel for the Estate then filed the Motion for Sanctions against Skylar under Rule 11. The basis of the Motion for Sanctions was that Skylar had filed a pleading (the motion to quash the Estate Discovery) that allegedly contained a false statement that Skylar had not been served with the Estate Discovery. In the Motion for Sanctions, the Estate sought findings of fraud and misrepresentations by Skylar, among other things and relief. (Paragraph ¶ 10);

- Rule 11 sanctions are typically reserved for matters of great importance. The Court finds that the purpose of the Motion for Sanctions filed by Mr. Stephens was not to benefit the administration of the Estate. Rather, the Court finds that the Motion for Sanctions had nothing to do with the Estate and was an attempt by the Estate for this Court to make a finding that Skylar had materially misled the Court. Although such a finding would in no way benefit the administration of the Estate, particularly since the motions to quash the Estate Discovery had been granted, and the Estate Discovery was moot, it would provide the plaintiffs (including the Estate) in the wrongful death lawsuit in the Jefferson Circuit Action a club to bludgeon Skylar every step of the way. After every answer the plaintiffs did not like, Skylar would be hit over the head with the findings of this Court that he had materially misled the Court. The Court finds that the award of attorneys' fee is clearly warranted under both Rule 11 as well as the Court's inherent ability to police against frivolous pleadings. (Paragraph ¶ 11);

- The Court finds that Skylar had no choice but to expend the time and money that he did in opposing the Motion for Sanctions. Had he not, he risked providing the plaintiffs in the wrongful death lawsuit with a weapon from which he could never defend himself. (Paragraph ¶ 12);

- The Court finds that the total amount requested in the Motion, $33,343.50, is reasonable in light of the facts and circumstances of this Estate and the Jefferson Circuit Action. The Court finds that the Motion for Sanctions was completely unnecessary to have the Estate administrated, yet the Estate chose to pursue this matter in an attempt to bolster the plaintiffs' case in the wrongful death lawsuit, and they should bear the entire cost for such a frivolous and unnecessary action. (Paragraph ¶ 13);

- At the hearing on the Motion for Sanctions, the Court asked if all attorneys at counsel table represented the Estate, and Mr. Stephens

responded that "Today they do, yes." This indicated that Mr. Stephens, Mr. Gillham, and Marion Humphrey all represented the Estate. After a short break, Mr. Gillham clarified that he was not representing the Estate but rather Savannah Baker. As such, Mr. Gillham should not be held liable for the attorneys' fees requested in the Motion as he was not a party or an attorney for the Estate. Hon. Humphrey made no such clarification that day; therefore, the Court must conclude that he was present at the hearing on behalf of the Estate. However, Hon. Humphrey did not file the Motion for Sanctions and was not active in the prosecution of the Motion for Sanctions. For these reasons, the Court finds that Hon. Humphrey should not be personally liable for the attorneys' fees requested in the Motion. (Paragraph ¶ 17);

- The Court finds that total amount request in the Motion should not be passed onto the Estate as it was in no way related to the administration of the Estate. Instead, it was a tactical decision by Mr. Stephens to bolster the Jefferson Circuit Action. Mr. Stephens has argued to the Court that the Motion for Sanctions was "made to protect the right of Mike Noble to continue to earn a living as a process server and private investigator by clearing his name." The Court finds that this rationale is equally as frivolous as the rationale stated in the Motion for Sanctions. The Estate owes no duty to Mr. Noble, and the Estate has no interest in "protecting his name." If Mr. Noble feels he has been slandered, he has avenues he can use to seek remedies and relief, but they are not found in the Estate. The Court finds that the Motion for Sanctions has been a frivolous endeavor by Mr. Stephens and had no benefit to the Estate. For these reasons, the Court finds that the total amount requested in the Motion should be paid by Mr. Stephens. (Paragraph ¶ 18); and,

- Skylar Wilson is hereby awarded a judgment against Greg Stephens in the total amount of $33,343.50 ("Judgment"). The Judgment must be paid within ten (10) straight days of the entry of this order on the Court's docket. (Paragraph ¶ 19).

71.    On September 16, 2020 the sanction Judgment against Stephens of the

Circuit Court of Faulkner County and the Judgment were affirmed by the Court of

Appeals, Case No. CV-19-927.

72.    The Judgment covered only the part of the fees and costs of Adams

Plaintiffs as related to the Motion for Sanctions. The Adams Plaintiffs incurred

18

2282717-v1

additional fees and costs in connection with the Second Probate Case and suffered an emotional toll on them and their families by the abuses of process employed in the entire Second Probate Case, which should never have been filed.

73.    All of the preceding judicial processes, including the deposition, sanction motions, hearings and trial, were an abuse of process because they involved the issuances of subpoenas, notices, processes, hearings, trial, appeal, and other acts for improper purposes, including but not limited to seeking information without a complaint or claim pending or for use in the separate Jefferson County Circuit Court proceeding to benefit Jeff Co Plaintiffs and Jeff Co Attorneys, were designed to annoy, embarrass, oppress, or otherwise harass Adams Plaintiffs, were an attempt to leverage the Adams Plaintiffs into a settlement, were not relevant to the Second Probate Case, and were continued attempts to bludgeon the credibility of Adams Plaintiffs for use in a prospective wrongful death lawsuit against Adams Plaintiffs and others, among other wrongful motives.

## COMPLAINT AND AMENDED COMPLAINT FILED
## IN JEFFERSON COUNTY, ARKANSAS

74.    On October 24, 2018, Jeff Co Plaintiffs' and their counsel, Stephens and K. Gregory Stephens P.A. (collectively, "Stephens") and Marion A. Humphrey ("Humphrey") filed the first outrageous and fabricated complaint ("Complaint") for Kerry as administrator of the estate of Luke Baker and individually, Savannah and Gena, containing allegations with no factual basis, in the Jeff Co Lawsuit. A true and correct copy of the Complaint in the Jeff Co Lawsuit is attached and incorporated herein by reference as **Exhibit 14**. Although the Complaint was

placed under seal shortly after it was filed, the allegations in it were broadcast by local news media in the hometowns of Adams Plaintiffs.

75.    Facing dismissal of the Complaint, Stephens, Humphrey and their newly expanded legal team that now included Luther O'Neal Sutter II and Sutter & Gillham P.L.L.C. (collectively, "Sutter"), Lucien Gillham and Sutter & Gillham P.L.L.C. (collectively, "Gillham"), and Sutter and Gillham's colleague, Tona DeMers, filed an amended complaint on December 31, 2018 ("Amended Complaint"), asserting claims that were even more outrageous than those contained in their original Complaint. A true and correct copy of the Amended Complaint in the Jeff Co Lawsuit is attached and incorporated herein by reference as **Exhibit 15**. The Complaint and Amended Complaint are sometimes collectively referred to as the "Complaints."

## UNLAWFUL EXHUMATION AND SECRET PRIVATE AUTOPSY

76.    Approximately two months before the Jeff Co Lawsuit was filed, Stephens facilitated the exhumation of the body of Luke from its grave in Crestlawn Cemetery owned by Roller. Some of the persons and entities involved with and/or who had knowledge of this exhumation included the Exhumation Defendants, (Baker Family, Jeff Co Attorneys, Noble Defendants, and Roller) Roller's representatives (including Mike Frazier), Wilbert Burial Vault Company, Inc., Ruff Mortuary Service, LLC, Dr. Frank Peretti (an Arkansas State Crime Lab employee) ("Dr. Peretti"), and Steve Nawojczyk (a former Pulaski County Coroner and investigator for Jeff Co Plaintiffs) ("Nawojczyk"). None of Defendants disclosed that

either the exhumation and autopsy had been performed until well after the completion of these acts.

77.    As demonstrated below, the paperwork to exhume the body of Luke was obtained by Kerry, Stephens and Roller using false information, and the exhumation that followed was illegally and secretly accomplished under the ruse of a "disinterment." (**Exhibit 16,** Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028.)

78.    Rather than comply with applicable laws and regulations for an exhumation (raising and opening a casket to remove the body, distinct from disinterring / moving a casket from one place to another), at least Jeff Co Plaintiffs, Estate, Stephens, Roller, and possibly others, simply ignored them and instead submitted paperwork, which contained false statements, to illegally exhume and remove Luke's body from its casket to conduct the secret private autopsy. Not only were these actions intended to preclude the Jeff Co Defendants and their consultants/experts from being present for the exhumation and autopsy, it is undisputed that these actions also resulted in the destruction of the body of Luke, thereby prejudicing Jeff Co Defendants by preventing any further testing and by the spoliation of key evidence.

79.    The illegal exhumation allowed to occur at Roller's cemetery was the initial act from which all of the other events described herein occurred and resulted in this lawsuit.

80.     Adams Plaintiffs discovered that after exhumation, a secret, private autopsy took place at Ruff Mortuary Service, LLC, in North Little Rock, Arkansas, and Adams Plaintiffs were not notified or allowed to attend the autopsy. This was a single opportunity and those Defendants who were involved with it knew full well the autopsy would destroy any future opportunity for Adams Plaintiffs to conduct an investigation of the body. In the Jeff Co Lawsuit, Stephens described for the Court that there is only a "finite" amount of tissue that could have been examined in the autopsy, so any chance that Adams Plaintiffs could observe, participate or conduct their own testing was taken from them. (**Exhibit 17,** February 21, 2019 Hearing Transcript, p. 176.)

81.     Jeff Co Plaintiffs and Jeff Co Attorneys, knowing they were going to file a lawsuit, had a duty to preserve such evidence, and they should have provided notice of the exhumation, autopsy, and potential for destructive testing. They knew that secretly exhuming a body, conducting a private autopsy on a heavily decayed body that included sawing the skull and severing the entrance wound of the bullet, and then returning the remaining body parts to the cemetery for re-burial in the casket, would yield the corpse essentially useless to Jeff Co Defendants for their testing. These actions amount to blatant and intentional spoliation of evidence by involved Defendants.

82.     Furthermore, tampering with evidence is a criminal offense in Arkansas if a person "alters, destroys, suppresses, removes, or conceals any record,

document, or thing with the purpose of impairing its verity, legibility, or availability in any official proceeding or investigation." *See* Ark. Code Ann. § 5-53-111.

### FRAUDULENT PAPERWORK TO "DISINTER" LUKE'S REMAINS

83.    At least by August 29, 2018, Stephens was representing that he was acting as both the attorney and a medical doctor[2] in the Luke Baker case. Stephens had arranged to exhume the body with the assistance of Roller and its representatives, including Mike Frazier[3] ("Frazier").

84.    Roller had embalmed and prepared Luke's body for the funeral and conducted the funeral service and burial. Roller owns Crestlawn cemetery where Luke was buried, exhumed and re-buried.

85.    In a memo of August 29, 2018, prepared on his letterhead, "Greg Stephens, J.D. M.D" enclosed a $4,200 deposit for "James Luke Baker Disinternment (sic) and Reinterment (sic)" for September 7 and September 10, 2018, respectively. He further misrepresented that, *"[t]he medical examiner's office will retrieve and return the remains from and to the gravesite."* (**Exhibit 18,** Stephens' disinterment request and Roller case activation, ADAMS 1995, 1991.)

86.    Based on this false information, Stephens asked Roller/Frazier to execute a required document, "ARKANSAS DEPARTMENT OF HEALTH

---

[2] **Exhibit 18,** Stephens Disinterment Request and Roller case activation. This was not the only document touting Stephens as a physician. He also signed the Roller Statement of Funeral Goods and Services Selected as "Dr. Greg Stephens M.D" and the Buyer as "Greg Stephens, M.D" (**Exhibit 19,** Statement of Funeral Goods and Services, ADAMS 1998.)

[3] Frazier is an experienced funeral home district manager for Roller. He carries multiple funeral designations including CCO and CCP. (**Exhibit 20,** Email from Frazier to Booker re Disinterment, ADAMS 2035.) At his deposition on September 26, 2019, he testified he had been a funeral embalmer, and in 1991 he was licensed by the State of Arkansas as a funeral director; **Exhibit 21,** Deposition of Frazier, September 26, 2019, p. 12.)

2282717-v1

DEPARTMENT Vital Records REQUEST TO DISINTER" for the State of Arkansas to issue a disinterment permit, which Roller did. (**Exhibit 22**, Disinterment Request to Department of Health, ADAMS 1996, and **Exhibit 23**, Roller fax confirmation of Disinterment Request, ADAMS 2003.)

87.    The Request to Disinter, which was signed by Kerry for the Baker Family represented that the body was going to be taken from Crestlawn "to Crime Lab for Autopsy and the re-interment to Crestlawn." However, the body was never going to the State Crime Lab for an autopsy.

88.    On September 1, 2018, "Greg Stephens, JD MD" sent a memo to Dr. Peretti with a copy to Frazier at Roller. (**Exhibits 24 and 25,** Memo from Stephens to Peretti re Disinterment, PERETTI – 000076 and ADAMS 1993.) In this memo, Stephens confirmed that he had scheduled the "disinterment" for Friday, September 7, 2018, with Frazier / Roller, that Dr. Peretti was arranging transportation for the body with the State Crime Lab for an autopsy, and the body would be returned to Crestlawn cemetery the following Monday. *Id.*

89.    On September 6, 2018, Kerry executed a "Disinterment Agreement" for himself and for the Baker Family, and Wilbur Burial Vault Company, Inc. was authorized to supply personnel and equipment to "disinter" the vault with casket at the Crestlawn Cemetery. (**Exhibit 16,** Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028, ¶ 1 and 3.) But this was no disinterment. It was instead the exhumation of a body for a private autopsy by Dr. Peretti. *Id.* at ¶ 4. Frazier testified he was aware that Dr. Peretti conducts private autopsies.

(**Exhibit 21**, Deposition of Frazier, September 26, 2019, p. 78.) The Baker Family authorized Frazier of Roller to get the permits required by law (**Exhibit 16,** Disinterment Agreement signed by Kerry Baker 9/6/18, PERETTI – 000028 at last ¶), which Roller failed to do. Roller, acting through its assistant manager Edward Ferguson, ignored the required administrative procedures and instead executed Kerry's fraudulent Request to Disinter, thereby assisting Stephens and the Exhumation Defendants in securing an inappropriate disinterment permit from the State to conduct an exhumation. (**Exhibit 22**, Disinterment Request to Department of Health, ADAMS 1996.)

90.     The Disinterment Permit was issued by the State upon false representations. The Permit specifically provided that the body was permitted to go to the State Crime Lab for autopsy. (**Exhibit 26**, State permit for disinterment, ADAMS 2036.) An official state autopsy never occurred because this was actually a private autopsy that required the parties to obtain a Court order.

91.     From the outset of this body retrieval process, the Baker Family, and Stephens provided false information to accomplish their improper goals. From the earliest dates discovered so far, April 28, 2017, Michael Noble of Conway, an investigator for the Baker Family and Jeff Co Attorneys, contacted Roller for information, advising that the Baker Family may request a "disinterment."

92.     On August 28, 2018, a quote was issued by Wilbur Burial Vault for expense to "Disinter Vault, Open Vault, Help Remove Wood Casket, Directors Will Transport Body / Casket to Crime Lab for Autopsy...". Everyone involved

misrepresented that (1) a disinterment was taking place instead of an exhumation; and (2) that the Arkansas State Crime Lab was conducting an autopsy. (**Exhibit 27**, Email from Roller re burial and disinterment, ADAMS 2034; **Exhibit 28**, Fees and itemization from vault company re disinterment, ADAMS 2005.)

93.     The repeated statements in the various forms and memos about retrieving and returning the body to Crestlawn should have been confirmation to everyone involved that the body was not being disinterred to bury it elsewhere. Indeed, all of the participants in fact knew the body was being exhumed for autopsy because Kerry and Stephens had represented this to them. (**Exhibit 18**, Stephens' disinterment request and Roller case activation, ADAMS 1995, 1991; **Exhibit 25**, Memo from Stephens re Disinterment, ADAMS 1993; **Exhibit 22**, Disinterment Request to Department of Health, ADAMS 1996.)

94.     Roller not only failed to comply with Arkansas law, it also failed to have and follow policies and procedures to conduct due diligence to verify the information included in the paperwork prepared by Roller with the Baker Family and Stephens prior to presenting the documentation to the State of Arkansas to request a state permit to allow a disinterment (even though this was not a disinterment of Luke's body). (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 83 - 91.) Here, the information included was never verified by Roller, and it conspired with the Baker Family and Stephens by using falsely completed disinterment forms to conceal their actions from Adams Plaintiffs.

26

## UNLAWFUL EXHUMATION AT CEMETERY IN FAULKNER COUNTY

95.    Under Arkansas law, an unlawful disinterment or exhumation is an abuse of a corpse, which is a class D felony, see Ark. Code Ann. § 5-60-101(a)(1).

96.    Present at the Crestlawn Cemetery on September 7, 2018 were (a) Roller representatives- Frazier, Anthony Williamson, Tyler Garland, and William Zumalt; (b) Stephens; (c) Stephens' unidentified female associate;[4] (d) an unidentified Wilber Vault representative; and (e) Roller contract grave digger Mark Chambers. (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 114 - 118.) After they gathered, the grave was dug. The vault was raised, broken open, and the casket was removed. *Id.* The casket was carried to a warehouse in the cemetery and opened. Garland and Zumalt took the body "in the advanced state of decomposition" and put it in a plastic bag. *Id.* The bag was loaded into a white Dodge minivan bearing no company markings and was not an Arkansas Crime Lab vehicle. *Id.* Per Frazier, "Dr. Stephens" and Dr. Peretti had arranged for the van to transport the body. *Id.* Stephens and his associate followed the white van out of the cemetery. *Id.*

97.    The body was not taken to the Arkansas State Crime Lab as represented in all the various paperwork provided by the Baker Family, Stephens and Roller to the Department of Health and according to the Department of Health Permit issued. Instead, the body was taken to Ruff Mortuary Service LLC in North

---

[4] "Dr. Stephens" and his associate were also present when the body was returned to Crestlawn for re-burial per the testimony of Frazier. (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 123 - 124.) The Faulkner County Coroner was not present because the exhumation was not disclosed to her as is required.

Little Rock for the secret autopsy that night, with Dr. Peretti, Nawojczyk and others in attendance. (**Exhibit 29**, Deposition of Peretti, September 18, 2019, p. 69.)

98.   Conspicuously absent from the exhumation was the Faulkner County Coroner, Jessica C. Thorn. Although Frazier has admitted "that the Coroner of the county of the burial was to be notified" before an exhumation, he admitted that *he did not inform her*. (**Exhibit 21**, Deposition of Frazier, September 26, 2019, pp. 103, 119 - 123.) According to Frazier, he "forgot" to provide the lawful notice to the Coroner. *Id.*

99.   One of the Coroner's deputies discovered the exhumation had occurred and reported the illegal activity to her. Upon discovering this after the exhumation and autopsy, Coroner Thorn contacted Frazier, whom she knew to be an experienced funeral director from her previous work with him at Roller. *Id.* Coroner Thorn inquired of Frazier and was informed that the exhumation had occurred, without notice to or permission of her, and without a court order. Despite his initial testimony that Coroner Thorn did not request any information from Roller about the exhumation, she did. When shown the documents Roller produced to Thorn, Frazier admitted that three days after the exhumation and private autopsy, he faxed the Arkansas Department of Health Disinterment Permit and original Certificate of Death to Coroner Thorn at her request. *Id.;* (**Exhibit 30**, 9/10/2018 facsimile re disinterment permit with Roller facsimile ribbon and death certificate, ADAMS 0476 – 0477.) The Permit contained false information that

28

originated from Jeff Co Plaintiffs, Stephens and Roller about where the body was being taken and that the State of Arkansas was conducting the autopsy. Upon information and belief, Coroner Thorn was never informed by any of them that the body really did not go to the State Crime Lab and that a private secret autopsy had taken place.

100.    Frazier also admitted under oath that there is not a form permit for an exhumation. (**Exhibit 21**, Deposition of Mike Frazier, September 26, 2019, pp. 139 - 141.) Further, he testified that Roller had no policies or procedures to allow, conduct, or otherwise participate in an exhumation to ensure that it is lawfully and legally conducted. For an exhumation, Frazier testified that he was aware that a court order is required in Arkansas. *Id.* He acknowledged that the procedure followed in the exhumation of Luke was not one of the legally allowed procedures to exhume a body. *Id.* As a Rule 30(b)(6) representative for Roller, Frazier further testified that Roller had a duty to use the correct paperwork, and it did not. *Id.* pp. 152 – 158. Further, there was no reason to open the casket and remove the body in the cemetery (risking contamination), other than the casket would not fit in the white van. *Id.* Frazier's confirmation of Roller's lack of policies and procedures allowed not only an illegal exhumation and autopsy but also spoliation of key evidence.

101.    Stephens, who upon information and belief was there in his capacity as both a doctor and a lawyer, and Roller knew that they were illegally opening the casket in the cemetery. Handling the body in the warehouse and bagging it

29

seriously compromised the integrity of the body, and hence the autopsy, which is analogous to breaking the chain of custody in a criminal proceeding. Further, in their capacities as funeral home representative, attorney and physician, they all knew the Faulkner County Coroner was required to be notified of any exhumation, with an opportunity to approve or contest the process in a court. They also all knew that a court order was required, but to keep the Adams Plaintiffs from knowing what was occurring, they did not get a court order. Public notice would have ensured that the Adams Plaintiffs knew of the exhumation, giving them the same opportunity to participate as the Jeff Co Plaintiffs and their attorneys and experts.

102.   Even the experts engaged by the Baker Family knew what occurred was illegal. Nawojczyk testified in his deposition in the Jeff Co Lawsuit that the exhumation of Luke from a Faulkner County cemetery for an autopsy was illegally accomplished. Nawojczyk confirmed under oath that he advised the Baker Family and Stephens that a court order was required to exhume a body from a cemetery, and despite notice, no such court order was ever obtained. (**Exhibit 31,** Deposition of Nawojczyk, February 7, 2020, pp. 239–240, 259-261.) Nawojczyk also testified that he was misled by Stephens into believing that the proper protocol including a court order before the exhumation had been followed. *Id.*

103.   Additionally, Dr. Peretti, who actually conducted the private autopsy with his assistants and Nawojczyk (among others who have not been identified) present, also testified that he was under the impression from Jeff Co Plaintiffs that they had followed the proper protocols and obtained a court order permitting the

exhumation of Luke's body. (**Exhibit 29**, Deposition of Peretti, September 18, 2019, p. 63.)

104.    Nawojczyk and Dr. Peretti both testified that, prior to being deposed in the Jeff Co Lawsuit by the Jeff Co Defendants, they were unaware Jeff Co Plaintiffs had neither sought nor obtained a court order allowing for the exhumation.

## CONCEALMENT OF AUTOPSY

105.    The private secret autopsy of Luke's body occurred on the night of September 7, 2018. Dr. Peretti took the physical samples known as wound cuts, which were in "very poor condition," to the State Crime histology lab to be processed and then stored in his State office. *Id.* at pp. 65 – 74.[5] One week later, on September 14, 2018, the autopsy report was completed and signed by Dr. Peretti. *Id.* The conclusions reached by Dr. Peretti were that Luke had died due to the gunshot wound to the head, but that the manner of death was inconclusive (no opinion possible) because of the "rotten" decomposition of the body and Roller's preparation of the wound including cleaning it and suturing it closed. *Id.* pp. 65-74, 136-142.

106.    As described by Dr. Peretti, "It was not a good sample." *Id.* Dr. Peretti further concluded that, other than the gunshot wound to the head, there was no evidence of any external or internal trauma to Luke's body. Despite having the autopsy results from Dr. Peretti and his opinion, the Jeff Co Plaintiffs and Jeff Co

---

[5] From review of the Arkansas State Crime Lab file produced to Defendants per a FOIA request, Defendants discovered that Stephens had been communicating with the Crime Lab, and when the Assistant Director discovered it, she instructed the employees to stop communicating with Stephens. (**Exhibit 32**, Email from Moran re ballistics test December 17, 2018, ADAMS 0264.)

31

Attorneys falsely alleged that Luke had been involved in a physical altercation

prior to his death, supposedly evidenced by additional trauma to his body. *Id.*

107.   The Jeff Co Plaintiffs and Jeff Co Attorneys had the autopsy report

from their own paid expert and his findings prior to their filing of the Complaint

and Amended Complaint.

108.   Not only did Dr. Peretti find the manner of death inconclusive, the two

other experts for the Jeff Co Plaintiffs and Jeff Co Attorneys also agreed. (**Exhibit**

**31**, Deposition of Nawojczyk, February 7, 2020 pp. 88 – 108.)

> Q:    Okay.   Mr. Steve, you've talked about reviewing all of the
> information that was provided to you, and reviewing the documents that
> were provided to you, and reviewing photographs that were provided to
> you, and not really being able to form some opinions but coming to some
> other conclusions.
>       Is there anything in all of your investigative work that would keep
> you from believing that Luke Baker died of an accidental gunshot wound
> to the head?
> A.    Could very well have been.
> Q.    Do you know of any facts that would cut against that finding?
> A.    Not that exist in this case. I mean, there's, there's nothing to lead
> you one way or the other. That's why I told Mr. Stephens that had to be
> done by statements, because the physical evidence was, was not there
> anymore.
>       It had been changed. So the scene was different after the body
> was moved. So then it depended on the autopsy and on the wound itself,
> is what drew down to be so important.
>       And that was – – once Peretti ruled it as inconclusive, which I
> agreed with, Greg [Stephens] seemed to not like that, you know, like
> that conclusion. And that's when he told me he was looking for another
> pathologist, so.
> Q.    I want to make sure I asked the question correctly, because I
> think I left out something very important.
>       **Do you know of any fact that would be contrary to a**
> **finding that this was a self-inflicted accidental gunshot wound**
> **to the head?**
> A.    **No.**

**Q.    From the facts of which you are aware, do those facts support this being a self-inflicted gunshot wound to the head?**

**Q.    Accidental self-inflicted gunshot wound to the head?**

**A.    There's no facts to refute that.**

Q.    And the facts you do know would support that finding?

A.    Maybe. Maybe.

Q.    Why do you say "maybe"?

A.    Well you – – I mean you're giving me a hypothetical that, you know, that I can't answer.

Q.    Well, I, I don't want a hypothetical I want – –

A.    The, the, – –

Q.    – – exactly what you know and all of your work, all of your investigation, all of the facts that you have determined in this matter. Take those facts. Those are not hypotheticals.

A.    It could have been an accident.

Q.    An accidental self-inflicted – –

A.    Yes.

Q.    – – gunshot wound to the head?

A.    Yes.

Q.    The facts you know would support that conclusion?

A.    Yes.

Q.    At any point did you ever tell anyone there that this was a distant gunshot wound to the head?

A.    No. I told them it was not a contact gunshot wound to the head. That's all I could tell them about it.

Q.    And I think you testified earlier that when you say a contact wound to the head, you are talking about the gun actually touching the head?

A.    Yes, ma'am.

* * * * *

A.    ...And then when they [the two pathologists at the Tac Air meeting, *infra*] did talk about the case, Peretti ran through his, what he did, and, and [pathologist Dr. Kris] Sperry said, you know, he agreed with, with the inconclusive, that there was no conclusion about the gunshot wound and where, the distance, which was the big question, the distance of the gunshot wound.

* * * * *

A.    I don't think Mr. Stephens said much. Luther was doing all the talking.

\* \* \* \* \*

Q.    Were there any comments made by anyone about the findings
that these two physicians had disclosed to everyone?
A.    No, not — other than they both agreed it was inconclusive.

*Id.* pp. 82-85, 93-94, 95. (Objections omitted and emphasis supplied.)[6]

109.    Despite having full knowledge that a) the autopsy report did not

support the theories promoted in the Jeff Co Lawsuit, b), the autopsy report, the

stippling photographs and other evidence exonerated the Jeff Co Defendants, and c)

both of Jeff Co Plaintiffs' experts, Dr. Peretti and Nawojczyk, could not support the

claims, the Jeff Co Plaintiffs and Jeff Co Attorneys filed their false Complaint and

one month later, their Amended Complaint, and continue to maintain these false

allegations two years later.  Not only were the allegations in the Complaints

absolutely contrary to Dr. Peretti's findings in his completed, written autopsy

report, Jeff Co Plaintiffs and Jeff Co Attorneys hid the autopsy report for the next

ten months.   They also lied to the Jeff Co Defendants and the Court about the

existence of the written autopsy report.   One clear and unequivocal example of Jeff

Co Plaintiffs and Jeff Co Attorneys' efforts to deliberately mislead Jeff Co

Defendants and that Court about the existence of the written autopsy report

occurred at the February 21, 2019, hearing where the following exchange took place

between that Court and Stephens:

---

[6] Nawojczyk testified that Dr. Peretti and Dr. Sperry had a private meeting without all the
attorneys. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 95.)  When Dr. Peretti was
asked to disclose the private meeting discussions, it drew objections from Jeff Co Attorneys and
Peretti's as well, and instructions not to answer.  Dr. Peretti would only say they talked for
approximately five minutes about the case and then he left. (**Exhibit 29**, Deposition of Peretti,
September 18, 2019, p. 159.)

THE COURT:    While we – –while we're on that.  It was a second autopsy done, I believe – –

MR. STEPHENS:  No.  They never did the first one.  I'm glad you mentioned – –

THE COURT:    You're talking – – the reason I'm – – remember – – the defense said that you – – you didn't place your – – was it autopsy or – – or lab result in the complaint.  Can you address that while – –

**MR. STEPHENS: They're not based on that, and we don't have a report.  We don't have a written report.  We didn't – – that's not what we – – that's not what we did.  He gave us a very brief oral report** because we – – we asked him to do two things....

\*\*\*\*\*\*

THE COURT:    Okay. So you exhumed the body.

MR. STEPHENS:  That's correct.

THE COURT:    For – – and the person didn't do a report?  And – –

MR. STEPHENS:  He [Dr. Peretti] gave us an oral report.  He – – I'm sure he's got some written report at his – – at his place.

THE COURT:    Okay.

MR. STEPHENS:  We were not asking for that because we were asking two questions.  I guess I could ask for it.

THE COURT:    You said at his place.  Is this– –

MR. STEPHENS:  He – – he's got a private autopsy location in Little Rock.  And we asked two question, (sic) and that – – he answered those two questions for us.  The reason I didn't ask for a preliminary report is because I wanted one report.  I'm going to have some more questions to ask him, but the slides that he got have to be prepared.  And – – and he has those.  But we are not sure – – and we're – – actually, we're waiting for the answer, to see what they say, and then we know what tests to run.  And so it's in process really.  I – –

THE COURT:    Well, when was it – – I'm – –

MR. STEPHENS:  It was in September [2018].

**Exhibit 17**, February 21, 2019 Hearing Transcript, pp. 173 – 175 (emphasis supplied).

110.    In addition to Stephens, Sutter and Humphrey were present for Jeff Co

Plaintiffs at this hearing, and neither corrected the statements of Stephens,

including maybe the most critical lie of all - that there was no written autopsy

report.

111.   At the time of that February 2019 hearing, despite expressly telling the Court otherwise and concealing its existence from the Jeff Co Defendants, at least the Jeff Co Plaintiffs, the Estate and Jeff Co Attorneys were in possession of Dr. Peretti's written autopsy report.  Nawojczyk emailed the autopsy report to Stephens and his associate Lynli Carlin the day it was finalized and signed by Dr. Peretti, September 14, 2018.  Nawojczyk, Plaintiffs' second expert, also advised that he had read the report and concurred with Dr. Peretti's findings. (**Exhibit 33**, Email from Nawojczyk to Stephens re review of Dr. Peretti Autopsy Report 9/14/2018, PERETTI – 000109; **Exhibit 34**, Peretti Autopsy Report, PERETTI – 000022-000027.)  On September 15, 2018, Nawojczyk also stated the gun powder and stippling were inconclusive so distance of gun to wound are a "question mark"; and cautioned that "we must make theory fit facts not the other way around." (**Exhibit 35,** September 15, 2018 Email from Nawojczyk to Noble re distance unable to be determined, PERETTI – 000110.)

112.   Stephens, Carlin, and Nawojczyk even met with Dr. Peretti about the autopsy report on September 17, 2018. (**Exhibit 36**, Stephens, Carlin, Nawojczyk met with Dr. Peretti about autopsy report, PERETTI – 000104.)  By October 8, 2018, Stephens was pressing Dr. Peretti for distance findings, which the Jeff Co Plaintiffs desperately needed to support their frivolous claims. (**Exhibit 37**, Stephens asking for distance findings, PERETTI – 000097.)  An appointment was set for Stephens and Carlin to discuss the autopsy report with Dr. Peretti on October 22, 2018. (**Exhibit 38**, Email from Peretti to Stephens re 6:30 meeting,

36

PERETTI – 000098.) The autopsy report was also distributed to another of the Jeff Co Plaintiffs' "experts" in Georgia, Dr. Kris Sperry on or about October 30, 2018. (**Exhibit 39**, Email from Peretti to Stephens autopsy report distributed 10/30/18 and invoice, PERETTI – 000101 and PERETTI – 000096; **Exhibit 29**, Deposition of Peretti, September 18, 2019, pp. 83-84.) Nawojczyk texted his "raw notes" (texts that were never produced in discovery to Jeff Co Defendants) based on the autopsy report to Stephens on November 7, 2018. And on November 8, Nawojczyk provided his corrected, not final report to Stephens and Carlin with copies to Dr. Peretti, another undisclosed expert Peter Valentin Consultants, and Noble Defendants. (**Exhibit 40**, Email from Nawojczyk with draft report and notes, PERETTI – 000085 - 000087.) Stephens, Nawojczyk and Dr. Peretti again met to discuss the autopsy report on November 10, 2018 at Rosalinda's in Little Rock. (**Exhibit 41**, November 8, 2018 Email from Nawojczyk to Peretti re meeting PERETTI - 000084.)

113.    Jeff Co Plaintiffs and Jeff Co Attorneys, at the very least, should have produced the autopsy report to Jeff Co Defendants in discovery, but instead they intentionally hid it. Jeff Co Attorneys lied to that Court about the existence of the written autopsy report and their possession of it.

114.    At the September 4, 2019 hearing in the Jeff Co Lawsuit,[7] the issue of whether there was an expert autopsy report was again raised. Despite having been

---

[7] Sutter, Gillham, Humphrey and Eric Spencer Buchanan and The Buchanan Firm, P.A. (collectively, "Buchanan") were present at this hearing. Buchanan had substituted for Jeff Co Plaintiffs, Kerry and the Estate of Luke Baker, after Stephens was held in contempt for making misrepresentations to the Court in his efforts to try to prevent Jeff Co Defendants from deposing Kerry. Clearly, Stephens never actually stopped representing the Jeff Co Plaintiffs and remained actively involved in the case, particularly in manipulating witnesses and communicating with Jeff Co Coroner Kelley. *See*, Verizon summary, *infra*.

37

present at the February 21, 2019 hearing where Stephens told that Court there was

no written autopsy report, Sutter finally admitted over six months later that Jeff Co

Plaintiffs had an autopsy report but that he had made the decision to withhold the

autopsy report from Jeff Co Defendants, because, according to Sutter, the report

was not "final". (**Exhibit 42**, September 4, 2019 Hearing Transcript, pp. 61 - 64.)  It

was not until September 18, 2019, after Dr. Peretti had engaged independent

counsel and appeared for a deposition, that Jeff Co Defendants learned that those

representations were untrue.  At that deposition, Dr. Peretti self-disclosed the

written autopsy report and testified, contrary to the statements to the Court by Jeff

Co Attorneys, the autopsy report that he prepared and sent to Jeff Co Attorneys on

September 14, 2018, was in fact a final report and the only autopsy report Dr.

Peretti was ever asked to render. (**Exhibit 29**, Deposition of Peretti, September 18,

2019, p. 164 – 165.)  The findings in the autopsy report, which were even supported

by the other two experts for Jeff Co Plaintiffs, defeated the fabricated theories in

their Complaints and the manufactured allegations contained in their filed

pleadings.

### OBSTRUCTION OF FOIA AT SHERIFF'S OFFICE, MISREPRESENTATIONS ABOUT THE AUTOPSY AND REPORT, AND THE ORIGIN OF THE RE-OPENED CASE

115.    On September 28, 2018, one of Defendants' Counsel in the Jeff Co

Lawsuit served a FOIA letter to the Jefferson County Sheriff's office ("Jeff Co

Sheriff") in an attempt to obtain the investigation file on Luke's death. (**Exhibit

43**, September 28, 2018 FOIA Request Letter from B. Hendrix to Jeff Co Sheriff.)

38

The Jeff Co Sheriff's response to this FOIA request represented that Jeff Co
Defendants' counsel could come and retrieve the file, indicating that the file was
closed. (**Exhibit 44**, October 2, 2018 Jeff Co Sheriff's Response to B. Hendrix
FOIA.) On October 3, 2018, twenty-four hours after Jeff Co Defendants received
notification that copies of the file could be picked up, the Jeff Co Sheriff sent a
second response to the FOIA request indicating the file was no longer available
because the investigation had been reopened. (**Exhibit 45,** October 3, 2018 Jeff Co
Sheriff's Response No. 2 to FOIA from B. Hendrix.)[8] This second response was the
direct result of the obstruction of justice activities orchestrated by Jeff Co Plaintiffs
and Jeff Co Attorneys, specifically designed to prevent Jeff Co Defendants from
receiving a copy of the public file they had properly requested—the same file Jeff Co
Plaintiffs had received years earlier upon letter request of Kerry dated November
23, 2015. (**Exhibit 50**, November 23, 2015 Letter from Baker to Jeff Co Sheriff.)

116.    In early November, 2018, according to a videotaped interview of the
sheriff-elect of Jefferson County, Lafayette Woods, Jr.,[9] he received a "visit from an
attorney that used to be a judge that I knew" [Marion Humphrey] who "came in

---

[8]  Another FOIA request letter was served on the Sheriff's office by Jeff Co Defendants on
December 11, 2018. (**Exhibit 46**, December 11, 2018 FOIA Request to Jeff Co Sheriff from B.
Hendrix.) On December 13, 2018, the Sheriff's office responded that the file could not be released
because the case was not closed. (**Exhibit 47**, December 13, 2018 Response to B. Hendrix FOIA
from Jeff Co Sheriff.) Other FOIA requests were also served on the Jefferson County Sheriff by
other of Defendants' counsel. (**Exhibit 48**, December 21, 2018 FOIA letter of M. Shannon, ADAMS
0102-0105; **Exhibit 49**, January 17, 2019 FOIA letter of J. Henry to Jeff Co Sheriff.) When the file
was finally produced, each time, a different set of documents was provided. At no time did the
Sheriff's office ever produce to Jeff Co Defendants the 81 jpeg images received by Kerry in his
original November 23, 2015 FOIA request to the same office. *See, infra.*

[9] At the time these representations were made to him, Lafayette Woods, Jr. was serving as a
Major in the Sheriff's Office. He became the Sheriff of Jefferson County in January 2019.

39

with another [unidentified] attorney in the same case",[10] and it was represented to

Sheriff Woods that the Baker Family had petitioned the Court for a court order

authorizing Luke's body to be exhumed for the purpose of an autopsy. (**Exhibit 51**,

DVD of videotaped interview of Woods.) Based upon the information above

regarding the "disinterment" of Luke's body, this was not true because no such court

order was ever sought or issued and the illegal exhumation of Luke's body had

already taken place two months earlier on September 7, 2018. Sheriff Woods

further stated that these attorneys also represented to him that they were waiting

on the autopsy results. *Id.* That representation was also a lie because the autopsy

report was finished, signed and provided to Stephens on September 14, 2018 and

circulated to Stephens and his colleague Lynli Carlin on September 14, 2018.

(**Exhibit 33**, Email from Nawojczyk to Stephens re review of Dr. Peretti Autopsy

Report 9/14/2018, PERETTI – 000109.)

117.    Sheriff Woods confirmed in the video that he had received a FOIA

request from counsel for Jeff Co Defendants (B. Hendrix) and because the

investigation was closed, he advised Mr. Hendrix that he could review the files

during regular business hours. Sheriff Woods further stated that a couple of days

later is when Humphrey and another of Plaintiffs' Jeff Co Attorneys visited the

sheriff's office and "revealed" that the Jefferson County Prosecuting Attorney had

authorized the sheriff's investigative unit to reopen the investigation. This was yet

---

[10] The identity of this individual and his role will be the subject of discovery in this case and
Adams Plaintiffs reserve the right to add parties and/or claims for at least obstruction, conspiracy, or
whatever causes of action the facts support.

another lie. The facts are, according to the Jefferson County Prosecuting Attorney, he did not have a file on this matter and did not "reopen" an investigation in his office or for the Jeff Co Sheriff. However, based on that misrepresentation of counsel, Sheriff Woods informed counsel for Jeff Co Defendants that he could not release his file under FOIA because the investigation had been reopened. (**Exhibit 45**, October 3, 2018 Jeff Co Sheriff Response No. 2 to FOIA from Hendrix.) These false statements, in particular, that the prosecutor was reopening the case, effectively stopped Jeff Co Defendants from being able to receive any FOIA production from the Sheriff during the early and critical stages of defending the Jeff Co Lawsuit. Jeff Co Defendants were not allowed to retrieve a copy of the file until December 17, 2018. Jeff Co Plaintiffs intentionally and effectively stalled Jeff Co Defendants' ability to defend against the false and vicious accusations by shielding the exonerating information contained in the requested files, including certain jpeg photographs in the Sheriff's file. The significance of these photographs, of the interference of production of them, and of the active concealment of the photographs is outlined below.

### THE OBFUSCATION, DELIBERATE CONFUSION, CONCEALMENT AND LIES AROUND THE 81 EXONERATING PHOTOGRAPHS A/K/A THE STIPPLING COVERUP

118. One of the more absurd allegations concocted and pled by Jeff Co Plaintiffs and Jeff Co Attorneys in their Complaints was that the wound to Luke's head did not demonstrate evidence of a "close range" gunshot wound. This was a critical element to the allegation that someone other than Luke pulled the trigger

on the gun that killed him. In an effort to promote this false narrative, Jeff Co Plaintiffs and Jeff Co Attorneys knowingly and intentionally misrepresented both in pleadings and in statements made in open Court, that there was no evidence of stippling around the gunshot wound on Luke's right temple. (**Exhibit 17**, February 21, 2019 Hearing Transcript pp. 176-178, 217-218, 237–241.) They also hid the best evidence of whether stippling existed from Jeff Co Defendants, their own experts and that Court.

119.    The Complaint stated the wound was "***believed to be*** a distant wound" per medical professionals, and the Amended Complaint stated it "***was*** a 'distant' wound" per medical professionals. *See* **Exhibits 14 and 15,** Complaint ¶ 31 and Amended Complaint ¶ 36 (emphasis supplied). Neither distance statement was factual nor had any medical professional reached that conclusion.

120.    Jeff Co Plaintiffs and Jeff Co Attorneys had 81 crystal-clear jpeg photograph images taken with a 35 mm camera by Jeff Co Sheriff deputies, including photos of Luke at JRMC the night of the incident, and photos of the accident site at Prairie Wings Lodge taken the night of the incident and the next morning. (**Exhibit 52**, 81 jpeg photographs, requested to be filed under seal.) Included among these photographs are several vivid photographs showing stippling on Luke's right temple and face around the gunshot wound. These 81 crystal clear photographs, however, were never produced by Jeff Co Plaintiffs or Jeff Co Attorneys despite discovery requests that required production of them, nor were they provided in response to multiple FOIA requests to Coroner Kelley.

42

121.   It was not until the deposition of Kerry on June 10, 2019, that Jeff Co

Defendants uncovered the fact that Kerry, in February 2016, had received a CD of

these remarkable 81 photographs from the Jeff Co Sheriff. (**Exhibit 53**, Deposition

of Kerry, June 10 and 26 and July 1, 2019, pp. 66-69, 99, 139, 330-340)   Initially

Kerry testified that upon receipt of the CD he placed it in his home safe and "it has

been sitting in my safe since I got it from Jefferson County." *Id.*, p. 331-332. He

then changed his testimony revealing that the file he received from Jeff Co Sheriff,

including the [77] paper copies of photos and the CD of [81] photos, had been given

to Stephens prior to May 2016. *Id.*, p. 332-333. Upon further examination, Kerry

again altered his story to reveal he had actually removed the CD from his safe and

taken it to work with him where he "had a girl at the office [Diana White] download

a copy of the CD" and "[s]he made [three or four] copies for me." *Id.*, at 335. These

copies were then distributed to Stephens, the Noble Defendants, and Jeff Co

Attorneys per Kerry's testimony. *Id.*, at 335-337. Both Stephens (who, while

having previously withdrawn as counsel in the case, was present for this deposition

anyway) and Buchanan stated at the June 10, 2019 deposition of Baker that they

had the CD with photos too. *Id.* at 99. The CD had never been provided by Jeff Co

Plaintiffs or Jeff Co Attorneys in discovery, and a copy was requested at the

deposition of Kerry. *Id.*

122.   Sixteen days later, on June 26, 2019, Kerry finally produced the CD of

photographs he received in early 2016. *Id.* at 339-340. The deposition on that day

was adjourned for a break, during which time Jeff Co Defendants were allowed for

43

the first time ever to review Kerry's CD from the Jeff Co Sheriff. *Id.* It was clear

from these newly produced 81 digital photographs that stippling was present

around the gunshot wound to Luke's head. Prior to this discovery, the only

photographs Defendants had ever received in response to their discovery the Jeff Co

Plaintiffs, and multiple FOIA requests to the Jeff Co Sheriff and Coroner Kelley,

were from the Jeff Co Sheriff - 77 poor quality/grainy, 4-to-a-page photographs

taken at JRMC and at the lodge. These 77 paper copies were not provided to Jeff

Co Defendants until after the Jeff Co Sheriff had "re-closed" the file and finally

allowed Jeff Co Defendants to review it in December 2018. (**Exhibit 54**,

Grainy/blurry 77 paper photographs Jeff Co Defendants received from Sheriff,

ADAMS 0058 – 0077, which will be requested to be filed under seal.)

123.     Coroner Kelley participated in the concealment of these 81 high-

resolution jpeg photographs. Coroner Kelley testified he had received these high-

resolution images from the Jeff Co Sheriff in October 2015 (just days after the

accident according to his testimony), but he failed to ever produce these 81

photographs pursuant to multiple, separate FOIA requests submitted directly to

him and his office by Jeff Co Defendants. (**Exhibit 55**, November 1, 2018 FOIA

letter from B. Hendrix; **Exhibit 56**, December 3, 2018 preservation letter to

Coroner Kelley; **Exhibit 57**, January 23, 2019 FOIA and preservation letter to

Coroner Kelley; **Exhibit 58**, July 16, 2019 FOIA Letter of J. Henry to Coroner

Kelley.) It now appears that the reason Coroner Kelley, an elected public official,

violated Arkansas FOIA law and concealed documents and photographs that were

2282717-v1

in his possession and in the possession of the Jeff Co Plaintiffs and Jeff Co Attorneys was for Kelley's own personal gain. The facts evidencing this are outlined below.

124.    Importantly, because the photographs offered direct support to contradict the allegations in the Complaints, Jeff Co Attorneys hid the photos from Jeff Co Defendants and even from their own expert witnesses - Nawojczyk and Dr. Peretti. Neither was aware of the existence of these photographs until they were deposed, and they both agreed the photographs reflected stippling around the gunshot wound.

125.    Former Pulaski County coroner Nawojczyk, who certainly knows stippling when he sees it, testified he had never been shown the stippling photographs by Jeff Co Plaintiffs. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 257.) Nawojczyk was visibly shaken when presented with the photos for the first time in his videotaped deposition and, not only did he acknowledge that the photographs were new to him, he admitted he could see stippling around the wound on Luke's head. *Id.* Nawojczyk further testified that one of these newly produced photographs was the best photograph of the wound in the case. *Id.* at p. 258.

126.    In fact, Nawojczyk went so far as to testify that he believed he had been duped in his work for Plaintiffs in the Jeff Co Lawsuit because he was not given everything he should have received (and which Jeff Co Plaintiffs and/or their Attorneys had) before reaching conclusions. *Id.* at pp. 115-116.

2282717-v1

127.   Similarly, Dr. Peretti, who testified he was qualified to identify stippling, also testified that he was never provided with the stippling photograph by Jeff Co Plaintiffs. (**Exhibit 29**, Deposition of Peretti, September 18, 2019 pp. 254 - 258.) He too was visibly shaken, and stated he was "shocked" when he saw the stippling photographs for the first time during his videotaped deposition.[11] *Id.*

128.   Critically important, even Coroner Kelley, whose Addendum and Second Supp. Death Report stated otherwise, testified at his deposition upon cross-examination that he observed stippling on Luke's face in the jpeg photographs. (**Exhibit 59**, Deposition of Coroner Kelly, March 5, 2020 pp. 306–309.; **Exhibit 60**, Two Stippling photographs,[12] requested to be filed under seal.)

## WRONGFULLY ATTEMPTING TO INFLUENCE EXPERT WITNESSES AND PUBLIC OFFICIALS

129.   Nawojczyk also testified under oath that Stephens tried to get him to convince Dr. Peretti to change the conclusion Dr. Peretti reached in his autopsy report. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 116, 206.) Specifically, Dr. Peretti had concluded there was no evidence of trauma to Luke other than the actual gunshot wound, and he would not determine the manner of death to be "murder". (*Id.;* **Exhibit 34**, Peretti Autopsy Report, PERETTI 000022 –

---

[11] At the now infamous Tac Air meeting, *infra,* Dr. Peretti called Nawojczyk aside to reveal Dr. Peretti "was very paranoid, and he said, Something's going on in this case. They didn't give us all of the information. And I mean, it was really kind of - - it took me kind of a little, a little bit, you know - - it surprised me to hear him say that. And he said, They're trying to set us up. And I didn't know what that meant. But that - - and Peretti - - that day is the day that Peretti told me Luther Sutter told him to hire, he needed to hire an attorney. And I always wondered why, you know, a witness had to have an attorney. Now I know." (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 96 – 97.)

[12] These stippling photographs were contained in **Exhibit 52**, the 81 jpeg photographs, image numbers 2647 and 2648.

000027.) These conclusions were problematic for Plaintiffs because their fabricated claims in the Amended Complaint included an alleged physical altercation leading to a fatal gunshot wound to Luke's head. The following are excerpts from and summaries of the deposition testimony of Nawojczyk: "Greg [Stephens] wanted me to try to convince Dr. Peretti to come to a different conclusion, and I couldn't, and I didn't try, because I was of the same opinion." (**Exhibit 31,** Deposition of Nawojczyk, February 7, 2020, p. 116–122.) Stephens tried to get Nawojczyk to convince Dr. Peretti to form an opinion of the manner of death when Dr. Peretti was firm that he could not. *Id.* Over the repeated "objections as to form" by Jeff Co Attorneys, Nawojczyk testified that he was unwilling to compromise his integrity for the Baker Family or Jeff Co Attorneys. *Id.* Nawojczyk testified Stephens would come up with all different theories of the case with no supporting evidence and Stephens was even "witness shopping" to get the proof needed to fit his theories, which Nawojczyk discouraged. *Id.* Nawojczyk testified that he "grew blue in the face" repeating to everybody that "[y]ou have to take your facts that you have and fit your theory into those facts." *Id.* Nawojczyk further testified that Stephens tried to get Nawojczyk to conceal documents from Jeff Co Defendants but Nawojczyk refused stating, "Judy's probably already got them, and I'm not going to put myself in a position of giving her a report that's different than the one she already has. I am just not going to do that. Good or bad, however it felt, that's what I told [Stephens]. That's what I was going to do. So as we were leaving Panera Bread he

47

said, So I guess you don't want to be an expert in this? And I said, That's what I've been trying to say. And that's the last, really, time that we talked." *Id.*

130.   Stephens played out hypothetical testimony scenarios with Nawojczyk for the various theories of the case. Nawojczyk would provide an answer but then inform Stephens that "as soon as Ms. Henry gets up and says, "Well, could it have been this" I would have to say, Yes, it could have been..." Stephens said, "*No, you can't say that, because that will ruin my case.*" And I said, you know, I'm here to tell you my opinion. You hired me, and you paid me. I'm your witness, but I'm not going to alter facts or misconstrue facts for anyone." *Id.* Emphasis supplied.

131.   Stephens also tried to get Nawojczyk and Dr. Peretti to help him convince Coroner Kelley to prepare an amended death certificate that included a laundry list of "findings" related to the death of Luke Baker. *Id.* Nawojczyk pleaded with Stephens that what he was proposing was improper and told Stephens specifically "you can't do that on a Death Certificate. You put what the Death Certificate calls for, and it doesn't call for you to do a paragraph of the case file. And that's what he wanted Dr. Peretti and me both to do. I mean, that - - you just don't do that, but only the facts of your, that you have in hand." *Id.* Stephens went so far to even request that Nawojczyk get Kelley to change the death certificate to "murder."

> Q.    So Mr. Stephens was trying to get you to talk to Dr. Peretti to change his testimony or his conclusions, and he was trying to get you to go to Chad Kelley to get him to change the Death Certificate to murder?
> A.    Yes.

**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 206.

132.    Unfortunately, Kelley eventually did in fact change the death certificate to include a lengthy, bizarre epistle of "findings" that unsurprisingly matched at least two critical theories Stephens was espousing:

> Q.    Is the language that Mr. Kelley put on the Death Certificate dated July 10th of 2019 consistent with what Mr. Stephens was telling you he was wanting on the Death Certificate?
> A.    Yes, a couple of those things.
> Q.    Which ones?
> A.    The non-self-inflicted and stippling.
> Q.    And no stippling?
> A.    No stippling.

*Id.* at p. 179.

133.    Defendant Sutter tried hard to preclude Defendants in the Jeff Co Lawsuit from deposing Nawojczyk, going so far as to advise Nawojczyk to ignore subpoenas and a Court Order denying Sutter's motion to quash.    (**Exhibit 61**, September 23, 2019 Letter to Nawojczyk; **Exhibit 62**, October 16, 2019 Order Denying Motion to Quash; **Exhibit 63**, October 16, 2019 Letter to Nawojczyk (third attempt) re subpoena; **Exhibit 64**, October 16, 2019 Email from Nawojczyk to Sutter; **Exhibit 65**, October 17, 2019 Email from Nawojczyk to Jeff Co Defendants; **Exhibit 66**, October 18, 2019 Email from Nawojczyk re not producing documents; **Exhibit 67**, October 18, 2019 Email from Sutter to Jeff Co Defendants re not communicating with consultants.)

2282717-v1

134.    All of these actions amount to at least witness tampering and influencing a public official because Coroner Kelley did in fact change the death certificate as Stephens wanted.

## OTHER INSTANCES OF OBFUSCATION, DELIBERATE CONFUSION, CONCEALMENT AND DISCOVERY ABUSES, INCLUDING DIRECTING WITNESSES TO IGNORE A COURT ORDER AND CHANGE TESTIMONY, A/K/A WITNESS TAMPERING

135.    In discovery, Jeff Co Plaintiffs and their respective Jeff Co Attorneys disclosed Nawojczyk and Dr. Peretti as their two expert witnesses,[13] whose alleged findings and testimony would purportedly support Plaintiffs' fabricated lawsuit allegations. This was a lie as neither of these individual's opinions support the allegations of the Complaints.

### ATTEMPTS TO INVOLVE NAWOJCZYK IN OBSTRUCTION

136.    On July 22, 2019, Jeff Co Defendants served a subpoena duces tecum on Nawojczyk as a fact witness to the unlawful autopsy, and requested that Nawojczyk produce, among other things, documents, communications, e-mails, and text messages that were in any way related to the death of Luke, within five (5) business days of service. Nawojczyk failed to comply with the subpoena and did not produce any documents.

---

[13] In Dr. Peretti's file production, it was discovered that Jeff Co Plaintiffs had another expert, Peter Valentin Consultants. (**Exhibit 40**, November 8, 2018 Email from Nawojczyk with draft report and notes, PERETTI – 000085 - 000087.) The same correspondence indicates that Nawojczyk also texted his "raw notes" to Stephens on November 7, 2018. Those text messages were withheld by Jeff Co Plaintiffs and have never been produced.

137.    On July 29, 2019, Sutter filed a motion to quash the subpoena to Nawojczyk in the Jeff Co Lawsuit, which that Court denied at a hearing on September 4, 2019.

138.    On September 23, 2019, in a good faith effort to obtain the previously subpoenaed documents, Jeff Co Defendants informed Nawojczyk, by letter, that the Court had orally overruled the motion to quash the subpoena issued to him and demanded that Nawojczyk comply with the Subpoena within five (5) business days. (**Exhibit 61**, September 23, 2019 Letter to Nawojczyk.)  Once again, Nawojczyk failed to respond to the letter, Subpoena and Court order.

139.    On October 16, 2019, the Court entered a written Order denying Sutter's motion to quash.  (**Exhibit 62**, October 16, 2019 Order Denying Motion to Quash.)  On the same day, Jeff Co Defendants made a third good faith attempt to obtain the requested documents and information, including providing Nawojczyk a copy of the Order and demanding compliance with the subpoena by October 18. (**Exhibit 63**, October 16, 2019 Letter to Nawojczyk (third attempt) re subpoena.) Defendants also informed Nawojczyk that failure to comply would result in a motion to compel. *Id.*  Nawojczyk promptly forwarded the Jeff Co Defendants' correspondence to Sutter, inquiring, "What do you advise?"  (**Exhibit 64**, October 16, 2019 Email from Nawojczyk to Sutter.)

140.    Nawojczyk responded to Jeff Co Defendants, copying Stephens with his correspondence, and began his letter, "Hello: I am in receipt of your letter of demand.  I am currently awaiting direction from my client.  I will be sending you

2282717-v1

links to satisfy your request as soon as I can…" (**Exhibit 65**, October 17, 2019 Email from Nawojczyk to Defendants re Direction of Clients.) Based on this communication, Nawojczyk appeared poised to comply with the Subpoena and court order.

141.    However, Nawojczyk, after consulting with Sutter, quickly changed his tune. Correspondence from Nawojczyk to Defendants on October 18, 2019 at 4:01 p.m., stated, "I spoke to Mr. Sutter at 4 PM and he has instructed me to advise you that I am a consulting expert witness and will not be called to testify, therefore, as instructed, I am not responding to this order for documents. Thank you." (**Exhibit 66**, October 18, 2019, Email from Nawojczyk re not producing documents.)

142.    Then, just minutes later at 4:04 p.m., Sutter reinforced Nawojczyk's message and chimed in, "That is correct. Please refrain from communicating with my consultants directly, Ms. Henry." (**Exhibit 67**, October 18, 2019 Email from Sutter.) This all occurred after Nawojczyk had already been disclosed as an expert for Jeff Co Plaintiffs in discovery.

143.    At the direction of Jeff Co Attorneys, Nawojczyk repeatedly failed to comply with a subpoena and a Court Order[14]; however, he finally appeared for his deposition on February 7, 2020. There, he testified that both Sutter and Stephens not only tried to prevent him from testifying, but they also tried to keep him from producing his file per the Jeff Co Defendants' subpoena and the Court's order. *Supra.* (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 105-122.)

---

[14] Nawojczyk is a former coroner and no stranger to the judicial process or the importance of following the law, including complying with a subpoena and court order.

144.   Jeff Co Attorneys' efforts to keep Nawojczyk from testifying and hide his file contents did not stop at simply directing him to ignore subpoenas and court orders. They also included more proactive steps, like trying to sanitize Nawojczyk's file of documents that were harmful to the fabricated and unsupported allegations contained in their Complaints. Specifically, after the first time Jeff Co Plaintiffs' motion to quash was denied, Stephens set a meeting with Nawojczyk at Panera Bread in Little Rock. *Id.* at pp. 112-117. At that meeting, Stephens attempted to remove documents from Nawojczyk's file to keep Nawojczyk from producing documents to Jeff Co Defendants.[15] *Id.* Nawojczyk testified that he told Stephens he intended to comply with Jeff Co Defendants' subpoena and the Court's order. The meeting became "heated" according to Nawojczyk. *Id.*

145.   Jeff Co Attorneys also attempted to influence Nawojczyk's testimony and opinions. In correspondence, Nawojczyk informed Dr. Peretti that he agreed with Dr. Peretti's inconclusive findings in the autopsy report shortly after it was signed. (**Exhibit 68**, September 14, 2018 Email from Nawojczyk to Dr. Peretti re autopsy report, PERETTI - 000113.) He also confirmed that, like Dr. Peretti, gun powder residue and stippling would not be found during the autopsy because of the cleaning of the body, suturing of the wound, and the impact of three years of deterioration of the body. (**Exhibit 35**, September 15, 2018 Email where Nawojczyk concurs with Peretti's findings, PERETTI – 000110.) Nawojczyk

---

[15] At the time of this meeting, Stephens had allegedly withdrawn in the case and was no longer representing Jeff Co Plaintiffs. However, it is clear from the correspondence discovered and from his actions, Stephens was very much still involved in the case for Jeff Co Plaintiffs.

2282717-v1

confirmed his opinion to Stephens and Carlin by email correspondence.  (**Exhibit 33**, Email from Nawojczyk to Stephens re review of Peretti Autopsy Report 9/14/2018, PERETTI – 000109.)

146.    Not satisfied with Nawojczyk's opinion, Stephens also tried to get Nawojczyk to alter his anticipated testimony about the manner of death.  (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, 117–121.)  Stephens' actions of improperly attempting to influence witnesses and manufacture expert witness testimony, as well as the actions of other Jeff Co Attorneys in this matter, clearly show the Jeff Co Lawsuit was never about seeking the truth of what occurred in relation to the death of Luke, but was instead a charade fabricated for money.[16] Sutter summed up the motivations best when he declared to the Court and Jeff Co Defendants: "Because I can guarantee you, your honor, I'm not in this for - - for my health.  *I'm in it to make a check*."  (**Exhibit 69,** June 6, 2019 Hearing Transcript, at p. 28) (emphasis supplied).  Sutter wasn't the only attorney "in it for the money" as Kerry testified that he paid Stephens *over $100,000.00* over a period of four – five months beginning about August 2018.  (**Exhibit 53**, Deposition of Kerry Baker, June 26, 2019, pp. 552-554.)

---

[16] In pursuit of their motives, Jeff Co Plaintiffs have made misrepresentations to that Court [i.e. *See* Order June 26, 2019 sanctioning Stephens], about both the existence and concealment of an expert report [September 4, 2019 transcript of Sutter admitting Jeff Co Plaintiffs had Dr. Peretti's autopsy report dated September 14, 2018 and he made the decision to conceal it.  Jeff Co Plaintiffs and Jeff Co Attorneys sat idly by while representations were made to the Court by other counsel that there was no written report.  (**Exhibit 17**, February 21, 2019 hearing transcript.)  The discovery abuses have been chronicled in other Jeff Co Lawsuit filings, including in the October 17, 2019 Defendants' Joint Response to Plaintiff Gena Baker's Memorandum Motion to Compel, Motion for Protective Order and Motion for Sanctions.

## NOBLE OBSTRUCTION

147.   Jeff Co Attorneys efforts to sanitize files and hide documents that should have been produced in discovery were not restricted to Nawojczyk's file. At his Court ordered deposition on September 6, 2019, at the law offices of Wright, Lindsey & Jennings ("WLJ"), one of Jeff Co Plaintiffs' investigators, Michael Noble, arrived over an hour late. Present at the deposition were counsel for all Jeff Co Defendants, as were Gillham, Buchanan and Humphrey for Jeff Co Plaintiffs. As Jeff Co Defendants were searching and waiting for Michael Noble, Gillham left from the WLJ premises for a period of time. As it turns out, and per Michael Noble's deposition testimony, Gillham had slipped off the premises so he could meet with Michael Noble and sanitize the investigation file, all while Jeff Co Defendants and their counsel were upstairs in a conference room, waiting for Michael Noble's arrival. (**Exhibit 70**, Deposition of Michael Noble, September 6, 2019, pp. 40-42.) Michael Noble testified that while he and Gillham were off the WL&J premises, Gillham took the file around to the back of Michael Noble's truck to a spot where Michael Noble could not see what Gillham was removing from the file. *Id.* Michael Noble, of course, just let this happen and only mentioned it when specifically questioned about it during his deposition.

148.   Michael Noble was also questioned extensively in his deposition about his and his father Allen Noble's communications with Jeff Co Plaintiffs and Jeff Co Attorneys. He provided only one email address for himself and one for his father, Allen, which he claimed were the only email addresses they used for their

2282717-v1

communications about the Baker Family's cases. However, after receiving Dr.

Peretti's file, Jeff Co Defendants discovered that the Noble Defendants and

Plaintiffs' counsel were communicating using another email address. (**Exhibit 40,**

Email from Nawojczyk, PERETTI 00085 – 000087.) Michael Noble failed to produce

any documents that included this email address. When questioned about other

missing documents, Michael Noble repeatedly testified that his father Allen had the

subpoenaed documents and Michael Noble did not have access to them even though

they are partners in the same investigation business and both grown men.[17]

(**Exhibit 70**, Deposition of Michael Noble, September 6, 2019, p. 51.)

## ATTEMPTS TO INVOLVE DR. PERETTI IN OBSTRUCTION

149.   On December 10, 2018, Stephens directed Dr. Peretti not to respond to

Defendants' FOIA request served on Dr. Peretti's employer, the Arkansas State

Crime Lab, where by all accounts Jeff Co Plaintiffs espoused they had taken Luke

Baker's body for autopsy. (**Exhibit 71**, Stephens email to Peretti to not respond to

FOIA request 12/10/18, PERETTI - 000080.) Then on December 12, 2018, Stephens

misrepresented to Dr. Peretti Jeff Co Defendants' rights to issue FOIA requests to

the State Crime Lab and the obligations to respond. Stephens further lied to Dr.

Peretti by misrepresenting that, "the gun does not match is making [Jeff Co

---

[17] There is a substantial gap from February 21, 2019 – December 17, 2019 in the investigative records produced by Michael Noble. It is unclear if this gap reflects those records Gillham removed from Michael Noble's file or if they are the records that had not been produced because they were allegedly in the possession of Michael Noble's father, Allen. Either way, there is a glaring 10-month gap in records that no one has adequately explained. These are the same investigators who were involved in the Second Probate Case for Plaintiffs, who served the subpoenas in a harassing manner and who appeared armed at Karla Cook's deposition as previously outlined in more detail.

2282717-v1

Defendants] scared." *Id.* Dr. Peretti was directed by Stephens to tell Jeff Co

Defendants to contact Sutter and Humphrey about the case and to also copy them

on correspondence. (**Exhibit 72,** Email from Stephens to Peretti re Do Not Release

Info 12/12/18, PERETTI - 000077.)  When the Jeff Co Defendants finally received

Dr. Peretti's file, they discovered in it that Jeff Co Plaintiffs had possession of a

specific type of bullet Luke used in the gun that, up until the ridiculous allegations

in this lawsuit, everyone agreed was the gun used by Luke when he accidentally

shot himself.  Jeff Co Defendants further learned that photographs of the bullets

were sent by Stephens to Dr. Peretti on December 6, 2018. (**Exhibit 73,** December

6, 2018 Email from Stephens to Peretti re bullets, PERETTI – 000082.)  As it turns

out, these are very unique bullets; however, it was not until Kerry was finally

ordered to sit for a deposition that Jeff Co Defendants learned that Kerry had a

partial box of these bullets.  Defendants requested a bullet in discovery but Jeff Co

Plaintiffs and Jeff Co Attorneys stonewalled the production.  The existence of these

specific bullets destroys another of the wildly fabricated theories Jeff Co Plaintiffs

have advanced throughout the Jeff Co Lawsuit—the "drop gun" theory, which is

discussed below.  Jeff Co Plaintiffs' attempts to involve Dr. Peretti in obstructing

Jeff Co Defendants' discovery was just another attempt to hide evidence.

## CONCEALMENT AND EVOLUTION OF THEORIES REGARDING THE MANNER OF DEATH

150.   Jeff Co Plaintiffs and Jeff Co Attorneys knew when they filed the

Complaint and Amended Complaint that the evidence confirmed this was an

accidental self-inflicted gunshot wound to the head.

57

151.    Jeff Co Plaintiffs asserted a barrage of inconceivable theories, one of which involved a "drop gun" as they describe it. In the Amended Complaint, Jeff Co Plaintiffs allege that "Defendants removed the murder weapon and replaced it with Luke's gun." Amended Complaint, ¶ 9. "[Jeff Co] Plaintiffs have been unable to get the final crime lab report or the investigative files of authorities, but have learned that the gun defendants proffered as a suicide weapon did not fire the fatal bullet. This leaves as the only logical conclusion that Wilson threw the gun away after killing Luke." *Id.* at ¶ 23. Jeff Co Plaintiffs then summarize by alleging that Wilson "disposed of the homicide weapon to cover his crime, and it was replaced by Luke's revolver which was used as what is referred to as a drop gun." *Id.* at ¶ 3.

152.    Jeff Co Plaintiffs hid the information about the bullets from Jeff Co Defendants because the bullets reveal that this theory about a "drop gun" is a complete fabrication. The bullets found in Kerry's safe were (i) the same type of unique bullets accessed and taken by Luke to the lodge, and (ii) consistent with the bullet examined by the Arkansas State Crime Lab that came from the body of Luke, removed at the autopsy by Dr. Peretti. (**Exhibit 74**, Arkansas State Crime Lab Report, ADAMS 0240.) The evidence supports the fact that Luke used his own revolver when he accidently shot himself. This is simply another of Jeff Co Plaintiffs' outrageous and factually inapposite theories to wrongfully pursue Jeff Co Defendants, and their efforts to hide evidence from Jeff Co Defendants and the Court and to otherwise conspire and conceal their lies.

58

153. Likewise, the lies alleged in the Complaints by the Jeff Co Plaintiffs and Jeff Co Attorneys about the adults, including Bryan and Brandon engaging in a conspiracy to cover up a homicide, providing drugs to the four friends, and other unfounded allegations that were plead and pursued in Jeff Co Lawsuit were abusive, malicious, and designed for an ulterior purpose including to extort a settlement from the Adams Plaintiffs.

**CHANGES TO THE EVOLVING MANNER OF DEATH:
DEATH CERTIFICATE, FIRST SUPPLEMENTAL REPORT OF CAUSE
OF DEATH, THE ADDENDUM TO CASE FILE INCLUDING
SECOND SUPPLEMENTAL REPORT OF DEATH REPORT, AND
CONSPIRACY OF JEFF CO PLAINTIFFS AND JEFF CO ATTORNEYS
WITH CORONER KELLEY**

154. At the very top of the list of unbelievable impropriety in this case are the actions of Jeff Co Plaintiffs, Jeff Co Attorneys and Coroner Kelley, all of whom conspired together to hide and manipulate evidence so they could manufacture a "manner of death" that Kelley could incorporate into Luke's death certificate to support Jeff Co Plaintiffs' ridiculous and outrageous allegations of murder, drug dealing and conspiracy to coverup a murder.

155. To understand this part of the story, context is essential. First, it should be noted that Kelley was just a few blocks away from the JRMC, yet he never viewed Luke's body for the days it remained there following the death, nor did he ever discuss the manner and cause of death with the medical staff, officers or his own deputy coroner, all of whom _were_ present at the hospital the night of the accident. He discussed it with none of them. Not once. Not ever.

156.   Second, the initial Certificate of Death ("Death Certificate") dated October 24, 2015 reported the death of Luke by "GSW Head" meaning gunshot wound to the head. (**Exhibit 3**, Original Death Certificate.)  This manner and cause of death was reached by all who reviewed the scene of the accident and who were present at JRMC with Luke and all his friends, each of whom were separately interrogated there by officers.

157.   And then, on November 30, 2018, over three years after the accident, only one month after Jeff Co Plaintiffs' filed their first frivolous complaint, and completely out of the blue to Jeff Co Defendants, Coroner Kelley issued a Supplemental Report of Cause of Death ("First Supp. Death Report").  Again, he took this step without ever speaking to anyone actually involved in the investigation of Luke's death, including his own, well-respected Deputy Coroner Kim Phillips, who participated in the examination of the body the night of the accident. (**Exhibit 75**, Kelly First Supp. Death Report, 11/28/18.)  In Coroner Kelley's First Supp. Death Report the cause of death did not change, "Gunshot Wound to Head." *Id.*  However, Kelley omitted the description of how the injury occurred that was on the Death Certificate. *Id.*  He added that an autopsy had been performed but that the autopsy findings were not available, although he never contacted Dr. Peretti to request them even though they had been completed over two months earlier. *Id.*  "Investigation by Law Enforcement" was listed as the basis for issuing the First Supp. Death Report. *Id.* (**Exhibit 59**, Deposition of Kelly, March 5, 2020, pp. 213-216.)  Importantly, after zero investigation, Coroner Kelley

60

arbitrarily changed the "manner of death" from "Accident" to "Could not be determined." *Id.*

158.   The alleged basis for issuing the First Supp. Death Report disappeared on or about December 17, 2019, when the Sheriff closed his file a second time with no charges, but Kelley left his file open.  When questioned under oath why Kelley kept his file open after the Sheriff closed his, Kelley changed his story and testified that the basis to keep his file open was that Jeff Co Plaintiffs had filed a civil suit, and he wanted to wait for the outcome. *Id.* (**Exhibit 76**, Kelley file notes, ADAMS 1914-1915.)

159.   Inexplicably, on July 10, 2019, Kelley issued a second Supplemental Report of Cause of Death ("Second Supp. Death Report") to state the death was due to a "Non-Self-Inflicted Gunshot Wound to Head," which matched what Jeff Co Plaintiffs alleged in their Complaints. (**Exhibit 77**, Second Supp. Death Report, July 10, 2019.)  Coroner Kelley also included a new description of how the injury occurred: "Non-Self-Inflicted Gunshot Wound to Head – No Stippling / Muzzle Impression or Burn Mark Leads One to Believe Distant Wound and Not Self-Inflicted." *Id.* (emphasis supplied).  Coroner Kelley included within the Second Supp. Death Report another "new" document of the same date, July 10, 2019, which he titled "Addendum to Case File Regarding James Luke Baker" ("Addendum").  When the Addendum including the Second Supp. Death Report was first provided to Jeff Co Defendants on July 15, 2019, they were, needless to say, shocked.  Considering that the Sheriff had long since closed his file on the matter, Jeff Co

61

Plaintiffs' Amended Complaint remained pending and unresolved, and nothing factually had changed or been favorably discovered (because it did not exist) for Jeff Co Plaintiffs in the past four years, there was, *at that time*, no apparent explanation why Coroner Kelly would issue this Second Supp. Death Report.

160.   Since the issuance of the Addendum with Second Supp. Death Report, however, there have been two significant events uncovered during the course of Jeff Co Defendants' investigation and discovery in the Jeff Co Lawsuit that demonstrate why these changes were made—a desperate conspiracy by Jeff Co Plaintiffs, Coroner Kelley and Jeff Co Lawyers, and Coroner Kelley's desire for self-preservation.

161.   In Nawojczyk's testimony, he revealed a part of the conspiracy between Jeff Co Attorneys and Coroner Kelley that was designed to concoct "facts" that would lend support to Jeff Co Plaintiff's allegations in their Amended Complaint. Specifically, Nawojczyk testified that he attended a meeting with Jeff Co Attorneys and their experts at a private airport, Tac Air, in Little Rock on July 5, 2019. **(Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, p. 191, et seq.) As of the date of this meeting, Kelley's First Supp. Death Report stated the cause of death as a "Gunshot Wound to Head" and cited that the reason for the supplement as "Further Investigation by Law Enforcement" (which investigation had closed over six months earlier). Also, the Addendum related to the manner of death of Luke

62

Baker had not yet been issued.  Present at this airport meeting were Stephens,

Sutter, Humphrey, Buchanan, Dr. Peretti, Nawojczyk, and Dr. Kris Sperry.[18]

162.    Nawojczyk testified that at the airport meeting Stephens gave him

some "notes" about the aforementioned 81 photo images with handwriting across

the top that said, "Greg Stephens Notes Work Product" (the "Photo Notations").  *Id.*

Stephens asked Nawojczyk to e-mail the Photo Notations to those gathered at Tac

Air, and Nawojczyk took photographs of the Photo Notations and emailed the Photo

Notations to Sutter, Humphrey, and Buchanan during the meeting.  (*Id.* at pp. 206-

208; 212-213; **Exhibit 78,** July 6, 2019 emails from Nawojczyk attaching photos

with the notations "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652,

and 659.)

163.    These Photo Notations were a compilation of Stephens' notes (and

perhaps Jeff Co Plaintiffs' investigator Michael Noble's notes), reflecting **Stephens'**

elaborate and graphic description of **his** "interpretation" of what each photograph

reflected.  The Photo Notations identify each photograph by a corresponding jpeg

number.  *Id.*

164.    On July 10, 2019, five days after the airport meeting, Coroner Kelley

issued his Addendum on the cause of Luke's death, citing the new cause of death as

---

[18] According to media accounts, Dr. Sperry, Georgia's Chief Medical Examiner, resigned from office while he was on leave and under investigation for filing false timesheets claiming he was working for the State when he was actually giving private depositions and court testimony in private cases.  Dr. Sperry had reportedly been engaged in moonlighting in more than 500 private cases as a paid forensic expert, creating conflicts of interest and undermining his scientific and medical judgment.  *See* "'Embarrassed' Medical Examiner Abruptly Retires", The Atlanta Journal-Constitution, Sept. 23, 2016, Judd, Alan.

"non-self-inflicted gunshot wound to head." To support his findings on this new

cause/manner of death, Kelley attached a detailed description of what he claims

were "his Jefferson County Coroner" findings related to each of the 81 photographs,

which miraculously and inexplicably were virtually identical to the Photo Notations

Stephens had prepared and circulated to the participants at the Tac Air meeting to

Jeff Co Attorneys and other attendees a few days earlier. Notably, and as will be

shown below, Jeff Co Defendants' data expert found that a document titled "photo

notations" had been loaded onto the computer used by Coroner Kelley, eight months

earlier on November 5, 2018. However, the document was not saved and the

external thumb drive from which the photo notations were downloaded was never

produced by Kelley to the Jeff Co Court appointed data expert for download or

analysis. *See,* section 3.H., infra. This was a further concealment and spoliation of

evidence.

165.   Throughout the course of the Jeff Co Lawsuit, Coroner Kelley was

given several opportunities to "come clean" about the fact that the Photo Notations

relating to these 81 photographs that he claims he prepared in his role as Coroner

and which "support" the conclusions in his July 10, 2019, Addendum, were actually

created by Stephens. In each instance, Kelley chose not to tell the truth.

166.   On July 23, 2019, three days before Sutter's deposition of Kelley when

Jeff Co Defendants were retrieving FOIA documents from Kelley, Kelley told

Melody Piazza, Jeff Co Defendants' consultant, that he wrote his Addendum,

including "his" photo notations, in one sitting the night of July 9, 2019, after

2282717-v1

Stephens came to Kelley's personal residence with a copy of the September 14, 2018 Dr. Peretti autopsy report. (**Exhibit 79**, Piazza Affidavit ¶ 9.) Kelley also stated that he did not provide "his" photo notations to anyone before he wrote the Addendum which included the photo notations on the night of July 9, 2019. (**Exhibit 59**, Deposition of Coroner Kelly, March 5, 2020, pp. 230–233.) Once again, this portion of the Addendum that Kelley purported to Ms. Piazza was his creation is, for all intents and purposes, identical to the Photo Notations prepared by Stephens and passed around at the Tac Air meeting five days earlier on July 5, 2019. It is obvious that this portion of the Addendum was authored by Stephens and simply recreated by Kelley to include in his Addendum. At his deposition, Coroner Kelley admitted the photo notations show where someone attempted to "white out" the handwritten notation across the top that state, "Greg Stephens Notes Work Product". (**Exhibit 78**, July 6, 2019 emails from Nawojczyk to Plaintiffs' attorneys attaching photos with the notations "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652 and 659; **Exhibit 80**, Photo Notations; **Exhibit 59**, Kelley Deposition, March 5, 2020, pp. 143-144.)

167. Nawojczyk testified about two other facts directly linking Stephens to the Photo Notations in the Kelley Report. First, Nawojczyk testified that the Tac Air meeting was the third time he had seen the Photo Notations. (**Exhibit 31**, Deposition of Nawojczyk, February 7, 2020, pp. 189–204.) The first time he saw at least the first page of the Photo Notations was in a strange series of email correspondence dated June 11, 2019, when Stephens had claimed them as his work

product. *Id.* at 190. The second time he saw them was at a meeting in Stephens'

office on McKinley in Little Rock that occurred about June 26, 2019. *Id.* at pp. 203-

204. Those in attendance at that meeting were Nawojczyk, Stephens, two new

private investigators Stephens had hired, and an associate of Stephens. According

to Nawojczyk's sworn deposition testimony, Stephens presented the Photo

Notations to the group for them to read at that meeting. *Id.*

168.    The second point Nawojczyk made about the Photo Notations in the

Addendum was that the notations contained strange descriptions one would not

expect to see from a coroner, an elected government official. *Id.* at 204-205. For

instance, the notations refer to a sex tape between Luke and his girlfriend, and

"Kelley" surmises that perhaps sexual activities between those two might have

resulted in a possible bite mark reflected in one of the photos. *Id.* Photo Notation

for jpeg Image 2640 was, "Photograph of Luke's left hand has a mark on it, possible

tooth impression. Not sure if this what caused the injury or not. It is my

understanding that he and his girlfriend made a sex tape that morning. I would

look at the tape to see if it could be seen in it." *Id.* Nawojczyk not only pointed out

that this notation had nothing to do with the case or Luke's death, but he was

repulsed by its inclusion in the Addendum. He also recalled that the only time he

had ever heard any reference to any sex tape had been in a previous discussion with

Stephens. Nawojczyk remembered that Stephens had previously been discussing

the sex tape and testified:

> Q.    Is that a description of an image that you would expect to see from
> a Coroner?

66

A.    No. I would never expect to see stuff about the sex tape. I mean, that just – it was – it was irrelevant to me, and I didn't, 1 didn't ever look at it. Didn't care to look at it.

Q.    And is it your testimony that the only person in the entire investigative process who ever mentioned a sex tape to you was Greg Stephens?

A.    Yes.

Q.    Did you ever talk to Mr. Kelley about a sex tape?

A.    No ma'am. I never talked to anybody about it.

Q.    Other than Mr. Stephens?

A.    Right.

*Id.*

169.    Buchanan also referenced during a court proceeding in the Jeff Co Lawsuit something about sexually graphic photos that were on Luke's phone. **Exhibit** 42 September 4, 2019 Hearing transcript, pp. 128, 130. Kelley testified that Stephens and Michael Noble told Kelley there was a sex tape, which ties Michael Noble and Noble Investigation to the Photo Notations as well. **(Exhibit 59,** Deposition of Kelley, March 5, 2020, pp. 147-148.) So, without Stephens or his/Jeff Co Plaintiffs' investigator Michael Noble, Kelley would not be privy to the existence of any sex videos on Luke's phone.

170.    Despite Jeff Co Plaintiffs' various motions and tactics to try to stop it, in early 2020, Jeff Co Defendants finally got their opportunity to depose Kelley. When confronted with the question of how on July 5, 2019, Stephens could have Photo Notations identical to the photo notations that Kelley had previously informed Ms. Piazza were the product of his work and that he prepared on July 9, 2019, Kelley changed his story. Kelley then testified that he had not prepared his photo notations the night of July 9, 2019, but instead had prepared them nearly

67

four years earlier on or around the date of death, October 24 up to October 27, 2015, which was around the timeframe he claims he would have received the photographs from the Jeff Co Sheriff. (*Id.*, pp. 297-301.) This testimony cannot be true because these Photo Notations refer to the autopsy report prepared by Dr. Peretti—the same autopsy report that was prepared three years later in September of 2018. [19]

171.    Another discovery was made by the data expert regarding what is most likely the Photo Notations discussed above. In reviewing the information recovered from the devices Kelley produced pursuant to a Jeff Co Court Order, the expert uncovered a file named "James Luke Baker JRMC ER Photograph Notations". *Infra*. The details of this file show that it was first accessed by Kelley on his computer from an external USB device on November 5, 2018. Kelley did not save this file to his computer. *See infra.*, Sect. H for more details.

172.    In hindsight, another series of events lend further support that Kelley did not prepare the Photo Notations and further, that Jeff Co Plaintiffs knew Kelley was about to produce the Addendum and Second Supp. Death Report with the Photo Notations prominently displayed. It is clear Sutter was planning the premier

---

[19] In addition to Stephens' hand-written notation on the top of two pages of these Photo Notations, Stephens also claimed these to be his notes and work product in a series of bizarre email correspondence with Nawojczyk and Michael Noble. On June 11, 2019, at 11:57 a.m., Stephens emailed these three persons with the Photo Notations document demanding to know "...ASAP where this report came from and whose it is ASAP." Responses were sent by Dr. Peretti and Nawojczyk that these were not their photo notations. Strangely, no response can be seen from Michael Noble, leaving the question of whether he assisted with the preparation of the Photo Notations. Shortly thereafter, at 12:42 a.m., Stephens replied and stated, "Then it must be mine so consider it work product from me for your review and consideration." (**Exhibit 81,** June 11, 2019 email from Stephens to Peretti, Nawojczyk and Noble, PERETTI 000064)

release of the Photo Notations, as shown by a series of Sutter-driven deposition notices issued in this case. On July 8, 2019, just three days after Sutter received the Photo Notations at the Tac Air meeting, he messaged the Jeff Co Defendants curiously withdrawing his previously adamant demand to take the deposition of Skylar on July 26, 2019. Sutter also declared that he was going to take a non-party deposition on that date, but mysteriously did not disclose the identity of the witness. **(Exhibit 82,** July 8, 2019 Email from Sutter re taking a deposition on July 26.) Stephens visited Kelley at his personal residence on July 9, 2019, and both the Addendum and Second Supp. Death Report were notarized the following day, July 10, 2019. The Addendum with Second Supp. Death Report was provided to Defendants on July 15, 2019, and the very next day, July 16, 2019, Sutter emailed a notice of his non-party deposition for Kelley on July 26. **(Exhibit 83,** July 16, 2019 Email from Sutter re Kelley notice of deposition.) So even before Coroner Kelley released the Addendum with Photo Notations and Second Supp. Death Report in which he claimed the Photo Notations as his own, Sutter had knowledge of their actual origin via the Tac Air meeting and distribution. Clearly, Jeff Co Plaintiffs already knew the bombshell Coroner Kelley was about to drop on Jeff Co Defendants by changing the death certificate and then claiming the Photo Notations as his own "Addendum" to the death certificate during Sutter's deposition of Kelley.

173. Astonishingly, during Sutter's incredibly strange deposition of Kelley, and even though Sutter was at the Tac Air meeting and had received the Photo Notations before the date Kelley claimed under oath he prepared them, Sutter

elicited six hours of extensive testimony of Kelley, during which time Sutter repeatedly elicited testimony from Kelley that he, Coroner Kelley, had prepared the Photo Notations. Every single lawyer sitting on Jeff Co Plaintiffs' side of the table had received the Photo Notations at Tac Air and should have known that Sutter was eliciting perjured testimony from Kelley, but never said a word. (**Exhibit 84**, Deposition of Kelley, July 26, 2019 with DVD, pp. 1–3, noting attorney appearances and DVD of videotaped deposition of Coroner Chad Kelley by L. Sutter)[20].

174.   When Jeff Co Defendants finally got an opportunity to depose Kelley on March 5, 2020, he was asked about the conclusions in his Addendum and in the Second Supp. Death Report that there was "no stippling" on the body of Luke and that death was from a "non-self-inflicted gunshot wound." (**Exhibit 77**, July 10, 2019 Kelley Second Supp. Death Report.)  When confronted with the stippling photograph of Luke's face and wound entrance over seven months after Sutter's deposition of him when he testified there absolutely was no stippling, Kelley conceded that there was in fact stippling on Luke's face. (**Exhibit 59,** Deposition of Kelly, March 5, 2020, pp. 307-308.)  Kelley testified that it was "a mistake on my part" to state that there was "no stippling" in the Addendum and on the Second Supp. Death Report, the latter of which was filed with the Arkansas Department of Health.

> Q.    Okay. You see stippling there. Why is that slight?  I see lots and lots of dots in the top picture.  Isn't that stippling, each little red spot?
> A.    Because it's more spread out in the bottom, is my opinion.

---

[20] The DVD of the complete video deposition contained in **Exhibit 84** will be requested to be filed under seal.

2282717-v1

Q.    Okay. But, but both photos show stippling. The red spots
or marks around the entrance wound; true?
A.    Uh-huh.
Q.    Yes?
A.    Yes.
Q.    All right. And so you would agree that is stippling in
Exhibit 26; right?
A.    (Witness nods head.)
Q.    Yes?
A.    Yes.

\*\*\*\*\*

Q.    Okay. So let me hand you 27. And acknowledging that not
all stippling looks the same, you see this photograph of Luke
Baker; right? You've seen this picture before?
A.    Yes.
Q.    All right. And you see the little arrow on there?
A.    Yes.
Q.    And it points to the gunshot wound which is in the hair;
correct?
A.    Yes.
Q.    And around the part that's not in the hair, do you see
stippling, Mr. Kelley, honestly?
A.    Slight.
Q.    Okay. So you do see slight stippling?
A.    Yes.
Q.    Okay. So why on the report that you filed with the Health
Department in the State of Arkansas do you say, your
Supplemental Report of Cause of Death July 10th, 2019, do you
say "No stippling"?
A.    A mistake on my part.
Q.    A big mistake; isn't it? It's a big mistake?
A.    Yes.

*Id.* at pp. 306-307.

175.    Despite the references to them in the Addendum, and despite having

the autopsy images on his laptop as will be shown below, Kelley , brazenly and

incredibly, testified that he did not have these photographs. *Id.* at. p. 152. Kelley

could offer no logical explanation as to how information about these photos could be

71

included in "his" Addendum if, as he testified under oath, he had no access to the photographs about which he was expressing an opinion. *Id.* There was no logical explanation for the inconsistencies in Kelley's testimony.

176.   When Kelley was deposed by Jeff Co Defendants and ultimately faced with the impossible testimony about his Addendum with Photo Notations he claimed he wrote but which could not possibly be true, Kelley acknowledged that he could not explain the irregularities in the Addendum. *Id.* at pp. 307-309.

177.   These references in Kelley's Addendum further demonstrate that Kelley's testimony that (a) he was never provided any photographs from the exhumation of Luke's body; and (b) he had never seen any photographs from the autopsy of Dr. Peretti, was deliberately false testimony, designed to bolster Jeff Co Plaintiffs' evolving case theories. (**Exhibit 77**, July 10, 2019 Kelley Second Supp. Death Report.)

178.   A review of the July 10, 2019 Addendum issued by Kelley expressly refers to autopsy photographs from the September 7, 2018 exhumation that Kelley testified he did not attend and photos he testified he had not seen.  For example, on page 5 of 15 in the Addendum, it reads "See exhumation photograph 2018-09-07 15-58-57." *Id.*

179.   Another set of facts also lends further support that Kelley did not prepare the Photo Notations.  In the Photo Notations, there are comments made about all 81 photographs known to exist, each identified by a jpeg number. (**Exhibit 52**, 81 jpeg photographs.)  Two comments in the Photo Notations identify

72

2 distorted photos by jpeg numbers (2672 and 2674), and one comment identifies

one photo by jpeg number (2675) where the image was unsupported and would not

open.  Kerry's CD contains 81 photographs identified by the same jpeg numbers

(2672 and 2674), which are both distorted, and one photo would not open (2675),

specifically matching the Photo Notations.  **(Exhibit 77,** July 10, 2019 Kelley

Second Supp. Death Report.)  The Jeff Co Sheriff's file received by Jeff Co

Defendants in December 2018 (three years after Kelley allegedly received his

photos), however, contains only 77 paper photographs, none of which are distorted,

and the image that would not open in Kerry's CD (photo of the money from Luke's

pocket) is present in the Sheriff's paper file.  **(Exhibit 54,** Grainy/blurry 77 paper

photographs Jeff Co Defendants received from Sheriff, ADAMS 0058 – 0077.)  So

clearly the Photo Notations were prepared from Kerry's CD provided to at least

Stephens, Buchanan and the Nobles, and could not possibly have been prepared

from the Sheriff's file.

180.    Under oath, Kelley also testified that he was going to amend the cause

of death in the Second Supp. Death Report to remove the language that it was a

"non-self-inflicted gunshot wound" because that was "incorrect."

> Q.    Well, then why did you put "Leads one to believe distant wound"
> on the report with the Supplemental Report of Cause of Death
> filed with the Arkansas Department of Health?
>
> A.    I just didn't think it was -- again, okay, it was a mistake on my
> part.
>
> Q.    Yeah, it was a mistake that we -- it was a mistake that was helpful
> to the Bakers in their lawsuit against all of these Defendants,
> even though there was no evidence for it; true?  And that's the
> long and short of it.

A.    If you say it is. I mean, I don't have anything against these people. I don't even know them. I mean, what would I have to gain from this lawsuit?

Q.    Well, what would you have to gain from, from just not leaving things just as they were?

A.    I can go back and amend it.

Q.    Okay. Have you thought about doing that today?

A.    I can do it.

Q.    I mean, the Supplemental Report of Cause of Death as we agreed should say gunshot wound to the head, cause of death; correct?

A.    Uh-huh.

Q.    Yes? Yes?

A.    Yes.

Q.    And you should remove "non-self-inflicted" because that's speculation; correct?

A.    Correct.

Q.    And then all of this stuff, describe how injury occurred, down at the bottom, that should be removed; shouldn't it?

A.    Okay.

Q.    Do you agree with that?

A.    Yes.

Q.    Okay. Are you going to do that? Are you going to go amend the Report of Cause of Death one more time?

A.    Yes.

**Exhibit 59,** Deposition of Kelley, March 5, 2020, at pp. 307-309.

181.    Over a year later, Coroner Kelley has still not amended the Second

Supp. Death Report. The same outrageous allegations against the Adams Plaintiffs

continue to float around, and Coroner Kelley's changing of death in public

documents has fueled those blatant lies.

182.    In public records, Defendants discovered allegations and facts that

form the basis of a complaint which may explain why Kelley would be motivated to

engage in this conduct with Plaintiffs.[21] (**Exhibit 85,** *Westbrook vs Kelley*

---

[21] **Exhibit 85** consists of a Docket Sheet, Complaint, Notice of Deposition of Kelley, and Order of Dismissal in *Westbrook vs. Kelley*, Jeff. Co. Cir. Ct. Case no. 35CV-14-541-2, filed November 10, 2014.

2282717-v1

pleadings.) In 2014, Kelley was sued by a former deputy coroner David Westbrook ("Westbrook") for sexual harassment. *Id.* Kelley was represented by a county attorney, and Westbrook was represented by Sutter. *Id.* After the case sat dormant for five years, on April 4, 2019, Sutter served a notice of deposition to depose Kelley in the *Westbrook* case. *Id.* However, the deposition was never taken because Sutter encouraged Westbrook to settle with Kelley for what Westbrook alleged (in a separate case) was a pittance of the damages Sutter had represented to Westbrook he could expect to receive from Westbrook's lawsuit against Kelley.[22] (**Exhibit 86,** Westbrook Counterclaim and Order in 63CV-19-1060.) This settlement prevented Westbrook's harassment case against Kelley from going to trial, and Kelley avoided the embarrassment and humiliation of the graphic and public disclosure of the allegations of sexual advances asserted by Westbrook. (**Exhibit 85,** *Westbrook vs Kelley* pleadings.) An order dismissing Westbrook's case against Kelley was filed on May 13, 2019, and became a final order on June 12, 2019. *Id.* Kelley was now poised to assist Jeff Co Plaintiffs and Jeff Co Attorneys and become the star witness for them. Indeed, just one month later, on July 10, 2019, Kelley in fact issued the Second Supp. Death Report identifying "non-self-inflicted gunshot wound" as the new cause of death, presumably "giving legs" to allegations of the Amended Complaint against Jeff Co Defendants. (**Exhibit 15,** Amended Complaint.)

---

[22] **Exhibit 86** consists of Westbrook's Amended Counterclaim against Sutter and Gillham PLLC and Third Party Complaint against Sutter and Gillham for Breach of Fiduciary Duties, Breach of Contract, Fraud, Unjust Enrichment and Piercing the Veil filed February 18, 2020, and Order of Dismissal, in *Sutter & Gillham PLLC vs. David Westbrook,* Saline Co. Cir. Ct., 63 CV 19-1060.

2282717-v1

183.    In his amended counterclaim/third party complaint that Westbrook

filed against Sutter and Gillham PLLC, Sutter and Gillham, Westbrook alleged he

had no idea when he settled his case against Kelley upon Sutter's urging, that

Kelley was going to become the lynchpin of Sutter's case against Defendants here.

(**Exhibit 86**, Westbrook Counterclaim and Order in 63CV-19-1060.)  Although an

order was entered dismissing Westbrook's malpractice counterclaim/third party

complaint against Sutter, Gillham and their firm, (*Id.*) the allegations raised by

Westbrook suggest why Coroner Kelley would take the following actions, all of

which were so beneficial to Jeff Co Plaintiffs and Jeff Co Attorneys:

- Knowingly giving perjured testimony about the origin of the Photo Notations included in the Addendum in furtherance of Jeff Co Plaintiffs' allegations
- Admitting in sworn testimony that the death certificate should be changed but, one year later, still failing to do so
- Knowingly giving perjured testimony about minimum contact with Jeff Co Lawyers and Jeff Co Plaintiffs' investigators when he spent over 105 hours talking to them, and exchanged 154 text messages with investigator Michael Noble for the time periods for which records were produced; See footnote 17 for record gaps
- Falsely amending public records to attempt to turn a self-inflicted accidental shooting into a homicide for the benefit of monetary gain for private parties in a civil lawsuit, without regard for the destruction of lives of young men and their families
- Knowingly creating a Second Supp. Death Report with false factual statements and opinions unsupported by any case facts, but which were favorable to Jeff Co Plaintiffs' Lawsuit
- Knowingly "creating" (or adopting) a bizarre and factually unsupported Addendum favorable to Jeff Co Plaintiffs' Lawsuit using the work product of Stephens or others associated with Jeff Co Plaintiffs
- Finally admitting that the photographs he had in his possession before he changed the original Death Certificate revealed stippling yet, preparing the First and Second Supp. Death Reports and an Addendum declaring there was no stippling and the gunshot wound was distant

- Intentionally failing to comply with numerous FOIA requests from Jeff Co Defendants by withholding part of the County Coroner file including exonerating stippling photographs that destroyed Jeff Co Plaintiffs' false claims
- Deleting files and text messages related to this case *after* Jeff Co Defendants served preservation letters on Coroner Kelley
- Withholding electronically stored information on devices used in the Coroner's duties from the Court appointed data expert, Avansic, *See infra.*

## THE DATA ANALYSIS OF CORONER'S DEVICES SUPPORTS THE CIVIL CONSPIRACY AND INTENTIONAL TORTS

184.    On October 16, 2019, Jeff Co Court appointed Avansic Inc. ("Avansic") as an IT expert to download the electronic devices of Kelley used in the county business of the coroner. On August 10, 2020, Jeff Co Court enter an order authorizing Avansic to produce the collected data to the parties.

185.    Jeff Co Defendants engaged a forensic IT consultant, Downstreem, to review the data collected from the devices produced by Kelley to Avansic. The data collected by Avansic was transferred by it to Downstreem for examination and analysis. After careful and thorough review, Downstreem prepared a Declaration of its findings. (**Exhibit 87**, Downstreem Declaration.) Kelley failed to produce all of the data to Avansic, and it is clear that he erased data from the devices used for County Coroner business.

186.    A summary of the analysis of Downstreem reveals the following:

- Downstreem was unable to examine the files outlined in its Declaration related to Luke because those files were absent from the coroner devices provided to and imaged by Avansic. In fact, there were no files (word documents, PDFs, etc.) related to Luke that were located on any of the devices Kelley provided to Avansic.

77

- Kelley utilized several USB devices to create, review and edit files related to Luke because the computer file system logs revealed dozens of interactions with files relating to Luke.

- Although Kelley was able to create, review and edit files related to Luke from the USB devices listed in Section 13 of the Declaration, Downstream was not able to examine the same USB devices or their contents because these devices were not produced by Kelley for forensic examination and analysis.

- A file with the name of "James Luke Baker JRMC ER Photograph Notations" has a "date created" of November 5, 2018. This does not mean that the file contents were originally created on Kelley's computer. Rather, the "date created" represents the date this file was first accessed on Kelley's computer from a USB device—November 5, 2018. Kelley did not save this file to his computer. A file with the same name was accessed on Kelley's computer from a USB device on July 10, 2019. Kelley did not save this file to his computer either. Because the file was never saved to Kelley's computer, Downstream was not able to examine and analyze the contents of this file.

- Although testimony by the pertinent individuals has been inconclusive on the date, they agree a meeting occurred between Kelley, Michael Noble (Jeff Co Plaintiffs' investigator), and Stephens sometime on or close to November 5, 2018. Moreover, based on an analysis of the cell phone records from Verizon for Kelley's cell phone, several calls were made around November 5, 2018, between (i) Michael Noble and Kelley, and (ii) Stephens and Kelley. Kelley last opened this file from a USB device on July 10, 2019 at 4:18:07 PM (CST). Upon information and belief, these notations were what eventually became part of the Second Supp. Death Report, (sometimes referred to as the "Chad Kelley Report") issued on July 10, 2019, and containing the Photo Notations.

- Based on the analysis of the Verizon phone records of Kelley for an Apple iPhone XS Max device, at least 150 text messages were exchanged between Michael Noble and Kelley. All of these text messages were deleted from the device prior to Kelley producing the device per the Court order. Many of these deleted messages were after Kelley was served with the FOIA requests and preservation letters of Jeff Co Defendants.

- The illegal autopsy of Luke occurred on September 7, 2018.

78

- Kelley testified that he waited until July 10, 2019 to issue his Addendum changing the death certificate because he was waiting to receive the September 7, 2018 autopsy photographs. (**Exhibit 59**, Deposition of Kelly, March 5, 2020, pp. 292-293.) However, a file with the name "2018-09-07 15-39-00.jpeg" was accessed from an external device, such as a USB device, connected to Kelley's computer at "F:\Luke Baker Photographs 01\Autopsy\" on November 4, 2018 at 7:31 a.m. (CST). Downstreem was not able to examine or analyze this USB/external device or its contents because it was not produced by Kelley as ordered by the Court.

- Analysis also revealed an additional 10 photographs stored on the same USB device that were opened on Kelley's computer, starting on November 4, 2018, at 7:31 a.m. (CST). These photographs were located in the following subfolders under "Luke Baker Photographs 01": (1) Autopsy; (2) Prairie Wings; and (3) JRMC-ER. Again, Downstreem was not able to examine or analyze this USB/external device or its contents because it was not produced by Kelley as ordered by the Court.

187.  The Jeff Co Court also entered an order on October 16, 2019, requiring Kelley's phone provider, Verizon, to identify, protect, and preserve everything responsive to the subpoena duces tecum issued and served by Jeff Co Defendants on Verizon. An order was entered on October 27, 2020 directing Verizon to turn over the phone records. Verizon produced the phone records, which have been summarized. (**Exhibit 88**, Summary of Verizon phone records of Kelley.)

188.  The Verizon records reveal just how involved Kelley was with Jeff Co Plaintiffs, apparently conspiring with them to bolster their claims against Jeff Co Defendants. The contacts were voluminous and inconsistent with the testimony and claims of Jeff Co Plaintiffs that Kelley, as the elected Jefferson County Coroner, was acting independently in this case. For example:

2282717-v1

- September 25, 2018 and October 23, 2020[23] - Kelley and Michael Noble exchanged approximately 175 telephone calls[24] totaling approximately 2803.07 minutes or 46.72 hours

- December 17, 2019 and October 1, 2020 - Kelley and Michael Noble exchanged approximately 154 text messages

- November 9, 2018 and October 29, 2020 - Kelley and Stephens exchanged approximately 511 telephone calls totaling approximately 3487.38 minutes or to 58.13 hours[25]

- January 23, 2019 and July 26, 2019 - Kelley and Kerry exchanged approximately 7 telephone calls totaling approximately 406 minutes or 6.77 hours

- February 21, 2019 - day of critical Jefferson County hearing before Judge Guynn on Defendants' Motion to Dismiss and the Motion for Stay on the Emergency Sealing of case

  - o 2/20/2019 - 3 calls from Michael Noble to Kelley totaling approximately 38 minutes

  - o 2/21/2019 - 3 calls from Michael Noble to Kelley totaling approximately 50 minutes

  - o 2/20/2019 - 5 calls exchanged between Kelley and Stephens totaling approximately 16 minutes

  - o 2/21/2019 - 3 calls exchanged between Kelley and Stephens totaling approximately 16 minutes

---

[23] There is an unexplained gap in the phone records of Kelley produced by Verizon. From the date of the accident, October 24, 2015 through March 21, 2016, no records were produced although the subpoena covered this gap. Therefore, the number of calls and time reflected in the analysis of the Verizon documents are likely far less than actual number of calls and time because of this missing data.

[24] Kelley testified that he had minimal contact with Michael Noble, which was a lie. (Exhibit 88, Summary of Verizon phone records of Kelley.) Kelley's files show no notes of any calls with Michael Noble. Interestingly, Kelley meticulously documented in his file the very few calls of one of Defendants' attorneys who was trying to make contact with Kelley to produce the files per the various FOIA requests. (Exhibit 76, Kelley file notes, ADAMS 1914-1915.)

[25] Kelley testified that he had minimal contact with Stephens, which was a lie. (Exhibit 59, Deposition of Kelly, March 5, 2020, pp. 234-235.)

2282717-v1

- July 6, 2019 - Tac Air meeting arranged by Sutter and Stephens on June 21/22, 2019 (**Exhibit 89**, Email re TAC Air meeting June 21, 2019, PERETTI – 000072) for Stephens, Sutter, Gillham, Humphrey, Buchanan, Nawojczyk, Dr. Peretti & Dr. Sperry to meet; the Photo Notations bearing the hand-written notations of author Stephens claiming the Photo Notations as his "work product" were given by Stephens to Nawojczyk who was asked to and did circulate them to Sutter, Humphrey, and Buchanan (**Exhibit 78**, July 6, 2019 emails from Nawojczyk attaching photos with the notations "Greg Stephens Notes Work Product," NAWOJCZYK 645, 652 and 659.) On June 28, 2019, Sutter also confirmed he had secured the location for the Tac Air meeting by email to stiffdoc@bellsouth.net, Dr. Peretti, Stephens, Humphrey, Gillham and Ehodge@sglaws.com. (**Exhibit 89**, Email re TAC Air meeting June 21, 2019, PERETTI – 000072.)

  - 7/2/2019 - 1 call between Stephens & Kelley
  - 7/3/2019 - 2 calls between Stephens & Kelley
  - 7/4/2019 - 3 calls between Stephens & Kelley
  - 7/6/2019 - 3 calls between Stephens & Kelley
  - 7/7/2019 - 3 calls between Stephens & Kelley
  - 7/8/2019 - 1 call between Stephens & Kelley

- July 9, 2019 - the night Stephens went to Kelley's house and allegedly took Dr. Peretti's autopsy report; also, the date Kelley told Melody Piazza that he prepared the Addendum throughout that night

  - 7/9/2019 - 0 calls between Stephens & Kelley

- July 10, 2019 - 15 page Addendum executed by Kelley and notarized; date Second Supp. Death Report executed by Kelley and notarized; and on
- July 15, 2019 - Kelley faxed Addendum to Defendants' counsel.

  - 7/8-10/2019 - 15 calls between Kelley and Stephens around the time of preparation and issuance of the Addendum including Photo Notations

  - 7/11-15/2019 - 8 calls between Kelley and Stephens after the Addendum was issued and then faxed to defense counsel on July 15, 2019 shortly before 9:00 p.m.

  - 7/15/2019 - 2 calls between Kelley and Stephens after the Addendum was faxed to defense counsel that exact night

    o    <u>7/15/2019</u> - 2 calls between Kelley and Kerry totaling 59 minutes after the Addendum was faxed to defense counsel shortly before 9:00 p.m.

- <u>July 26, 2019</u> - Kelley deposition taken only by Jeff Co Plaintiffs' attorney Sutter (Kelley developed a back ache, abruptly ending the deposition after Sutter finished his examination, and no one else was allowed to depose Kelley; took from then to March 5, 2020, for Jeff Co Defendants to get Kelley back under oath for deposition despite repeated efforts); Sutter and Kelley displayed each of the 81 photos and Kelley "read" the Photo Notations about each image. Kelley often stumbled in reading some of the words which made it appear obvious he had not prepared them. Although Sutter, Humphrey, Sutter's son, Jacob Sutter, Sutter's investigator/bug sweeper David Singer, and Buchanan were present, not one single attorney, representative or investigator of Jeff Co Plaintiffs ever disclosed that these Photo Notations about which Kelley was testifying under oath were the work product of Stephens and that each attorney had been previously provided a full copy of them at Tac Air. **Exhibit 84**, Deposition of Kelley, July 26, 2019 with DVD by Sutter.

      o    <u>7/26/2019</u> - 4 calls from Kelley to Stephens at 7:23 am, 8:15 am, 8:29 am, and 3:32 pm totaling approximately 49 minutes of talk time

      o    <u>7/26/2019</u> - 2 calls exchanged between Kelley and Stephens after the deposition was concluded totaling approximately 11 minutes of talk time and 1 call from Kelley to Stephens on July 27, 2019 for 29 minutes of talk time

      o    <u>7/26/2019</u> - 1 call from Kelley to Kerry on July 26, 2019 at 10:30 p.m. totaling approximately **255 minutes or 4.25 hours of talk time**

- <u>September 4, 2019</u> - Jefferson County Hearing on gathering the data from all of Kelley's electronic devices and various motions related to discovery, motions to quash depositions subpoenas of Dr. Peretti, Nawojczyk, Michael Noble and Deputy Coroner Kim Phillips, motion for protective order related to Gena's mental health history, and motion to quash subpoena to AT&T for Jordan Case's records

      o    <u>9/4/2019</u> - 5 calls exchanged between Kelley and Stephens, including during the lunch recess; Stephens was not in

attendance at this hearing as he had allegedly withdrawn from
representing Plaintiffs on July 26, 2019

- Of the approximately 848 total calls and text messages exchanged
  between Kelley with Michael Noble, Stephens or Kerry, approximately
  411 occurred after regular business hours of 8:00 a.m. – 5:30 p.m.

## OBSTRUCTION IN JEFFERSON COUNTY CIRCUIT COURT

189.   In Jefferson County, the Court recognized and expressed its

displeasure with the actions of Jeff Co Plaintiffs and some of their counsel,

including Stephens lying to the Court regarding Kerry's medical condition and

physical capabilities and Sutter's threatening and attempt to intimidate Jeff Co

Defendants' counsel Judy Henry following a Court hearing.  Each time the Court

chastised Jeff Co Plaintiffs:

THE COURT: How do you know what was going on with him
[Kerry Baker]?

MR. STEPHENS: Well, I am a medical doctor, and so I know -- I
-- what, I was seeing, but I did not want to diagnose him. And so I
wanted him to go to his doctor and have his doctor diagnose him. I did
talk to the doctor, and he said, Yes, he's under stress; I've already seen
him before; I've talked to him; I know he's under stress. And then I
described what he was going to be facing over the next week, and I asked
him what I should do with regard to his health care, which is what I
think I should have done.

THE COURT: Mr. Stephens, I -- I understand you're a doctor. I'm
not a wrestler either, but I'm trying not to jump off this top rope on you.
I – I just –

*****

THE COURT: … But -- but out of all this that's been going on, I
-- I think you're lying to me. I go out of my way to make sure everybody
has a fair -- fair trial  …  You know, just -- but for a man to be driving
around all day and -- and having -- say he had shingles and can't be
around pregnant women, and now, all of a sudden, y'all come here and

83

change your story. And I don't appreciate that, and I could have been doing something else today. And it just – it don't feel right and it don't look right. And, quite frankly, it's unprofessional and you don't treat people like that … But what's going on here, it's not right.

And -- and Mr. Sutter know, when somebody is trying to take advantage of somebody else, I'm going to come off the top rope and it ain't going to be good. As a matter of fact, somebody was doing him wrong, and I -- I got at them. And so -- and I told you that when I first met you.

**Exhibit 69**, June 6, 2019 Hearing Transcript, pp. 78-81.

190.    In another instance, the Court had to warn Sutter for inappropriate conduct of trying to intimidate Defendants by getting up in the face of their counsel in the courtroom and speaking inappropriately to her:

THE COURT:  …  Now, I got -- Mr. Sutter, I got one thing that doesn't have anything -- at the last hearing, before I left the bench, I told y'all to be civil and to get along. And I walked out the door. And Jerrie, my trial court assistant, said you came up to Ms. Henry and you pointed your finger in her face, you said something to her.

Now, she didn't hear everything that was said, but she did tell me she thought it was inappropriate. So if she could have told me what all was said and confirmed it and –

MR. SUTTER: You want me to tell you?

THE COURT: And my court reporter told me too. Told me something as well.    But --

MR. SUTTER: I'll be glad to tell you.

THE COURT: What did you say then? What -- no. I don't need to know. But if it was inappropriate, you might not want to tell me. Okay.

MR. SUTTER: All I'm saying is -- okay.

THE COURT: Just listen to me. I – they couldn't confirm what was said. But they just said it felt like you was trying to intimidate her.

MR. SUTTER: Was not.

THE COURT: All Right. But these -- my court reporter and from TCA, they don't have anything to do with this. But I just want you to know, I don't appreciate that if that was your intent. All Right.

MR SUTTER: No. My intent -- I said basically the same –

84

THE COURT: I'm just -- I'm not -- I'm just -- just leave it alone. What I'm telling you how I -- we're professionals. It's the second time I've done told you that. If you're going to pick on somebody, find one of these big guys around her to pick on. If that was -- if that happened. But I wasn't in there. I was out here. So I'm just telling you what they told me. All Right. And I'm done with it. All Right.

**Exhibit 42,** Sept. 4, 2019 Hearing Tr., pp. 193 - 195

191.    The defense efforts of Jeff Co Defendants were further obstructed by Jeff Co Plaintiffs and Jeff Co Attorneys, particularly during the deposition of primary plaintiff, Kerry. In addition to attempting to prevent Kerry's deposition entirely, after he was ordered to appear for his deposition, all of the Jeff Co Attorneys continually interrupted the examination, inserting objections, and directing Kerry not to answer, collectively over 1,150 times.

192.    Importantly, Kerry, a key witness and lead plaintiff for Jeff Co Plaintiffs, refused to disclose any facts or proof to substantiate any of the primary allegations in the Amended Complaint as to the Adams Defendants. **Exhibit 53**, Deposition of Kerry Baker, July 1, 2019, pp. 808-809, 811-818, 821-828, 833-836,886, 976 (all objections omitted).

193.    The Jefferson County Lawsuit is still pending although Jeff Co Defendants' motion to dismiss with prejudice is pending. The Jeff Co Plaintiffs have asked to dismiss the Amended Complaint without prejudice, and Jeff Co Defendants are requesting it be dismissed with prejudice.

## COUNT I – ABUSE OF PROCESS

194.    Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing.

195.    The tort of abuse of process is alleged against the Abuse of Process Defendants.

196.    Some of the Abuse of Process Defendants were parties and counsel of record in the Jeff Co Lawsuit and others were participants in using and abusing judicial processes as more specifically set forth above.

197.    Filing the Second Probate Case while the First Probate Case was opened was an abuse of process and designed to conceal that the Baker Family had already filed and settled their claims for Luke's death on the basis that it was an accident, not a murder.

198.    The Second Probate Case, including the filing and prosecution of the motion for sanctions, was willfully initiated and directed towards the Adams Plaintiffs by at least Stephens, Kerry and the Estate for improper reasons.

199.    As evidenced by the Faulkner County Circuit Court's findings in Order 2, Stephens abused the discovery process by willfully issuing notices of depositions to the Adams Plaintiffs and their telephone providers in the Second Probate Case for the ulterior purpose of obtaining leverage in the Jefferson County Lawsuit, which was designed to benefit some or all of the other Abuse of Process Defendants.

200.    Further, as evidenced by the Court's findings in Order 2, Stephens, Kerry and the Estate improperly and willfully filed and attempted to prosecute the Motion for Sanctions for the ulterior purpose of obtaining leverage against Adams Plaintiffs in the Jefferson County Lawsuit, which was designed to benefit some or all of the Abuse of Process Defendants.

2282717-v1

201.    The judicial processes in the Second Probate Case were used to extort or coerce Adams Plaintiffs and obtain leverage over Adams Plaintiffs in the Jefferson County Lawsuit or for other ulterior purposes.

202.    The purpose of the Second Probate Case was supposed to be to administer assets of the Estate and not to develop, manufacture and prosecute claims that should have been brought by a separate non-probate proceeding.

203.    The Jeff Co Lawsuit was willfully initiated and carried out for an improper purpose towards the Adams Plaintiffs by some or all the Abuse of Process Defendants.

204.    The judicial processes in the Jeff Co Lawsuit were used to attempt to extort or coerce Adams Plaintiffs and obtain leverage over Adams Plaintiffs in the Jeff Co Lawsuit.

205.    Abuse of Process Defendants' actions caused Adams Plaintiffs to suffer compensatory damages in the form of attorneys' fees and costs, reputational harm, emotional distress, and other damages. The amount of damages will be determined at trial.

206.    The Abuse of Process Defendants also knew that their conduct would naturally and probably result in damages to Plaintiffs. The Abuse of Process Defendants acted with malice and/or reckless disregard of these consequences, from which malice may be inferred. As such, Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

2282717-v1

## COUNT II – CIVIL CONSPIRACY

207.   Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

208.   The civil conspiracy is plead against Abuse of Process Defendants and Exhumation Defendants based on some or all of their agreements to accomplish a purpose that is unlawful, oppressive and/or immoral, all as more specifically outlined above.

209.   Upon information and belief, some or all of the Abuse of Process Defendants knowingly entered into an agreement to pursue the Second Probate Case, including the filing of the motion for sanctions, for the ulterior purpose of gaining an advantage in the Jefferson County Lawsuit, unjustly oppressing the reputations of Adams Plaintiffs, and leveraging them for personal or financial gain.

210.   Upon information and belief, some or all of the Abuse of Process Defendants knowingly entered into an agreement to pursue the Jefferson County Lawsuit for the ulterior purpose of obtaining leverage over the Adams Plaintiffs for personal or financial gain.

211.   Some or all of the Abuse of Process Defendants and Exhumation Defendants committed abuse of process against Adams Plaintiffs.

212.   Abuse of Process Defendants, individually and/or collectively, and Exhumation Defendants, individually or collectively, committed overt acts in the Second Probate Case and/or in the Jefferson County Lawsuit and/or by filing numerous pleadings with misrepresentations and false allegations, issuing notices

2282717-v1

of deposition and subpoenas to Verizon and AT&T, intimidating witnesses, parties and counsel, and/or by engaging in an unlawful exhumation, a secret private autopsy and aa concealment of the autopsy report, concealing other evidence, destroying evidence, abusing the judicial process by fraud, lies and misrepresentations, and/or all other abusive, oppressive, immoral and unlawful conduct, as more specifically set forth above.

213.    Abuse of Process Defendants initiated these actions in the Probate Case with the sole intent of harming Jeff Co Defendants which was to the benefit of the Abuse of Process Defendants.

214.    Exhumation Defendants' actions started a chain of events and were done with the sole intent of harming Jeff Co Defendants and the Exhumation Defendants' actions lead to other actions that harmed Jeff Co Defendants.

215.    Abuse of Process Defendants initiated the action in the Jefferson County Lawsuit with the intent of leveraging Adams Plaintiffs to recover monetary damages from them and/or for other personal gain.

216.    Abuse of Process Defendants and Exhumation Defendants caused damages to Adams Plaintiffs as participants in the civil conspiracy.

217.    Adams Plaintiffs have suffered damages by being forced to devote extraordinary amounts of time, and financial and emotional resources to uncover, refute and defend the baseless allegations in the Probate Case and the Jefferson County Lawsuit, including substantial attorneys' fees and costs.  Adams Plaintiffs

2282717-v1

have also suffered reputational harm and other damages. The amount of compensatory damages will be determined at trial.

218. The Abuse of Process Defendants and the Exhumation Defendants committed the tort of civil conspiracy independently and/or in connection with all of the other torts alleged against them.

219. The individual Defendants acted for themselves, and for the benefit of their respective company Defendants, in committing the torts and engaging in the civil conspiracy.

220. The Abuse of Process Defendants and Exhumation Defendants also knew that their conduct would naturally and probably result in damages to Adams Plaintiffs. The Abuse of Process Defendants acted with malice and/or reckless disregard of these consequences, from which malice may be inferred. As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

## COUNT III – NEGLIGENCE

221. Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

222. The conduct of Defendants as more specifically outlined above was at best, negligent, and at worst fraudulent.

223. Defendants owed Adams Plaintiffs duties, among others, of professional responsibility, candor, ethical conduct, to abide by laws, rules, regulations, and public trust, and compliance with policies and procedures governing them and their respective businesses and professions.

90

224.    Defendants failed to abide by the duties governing them and their respective businesses and professions.

225.    Because of Defendants' conduct, operating unilaterally or collectively, they breached their respective duties to Adams Plaintiffs and caused harm and damages to Adams Plaintiffs as outlined in this complaint.

226.    Adams Plaintiffs suffered compensatory damages in the form of attorneys' fees and costs.  The amount of compensatory damages will be determined at trial.

## COUNT IV – FRAUD

227.    Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

228.    The conduct of Defendants as more specifically outlined above as to each Defendant, separately and collectively, involved a series of fraudulent actions, misrepresentations and other intentional conduct, and includes but not limited to the following:

- Unfounded allegations against long-standing family friends of a homicide, conspiracy to hide a murder, and drug dealing to children of the families;
- Allegations of homicide made in Jeff Co Lawsuit which were 180 degrees contrary to the allegations made in First Probate Estate of accidental death to recover accidental death insurance benefits;
- Illegal and concealed exhumation of Luke's body accomplished through lies, misrepresentations, and fraud;
- Secret private autopsy resulting in spoliation of key evidence;
- Misrepresentations and concealment of a written autopsy report that does not support Jeff Co Plaintiffs and Jeff Co Attorneys' allegations;
- Concealment of a CD (hidden in Kerry's home safe and with copies in the possession of Jeff Co Plaintiffs' and Jeff Co Attorneys' and their

91

investigators) containing key exonerating photographs of Luke
evidencing facial stippling, indicating a close-range gunshot wound;
- Concealment of unique bullets used by Luke which further exonerate
  Defendants;
- Lies and misrepresentations to and fraud on the Jefferson County
  Circuit Court, State and County public officials, Jeff Co Plaintiffs and
  Jeff Co Attorneys' own experts, and Defendants;
- Witness tampering and sanitizing files of witnesses;
- Public corruption of and collusion and conspiracy with the Jefferson
  County Coroner to turn an accidental self-inflicted gunshot wound into
  a homicide;
- Manipulation of other State and County officials by lies,
  misrepresentations and fraud; and
- Many other false representations of material facts.

229.    When the fraudulent actions were taken, Defendants knew of the

falsity of the representations and/or lack of basis for taking the actions.

230.    When the fraudulent actions were taken, Defendants intended to

induce reliance of Adams Plaintiffs on the false representations and or fraudulent

actions taken.

231.    Adams Plaintiffs relied on the representations and actions of

Defendants as Defendants were in positions of trust, private or public, and

Defendants expected them to not make misrepresentations, such as, there is no

written autopsy report, when in fact there was and some or all of Defendants knew

there was and that the autopsy report provided results unfavorable to Jeff Co

Plaintiffs' claims.

232.    Adams Plaintiffs were damaged by the misrepresentations and

fraudulent conduct of Defendants.

233.    Adams Plaintiffs suffered compensatory damages in the form of

attorneys' fees, costs and other damages. One of the results of the

92

misrepresentations and allegations of fraud and illegal conduct alleged against Adams Plaintiffs is that their insurance carriers denied coverage, requiring Adams Plaintiffs to be responsible for the cost of defense. The amount of compensatory damages will be determined at trial.

234.    Defendants also knew that their conduct would naturally and probably result in damages to Plaintiffs. The Abuse of Process Defendants acted with malice and/or reckless disregard of these consequences, from which malice may be inferred. As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

### COUNT V – FOIA VIOLATIONS AND OTHER TORTS

235.    Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

236.    Coroner Kelley was served with numerous FOIA requests by Adams Plaintiffs.

237.    Coroner Kelley failed to timely and fully comply with the obligations of the FOIA.

238.    Coroner Kelley concealed photographs he had or to which he had access that exonerated Adams Plaintiffs. To this day, Kelley has never produced to the Adams Plaintiffs these photographs clearly showing stippling, debunking the false and fraudulent allegations against Adams Plaintiffs.

239.    Coroner Kelley's actions not only violated FOIA law, they violated other laws regulating public officials and requiring honest services.

2282717-v1

240.   The actions of Kelley harmed Adams Plaintiffs who suffered compensatory damages in the form of attorneys' fees, costs and other damages. One of the results of the misrepresentations and allegations of fraud and illegal conduct alleged against Adams Plaintiffs and which Kelley offered false testimony and support, is that the insurance carriers denied coverage, requiring Adams Plaintiffs to be responsible for the cost of defense. The amount of compensatory damages will be determined at trial.

241.   Kelley also knew that his failure to comply with FOIA law would naturally and probably result in damages to Adams Plaintiffs. He acted with malice and/or reckless disregard of the consequences of his actions, from which malice may be inferred. As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

## COUNT VI - CIVIL ACTION BY CRIME VICTIMS

242.   Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

243.   The Arkansas Code allows a crime victim to bring a civil claim for damages caused by conduct that would be a felony under Arkansas law, which, upon a showing by a preponderance of the evidence, the victim who was injured or damaged may recover damages and attorney fees. *See* Ark. Code Ann. § 16-118-107. The Arkansas "civil action by crime victim" statute provides:

94

(a)(1) Any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct.

(2) The burden of proof for showing conduct that constituted a felony shall be a preponderance of the evidence.

(3) If the person who is injured or damaged prevails, he or she shall be entitled to recover costs and attorney's fees.

(b) The action may be maintained by the person who was injured or damaged or, after the person's death, the executor, administrator, or representative of his or her estate.

(c) The remedy provided in this section shall be in addition to any other remedies in law or equity.

*Id.*

244.    Defendants engaged in actions that constitute felonious conduct under Arkansas law, which directly caused harm to the Plaintiffs. Defendants conduct, as more specifically set forth above, creates a civil cause of action and provides for liability as a result of their damage to Plaintiffs.

245.    The actions of Defendants as previously described above as to each of them constitute at least, but not limited to, some or all of the following felonies:

Ark. Code Ann. § 5-60-101, Abuse of a corpse

Ark. Code Ann. § 5-53-110, Tampering

Ark. Code Ann. § 5-54-121, Tampering with a public record

Ark. Code Ann. § 5-53-111, Tampering with physical evidence

Ark. Code Ann. § 5-53-108, Witness bribery

Ark. Code Ann. § 5-53-102, Perjury

Ark. Code Ann. § 5-52-107, Abuse of office

Ark. Code Ann. § 5-52-101, Abuse of public trust

Ark. Code Ann. § 16-118-107, Conspiracy

246.    The conduct of Defendants who knowingly unlawfully exhumed the body of Luke under the guise of a disinterment constitute an abuse of corpse under Ark. Code Ann. § 5-60-101.

247.    The conduct of Defendants who induced or attempted to induce Kelley, Dr. Peretti, Nawojczyk, or others to testify or inform falsely constitute tampering under Ark. Code Ann. § 5-53-110.

248.    The conduct of Defendants who with the purpose of impairing the verity or availability of a public record made a false entry in or falsely altered public records or erased, obliterated, removed, destroyed or concealed a public record constitutes tampering with a public record under Ark. Code Ann. § 5-54-121. The public records at issue include but are not limited to the disinterment application, disinterment permit, the Coroner's file, content of Coroner's devices, First Supp, Death Report, Second Supp. Death Report, Addendum and 81 jpeg photographs.

249.    The conduct of Defendants who altered, destroyed, suppressed, removed, or concealed any record, document, or thing with the purpose of impairing its verity or availability in connection with the Jeff Co Lawsuit constitutes

96

tampering with physical evidence under Ark. Code Ann. § 5-53-111. The records, documents, things at issue include but are not limited to the disinterment application, disinterment permit, the Coroner's file, content of Coroner's devices, First Supp. Death Report, Second Supp. Death Report, Addendum, 81 jpeg photographs, Noble files, and bullets.

250.   The conduct of Defendants who offered, conferred, or agreed to confer any benefit upon Kelley as a witness or a person Defendants believed may be called as a witness with the purpose of influencing Kelley's testimony, or induced Kerry to absent himself from his deposition, or solicited, accepted, or agreed to accept any benefit and the conferring of the benefit constitutes witness bribery under Ark. Code Ann. § 5-53-108.

251.   Defendants Kelley and Mike Noble knowingly made false material statements under oath in their depositions in connection with the Jeff Co Lawsuit and committed perjury under Ark. Code Ann. § 5-53-102.

252.   Defendant Kelley's conduct as a public servant with the purpose of benefiting in a pecuniary fashion or of harming Adams Plaintiffs, knowingly committed unauthorized acts purporting to be acts of his office including but not limited to making false oaths, baselessly changing public documents related to the death of Luke, destroying public record evidence, and concealing public record evidence, and omitted to perform his duty imposed on his by law or clearly inherent in the nature of his office to correct the series of death related documents to show Luke's death occurred by accidental self-inflicted gunshot wound to the head. This

97

conduct constitutes an abuse of the Coroner's office under Ark. Code Ann. § 5-52-107.

253.    Defendant Kelley accepted, or agreed to accept a benefit or consideration for having given as an elected servant, a decision or opinion favorable to Jeff Co Plaintiffs and Jeff Co Attorneys for having otherwise exercised Kelley's discretion in favor of them, and his conduct constituted an abuse of public trust under Ark. Code Ann. § 5-52-101

254.    Defendants conspired to harm the Adams Plaintiffs with the purpose promoting or facilitating the commission of any one or more of the previously stated criminal offenses by agreeing with one or more other Defendants or with other persons that one of more of them will engage in conduct that constitutes that offense, or that the person will aid in the planning or commission of that criminal offense and the Defendants or another person with whom they conspired did an overt act in pursuing the conspiracy.  The conduct of Defendants constitutes criminal conspiracy under Ark. Code Ann. § 16-118-107.

255.    Plaintiffs are entitled to recover their damages, fees and costs in this Faulkner Co case, and any other relief allowed under this civil action by crime victims statute and Count VII.

### COUNT VII – TORT OF OUTRAGE

256.    Adams Plaintiffs reallege and incorporate herein each and every paragraph contained in the foregoing paragraphs of this complaint.

257.    The tort of outrage is asserted against all Defendants.

258.    Adams Plaintiffs have sustained damages in defending against the false and defamatory allegations against them, suffered emotional distress of having to confront the false allegations and fraudulent conduct, and also suffered reputational harm and other damages.

259.    The conduct of Defendants and the actions taken by them in the illegal exhumation and autopsy, destruction and spoliation of evidence, concealing exonerating photos, reports, and other information, tampering with witnesses, improperly influencing public officials, opening a Second Probate Case for improper purposes, filing baseless claims in the Jefferson County Lawsuit, and for all of the other fraudulent acts, misrepresentations and other intentional torts, all as more specifically outlined above, are outrageous in character and extreme in degree. The conduct goes beyond all possible bounds of decency, was atrocious and utterly intolerable.

260.    Defendants willfully and wantonly engaged in extreme and outrageous conduct as more specifically outlined above for the purposes of personal and financial gain.

261.    Defendants knew or should have known that in the light of the surrounding circumstances that their conduct would naturally and probably result in damages and emotional distress and continued such conduct in reckless disregard of the consequences for over two years.

262.    Defendants proximately caused damage to Adams Plaintiffs in the nature of emotional distress.

99

263.   Defendants also knew that their conduct would naturally and probably result in damages to Adams Plaintiffs, acting with malice and/or reckless disregard of these consequences, from which malice may be inferred.   As such, Adams Plaintiffs request punitive damages pursuant to Ark. Code Ann. § 16-55-206.

## JURY TRIAL DEMAND

264.   The Adams Plaintiffs demand a trial by jury.

WHEREFORE, plaintiffs Bryan Adams, Brandon Adams, and Skylar Wilson, pray that this Court award (i) a judgment against Defendants, jointly and severally, in an amount to be determined at trial; (ii) punitive damages against Defendants, jointly and severally; (iii) their attorneys' fees and costs incurred herein; and (v) all other relief to which they are entitled.

2282717-v1

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
(501) 376-9442 FAX
jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com


By: /s/ Judy S. Henry
     Edwin L. Lowther, Jr. (81107)
     Judy Simmons Henry (84069)
     Scott A. Irby (99192)
     Jacob P. Fair (2015167)

     *Attorneys for Plaintiffs*
     *Bryan Adams, Brandon Adams and*
     *Skylar Wilson*


NEELY LAW FIRM
1514 South Poplar
Pine Bluff, AR 71601
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr.
     Efrem B. Neely, Sr. (2008047)

     *Attorneys for Plaintiffs*
     *Bryan Adams, Brandon Adams and*
     *Skylar Wilson*

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR  72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com
jprice@qgtlaw.com


By: /s/ Thomas G. Williams _____
    Thomas G. Williams, Bar I.D. #88186
    Joseph W. Price, II, Bar I.D. #2007168

    *Attorneys for Plaintiffs*
    *Bryan Adams, Brandon Adams and*
    *Skylar Wilson*

102

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2021-Jun-22 12:59:36
35CV-18-1077
C11WD01 : 8 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                    PLAINTIFFS

VS.                         CASE NO. 35CV-18-1077

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER                                 DEFENDANTS

## ORDER GRANTING DEFENDANTS' JOINT RENEWED AND AMENDED MOTION TO DISMISS CASE WITH PREJUDICE AND FOR PRESERVATION OF INFORMATION

Before the Court is Defendants'[1] Joint Renewed and Amended Motion to

Dismiss Case With Prejudice and for Preservation of Information, with 81 exhibits,

and Brief in Support, all filed on April 13, 2021, (collectively, the "Motion"). On

April 14, 2021, separate defendants Austin Tate, John Tate, and Mary Tate ("Tate

Defendants") filed a joinder in and adoption of the Motion. On April 21, 2021, and

---

[1] "Defendants" includes Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla Cook, Prairie Wings South LLC, Prairie Wings Lodge, LLC, Christy Adams, Brandon Adams, Reliance Health Care, Inc., Todd Ross and Joel Whicker.

EXHIBIT

C

April 26, 2021, responses to the Motion were respectively filed by the Estate of James Luke Baker, Kerry Baker, and Savannah Baker Case (collectively, the "Responses"). On April 27, 2021, a reply ("Reply") was filed by Defendants with legal authorities and optional pathways to a dismissal with prejudice. *Pro se* plaintiff Gena Baker filed a motion for extension of time to respond to the Motion on April 30, 2021.

The Court held a hearing on the Motion and Responses on June 2, 2021. Upon consideration of the Motion, Responses, Reply, arguments of counsel, other evidence and proof, and being fully knowledgeable about this case from prior hearings and filings, and for the reasons stated at the conclusion of the hearing on the record during the June 2, 2021 hearing, which are attached as Exhibit A and incorporated herein, the Court FINDS and ORDERS as follows:

1.      Based on the arguments, and the legal authorities, including both case law and Arkansas Rules of Civil Procedure, that provide this Court with discretion as and optional pathways provided by Defendants in their Motion, Reply, and in argument at the hearing, the Motion is hereby GRANTED. The complaint and amended complaint filed by Plaintiffs against Defendants and Tate Defendants are hereby dismissed with prejudice.

2.      The Motion was supported by 81 exhibits evidencing misconduct and a pattern of the abuse of the judicial process by the Plaintiffs and at least some of their counsel and certain conduct warranting the dismissal of the complaint and amended complaint with prejudice, including at least the following:

2

- Baseless allegations pending for over two years resulting in a miscarriage of justice;

- Use of fraudulent paperwork to allegedly disinter a body;

- Misrepresentations to government officials regarding illegal exhumation of a body in Faulkner County;

- Failure to comply with Arkansas exhumation law including failure to notify Faulkner County Coroner and failure to obtain a court order authorizing an exhumation;

- Spoliation of key evidence;

- False representations regarding a secret autopsy, concealment of the autopsy report and misrepresenting the status of the autopsy report to the Court and Defendants;

- Obstruction of FOIA at the Jefferson County Sheriff's Office, misrepresentations to Sheriff about the autopsy and report, and the origin of the re-opened case;

- Concealment and false representations regarding exonerating photographs;

- Wrongfully attempting to influence a public official, the Jefferson County Coroner, who was to be used as Plaintiffs' expert witness;

- Deliberate concealment and false representations regarding the Photo Notations (as defined in the brief supporting the Motion), allowing the Jefferson County Coroner to include the Photo Notations as a public record in a July 10, 2019 Addendum as if he were the author;

- Knowingly eliciting false testimony from the Jefferson County Coroner regarding the Photo Notations;

- Discovery abuses including but not limited to directing witnesses to ignore a subpoena duces tecum and Court Order and attempting to improperly influence fact and expert witness testimony;

- Discovery abuses including concealing documents and information from witnesses and Defendants, and removing or attempting to remove documents and information from witnesses' files; and

3

- Witness tampering including attempts to have witnesses change their testimony.

3.    In Responses filed by Plaintiffs and on the record at the hearing, Plaintiffs did not dispute or refute the allegations set forth in the Motion or presented at the hearing. Instead, Plaintiffs solely relied on Rule 41(a)(1) of the Arkansas Rules of Civil Procedure as their basis to request dismissal of the case without prejudice. None of the facts stated in the Motion and supported by the 81 exhibits were refuted with any evidence other than blanket arguments of counsel for Plaintiffs present at the hearing that they did not personally participate in the conduct.

4.    The Court FINDS that (i) it has the inherent authority under the Rules and authorities cited by Defendants to protect the integrity of the court in actions pending before it, and (ii) Rule 41(a)(1) is not intended to be a bar from a Court exercising its inherent authority by dismissing a case with prejudice when unique facts and circumstances of misconduct, abuse of process, fraud, misrepresentations, spoliation, and other misconduct, to address the miscarriage of justice are present.

5.    The Court FURTHER FINDS that abuse of process, fraud, misrepresentations, spoliation, and other misconduct resulting in a miscarriage of justice occurred in this case, all of which warrant dismissal of the case with prejudice.

6.    The Court FURTHER FINDS that it has the authority to dismiss the case with a prejudice as one remedy for the misconduct as set out in the Motion and Reply.

7.    The Court hereby FURTHER FINDS AND ORDERS that Plaintiffs', Plaintiffs' current and former attorneys, investigators, witnesses, experts and consultants (including the Jefferson County Coroner Chad Kelley), and anyone acting with Plaintiffs or at their direction, immediately identify, and indefinitely protect and preserve any and all documents, data and other information in any way related to this case or the death of Luke Baker. Plaintiffs are ORDERED to immediately notify all of their current and former attorneys, investigators, witnesses, experts and consultants (including the Jefferson County Coroner Chad Kelley) of this Court's order.

8.    Rule 11 of the Arkansas Rules of Civil Procedure allows the Court to impose an appropriate sanction on its own initiative.

9.    The Court may also utilize Rule 11 of the Arkansas Rules of Civil Procedure on its own initiative to sanction Plaintiffs and their attorneys in its sole discretion. The Court is greatly concerned that the complaint, amended complaint, and other filings may be in violation of Rule 11. One example of such conduct would be the filing of numerous pleadings that contained allegations Plaintiffs and their counsel knew were entirely inconsistent with the photographs and the autopsy report that were in their possession but not timely disclosed or provided to Defendants in discovery.

5

10.    Although the Court is ORDERING the dismissal with prejudice on the Defendants' Motion on other grounds, the Court alternatively FINDS that another pathway to achieve the same result could be to conduct a Rule 11 hearing. The Court offered Plaintiffs this alternative, and they chose not to address the alternatives.

11.    *Pro se* plaintiff Gena Baker appeared at the hearing on June 2, 2021, and had the opportunity to be heard on her request for extension of time to respond to the Motion. The Court FINDS that the motion for extension of time filed by *pro se* plaintiff Gena Baker is hereby DENIED as MOOT. Any other motions currently pending before the Court and not addressed at the hearing on June 2, 2021, if any, are hereby DENIED as MOOT.

12.    This is a final order under Rule 54 of the Arkansas Rules of Civil Procedure.

IT IS SO ORDERED.

_____
HONORABLE ALEX GUYNN

_____
DATE

6

PREPARED AT THE COURT'S REQUEST BY:

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  jhenry@wlj.com
              sirby@wlj.com
              jfair@wlj.com

By: /s/ Judy S. Henry
        Judy Simmons Henry (84069)
        Scott A. Irby (99192)
        Jacob P. Fair (2015167)

        *Attorneys for Bryan Adams, Skylar Wilson, Travis Jones,*
        *Carson Cook, Karla Cook, Prairie Wings South, LLC,*
        *Prairie Wings Lodge, LLC, Christy Adams, Reliance Healthcare, Inc.,*
        *Brandon Adams and Todd Ross*

Copies provided to:

Terry F. Wynne (via email:  tfwynne@cablelynx.com)
Eric Buchanan (via email:  eric.buchanan@thebuchananfirm.com)
Hon. Marion Humphrey (via email: marionhumphreysr@gmail.com)
Efrem Neely (via email: efneely@neelylaw.net)
Blake Hendrix (via email: bhendrix@fc-lawyers.com)
David D. Wilson (via email:  wilson@fridayfirm.com)
Martin A. Kasten (via email:  mkasten@fridayfirm.com)
Tommy Williams (via email:  twilliams@qgtlaw.com)
Emily Runyon (via email:  emily.runyon@mrmblaw.com)
Carter Fairley (via email:  cfairley@barberlawfirm.com)
Andy Turner (via email:  andy@turnerlawfirmpa.com)
Kaleb Jones (via email: kaleb@turnerlawfirmpa.com)
Mel Sayes (via email:  msayes@msslawfirm.com)
Jay Sayes (via email: jsayes@msslawfirm.com)
Gena Baker, *pro se*  (via U.S. mail)

7



Arkansas Judiciary

**Case Title:**      KERRY BAKER ET AL VS BRYAN ADAMS ET AL

**Case Number:**   35CV-18-1077

**Type:**           ORDER MOTION GRANTED

So Ordered

Alex V. Guynn, 11th W Circuit Division
1 Judge

Electronically signed by AVGUYNN on 2021-06-22 12:59:46    page 8 of 8

1

1   IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
    FOURTH DIVISION
2

3   IN RE: ESTATE OF JAMES LUKE BAKER, DECEASED          23PR-2018-562

4

5
                        RULINGS OF THE COURT
6
                       Motions Hearing held before
7                     The Honorable David M. Clark
                          Circuit Court Judge
8                       Twentieth Judicial District
                            Conway, Arkansas
9
                          February 11, 2019
10

11

12  APPEARANCES OF COUNSEL:

13  on behalf of the Estate:              MR. KENNETH GREGORY STEPHENS
                                          P.O. Box 1048 / 1422 Caldwell, Ste. J
14                                        Conway, AR 72033

15                                        MR. MARION HUMPHREY, SR.
                                          108 S. Rodney Parham Road
16                                        Little Rock, AR 72205-4708

17                                        MR. LUCIEN GILLHAM
                                          Sutter & Gillham PLLC
18                                        P.O. Box 2012 / 310 W. Conway Street
                                          Benton, AR 72015
19

20  on behalf of Skylar Wilson:          MS. JUDY SIMMONS HENRY
                                          MR. JACOB P. FAIR
21                                        Wright, Lindsey & Jennings LLP
                                          200 W. Capitol Avenue, Ste. 2300
22                                        Little Rock, AR 72201

23                                        MR. J. BLAKE HENDRIX
                                          Fuque Campbell PA
24                                        3700 Cantrell Road, Ste. 205
                                          Little Rock, AR 72202
25





CERTIFIED
ORIGINAL TRANSCRIPT

1                   <u>RULINGS OF THE COURT</u>

2        THE COURT: A long time ago we argued about service; I made a ruling

3 on all that and now we're back for I don't understand what. What is this hearing going to

4 accomplish? Why are we wasting our time? Assuming he was there, assuming he lied

5 about being there why are we wasting the Court's time over something so minute that has

6 no bearing on this probate matter? Because, as I stated, the probate matter is to determine

7 the assets, collect the assets, and distribute the assets. Everything you tried to do was

8 improper use of this case, plain and simple. That's not what probate is about. They came

9 in and graciously agreed to accept service which made life even easier for you because you

10 didn't have to go get them served. I tell you had they not done that I would have denied

11 every request you had because it had no bearing on the probate case. Does it have a

12 bearing on the wrongful death lawsuit? Absolutely. Absolutely. It's a fishing expedition and

13 it's an improper fishing expedition. They acquiesced to give you what you wanted and now

14 we're here arguing over some minor detail that has no bearing on this.

15      Again, Rule 4 states: "For service to be perfected under (d)(1) upon the individual

16 other than the ... by delivering a copy of the summons and complaint to him personally; or,

17 if he refuses it, by offering a copy to him." At no point in time did Mr. Nobles ever testify

18 that he offered a copy to the person he saw at the door. It goes on to say: "...or by leaving

19 a copy thereat at his dwelling, house or usual place of abode." So Mr. Nobles left it there,

20 but it was not his dwelling, his reasonable place of abode, so there was not any good

21 service. So everything that they've alleged is perfectly valid, so I do not find there's been

22 any fraud committed on the Court. I don't find there's been anything to deceive the Court.

23      Ms. Henry, you will submit your attorney's bills for everything as it relates to this

24 hearing to Mr. Stephens. They will be paid within ten (10) days.

25      If you dispute the amount, you can set it for a hearing.

1    And, same thing, if I'm back here on any other things of this nature that are a

2  complete waste of my time, that have no bearing on my resolving the probate case, I will

3  be just as draconian because we shouldn't be wasting my time on stupid – on stuff this

4  stupid, and that's absolutely what it is.  There is no other way to describe this hearing.  It

5  is completely stupid, a waste of time, does not further the ends of justice, does not

6  accomplish anything that I have to resolve in this case.  So, if I appear to be upset, it's

7  because I am.  We shouldn't be wasting everybody's time over stupid things.  I've read your

8  emails back and forth; you are going to have a lovely time visiting with each other because

9  you-all apparently want to communicate like kindergarten children.  And, if you want to

10  practice law that way, I am perfectly fine with it until it affects me.  And, once I have to deal

11  with these things, I will be just as draconian if not more so because the parties are clearly

12  put on notice that this is not the way this Court operates.

13    With that, we're adjourned.

14    **(Thereupon, these proceedings were concluded.)**

15

16

17

18

19

20

21

22

23

24

25

3

REPORTER'S CERTIFICATE

STATE OF ARKANSAS  )

COUNTY OF FAULKNER )

I, Julie Beckman, hereby certify that I am a Certified Court Reporter for the State of Arkansas, Fourth Division Circuit Court, 20th Judicial District, that on the 11th day of February, 2019, I was present for the proceedings had in the within-named cause. I further certify that the foregoing pages contain and are a true and correct transcription of the Court's Rulings as reported verbatim stenomask by me at the time of the motions hearing and transcribed and reduced to typewriting by myself.

Witness my hand and seal this 20th day of February, 2019.

Julie Beckman
Certified Court Reporter, No. 309
Mail: 801 Locust
Conway, AR  72034
501-328-4156

Fee: $16.40

**CERTIFIED
ORIGINAL TRANSCRIPT**

4

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
FIRST DIVISION


KERRY BAKER, AS ADMINISTRATOR                    PLAINTIFFS
OF THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER, INDIVIDUALLY; AND
SAVANNAH BAKER CASE, INDIVIDUALLY;
AND GENA DOWNEY BAKER, INDIVIDUALLY


VS.                          35CV-18-1077


BRYAN ADAMS; SKYLAR WILSON; TRAVIS JONES;        DEFENDANTS
CARSON COOK; KARLA COOK; PRAIRIE WINGS
SOUTH, LLC; AUSTIN TATE; JOHN TATE; AND
CERTAIN JOHN DOE COMPANIES; AND INDIVIDUAL
JOHN AND JANE DOES TO BE DETERMINED; AND
PRAIRIE WINGS LODGE, LLC; CHRISTIE ADAMS;
MARY TATE; RELIANCE HEALTH CARE, INC.;
BRANDON ADAMS; TODD ROSS; AND JOE (SIC)
WHICKER


**RECORD OF HEARING**


        BE IT REMEMBERED, That on the 2nd day of June 2021, came
on for hearing the captioned cause before the Honorable Alex
Guynn, Circuit Judge, First Division of the Eleventh Judicial
Circuit-West of Arkansas, of which Jefferson County, Arkansas, is
a part; the following proceedings transpired with said hearing
being reported by LaJuana Grady, Arkansas Supreme Court Certified
Court Reporter, the Official Reporter for said First Division of
the Circuit Court, for the Eleventh Judicial Circuit-West of
Arkansas.



EXHIBIT
E

2

APPEARANCES:


ON BEHALF OF THE PLAINTIFFS:

        MR. ERIC BUCHANAN
        Attorney for Estate and Kerry Baker
        BUCHANAN LAW FIRM
        1700 Main Street
        Little Rock, Arkansas 72206

        Hon. MARION HUMPHREY
        Attorney for Savannah Case
        ATTORNEY AT LAW
        108 South Rodney Parham Road
        Little Rock, Arkansas

        GINA BAKER
        Gina Downey Baker, Individually
        PRO SE
        44 Hawk Drive
        Vilonia, Arkansas 72173


ON BEHALF OF THE DEFENDANTS:

        MS. JUDY SIMMONS HENRY
        MR. JACOB FAIR
        Attorneys for all Defendants excluding John Tate and
        Austin Tate
        WRIGHT, LINDSEY, & JENNINGS LLP
        200 West Capitol Avenue, Suite 2300
        Little Rock, Arkansas 72201

        EFREM B. NEELY
        NEELY LAW FIRM
        For all named defendants, other than John and Mary and
        Austin, and the Doe defendants
        1514 South Poplar Street
        Pine Bluff, Arkansas 71601

        MR. THOMAS G. WILLIAMS
        Attorney for Prairie Wings South, LLC
        QUATTLEBAUM, GROOMS, & TULL PLLC
        111 Center Street, #1900
        Little Rock, Arkansas 72201

APPEARANCES CONTINUED:

MR. JAY SAYES
Attorney for John Tate and Austin Tate
MATHEWS, SANDERS & SAYES
825 West 3rd Street
Little Rock, Arkansas 72201

MR. CARTER FAIRLY
Attorney for Todd Ross
BARBER LAW FIRM
425 West Capitol Avenue, Suite 3400
Little Rock, Arkansas 72201

MS. EMILY RUNYON
Attorney for Karla and Carson Cook
MUNSON, ROWLETT, MOORE, BOONE
400 West Capitol, Suite 1900
Little Rock, Arkansas 72201

MR. MARTIN KASTIN
Attorney for Prairie Wings South, LLC and Prairie Wings
Lodge, LLC
FRIDAY, ELDREDGE & CLARK
400 West Capitol, Suite 2000
Little Rock, Arkansas 72201

MR. JOHN ATKINS
Attorney for Todd Ross
TURNER LAW FIRM
2796 South 2nd Street
Cabot, Arkansas 72023

MR. ERIC BELL
Attorney for Reliance Health Care, et al.
ATTORNEY AT LAW

REPORTER'S NOTE:
All parties were present for hearing via Zoom.

4

**TABLE OF CONTENTS**

Style and Caption                              1

Appearances                                    2

Ruling of The Court                            5

Conclusion of Proceedings                     16

Certificate of Reporter                       17

5

|   |   |
|---|---|
| 1 | **RULING OF THE COURT** |
| 2 | **JUNE 2, 2021** |
| 3 | THE COURT: Here is what I'm going to do, Ms. |
| 4 | Henry, I know you can go on for days. Don't take |
| 5 | that the wrong way. |
| 6 | MS. HENRY: Your Honor, I want to address just |
| 7 | aa couple points before I address the law that they |
| 8 | relied upon and -- |
| 9 | THE COURT: Hold on, hold on, Ms. Henry. |
| 10 | MS. HENRY: Okay. |
| 11 | THE COURT: I think I can resolve all of this. |
| 12 | I wanted to give Mr. Humphrey and Mr. Buchanan the |
| 13 | opportunity to speak and clear their name. From what |
| 14 | I see, the defendants are pointing it towards Mr. |
| 15 | Stephens, Mr. Sutter, Mr. Gillham. |
| 16 | Now, them bullets and the CDs, that still needs |
| 17 | to be explained, but that's not for me to determine. |
| 18 | We can do two things: Either we can have a Rule 11 |
| 19 | hearing and they can dig a whole lot deeper and find |
| 20 | out what's going on, or I can dismiss this with |
| 21 | prejudice and everybody can go about their business |
| 22 | and whatever information y'all have that needs to be |
| 23 | preserved. But, quite frankly, I'm tired of |
| 24 | theatrics. A young man died. A father deserves |
| 25 | answers. I was real patient with everybody because, |

1          if that what have happened to my relative, I would

2          want some answers.  And to me, you know, it goes to

3          that old adage, Hurt people hurt people.

4              Now, I think, by the father being hurt, he was

5          going to the extreme.  And greedy lawyers also hurt

6          people.  And I'm not saying that Mr. Buchanan or Mr.

7          Humphrey is greedy.  But I can tell you for sure, I

8          think Mr. Stephens is and Mr. Gillham.  But it's been

9          enough stuff here to -- for me to sort through it.

10         And the plaintiffs wanted discovery; I gave it to

11         them.  And I think it backfired on them.  And it's

12         not funny now when the rabbit got the gun.  So I

13         think -- I think I'm just going to go ahead and

14         dismiss this with prejudice.

15             Mr. Buchanan and Mr. Humphrey, y'all got

16         anything for the record?

17             MR. HUMPREY:  Just an objection.  Our arguments

18         we've made will suffice will Savannah Baker Case.

19             THE COURT:  All right.  So do -- so with it

20         being dismissal with prejudice, I don't think there

21         is a need for a Rule 11 hearing.  Now if y'all are

22         carrying on, we can have that.  But I just think -- I

23         think that will suffice and everything will be taken

24         care of.

25             Ms. Henry, you got any comments for the record,

1          ma'am?

2              Ms. Henry:  Your Honor, not in regard to the

3          motion to dismiss, but we do have the motion for

4          relief that we're asking the Court to allow us to

5          use.  There were four exhibits that I identified,

6          two of which that I think were covered under the

7          protective order that the plaintiffs had presented to

8          the Court.  There was a paragraph in your protective

9          order that indicated that if we need relief from the

10         order that we could come back to you and show cause

11         why we should be able to use the exhibits in a

12         different preceding because the way they had drafted

13         the order was that we couldn't use them in any

14         administrative preceding, which would be a supreme

15         court preceding, would be a committee on professional

16         conduct, would be the Faulkner County case.  And

17         their response was:  We'll just go get them in

18         discovery in Faulkner County.  And I've already

19         articulated why that's not feasible.  And so Mr. Fair

20         had -- was prepared to give him a five-minute

21         presentation literally on why we were seeking relief

22         from the protective order if the Court will indulge

23         us on that before the dismissal order is entered.

24             MR. BUCHANAN:  Your Honor, may I interject, Your

25         Honor?

```
 1                    THE COURT:  Yes, sir, you may.
 2                    MR. BUCHANAN:  I just want to make sure that the
 3          record reflects that I am renewing my objections that
 4          were already stated concerning our motion to dismiss
 5          pursuant to Rule 41(a)(1).
 6                    THE COURT:  I understand.
 7                    MR. HUMPHREY:  Yes.  And I want to renew mine
 8          for the record, Your Honor, in my motion for this to
 9          be dismissed pursuant to Rule 41.
10                    THE COURT:  And just so I'm clear in my -- I'm
11          dismissing it with prejudice through what the Court
12          believes is fraud and mistruth put upon by -- not
13          saying Mr. Humphrey or Mr. Buchanan -- but for sure
14          Mr. Stephens by actions of him.  I believe when Mr.
15          Gillham's -- I can't prove it -- with that
16          investigator taking documents out of the file.  Now,
17          that's why I'm doing it with prejudice.  Based on I
18          believe there is a miscarriage of justice going on
19          here.  So that's why I did it just so I'm clear as
20          well.
21                    Mr. Fair, you -- you say you can do it in five
22          minutes.
23                    MR. FAIR:  Yes, Your Honor.  I'll be brief.
24          Five minutes.
25                    THE COURT:  I'll give you 10 or 15.  I ain't in
```

9

1          no rush.

2                  MR. FAIR:  Okay.  Fantastic Judge.

3                  Jake Fair, I represent all the defendants other

4          than the Tates.  We filed a motion for relief from

5          the protective order that was entered in this case.

6          As Ms. Henry alluded to earlier, we have filed a

7          complaint in Faulkner County Circuit Court against

8          some of the plaintiffs and others.  There are some

9          exhibits that would like to file in that -- in that

10         case that may be covered by your protective order

11         entered in this case.  I use the word "may" because

12         it's not completely clear based on the wording of the

13         protective order that they are covered.  But out of

14         an abundance of caution and respect for this Court,

15         we -- you filed this motion for relief for the

16         protective order.

17                 The Court entered a protective order that was

18         prepared by the plaintiffs in October of 2019.  The

19         protective order prevents disclosure of what's called

20         "confidential discovery material" as that term is

21         used in the order.  The opening paragraph in the

22         protective order defines that as:  Plaintiffs

23         produced documents, photographs, charts, reports,

24         recordings, and data.  So the protective order by its

25         terms appears to only cover documents that were

1          actually produced by the plaintiffs to defendants.

2          It doesn't apply to, for example, documents obtained

3          by the defendants from third parties.  You may recall

4          that the defendants in this case objected to the

5          entry of that drafted protective order by the

6          plaintiffs because it contained statements about the

7          use of documents and confidential discovery material

8          produced by the plaintiffs in discovery.  For

9          example, the order prevents the use of confidential

10         discovery material and I quote, "In any other

11         administrative complaint preceding or civil action."

12         This language is problematic as it would on its face

13         not allow the disclosure of any documents produced by

14         the plaintiffs in this case and the other civil case

15         like the one we have filed in Faulkner County or in

16         any other similar proceeding.  So this is obviously

17         problematic.  I don't think the protective order was

18         never intended to be a shield to prevent us from

19         using those documents to file a lawsuit or to

20         disclose misconduct.  Instead, I think the protective

21         order and the Court's intent behind the protective

22         order was to prevent the public disclosure of graphic

23         and sensitive photographs of Luke Baker, the body of

24         Luke Baker.  And you may recall that there were some

25         intimate videos and photographs of Luke Baker and his

1    girlfriend.  And I think that was the intent for the
2    Court in entering that protective order was to
3    prevent those -- prevent those from public
4    disclosure.

5    So briefly, Judge, I'll go over the four
6    exhibits that we would like for leave to file in the
7    Faulkner County case:  (1) Is a disc of the 81 JPEG
8    photographs that you've heard today.  This was marked
9    as Exhibit 9 to 39 to defendants' motion to dismiss.
10   (2) The grainy or blurry photographs defendants
11   received from the sheriff's office.  This was marked
12   as Exhibit 41 to defendants' motion to dismiss.
13   Exhibit (3) is the two stippling photographs from the
14   81 JPEG photographs that were obtained from Mr.
15   Baker.  This was marked as Exhibit 49 to defendants'
16   motion to dismiss.  And (4) is the DVD of the
17   deposition of Chad Kelley conducted by the plaintiffs
18   where Mr. Sutter put on photographs of the body.  So
19   we would like to file that deposition video.  But he
20   showed those photographs.

21   Only two of these photographs were actually
22   produced by the plaintiffs to defendants that may be
23   confidential discovery material.  Although the
24   protective order contained a requirement that you
25   marked these documents as confidential, they never

12

1       did that on any of these documents so it's not

2       completely clear that they are covered.  But again,

3       out of an abundance of caution, we filed the motion

4       for relief from the protective order.

5           Ms. Henry hit on it briefly, but in the response

6       filed in this case, the plaintiffs argue that we

7       failed to cite any legal authority that would allow

8       you to give us relief from the protective order.

9       Well, Judge, the protective order itself, paragraph

10      seven of it contains a statement that we may seek

11      modification of the order and you may modify it.  So,

12      Judge, we're here today on that basis.  The order

13      says we can seek relief or modification.  That's

14      exactly what we've done.

15          They've also argued that we shouldn't be allowed

16      to use these four exhibits in Faulkner County because

17      we could obtain those photographs in discovery in

18      that case.  Judge, we've gone through a great deal of

19      discovery and a lot of resources and times has been

20      committed by many lawyers in this Court to obtain

21      this information.  So to require -- it's not logical

22      to require us to go over here to a different

23      proceeding, issue the same discovery to get the same

24      documents when Ms. Henry has articulated today very

25      well the struggles that we went through to get it in

1          the first place.

2                  Judge, to summarize, the defendants have

3          previously told this Court that it's not our intent

4          to publish sensitive photographs or other explicit

5          materials produced in discovery to the public.  That

6          remains true today.  Instead, Judge, we are asking

7          that you give us relief from the protective order and

8          allow us to file these four exhibits under seal in

9          Faulkner County.  In Faulkner County, we have already

10         filed a motion asking that Court to file these

11         exhibits under seal, assuming we get your relief from

12         the protective order.  So filing these exhibits under

13         seal should alleviate any concern of the plaintiff's

14         or the Court that this sensitive information will

15         become public record.  So there's no harm or

16         prejudice to any party.  And we're asking that you

17         grant our relief from the protective order and allow

18         us to file these four exhibits under seal.  I'm happy

19         to answer any questions that the Court may have.

20                 THE COURT:  I don't have any questions.  You can

21         use those photos and whatever legitimate need that

22         you may have for them.  I think it will help out a

23         lot to find the truth.  That family -- well, both

24         families have had their name damaged.  And, like I

25         said before, I don't think we'll be here if the

1    defendants worked at UPS.  All right.  But obviously,

2    they loaded.  They got some cash and people want to

3    get out them some.  What I will do, you can use those

4    photos however you want to, photos or exhibits,

5    whatever is under seal, use it however you want to.

6    That's not my concern any more.  I think I've done a

7    good job of giving a fair opportunity to find the

8    truth in discovery in this matter.  But however you

9    want to use those photos, you can use them, photos or

10    discovery --

11          MR. BUCHANAN:  Your Honor --

12          THE COURT:  Sir?

13          MR. BUCHANAN:  I'd like to note my objections,

14    Your Honor, in my pleading.

15          THE COURT:  That's fine.

16          Not just photos, whatever is sealed, you can use

17    it in whatever manner you want to involving that

18    lawsuit or whatever you may have.

19          Anything else?  Ms. Henry?

20          MS. HENRY:  Your Honor, would you like me to

21    take a stab at drafting those orders?

22          THE COURT:  Yeah, that would save me a whole

23    bunch of time.

24          Anything else from anybody?

25          MS. HENRY:  Your Honor, in the order dismissing

```
 1              the case with prejudice, may we include that the
 2              Court is ordering them to preserve -- identify,
 3              protect, and preserve all of the information?
 4                   THE COURT:  Yes, ma'am.
 5                   MR. HUMPHREY:  Your Honor, I think I had mine on
 6              mute when I said same objections with Mr. Buchanan
 7              raised for the record.
 8                   THE COURT:  Okay.  That's fine.  All right.
 9              Anything else?
10                   MS. HENRY:  Nothing from us, Judge.
11                   MR. BUCHANAN:  No, Your Honor.
12                   THE COURT:  All right.  I realize -- I would say
13              I enjoyed this, but I'll be lying to you.  But it's a
14              job.  But I hate the way it turned out.  I like good
15              lawyers to go out and fight and I get to go eat my
16              popcorn and watch.  But this wasn't -- this wasn't
17              what I expected at all.  But I don't have to worry
18              about seeing y'all ever again.  Not this many people
19              at one time.  Okay.  All right.  So I'm going to go
20              back here and deal with regular folks that have
21              regular problems.
22                   Anybody got anything else?  That's it?
23                   MR. FAIR:  Thank you, Judge.
24                   THE COURT:  Y'all take care.
25                   MR. NEELEY:  No, Your Honor.
```

```
1                    MR. BUCHANAN:  No, Your Honor.

2                    THE COURT:  Take care.

3                    MR. HUMPHREY:  No, Your Honor.  Thank you, Your

4          Honor.

5                    MR. FAIR:  Thank you.

6                    [WHEREUPON, the proceedings were adjourned.]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE

I, LaJuana Grady, Official Court Reporter for the Circuit Court, Eleventh District-West Judicial Circuit of Arkansas, certify that I recorded the proceedings by stenomask shorthand recording in the case of **KERRY BAKER, AS ADMINISTRATOR OF THE ESTATE OF JAMES LUKE BAKER, AND KERRY BAKER, INDIVIDUALLY; AND SAVANNAH BAKER CASE, INDIVIDUALLY; AND GENA DOWNEY BAKER, INDIVIDUALLY VS. BRYAN ADAMS; SKYLAR WILSON; TRAVIS JONES; CARSON COOK; KARLA COOK; PRAIRIE WINGS SOUTH, LLC; AUSTIN TATE; JOHN TATE; AND CERTAIN JOHN DOE COMPANIES; AND INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED; AND PRAIRIE WINGS LODGE, LLC; CHRISTIE ADAMS; MARY TATE; RELIANCE HEALTH CARE, INC.; BRANDON ADAMS; TODD ROSS; AND JOE (SIC) WHICKER, Jefferson County Circuit Number 35CV-18-1077, June 2, 2021,** before the Honorable Alex Guynn, Circuit Judge thereof, at Pine Bluff, Arkansas; that said recording has been reduced to a transcription by me, and the foregoing pages numbered 1 through 16 constitute a true and correct transcript of the proceedings held, to the best of my ability, along with all items of evidence admitted into evidence.

WITNESS MY HAND AND SEAL as such Court Reporter on this _____ day of _____ 2021.

_____
LaJuana Grady
Supreme Court Certified Reporter No. _____

(S E A L)

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2021-Jun-25 21:37:10
35CV-18-1077
C14WD01 : 13 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
1ˢᵀ DIVISION

KERRY BAKER, ET AL                                      PLAINTIFFS

vs.                           CASE NO. 35CV-18-1077

BRYAN ADAMS, ET AL                                      DEFENDANTS

vs.

LUTHER SUTTER                                           INTERVENOR

## MOTION TO INTERVENE & TO RECUSE

Comes the Intervenor, Luther Sutter, for his Motion he states:

1.    This Motion is filed to prevent a fraud upon the Court.  Luther Sutter represented Gena Baker in order to address any conflict issues that existed between Ms. Baker and her former husband, Kerry Baker.  Greg Stephens represented the Estate, then Eric Buchanan replaced him as lawyer for the Estate.  Marion Humphrey represented Savannah Baker, who was also estranged from her mother, Gena Baker.

2.    Here, Intervenor seeks to participate in this action in order to file appropriate motions under Rule 59 and Rule 60 to expose a fraud on the Court and prevent a miscarriage of justice. Rule 24 allows for intervention when an interest or right may be at stake.   Luther Sutter has a property right in his license and reputation.  So, Luther Sutter demands Due Process.

3.    Luther Sutter was hired December of 2018 by Gena Baker.

4.    So, Mr. Sutter undertook the representation of Ms. Baker, but the representation quickly became unpleasant.  Throughout the course of this litigation, Defense Counsel, Judy Henry, alleged misconduct on behalf of Luther Sutter. In fact, she attempted to obtain an order in another proceeding that sanctioned the undersigned for actions at a hearing that



he was not even at. The order of this Court was obtained as part of Defendants' year long quest to "get" the undersigned.

5.     The critical issue is whether or not stippling was present. In close contact gun wounds, stippling is always present.

6.     If stippling is present, then its presence is evidence of a close contact wound. This is the jury question in this case.

7.     After Luke Baker died, there was little to no investigation of his death. It is axiomatic that one never "buries the bullet." This is because if there is an alleged self-inflicted wound, one would want to be able to see if the bullet matched the alleged gun or not. However, in this case, the Assistant Coroner did not request an autopsy that was in breach of the general accepted practices in circumstances involving a claimed suicide. Nonetheless, the Death Certificate incorrectly reflected that Luke Baker had committed suicide.

8.     When Luke Baker died, there were two (2) people in the room. Luke Baker and Skylar Wilson.

9.     Shortly after Luke Baker's death. Mr. Wilson gave several conflicting statements. First, Skylar told the 911 operator that Luke Baker always does this kind of stuff. Then he told the 911 operator that Luke Baker said "see there's nothing in it" after Luke allegedly clicked the gun in the air. In the statement to law enforcement, Skylar said Luke laughed when he said to stop and then put the gun to his head and fired. At no point did Skylar tell the 911 operator or the law enforcement officers that Luke had pointed the gun at him. This change in his account of events occurred during his deposition. Skylar was unable to

provide any rational for not telling law enforcement this. He also was unable to remember most if not all of the events before and after the shooting. See Attached **Exhibit L.**

10.    Nonetheless, the Coroner and Jefferson County Sheriff's investigation was shoddy, especially in light of the suspicious nature of Skylar Wilson's conflicting statements. So, because Kerry Baker did not understand the events that occurred that night, Luke Baker was buried, all the while, his father thought his death was an accident.

11.    However, Luke Baker's death continued to bother Kerry Baker. So, Kerry Baker hired Greg Stephens to investigate Luke Baker's death.

12.    Mr. Stephens opened an Estate and hired Frank Peretti to perform an autopsy in September of 2018. Mr. Stephens then subsequently filed suit in this Court in November 2018. Luther Sutter was not retained until December of 2018.

13.    After he was retained, Luther Sutter began acquainting himself with the progress of the case, and it quickly became apparent that the Adams' and their lawyers were adopting a scorched earth strategy in an attempt to halt discovery.

14.    During the course of the case, one of the Defendants' lawyers, Efrem Neely, spoke with David Westbrook, a former client of Luther Sutter. Mr. Westbrook testified that Neely spoke with him about the progress of Westbrook's case. After speaking with Mr. Neely, Westbrook allegedly became suspicious that Luther Sutter had settled his case for less money in order to influence the Coroner. *Exhibit A,* Westbrook Depo., 53, 73-76, 95-96, 109

15.    Luther Sutter had sued the coroner for David Westbrook, alleging discrimination and retaliation. The case involved same sex discrimination under the Arkansas Civil Rights Act, a fact scenario that had never been addressed by the Arkansas Supreme Court.

Nonetheless. Mr. Sutter undertook representation: and eventually settled his case in May of 2019.

16.   The settlement was the result of an arm's length negotiation between Luther Sutter and Burt Newell.  See Westbrook testimony attached hereto as ***Exhibit A*** & Burt Newell Affidavit attached hereto as ***Exhibit B***.

17.   In the litigation that ensued as a result of Westbrook's allegation. summary judgment was granted in favor of Luther Sutter finding that he had breached no duty to David Westbrook. *See Exhibit J Sutter & Gillham. PLCC v. Westbrook*, Case No. 63CV-19-1060, Order of 9/16/20.  That Order was appealed, but Westbrook failed to perfect the appeal, and so it is a final Order.

18.   Defense Counsel knew of this order and in fact coordinated with Westbrook's lawyer. Chris Burks. Consequently, there is no factual or legal basis to assert that Luther Sutter committed any misconduct with respect to Westbrook and the Coroner.

19.   Judge Alex Guynn and Efrem Neely were long term law partners.  The Defendants hired Efrem Neely simply because of this relationship.

20.   Judge Alex Guynn disclosed the conflict, and undersigned counsel's client did not object. At the present time. however. Luther Sutter objects to this Court's continued participation in this case because of an appearance of impropriety. So, Luther Sutter asks the Court to recuse just like it has done in every other case besides this one.

21.   This Court ignored established Arkansas law and refused to dismiss the lawsuit under Rule 41. Eventually, without Notice to the undersigned or its lawyers. this Court took the extraordinary step of dismissing the lawsuit with prejudice because of alleged discovery misconduct without giving Luther Sutter Due Process.

22.  In fact, neither Luther Sutter nor Lucien Gillham committed any type of discovery fraud. The only thing Defendants claim that Lucien Gillham did was commit discovery fraud when he removed documents from his investigator's file. See **Exhibit G** at p. 52:4-6.

23.  Acting on instructions from Luther Sutter, Mr. Gillham did indeed meet with the investigator before his deposition and did indeed remove certain documents from Mr. Nobles' file. Once the deposition convened, the witness revealed what had happened without objection from Mr. Gillham. There was no discovery fraud.

24.  This Court had held that work product objections and made proper discovery objections, as allowed by the Court. See Transcript at page 122:11-22 attached as **Exhibit C.** The materials removed were work-product. Mr. Gillham's actions were entirely appropriate and approved by Luther Sutter.   There was no discovery fraud.  Neither Mr. Buchannan or Mr. Humphrey made a record saying that Mr. Gillham's action were improper, nor have they ever accused Mr. Gillham of discovery fraud. But Ms. Judy Henry persists in her misconduct thereby warranting relief under Rule 59 and Rule 60.

25.  Ms. Judy Henry continually and unequivocally represented to this Court that the autopsy report was never produced by Plaintiffs on 9/4/2019. See **Exhibit C** at p.35. She alleged among other things that this was a concerted effort by the undersigned to conceal the autopsy report. In fact, in July of 2019, Judy Henry along with all defense counsel received the autopsy report from Attorney Stephens as part of a document production to Defense Counsel. See **Exhibit K**. She continues to allege this today. In the most recent hearing, Ms. Judy Henry told the Court numerous falsehoods regarding the report. Ms. Henry stated:

> I want to focus on the misrepresentations about the autopsy report.
> The Court will recall that you raised with counsel for the plaintiffs

whether or not there was a written autopsy report because we, the defendants, were complaining that we had never received an autopsy report after we found out that it had been performed. And you were specifically told in court by plaintiff's counsel with other counsel sitting at counsel table that there was no report. This was an absolute misrepresentation and fraud on the Court that there was no written autopsy report because the autopsy was done on Friday, September 7th of 2018. And the one and only final autopsy report was issued seven days later on Friday, September 14th, 2018. That autopsy report was concealed from defendants. And one might ask why. Well, because the autopsy report is contrary to the allegations of the plaintiffs' complaint and amended complaint.

**Exhibit G** at p. 11.

Contrary to what Defense Counsel has led this Court to believe, Mr. Stephens had turned over the initial autopsy report in the email attached hereto as **Exhibit K**. How could the undersigned conceal an autopsy report at the September 2019 hearing when the autopsy report had been sent to Ms. Judy Henry in July 2019 by Mr. Stephens? Exhibit K. Mr. Sutter did not mislead the court. In fact, the evidence shows Ms. Henry has misled this Court on numerous occasions leading in the culmination of this Court's Order finding the undersigned somehow committed discovery abuse.

26.    With respect to Luther Sutter, the Adams' claim that Mr. Sutter bribed, or influenced, the coroner. However, attached as **Exhibit D** is an Order granting Mr. Sutter summary judgment finding that no such evidence existed.

27.    The next thing the Adams falsely claim is that Mr. Sutter mislead the Court when he said Dr. Peretti's report was not final. Mr. Sutter had drafted a report for Mr. Peretti to review. As Mr. Sutter told the Court, he could not present this to Peretti until Mr. Skylar Wilson had been deposed. As far as the autopsy report that was created in September 2018, that had been turned over as previously discussed above. Exhibit K. To Mr. Sutter's knowledge, Dr. Peretti received all the files. Mr. Sutter was unaware of any photos in

Kerry Baker's safe and, he did not represent Kerry Baker. Indeed, Mr. Sutter's review of the file indicated that the Dr. Peretti had been provided with *all* of the photographs. See Email attached hereto as **Exhibit E**. Furthermore, Dr. Peretti indicated that he had received all of the photographs.

28.    Ms. Henry's allegations that Mr. Sutter mislead the Court about the autopsy report are frivolous. Dr. Peretti's report, attached as **Exhibit F**, shows that the report on the issue of stippling was inconclusive. Mr. Sutter had drafted a supplemental autopsy report for Dr. Peretti's review. Skylar's deposition had not been taken either. Thus, the report was not final, and that was the lawyer's call – not Peretti's. The lawyer controls what the witness sees and what the witness does not see, and Dr. Peretti had not yet had the benefit of Skylar Wilson's sworn deposition. Luther Sutter routinely refuses to turn over expert reports to experts such as Dr. Peretti until the deposition of the parties have been taken. This is a matter of judgment, for which Mr. Sutter cannot be held liable. Nor is it fraudulent. If a final report had been generated without Skylar Wilson's deposition being taken, Henry would no doubt have attacked the expert for not hearing Wilson's side before coming to a conclusion. Sutter never presented the draft report to Dr. Perretti.

29.    Even more to the point, the Adams, through their lawyers, have caused this Court to enter an Order without an adequate, factual basis, and without notice of an opportunity to be heard to Mr. Sutter, Mr. Gillham and Sutter & Gillham, P.L.L.C. This Court has recognized that lawyers have that right. See **Exhibit G** 49:1-5. The Court wanted to give the lawyers present an opportunity to clear their name. Now this Court's Order is being utilized to harm the undersigned. Yet, this Court was nothing more than a cat's paw for the Adams and their lawyers. As an example, this Court concluded there was

stippling present. See Transcript at Page 14:25 attached as **Exhibit G**. However, Dr. Sperry concluded otherwise. See Affidavit of Dr. Sperry attached as **Exhibit H**.

30.     The next thing the Adams falsely alleged that Mr. Sutter did was perpetuate false testimony by the Coroner. This allegation is absolutely false. Mr. Sutter deposed Chad Kelly to obtain his testimony under oath about his report and the reasons for the changes. Mr. Sutter did not know any testimony was false.

31.     With respect Chad Kelley's conclusions, neither Luther Sutter nor Lucien Gillham ever had any direct contact with the coroner outside of his deposition.

32.     Mr. Sutter did not know the coroner perjured himself or did anything wrong. The purpose of the deposition was to see the factual basis for the change in his report. Indeed, the forensic evidence from the Coroner's computer shows that the report was initially created months before Luther Sutter was even involved. See **Exhibit I**

33.     Then the Adams falsely alleged that there was improper conduct at the Little Rock airport. At his own expense, Luther Sutter hired his own lawyer to double-check what he had done in connection with this case and hired an additional expert to figure out exactly what Dr. Peretti was saying. The Adams and their lawyers do not even accurately allege who attended the meeting at the Tac Air Airport. Present at the meeting were Marion Humphrey, Eric Buchannan, Greg Stephens, Luther Sutter, his son, Kris Sperry, Steve Nawojczyk, Dr. Peretti and Andrew Clarke, Luther Sutter's lawyer. The purpose of the meeting at the Tac Air Airport was for Dr. Peretti to explain to Dr. Sperry what his report meant on the issue of stippling.

34.     Introductions were made. Shortly after introductions were made, Dr. Sperry and Dr. Peretti dismissed everyone from the room so that they could talk expert to expert. After

Dr. Sperry and Dr. Peretti concluded their discussions, Luther Sutter was informed that they were in agreement and Dr. Sperry memorialized his conclusions in the Affidavit attached as **Exhibit H**. Mr. Humphrey agreed that this affidavit was strong and helped the clients. See Email attached hereto as **Exhibit M.** One wonders why counsel never presented this affidavit to the Court.

35.    Defendants authorized their lawyers to make these false statements, even though Defendants and their lawyers knew their allegations were false. So, acting thorough their lawyers, caused the process attached as **Exhibit J** to be issued., as well as wide ranging subpoenas for an improper purpose.

36.    Even worse, Defendants have repeatedly led this Court to believe that Luther Sutter has concealed the autopsy report. The axiomatic event in their timeline was the September 4, 2019 hearing. In that hearing,

37.    Defendants, through their lawyers, knew Plaintiff, Luther Sutter, and Lucien Gillham were entitled to notice and an opportunity to be heard.  Plaintiff requested a copy of the proposed precedent from defense counsel, but defense counsel refused to provide a copy.  Defendants have intentionally conspired with each other to obtain an order on false facts, using Judge Guynn as a cat's paw.  Thus, the Order attached as **Exhibit "J"** was designed to further perpetuate this fraud that there was no evidence Wilson was the shooter.

38.    As alleged above, Luther Sutter hired his own lawyer, Andy Clarke, to review his action and judgment, as well as encouraged Dr. Peretti and Mr. Navochez to obtain their own counsel. These are not the actions of a crook.  Defendants' lawyers, acting within the

scope of their authority, obtained the Order attached as Exhibit J in a desperate attempt to destroy Luther Sutter, an improper purpose.

39.    So, Plaintiff seeks to intervene to seek an order setting aside the order attached as Exhibit J because no party will adequately protect Luther Sutter's rights. Rule 24 provides for intervention as a matter of right where, "the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." ARCP 24(a)(2). Permissive intervention is appropriate when: "when an applicant's claim or defense and the main action have a question of law or fact in common." ARCP 24(b)(2). "In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Id.

40.    Here, Defendants have obtained from the Court an Order that has no basis in fact or in law, without notice or opportunity to be heard for Lucien Gillham, Luther Sutter, or Sutter & Gillham, PLLC. That Order has the Court stating that abuse of process, fraud, and outrage have occurred. This is simultaneous with the lawsuit they improperly filed in Faulkner County. The clear plan is to argue that collateral estoppel and res judicata will impose liability on the Baker Estate, Kerry Baker, Gena Baker, and Savannah Baker, without even letting them have a jury trial. That suit is also filed against Luther Sutter, Lucien Gillham, Sutter & Gillham, PLLC, and Greg Stephens. It is clear Defendants will try to impose collateral estoppel and res judicata against Sutter,

Gillham. Sutter & Gillham. and Stephens. as well. depriving them of a jury trial. without ever giving them Due Process. notice. of the right to be heard.

41.     Upon information and belief. Defendants did not consult appropriately in accordance with Rule 37 therefore mandating that the motion be denied under *Jefferson Hosp. Assn. v. Davis*. 2020 Ark. App. 562. 11 (Ark. App. 2020) (the statement must include the names of the parties who conferred or attempted to confer, the manner by which they communicated, the dispute at issue, as well as the dates, times, and results of their discussions, if any).

42.     This is a concern because the Order indicates that Buchanan and Humphrey did not even dispute the allegations of misconduct, as was their obligation.  If that is true. it is inexplicable, and these issues were not truly contested.  Accordingly, this is a basis for permitting intervention.

        **WHEREFORE**, Luther Sutter prays this Court recuse and reassign this matter, then to permit him to intervene. to set aside the 6/22/2021 Order due to Defendant's fraud. for costs. and for all other proper relief.

                            Respectfully Submitted.

                            **SUTTER & GILLHAM, P.L.L.C**.
                            310 W. Conway Street
                            P.O. Box 2012
                            Benton, AR 72015
                            (501) 315-1910 -  Office
                            (501) 315-1916 – Facsimile
                            Luther.sutterlaw @ gmail.com

                    By:     */s/ Luther Oneal Sutter*
                            Luther Oneal Sutter, Ark. Bar #95-031

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon <u>all</u> counsel this 25th day of June. 2021 via Eflex as indicated below:

Mel Sayes
Matthews, Sanders & Sayes, P.A.
825 West Third Street
Little Rock, AR  72201
Email:  msayes@msslawfirm.com

Judy Simmons Henry
Scott A. Irby
Jacob P. Fair
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR  72201
Emails:  jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com

J. Carter Fairley
Barber Law Firm PLLC
425 West Capital, Suite 3400
Little Rock, AR  72201
Email:  cfairley@barberlawfirm.com

David D. Wilson
Martin A. Kasten
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
Email:  wilson@fridayfirm.com
mkasten@fridayfirm.com

Blake Hendrix
Annie Depper

Thomas G. Williams
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
Email:  twilliams@qgtlaw.com

John E. Moore
Emily M. Runyon
Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
Emails:  john.moore@mrmblaw.com
emily.runyon@mrmblaw.com

Efrem Neely
1514 South Poplar Street
Pine Bluff, AR  71601
Email:  ebneely@neelylaw.net

Andy Turner
Kaleb Jones
Turner Law Firm, PA
PO Box 1225
Cabot, AR  72023
Emails:  andy@turnerlawfirmpa.com
kaleb@turnerlawfirmpa.com

Eric Spencer

Fuqua Campbell, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR  72202
Emails:  bhendrix@fc-lawyers.com
adepper@fc-lawyers.com

Terry F. Wynne
Attorney at Law
415 West 6th Ave. Ste A
Pine Bluff, AR  71601
tfwynne@cablelynx.com

Email:  espencer@aristotle.net

Marion Humphreys
Email:  marionhumphreys@gmail.com

By:     /s/ Luther Sutter
        Luther Oneal Sutter, ARBN 95-031

        luther.sutterlaw@gmail.com

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2021-Jul-15  16:29:50
35CV-18-1077
C11WD01 : 18 Pages

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### 1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                    **PLAINTIFFS**

VS.                              **CASE NO. 35CV-18-1077**

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER                                 **DEFENDANTS**

### DEFENDANTS' RESPONSE TO MOTION TO
### INTERVENE AND RECUSE AND BRIEF IN SUPPORT

### I.     INTRODUCTION

On June 25, 2021, Luther Sutter—an attorney who formerly represented separate plaintiff Gena Downey Baker in this case and voluntarily withdrew—filed a motion to personally intervene and for Judge Guynn to recuse ("Motion"). The Motion should be denied for the following reasons, any one of which is alone sufficient for denial:

- Intervention is not timely pursuant to Rule 24(a) of the Arkansas Rules of Civil Procedure.

2348608-v1



EXHIBIT
G

- The Motion seeking to intervene is facially deficient because it does not include a proposed pleading as required by Rule 24(c) of the Arkansas Rules of Civil Procedure.

- Mr. Sutter lacks standing to intervene because he does not claim an interest relating to the property or transaction that is the subject of the case as required by Rule 24(a) of the Arkansas Rules of Civil Procedure.

- The alleged basis for intervention is substantively without merit.

- The Motion seeking recusal of the Court should be denied because it states no legitimate reason for recusal and cites no applicable authority, all relationships were timely disclosed, and Plaintiffs expressly stated their pleasure with the presiding judge and the chosen counsel of Defendants.

This Court has presided over this case for almost three years rendering decisions for and against both sides, after full briefing and most often, after hearing oral arguments from each side. Mr. Sutter made no objection or request for intervention or recusal until June 25, 2021, after the Court made rulings with which Mr. Sutter, without a client, disagrees. Request for intervention and recusal should both be denied.

## II.    ARGUMENT

### A.    The motion to intervene should be denied because it was not timely filed.

Intervention is permissible under Rule 24 of the Arkansas Rules of Civil Procedure so long as (1) a timely application is made by the person seeking to

2348608-v1

intervene and (2) "the applicant claims an interest relating to the property or transaction which is the subject of the action."[1]

A threshold question in determining whether intervention should be allowed is whether application was made in a timely manner. *Employers Nat'l Ins. Co. v. Grantors*, 313 Ark. 645, 855 S.W.2d 936 (1993). The issue of timeliness is a matter well within the sound discretion of the trial court and is subject to reversal only where that discretion has been abused. *Id.* Arkansas courts have shown a strong reluctance to grant intervention after final judgment. *See generally Wilson v. Harris*, 227 Ark. 808, 302 S.W.2d 86 (1957) (holding that, generally, once litigation has progressed to final judgment, it is too late for third persons to intervene) and *Bank of Quitman v. Phillips*, 270 Ark. 53, 603 S.W.2d 450 (Ark. App. 1980) (affirming the ruling of the trial court that denied the motion to intervene as untimely when it was filed on the day a case was set for trial).

Here, the motion to intervene was untimely because it was not filed until after a final order was entered granting the motion to dismiss the case with prejudice. Mr. Sutter knew that this case had been pending since October 23, 2018—almost three years—but he did not seek intervention until it was concluded. Nor does Mr. Sutter provide any meritorious reason for his delay in seeking intervention or explain how the existing parties would not be prejudiced by his attempt to enter the case and disrupt the Court's final judgment. Mr. Sutter's

---

[1] Intervention under Rule 24 is also permissible "when a statute of this state confers an unconditional right to intervene"; however, no such statute is raised or exists in this matter.

attempt to intervene is untimely and wholly inconsistent with "the just, speedy and inexpensive determination of [this] action." Ark. R. Civ. P. 1. For this reason alone, the motion to intervene should be denied, making the request to recuse moot.

**B.      The request for intervention should be denied because the Motion is facially deficient as it does not include a proposed pleading as required by Rule 24(c) of the Arkansas Rules of Civil Procedure.**

Rule 24(c) of the Arkansas Rules of Civil Procedure provides that the "motion shall state the grounds therefor and ___*shall*___ be accompanied by a pleading setting forth the claim or defense for which intervention is sought." (emphasis supplied.) In *Schact v. Garner,* 281 Ark. 45, 661 S.W.2d 361 (1983), a party moving to intervene refused to file a proposed pleading as required by Rule 24(c) but insisted on being allowed to intervene. The trial court denied the motion to intervene, and the Arkansas Supreme Court affirmed the ruling noting that the applicant had not shown entitlement to intervene as a matter of right or permissively because it failed to file a proposed pleading. *Id.; see also Polnac-Hartman & Assocs. v. First Nat. Bank in Albuquerque,* 292 Ark. 501, 504, 731 S.W.2d 202, 204 (1987) (affirming the trial court's decision that the appellant did not comply with Rule 24(c) because it failed to file a pleading setting forth a claim or defense).

Here, Mr. Sutter has clearly failed to comply with Rule 24(c) because the Motion does not contain any pleading setting forth Mr. Sutter's claim or defense. The reason Rule 24(c) requires a pleading be attached to a motion to intervene is so the Court can evaluate the applicant's claim that he has an interest relating to the property or transaction which is subject of the action. The pleading requirement

4

also allows the other parties to substantively evaluate the applicant's alleged basis for intervention. Mr. Sutter's failure to comply with the mandatory pleading requirement of Rule 24(c) precludes the Court and parties from making a substantive determination as to intervention. For this reason alone, the motion to intervene should be denied.

### C.    The Motion should be denied because Mr. Sutter lacks standing to intervene.

Even assuming Mr. Sutter timely and properly sought to intervene in this case, which he has not, he lacks standing to intervene. To intervene, Mr. Sutter must satisfy the requirement that he "claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." Ark. R. Civ. P. 24(a). It is a well-recognized general rule that strangers to the record have no standing on which to base an application to vacate a judgment, unless so authorized by statute. *Weill v. Weill*, 226 Ark. 206, 288 S.W.2d 946 (1956).

Here, the property/transaction is a wrongful death case, and Mr. Sutter is neither an heir nor personal representative of the deceased. For this reason, he has no personal interest in this case, and the motion to intervene should be denied.

Mr. Sutter also claims he is seeking to intervene to file a motion to vacate or set aside the final order dismissing this case with prejudice. Because Mr. Sutter was only counsel of record before he voluntarily withdrew as counsel, he has no standing to set aside an order where he was not a party, but rather, an officer of the

Court. The findings Mr. Sutter seeks to overturn are based on his and his co-counsels' conduct while Mr. Sutter was in the case as Gena Baker's attorney, and that does not provide any standing. For these reasons, the Motion to intervene should be denied, making the recusal request moot.

**D.    The allegations and illogical explanations in the Motion are substantively without merit.**

Unlike the "facts" alleged in the filings by Mr. Sutter in this case, the facts alleged by Defendants in their pleadings, most notably their motion to dismiss this case with prejudice, are supported by numerous exhibits, including photographs, sworn deposition testimony and other solid proof. Conversely, Mr. Sutter's Motion makes several allegations, almost none of which are supported by any evidence (and are, in fact, inconsistent with the evidence) or have anything to do with the actual relief sought in the Motion. Because the Motion to intervene is facially deficient, Defendants do not intend to waste this Court's time refuting all of the illogical explanations and allegations made by Mr. Sutter, but rather will rely on the proof presented in its motion to dismiss. Mr. Sutter's Motion is simply another attempt to muddy the waters and tender some explanation for his and his co-counsels' relentless onslaught of false and baseless allegations they have made throughout the nearly three-year lifespan of this concocted case.

One specific example of Mr. Sutter's attempt to muddy the waters that merits discussion are the allegations contained in paragraph 25 of the Motion regarding Mr. Sutter and his cohort's failure to disclose the autopsy report. Mr. Sutter claims in Paragraph 25 that the Defendants have made some type of misstatements

related to the autopsy report. This is simply another misrepresentation by Mr. Sutter that is inconsistent with the proof and record in this case.

Defendants' motion to dismiss irrefutably demonstrated in great detail how Plaintiffs and their counsel failed to disclose and produce the autopsy report that was finalized and dated September 14, 2018, until ten months later in July 2019. There is also no dispute that Greg Stephens lied in open court about the existence of the autopsy report while other of Plaintiffs' counsel, including Mr. Sutter, sat idly by and remained silent. And it was Mr. Sutter who finally admitted in a later court hearing that he was aware of the autopsy report, but that he had made the decision not to produce it to the Defendants. *See* Defendants' Joint Renewed and Amended Motion to Dismiss Case with Prejudice and for Preservation of Information and supporting brief documenting these facts in detail.[2]

Defendants now know the autopsy report was personally delivered to the home of Jefferson County Coroner Chad Kelley on July 9, 2019, by Greg Stephens, and then the autopsy report was also included as an attachment to the "Chad Kelley Report" dated July 10, 2019—the very next day. We also know that Mr. Sutter notified counsel by e-mail on July 8, 2019, that he intended to depose a third-party witness (which turned out to be Chad Kelley) prior to the issuance of the "Chad Kelley Report," which no one other than the Plaintiffs and their counsel was expecting. The issuance of the "Chad Kelley Report" also occurred shortly after the Tac Air airport meeting that occurred on or about July 6, 2019, where the "Greg

---

[2] The motion to dismiss and brief are incorporated herein pursuant to Ark. R. Civ. P. 10(c).

Stephens Work Product Notes"(which eventually became the "Chad Kelly Report" approximately four days later) were circulated to those present, including Mr. Sutter. *See* Defendants' Joint Renewed and Amended Motion to Dismiss Case with Prejudice and for Preservation of Information and Brief in Support for more Tac Air details.

Mr. Sutter correctly claims in his Motion that Greg Stephens produced the autopsy report to Defendants on July 11, 2019, but that has never been a point of dispute. The problem with the timing of the production of the autopsy report was that it was not produced until after it was a) provided to Coroner Kelley to include with his second changes to the death certificate, and b) held in secret from Defendants for ten (10) months, during which time Plaintiffs and their counsel lied about its existence to the Court and ***continuously filed pleadings containing allegations that were directly contradicted and unsupported by the autopsy report***.

Mr. Sutter's request to intervene changes nothing about the (i) failure to timely disclose a written autopsy report to Defendants, (ii) false statements to the Court about the existence of the report, and (iii) admission by Mr. Sutter that he personally decided, apparently on behalf of all Plaintiffs and their counsel, to conceal the report. The explanations provided by Plaintiffs and their counsel related to the autopsy report continue to evolve, change and become even more illogical as they are confronted with evidence that contradicts their previous

explanations, and this Motion is no different. Intervention based on factually inaccurate claims would be improper.

**E.    The request for the recusal of the Court is untimely and substantively without merit.**

Mr. Sutter cannot seek recusal of Judge Guynn because Mr. Sutter is not a party to this case. For this reason alone, the request for recusal should be denied.

Even if the Court permitted Mr. Sutter to intervene in this case, which is unwarranted, the Court should deny his recusal request because the Motion states no legitimate reason for recusal and cites no applicable authority. This Court's impartiality is presumed, and the Court "has a duty to sit on a case unless there is a valid reason to disqualify." *Perroni v. State*, 358 Ark. 17, 25, 186 S.W.3d 206, 210 (2004). The burden of proving bias or prejudice to overcome that presumption falls on Sutter as the party seeking recusal. *Turner v. State*, 325 Ark. 237, 244, 926 S.W.2d 843, 847 (1996). Mr. Sutter has not and cannot meet this burden.

During the case, the Court disclosed relationships he had with the attorneys of record including his relationship with one of Plaintiffs' original attorneys who remains counsel in the case, Marion Humphrey, and with one of Defendants' attorneys, Efrem B. Neely, Sr. Plaintiffs and their counsel, including Mr. Sutter, never sought recusal. In fact, when Mr. Neely entered his appearance in the case, it was Mr. Sutter who expressed to the Court that Plaintiffs "welcome" Mr. Neely's entrance in the case as a "fine addition." **Exhibit 1, Hearing Transcript, February 21, 2019, pp. 1- 3, 11-14, 28-31, 257.** Mr. Sutter was so overjoyed, he

sent Mr. Neely a congratulatory text for joining the defense. *Id* at 12.[3] In his

Motion, Mr. Sutter acknowledges that he—as counsel of record for one of the

Plaintiffs—previously asked the Court to not recuse but rather continue presiding

over the case. Motion ¶20. The Court determined that despite the Defendants'

concern about the disclosure of these relationships, he had the ability to be

impartial.

Now, after this case has been extensively litigated for three years and the

Court has made a dispositive ruling adverse to Plaintiffs, Mr. Sutter seeks recusal.

This extraordinary attempt to disqualify this Court for lack of impartiality is not

only disingenuous, it is baseless and a far cry from the truth, as demonstrated by

the entire record of this case.

Although Mr. Sutter complains about certain rulings in the Motion, there is

nothing in the record of this case that even remotely suggests any bias on the part

of this Court. Showing bias requires more than allegations and complaints about

the rulings in the case—it requires actual facts demonstrating that a court cannot

fairly preside over the case. The Court has properly considered numerous motions

and other pleadings filed by the Plaintiffs and their counsel in this case, including

many that were filed and ruled upon before Mr. Sutter withdrew from the case in

the face of his bad faith conduct. Judge Guynn has rendered numerous important

rulings, but only after providing the opportunity for all parties to be heard.

---

[3] Exhibit 1, pg. 12, beginning at line 6 appears to contain an error in that the statement starting with "But—but I like to have a fair fight..." to line 11 should be attributed to the Court.

Decisions have been impartially made throughout the case, some for Plaintiffs and some for Defendants.

In fact, beginning with their initial pleadings in this case, Defendants sought the dismissal of this case because they knew Plaintiffs' allegations were lies. Had the Court been biased, there were numerous opportunities to dismiss this case before now, but the Court did not do so. Instead, over two years of discovery was permitted, which came at great personal and financial cost to Defendants, before the case was dismissed. Dismissal occurred only after Defendants demonstrated, with uncontroverted proof, that Plaintiffs had indeed concocted this case and engaged in inappropriate and unethical behavior, all as chronicled in Defendants' motion to dismiss with exhibits and brief and as set out in the Court's order dismissing this case. To call the Court the Defendants' "cat's paw" under these circumstances is baseless and reprehensible. Mr. Sutter has the significant burden to show judicial bias, and he has failed to identify a single fact that comes near meeting that burden.

In addition to being baseless, Mr. Sutter's recusal request should be denied because it is untimely. Mr. Sutter has waited too long to seek recusal and, therefore, waived the issue. Waiver of grounds for judicial recusal or disqualification occurs when there is a "failure to seasonably object." *Worth v. Benton Cty. Circuit Court*, 351 Ark. 149, 154, 89 S.W.3d 891, 895 (2002). Objecting seasonably in the context of judicial recusal requires quick action by the party seeking recusal—the Arkansas Supreme Court has found waiver when a party

waited as little as three months to seek recusal. *Id.* (citing case in which waiver occurred after three months and holding that a party that waited four years to seek recusal waived its basis for recusal).

Here, Judge Guynn presided over this case for thirty-two (32) months. Mr. Sutter made no objection or request for his recusal until June 25, 2021. Recusal only became an issue after the Court made rulings that Mr. Sutter did not like. The Arkansas Supreme Court takes a dim view of this. As the Supreme Court put it in *Worth*, "it has long been the law in Arkansas that a party may not speculate on the outcome and thereafter take advantage of a fact supporting disqualification known but not raised by him until after an adverse decision is rendered." 351 Ark. at 155, 89 S.W.3d at 895 (citations omitted). In that case, the party seeking disqualification of the judge knew of the reason for disqualification on the day the complaint was filed but did not raise the issue until it received an adverse ruling on summary judgment. *Id.* Assuming the fact that Mr. Neely is one of many counsel for Defendants is Mr. Sutter's problem, the parties and all counsel, including Mr. Sutter, have known the alleged basis for recusal since February 14, 2019, which is the date Mr. Neely entered his appearance in this case. This fact serves as no basis for recusal per the appellate court.

The Motion fails because it states no legitimate factual basis for recusal. Moreover, the Motion also fails because Mr. Sutter waited until after he received rulings that he did not like to seek the recusal of Judge Guynn. And even if Mr. Sutter had some unstated basis for recusal, the Motion still fails because he waited

12

too long to raise it, after entry of a ruling with which he disagrees. For these reasons, the Motion should be denied.

### III.    CONCLUSION

For any one of the reasons stated in this response, the untimely and unsupported Motion to intervene and recuse should be denied.

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
(501) 376-9442 FAX
jhenry@wlj.com; sirby@wlj.com; jfair@wlj.com

By: /s/ Judy S. Henry_____
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Bryan Adams,*
    *Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook,*
    *Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC,*
    *Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams, Todd Ross and*
    *Joel Whicker*

13

Neely Law Firm
10515 W. Markham, Suite J2
Little Rock, AR 72205
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr. _____
    Efrem B. Neely, Sr. (2008047)

    *Attorneys for Bryan Adams,*
    *Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook,*
    *Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC,*
    *Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams, Todd Ross and*
    *Joel Whicker*

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR 72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com

By: /s/ Thomas G. Williams_____
    Thomas G. Williams, Bar I.D. #88186

*Attorneys for Prairie Wings South, LLC*

14

Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
(501) 376-2011
(501) 376-2147 FAX
wilson@fridayfirm.com
mkasten@fridayfirm.com


By: /s/ David D. Wilson _____
    David D. Wilson (90112)
    Martin A. Kasten (99100)

*Attorneys for Prairie Wings South, LLC and
Prairie Wings Lodge, LLC*



Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
501-374-6535
501-374-5906 Fax
emily.runyon@mrmblaw.com


By: /s/ Emily M. Runyon _____
    EMILY M. RUNYON (2005172)

*Attorneys for Karla Cook and
Carson Cook*

FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
501-374-0200
EMAIL: bhendrix@fc-lawyers.com
        adepper@fc-lawyers.com


By: /s/ Blake Hendrix_____
    Blake Hendrix (86066)
    Annie Depper (2009267)

*Attorneys for Skylar Wilson*

16

2348608-v1

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2021, a copy of the foregoing was served by first class United States mail, postage prepaid, upon the following:

Eric S. Buchanan
P.O. Box 166643
Little Rock, AR 72216

*Attorneys for Estate and Kerry Baker*

Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205

*Attorney for Savannah Case*

Gena Baker
44 Hawk Drive
Vilonia, AR 72173

*Pro se Plaintiff*

Mel Sayes
Jay Sayes
825 West 3rd St
Little Rock, AR 72201

*Attorneys for John Tate and Austin Tate*

Luther Oneal Sutter
Lucien Gillham
Sutter & Gillham, P.L.L.C.
310 W. Conway Street
Benton, AR 72015

*Pro se non-parties*

2348608-v1

Robert S. Tschiemer
P.O. Box 549
Mayflower, AR 72106

*Attorney for Kerry Baker as Administrator*
*of the Estate of James Luke Baker and Individually*

/s/ Judy S. Henry
Judy Simmons Henry

18

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2021-Jul-22 19:11:21
35CV-18-1077
C11WD01 : 9 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
FIRST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
KERRY BAKER, INDIVIDUALLY;
SAVANNAH BAKER CASE;
AND GENA DOWNEY BAKER                                    PLAINTIFFS

V.                      CASE NO. 35CV-18-1077

BRYAN ADAMS; SKYLAR WILSON;
TRAVIS JONES; CARSON COOK; KARLA COOK;
PRAIRIE WINGS SOUTH, LLC; AUSTIN TATE; JOHN TATE;
CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED;
PRAIRIE WINGS LODGE, LLC; CHRISTIE ADAMS;
RELIANCE HEALTH CARE INC;
BRANDON ADAMS; and TODD ROSS                            DEFENDANTS

## PLAINTIFFS' REPLY TO RESPONSE TO MOTION TO INTERVENE AND MOTION TO RECUSE

Come Luther Sutter, and for his Reply states as follows:

1.      The Motion sets out the relevant allegations concerning the fraud perpetrated on the Court. Rule 8 requires pleadings to be construed liberally to do substantial justice. Now, Ms. Henry has successfully run out the clock on any Rule 59 motion. Both she and Eric Buchanan refused to send Luther Sutter the proposed precedent. Then took the maximum amount of time to respond to the Motion. Thus, Rule 59 is no longer available. But Rule 60 is. Attached is a proposed Motion which tracks the Motion to Intervene. So, Luther Sutter was not untimely, did not fail to exercise due diligence, and substantially complied with the pleading requirements. Nonetheless, attached is a proposed Rule 60 motion, incorporated by reference herein.

**EXHIBIT**

**H**

1

2.      Clearly, Luther Sutter's interest has not been protected. Else, why would the Court not have Dr. Sperry's report that certainly creates a fact issue on how Luke died? And why wouldn't Plaintiffs' counsel show the Court just how dishonest these lawyers have been? Nobody knows. But the end result is that there has been a fraud on the Court sufficient to invoke Rule 60.

3.      The Arkansas Rules of Professional Conduct are particularly instructive. "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Ark. R. Prof. Cond. 3.1. Further emphasizing the duty of candor, Rule 3.3(a)(1) states: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal; or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Ark. R. Prof. Cond. 3.3..

4.      As discussed in the Rule 60 Motion, Ms. Henry and the rest of the defense counsel have repeatedly represented to the Court that the autopsy report was never turned over by the Plaintiffs. There are no muddied waters. Ms. Henry told the Court:

> MS. HENRY: - -- I'm sorry. Let me back up.The Peretti report was finished September 14th of 2018. We got the report -- we, being the defendants. We got the report out of Chad Kelley's production on July 15th, 2019. He faxed it to Mr. Blake Hendrick's partner, Annie Depper, and me at 9:00 o'clock that night. To be precise, 8:58 p.m., on July 15th, 2018. We get a 15-page supplemental report from Mr. Kelley, and at the back of his supplemental report is Dr. Peretti's five-page autopsy report.
> THE COURT: So you're saying he used Peretti's autopsy report to help him?
> MS. HENRY: One would -- I'm saying he had it. We're the defendants. We're defending an alleged crime: a murder, a supplying of drugs, a conspiracy. And *we don't have an autopsy report,* but the coroner in Jefferson County who wasn't even at the scene gets the report. He has it in his -- he produced it to us on July 15th at 9:00 o'clock at night.

2

**Ex. C** p. 35:2-20.(emphasis added)

5.    Lest one believe Ms. Henry misspoke, she did it again:

> I want to focus on the misrepresentations about the autopsy report.
> The Court will recall that you raised with counsel for the plaintiffs
> whether or not there was a written autopsy report because we, the
> defendants, were complaining that *we had never received an*
> *autopsy report* after we found out that it had been performed. And
> you were specifically told in court by plaintiff's counsel with other
> counsel sitting at counsel table that there was no report. This was
> an absolute misrepresentation and fraud on the Court that there was
> no written autopsy report because the autopsy was done on Friday,
> September 7th of 2018. And the one and only final autopsy report
> was issued seven days later on Friday, September 14th, 2018. That
> autopsy report was concealed from defendants. And one might ask
> why. Well, because the autopsy report is contrary to the allegations
> of the plaintiffs' complaint and amended complaint.
> **Exhibit G** at p. 11 (emphasis added).

These were just the misrepresentations that were made in open Court.  The misrepresentations

continued in the pleadings, including the Motion to Dismiss

6.    But now, in the Response to the Motion to Intervene Defendant's agree that the

report was produced in discovery.  But they say that this was never the issue. In their response,

Defendants have stated:

> Mr. Sutter correctly claims in his Motion that Greg Stephens
> produced the autopsy report to Defendants on July 11, 2019, but
> that has never been a point of dispute. The problem with the timing
> of the production of the autopsy report was that it was not
> produced until after it was a) provided to Coroner Kelley to
> include with his second changes to the death certificate, and b)
> held in secret from Defendants for ten (10) months, during which
> time Plaintiffs and their counsel lied about its existence to the
> Court and continuously filed pleadings containing allegations that
> were directly contradicted and unsupported by the autopsy report.

Defendant's Response to Motion to Intervene, Page 8. As demonstrated above, the Defendants have claimed that the report was concealed from them. They falsely claimed in the September 2019 hearing that they never received the autopsy report from the Plaintiffs. They previously claimed they only received it from Chad Kelley.

7.     Also, Ms. Henry and Mr. Williams claim the report was held in secret from Defendant's for ten months. How?

TIMELINE OF KEY DATES

COMPLAINT FILED                              10/23/2018

FIRST MOTION TO DISMISS FILED                11/1/2018

MOTION TO STAY DISCOVERY FILED               12/6/2018

LUTHER SUTTER'S ENTRY OF APPEARANCE 12/11/18

HEARING                                      2/21/19

DEFENDANTS SERVE DISCOVERY                   4/22/2019

PLAINTIFFS ANSWER DISCOVERY                  6/5/2019

HEARING                                      6/6/19

CHAD KELLY RECEIEVES AUTOPSY REPORT[1]       7/9/19

DEFENDANTS RECEIVE AUTOPSY REPORT   7/11/19

HEARING WITH HENRY'S LIES                    9/4/19

LUTHER SUTTER WITHDRAWS                      2/6/20

So, the autopsy report was not concealed for 10 months, as these lawyers claim on page 8 of the Response to the Motion to Intervene. These statements are incapable

---

[1] Luther Sutter cannot confirm this date on personal knowledge.

4

of reconciliation. In their response, they admit the falsity of their statements in the complaint and the motion to dismiss.  But even if Plaintiffs did not send the Autopsy Report to the Defendants, the Court recognized that Plaintiffs could make work product objections.

10.   At the September 4, 2019 hearing, Luther Sutter repeatedly inquired about how to object to specific attempts by Defendants to obtain work product or privileged material. The Court made clear, in denying the Motion to Quash deposition subpoenas, that specific objections to specific questions or requests based upon privilege would be allowed; and the Court would rule on them in the future:

> MR. SUTTER:       The law allows us an immediate appeal when your order   discloses what we believe to be privileged communications. I'm going to put the -
>
> THE COURT:        I didn't say – well, privilege communication – I – what I'm saying is information – I'm not saying privileged information. I'm saying he can be deposed. (R.at 122,13-20).

The Court indicated it was not ruling that privileged material had to be released, but that such objection could be made at the time of questioning on a question by question, or document by document basis.

Then at page 167, line 14 of the September 4, 2019 hearing transcript, Mr. Sutter confirmed:

> MR. SUTTER:       But I think you were clear this morning that I was going to be able to object on appropriate privilege grounds.
>
> THE COURT:        Well, you had it correct. That – that's what I said this morning.

Mr. Irby admitted as much:

> MR. IRBY:   I think the – the issue is he—is that we don't – you haven't heard any objection he's made … I think the deposition

should go forward as scheduled. that – the motion – the denial
should be entered of record in the order. and they should go
forward. If he feels that he needs to object. then there's going to be
– you know. then there's – there's ways to deal with that. Judge.

MR. SUTTER:          We agree. Your Honor.

THE COURT:          Okay. For once. All right. All right. I – I can
anticipate what's going to happen. but as of right now. everything
goes. like – like you said.
(R. at 168, 3).

14.     Despite this clear instruction from the Court, to which Mr. Irby and

Mr. Sutter both stipulated. Ms. Henry contradicted her own firm's representations

by claiming all privilege objections were denied and has caused this Court to

enter a fraudulent Order.  Plaintiffs were entitled to withhold the Autopsy report

on work product objections until the Court ruled.  But they didn't!  Anyone with a

law license ought to know better.

15.     There has no been waiver of the right to ask this Court to recuse.

Luther Sutter had the highest respect for Efrem Neeley when he entered his

appearance. so he stands by that comment because it was true when made.  But

the comments were made as a lawyer.  Now. Luther Sutter is a litigant and

believes there is evidence to create an appearance of impropriety at least.  The

Court and Mr. Neely continue to socialize with each other and are fraternity

brothers who have taken a secret oath.  What is this oath?  Would a reasonable

person question the Court's impartiality?    Luther Sutter believes so.    An

evidentiary hearing should be required or Luther Sutter should be allowed to

proffer his evidence in camera.

WHEREFORE Luther Sutter requests that he be allowed to Intervene. and

for all other proper relief.

Respectfully submitted.

SUTTER & GILLHAM, P.L.L.C.
Luther Sutter (AR95031)
P.O. Box 2012
Benton, AR  72018
501-315-1910 Office
501-315-1916 Facsimile
Attorneys for Gena Baker

By:   */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Ark. Bar No. 95031
*Luthersutter.law@gmail.com*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was served upon <u>all</u> counsel this 22nd day of July. 2021 by Eflex copy to the below indicated counsel of record:

Mel Sayes
Matthews, Sanders & Sayes. P.A.
825 West Third Street
Little Rock, AR  72201
msayes@msslawfirm.com
*Attorney for John & Mary Tate, and*
*Austin Tate*

Judy Simmons Henry
Scott A. Irby
Jacob P. Fair
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR  72201
jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com
*Attorneys for Bryan Adams, Skylar Wilson,*

Thomas G. Williams
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
twilliams@qgtlaw.com
*Attorney for Prairie Wings South, LLC*

John E. Moore
Emily M. Runyon
Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR  72201
john.moore@mrmblaw.com
emily.runyon@mrmblaw.com
*Attorneys for Karla Cook and Carson Cook*

J. Carter Fairley

7

*Travis Jones, Carson Cook, Karla Cook,*
*Prairie Wings South, LLC.*
*Prairie Wings Lodge, LLC, Christy Adams,*
*Reliance Healthcare, Inc., Brandon Adams,*
*and Todd Ross*

Barber Law Firm PLLC
425 West Capital, Suite 3400
Little Rock, AR  72201
cfairley@barberlawfirm.com
*Attorney for Joe Whicker*

David D. Wilson
Martin A. Kasten
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
wilson@fridayfirm.com
mkasten@fridayfirm.com
*Attorneys for Prairie Wings South, LLC*
*And Prairie Wings Lodge, LLC*

Andy L. Turner
Turner Law Firm
P.O. Box 1225
Cabot, AR 72023
andy@turnerlawfirmpa.com
*Attorney for Todd Ross*

Efrem B. Neely, Sr.
Neely Law Firm
1514 S. Poplar St.
Pine Bluff, AR 71601
ebneely@neelylaw.net
*Attorneys for Bryan Adams, Skylar Wilson,*
*Travis Jones, Carson Cook, Karla Cook,*
*Prairie Wings South, LLC,*
*Prairie Wings Lodge, LLC, Christy Adams,*
*Reliance Healthcare, Inc., Brandon Adams,*
*and Todd Ross*

J. Blake Hendrix
Fuqua Campbell P.A.
Riviera Tower
3700 Cantrell Road, Ste 205
Little Rock, AR 72202
bhendrix@f-clawyers.com
*Attorney for Skylar Wilson*

Hon. Terry Wynne

8

Jefferson Co. Attorney
415 W. 6th Ave.. Ste A
Pine Bluff. AR 71601
*tfwunne@cablelynx.com*


By:    */s/ Luther Oneal Sutter*
       Luther Oneal Sutter, Ark. Bar No. 95031
       *Luthersutter.law@gmail.com*

ELECTRONICALLY FILED
Saline County Circuit Court
Myka Bono Sample, Circuit Clerk
2020-Sep-16  10:16:15
63CV-19-1060
C22D02 : 4 Pages

# UNIFORM COVER PAGE
[To be used when required by Administrative Order No. 2 (g)*]

COURT:    <u>CIRCUIT</u>    COURT OF <u>SALINE</u>    COUNTY

Docket/Case Number:  <u>63CV-19-1060</u>

CASE NAME:
PLAINTIFF/
PETITIONER:    <u>SUTTER & GILLHAM, PLLC</u>

DEFENDANT/
RESPONDENT:    <u>DAVID WESTBROOK</u>

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):    <u>ORDER</u>

*Administrative Order No 2.
    (g) *File Mark*. (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).
    (2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.



EXHIBIT
I

IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS

SUTTER & GILLHAM, PLLC

**PLAINTIFF/**
**COUNTER-DEFENDANT**

V.                          CASE NO. 63CV-19-1060

**DAVID WESTBROOK**

**DEFENDANT/**
**COUNTER-PLAINTIFF**

v.

**LUTHER SUTTER**                          **THIRD PARTY DEFENDANT**

**LUCIEN GILLHAM**                          **THIRD PARTY DEFENDANT**

## ORDER

CAME BEFORE THE COURT THE PARTIES, on September 1, 2020, and a hearing was held on the following Motions: Motion to Quash Deposition Regarding Jerri Dean, Westbrook's Motion to Quash, and Counter-Defendant, Sutter & Gillham, P.L.L.C's Motion for Summary Judgment:

    1.    Westbrook's Motion to Quash is denied

    2.    The grant of summary judgment may be appropriate in a legal malpractice suit. *See Pugh v Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997). In a legal-malpractice case, a plaintiff must prove that the attorney's conduct fell below the generally accepted standard of practice and that this conduct proximately caused the plaintiff's damages. *S. Farm Bureau Cas. Ins. Co. v. Daggett*, 354 Ark. 112, 118 S.W.3d 525 (2003). *See Grassi v. Hyden*, 2010 Ark. App. 203, 374 S.W.3d 183. In the absence of such expert testimony, a directed verdict in favor of the defendant is proper. *See Id.* The only exception is where the trial court determines that expert testimony is not necessary because the case falls within the common-knowledge exception. *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003). The Motion for Summary Judgment of Counter-Defendant Sutter & Gillham, P.L.L.C., is granted for the following reasons:

a.       Counter-Defendant Sutter & Gillham, P.L.L.C. moved for summary judg-ment on on Counter-Plaintiff Westbrook's claims for legal malpractice. The facts are reviewed in the light most favorable to Westbrook, with a l admissible evidence considered, all reasonable inferences drawn in Westbrook's favor, and fact disputes resolved in Westbrook's favor. However, Westbrook failed to meet proof with proof.

b.       For the first time at the hearing, orally, Westbrook claimed to need more discovery to respond to summary judgment, and not through an affidavit as required under Rule 56, or a Motion, or as part of his Response to the Motion for Summary Judgment. It was undis-puted at the hearing that Westbrook had issued no written discovery, had taken no depositions, had requested no depositions, and had issued no subpoenas.  Nor was there any indication that after the motion for summary judgment was filed that Westbrook undertook any efforts to conduct discovery. Although Westbrook argued that the case was "brand new," the case was filed in the Fall of 2019, a hearing was held in January 2020, and the CounterClaim was filed in February 2020. Indeed, on July 8, 2020, Requests for Admissions were filed with the Court by Sutter & Gillham, P.L.L.C., and Westbrook filed no Response to them.  The case is nearly a year old and there was opportunity for Westbrook to conduct discovery. Accordingly, the issue of needing more discovery under Rule 56 was waived, and relief on that basis is denied.

c.       Westbrook failed to provide any expert testimony to indicate what the standard of care was, that it was breached at all, how it was breached, that there was a breach of fiduciary duty, or how any alleged breach caused damage to Westbrook. Westbrook's counsel indicated that he had consulted with other lawyers, and that after discovery, if an expert was needed, he would be happy to get one. In light of the evidence in the Counter-Defendant's Motion for Summary Judgment, the Response, the Reply, and supporting materials, expert testimony was required to defeat summary judgment. Therefore, summary judgment is granted.

d.       Westbrook made reference to the Arkansas Rules of Professional conduct in Response, but the Rules are not designed for a basis of civil liability, but are to provide guidance

to lawyers and to provide a structure for regulatory conduct through disciplinary agencies. *Orsini v. Larry Moyer Trucking, Inc.*, 310 Ark. 179, 184, 833 S.W.2d 366, 369 (1992).

e.      The affidavit of the defense counsel in Westbrook's case against Kelly indicated that the settlement was a good deal for Westbrook.

f.      Accordingly, Counter-Defendant, Sutter & Gillham, P.L.L.C.'s Motion for Summary Judgment is hereby granted, and Counter-Plaintiff Westbrook's Counter Claim is dismissed with Prejudice.

5.      After the Court's ruling on the Motion for Summary Judgment, Plaintiff Sutter & Gillham, P.L.L.C. moved to dismiss their Complaint without prejudice. That motion is hereby granted. Sutter & Gillham, P.L L.C.'s Complaint is hereby dismissed without prejudice.

IT IS SO ORDERED, on this, the ___*11*___ day of ___*September*___ 2020.

_____

THE HONORABLE DAVID LASER
Special Circuit Judge sitting by assignment.


Prepared by:

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501/315-1910  Office
501/315-1916  Facsimile
Attorneys for the Plaintiff

*/s/ Luther Oneal Sutter*
Luther Oneal Sutter. Esq., ARBN 95-031
luther.sutterlaw@gmail.com

cc:

Counsel for Defendant/Counter-Plaintiff, David Westbrook

Chris Burks
Chris@whlawoffices.com

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2021-Jun-22  12:59:36
35CV-18-1077
C11WD01 : 8 Pages

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
### 1ST DIVISION

**KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY**                **PLAINTIFFS**

**VS.**                **CASE NO. 35CV-18-1077**

**BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER**                **DEFENDANTS**

### ORDER GRANTING DEFENDANTS' JOINT RENEWED AND AMENDED MOTION TO DISMISS CASE WITH PREJUDICE AND FOR PRESERVATION OF INFORMATION

Before the Court is Defendants'[1] Joint Renewed and Amended Motion to

Dismiss Case With Prejudice and for Preservation of Information, with 81 exhibits,

and Brief in Support, all filed on April 13, 2021, (collectively, the "Motion").  On

April 14, 2021, separate defendants Austin Tate, John Tate, and Mary Tate ("Tate

Defendants") filed a joinder in and adoption of the Motion.  On April 21, 2021, and

---

[1] "Defendants" includes Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla Cook, Prairie Wings South LLC, Prairie Wings Lodge, LLC, Christy Adams, Brandon Adams, Reliance Health Care, Inc., Todd Ross and Joel Whicker.

**EXHIBIT**
**J**

April 26, 2021, responses to the Motion were respectively filed by the Estate of James Luke Baker, Kerry Baker, and Savannah Baker Case (collectively, the "Responses"). On April 27, 2021, a reply ("Reply") was filed by Defendants with legal authorities and optional pathways to a dismissal with prejudice. *Pro se* plaintiff Gena Baker filed a motion for extension of time to respond to the Motion on April 30, 2021.

The Court held a hearing on the Motion and Responses on June 2, 2021. Upon consideration of the Motion, Responses, Reply, arguments of counsel, other evidence and proof, and being fully knowledgeable about this case from prior hearings and filings, and for the reasons stated at the conclusion of the hearing on the record during the June 2, 2021 hearing, which are attached as Exhibit A and incorporated herein, the Court FINDS and ORDERS as follows:

1.    Based on the arguments, and the legal authorities, including both case law and Arkansas Rules of Civil Procedure, that provide this Court with discretion as and optional pathways provided by Defendants in their Motion, Reply, and in argument at the hearing, the Motion is hereby GRANTED. The complaint and amended complaint filed by Plaintiffs against Defendants and Tate Defendants are hereby dismissed with prejudice.

2.    The Motion was supported by 81 exhibits evidencing misconduct and a pattern of the abuse of the judicial process by the Plaintiffs and at least some of their counsel and certain conduct warranting the dismissal of the complaint and amended complaint with prejudice, including at least the following:

- Baseless allegations pending for over two years resulting in a miscarriage of justice;

- Use of fraudulent paperwork to allegedly disinter a body;

- Misrepresentations to government officials regarding illegal exhumation of a body in Faulkner County;

- Failure to comply with Arkansas exhumation law including failure to notify Faulkner County Coroner and failure to obtain a court order authorizing an exhumation;

- Spoliation of key evidence;

- False representations regarding a secret autopsy, concealment of the autopsy report and misrepresenting the status of the autopsy report to the Court and Defendants;

- Obstruction of FOIA at the Jefferson County Sheriff's Office, misrepresentations to Sheriff about the autopsy and report, and the origin of the re-opened case;

- Concealment and false representations regarding exonerating photographs;

- Wrongfully attempting to influence a public official, the Jefferson County Coroner, who was to be used as Plaintiffs' expert witness;

- Deliberate concealment and false representations regarding the Photo Notations (as defined in the brief supporting the Motion), allowing the Jefferson County Coroner to include the Photo Notations as a public record in a July 10, 2019 Addendum as if he were the author;

- Knowingly eliciting false testimony from the Jefferson County Coroner regarding the Photo Notations;

- Discovery abuses including but not limited to directing witnesses to ignore a subpoena duces tecum and Court Order and attempting to improperly influence fact and expert witness testimony;

- Discovery abuses including concealing documents and information from witnesses and Defendants, and removing or attempting to remove documents and information from witnesses' files; and

3

- Witness tampering including attempts to have witnesses change their testimony.

3.      In Responses filed by Plaintiffs and on the record at the hearing, Plaintiffs did not dispute or refute the allegations set forth in the Motion or presented at the hearing. Instead, Plaintiffs solely relied on Rule 41(a)(1) of the Arkansas Rules of Civil Procedure as their basis to request dismissal of the case without prejudice. None of the facts stated in the Motion and supported by the 81 exhibits were refuted with any evidence other than blanket arguments of counsel for Plaintiffs present at the hearing that they did not personally participate in the conduct.

4.      The Court FINDS that (i) it has the inherent authority under the Rules and authorities cited by Defendants to protect the integrity of the court in actions pending before it, and (ii) Rule 41(a)(1) is not intended to be a bar from a Court exercising its inherent authority by dismissing a case with prejudice when unique facts and circumstances of misconduct, abuse of process, fraud, misrepresentations, spoliation, and other misconduct, to address the miscarriage of justice are present.

5.      The Court FURTHER FINDS that abuse of process, fraud, misrepresentations, spoliation, and other misconduct resulting in a miscarriage of justice occurred in this case, all of which warrant dismissal of the case with prejudice.

4

6.    The Court FURTHER FINDS that it has the authority to dismiss the case with a prejudice as one remedy for the misconduct as set out in the Motion and Reply.

7.    The Court hereby FURTHER FINDS AND ORDERS that Plaintiffs', Plaintiffs' current and former attorneys, investigators, witnesses. experts and consultants (including the Jefferson County Coroner Chad Kelley), and anyone acting with Plaintiffs or at their direction, immediately identify, and indefinitely protect and preserve any and all documents, data and other information in any way related to this case or the death of Luke Baker.  Plaintiffs are ORDERED to immediately notify all of their current and former attorneys, investigators, witnesses, experts and consultants (including the Jefferson County Coroner Chad Kelley) of this Court's order.

8.    Rule 11 of the Arkansas Rules of Civil Procedure allows the Court to impose an appropriate sanction on its own initiative.

9.    The Court may also utilize Rule 11 of the Arkansas Rules of Civil Procedure on its own initiative to sanction Plaintiffs and their attorneys in its sole discretion.  The Court is greatly concerned that the complaint, amended complaint, and other filings may be in violation of Rule 11.  One example of such conduct would be the filing of numerous pleadings that contained allegations Plaintiffs and their counsel knew were entirely inconsistent with the photographs and the autopsy report that were in their possession but not timely disclosed or provided to Defendants in discovery.

5

10.    Although the Court is ORDERING the dismissal with prejudice on the Defendants' Motion on other grounds, the Court alternatively FINDS that another pathway to achieve the same result could be to conduct a Rule 11 hearing. The Court offered Plaintiffs this alternative, and they chose not to address the alternatives.

11.    *Pro se* plaintiff Gena Baker appeared at the hearing on June 2, 2021, and had the opportunity to be heard on her request for extension of time to respond to the Motion. The Court FINDS that the motion for extension of time filed by *pro se* plaintiff Gena Baker is hereby DENIED as MOOT. Any other motions currently pending before the Court and not addressed at the hearing on June 2, 2021, if any, are hereby DENIED as MOOT.

12.    This is a final order under Rule 54 of the Arkansas Rules of Civil Procedure.

IT IS SO ORDERED.


_____
HONORABLE ALEX GUYNN


_____
DATE

PREPARED AT THE COURT'S REQUEST BY:

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  jhenry@wlj.com
          sirby@wlj.com
          jfair@wlj.com

By: /s/ Judy S. Henry
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Bryan Adams, Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook, Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC, Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams and Todd Ross*

Copies provided to:

Terry F. Wynne (via email:  tfwynne@cablelynx.com)
Eric Buchanan (via email:  eric.buchanan@thebuchananfirm.com)
Hon. Marion Humphrey (via email: marionhumphreysr@gmail.com)
Efrem Neely (via email: efneely@neelylaw.net)
Blake Hendrix (via email: bhendrix@fc-lawyers.com)
David D. Wilson (via email:  wilson@fridayfirm.com)
Martin A. Kasten (via email:  mkasten@fridayfirm.com)
Tommy Williams (via email:  twilliams@qgtlaw.com)
Emily Runyon (via email:  emily.runyon@mrmblaw.com)
Carter Fairley (via email:  cfairley@barberlawfirm.com)
Andy Turner (via email:  andy@turnerlawfirmpa.com)
Kaleb Jones (via email: kaleb@turnerlawfirmpa.com)
Mel Sayes (via email:  msayes@msslawfirm.com)
Jay Sayes (via email: jsayes@msslawfirm.com)
Gena Baker, *pro se*  (via U.S. mail)

7



Arkansas Judiciary

**Case Title:**      KERRY BAKER ET AL VS BRYAN ADAMS ET AL

**Case Number:**   35CV-18-1077

**Type:**          ORDER MOTION GRANTED

So Ordered

Alex V. Guynn, 11th W Circuit Division
1 Judge

Electronically signed by AVGUYNN on 2021-06-22 12:59:46    page 8 of 8

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins Circuit Clerk
2022-May-02 09:00:46
35CV-17-16
C11WD01 : 2 Pages

IN THE CIRCUIT COURT OF JEFFERSON COUNTY
DIVISION

LEE ANDREW DAVIS                                                    PLAINTIFF

VS.                        CASE NO. 35cv-17-16

JEFFERSON HOSPITAL ASSOCIATIONON, INC.,
ET AL.                                                             DEFENDANTS

### ORDER GRANTING MOTION TO WITHDRAW

On this day is presented the Motion to Withdraw as counsel for Plaintiff Lee Davis, by Sutter & Gillham, P.L.L.C., L. Oneal Sutter, and Lucien Gillham.  Plaintiff is still represented by Gene McKissic.  Accordingly, the Court finds that the Motion to Withdraw should be, and is, hereby granted.

IT IS THEREFORE ORDERED that Sutter & Gillham, P.L.L.C., L.Oneal Sutter, anddLucien Gillham are relieved as counsel for Plaintiff Lee Davis, on this, the _____ day off _____, 2022.

_____
HONORABLE ALEX GUYNN

DATED: _____

PREPARED BY:

Lucien Gillham
Sutter & Gillham, PLLC
310 W. Conway
Benton, AR 72015

/s/ Lucien Gillham


EXHIBIT
K



Arkansas Judiciary

**Case Title:**      LEE ANDREW DAVIS V JEFFERSON HOSPITAL ORG
ET AL

**Case Number:**   35CV-17-16

**Type:**            ORDER MOTION GRANTED


So Ordered

Alex V. Guynn, 11th W Circuit Division
1 Judge

Electronically signed by AVGUYNN on 2022-05-02 09:00:32    page 2 of 2

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins. Circuit Clerk
2021-Jun-25 21:37:10
35CV-18-1077
C11WD01 : 5 Pages

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS**
**5TH DIVISION**

KERRY BAKER, ET AL                                    PLAINTIFFS

vs.                        CASE NO. 35CV-18-1077

BRYAN ADAMS, ET AL                                    DEFENDANTS

## EXHIBIT H TO MOTION TO INTERVENE



## DECLARATION UNDER OATH OF KRIS SPERRY, M.D.


## MANNER OF DEATH


In determining the manner of death in this case, I have been provided with documentation concerning the events which includes the coroner's reports, autopsy report of Frank Peretti, MD, AR089-18 (9/7/18), crime scene investigation, death certificate, photographs from the scene, hospital, and the exhumation autopsy, 911 tape and transcript, and written statement of Skylar Wilson.

### PERTINENT FACTS TO DETERMINATION OF MANNER OF DEATH

1.     Autopsy Report, Analysis of Gunshot Wound – no obvious muzzle imprint, identifiable soot deposition or gunpower residue.

2.     Analysis of Gun – no evidence of fingerprints, blood or blood spatter found on gun.

3.     Analysis of Gun Powder Residue on Hands of James Baker – No evidence of gun powder residue on hands of James Baker.

4.     Analysis of 911 Tape – Skylar Wilson notes the following on the 911 Tape concerning the facts of the shooting:

> "We were in the living room and he pulled out his gun and he took out three bullets and said, 'Let's play Russian Roulette.' And I said, 'No, bro, that's not even funny.' Cause he always does that shit. And he clicked it in the air and he said, 'See, there's nothing in it.' And then he put it to his head and pressed it and it shot him."

5.     Analysis of Written Statement of Skylar Wilson – in a handwritten statement Skylar Wilson notes the following concerning the facts of the shooting:

> "… He pulled out his gun and said let's play Russian Rolet [sic] and I said no this is not funny bro put I away.  Then he took out 3 bullets and put it at the cealing [sic] and fired and nothing happened.  Then he laughed and put it to his head and fired.  Then I went into my friends room and yelled at them at what he did and they thought it was a joke…"

OPINIONS

Based on a review of the pertinent facts, there was only one witness to the death of Mr. Baker, Mr. Skylar Wilson. The facts of the shooting as set forth by Mr. Wilson indicate that Mr. James Baker suffered a self-inflicted gunshot wound at contact range to his head when he pushed the handgun to his head and pulled the trigger. Based on the forensic evidence set forth above, this version of events is a forensic impossibility and the gunshot wound to Mr. Baker's head was fired from an approximate distance of greater that two feet. Based on my review of the evidence, this death should be classified as a homicide based on the following analysis.

1.      The examination of the wound trajectory showed an angled path from right to left, front towards back and upward. The wound trajectory indicated that the projectile went through both parietal lobes of the brain, which would have produced instantaneous unconsciousness and produced death rapidly.

2.      Based upon the description of the shooting by Skylar Wilson, the only eye witness to the death, when the decedent "put" the gun to his head and shot himself, this maneuver would create a contact wound, which means that the weapon's muzzle would be in contact with (touching) the skin of the head. If this description was accurate, there would be a contact wound to the scalp where the gun barrel came in contact to the scalp. Further, if the gun was held within a few centimeters from the scalp, this would produce a very close range wound pattern, with dense soot and gunpowder deposition throughout the wound margin, the skin surrounding the wound, and along the missile track in the scalp and onto the bone periosteum around the missile perforation. Further, with a contact wound, near contact wound, or very close range gunshot wound, you would also see evidence of singing of the hair. Finally, with a contact wound, near contact wound or very close range wound, you would expect to see evidence of blood or blood spatter on the gun. In this case, there is no evidence of burning at the site of the entrance wound, any evidence of singing of the hair or blood or blood spatter on the gun. Therefore, it is my opinion that the projectile that caused James Baker's death was not fired while the firearm muzzle was either pressed to his head or in immediate proximity to his head.

3.      Further, in contact gunshot wounds, near contact gunshot wounds or very close range gunshot wounds of the head, soot, gunpowder, small metal fragments and vaporized metals would be deposited in and along the wound track, which would include deposition onto and into the skin, the periosteum, and the cranial bones. No such deposition could be found anywhere in this autopsy. While the absence of soot on the skin at a time point three years after death might be inconclusive given the time delay and cleaning of the body for the funeral, you would expect to find some deposition, especially embedded in the bone around the wound margin if it were a contact or near contact wound, even years later, and none could be found.

4.      Based on my years of experience as a medical examiner and examination of numerous bodies after burial and exhumation, evidence of a contact wound would still be observable at a three-year post-mortem examination. As set forth in the autopsy, there were peri-mortem wounds still visible, including injuries on the right cheek.

5.      If the gun would have been pointed at the head and fired from further out, from approximately six inches up to approximately two feet, this would produce an intermediate range wound. With an intermediate wound, one would expect to find evidence of stippling or gun powder tattooing on the skin of the head and face. Further, at this distance, one would also expect to see some soot, gunpowder residue or deposition of metal fragments impacted into the skin, the periosteum, and the cranial bones and blood or blood spatter on the gun. While this is not what was described by the only witness, there was no evidence of stippling or gunpowder tattooing at the autopsy nor within the post-mortem photos taken in the ER which showed only dried blood particles with no evidence of punctate tattooing on the scalp which would be expected in an intermediate wound. The autopsy did not reveal any evidence of gunpowder or metal fragment tattooing in the area around the wound.

6.      Given this lack of evidence of any contact wound, near contact wound, or intermediate wound, it is my opinion that the wound to Mr. Baker's head would be described as a distant-range gunshot wound. A distant gunshot wound is a gunshot wound from a weapon fired at a distance too far away from the head to leave evidence of stippling or gunpowder tattooing, and with respect to the weapon that was used in the shooting, this would comprise a distance of approximately at least two feet. The absence of burn marks, singing to the hair, soot or gunpowder residue in the wound, soot, gunpowder residue, vaporized metals in the underlying bone, metal fragments in the skin or the periosteum, the absence of tattooing and blood or blood splatter on the gun, among other things, support my opinion that this was a distant gunshot wound. This is also supported by the autopsy, examination of the body, examination of the photos from the ER and the other evidence reviewed in this case.

7.      Based on my evaluation of all the evidence in this case, it is my opinion that Mr. Baker did not sustain a self-inflicted gunshot wound to the head. There is no physical evidence that the gunshot wound was from contact range, near-contact range, or intermediate range. Therefore, it is my opinion that Mr. Baker was killed from a distant shot, more than approximately two feet, and that his manner of death would be classified as a homicide.

8.      All of the opinions expressed herein are held to a reasonable degree of forensic certainty.

Pursuant to 28 U.S.C. § 1746, I, Kris Sperry, M.D. do declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief.

Kris Sperry, M.D.

Date: July 19, 2019

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY          **PLAINTIFFS**

VS.                          NO. 35CV-18-1077

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,
AND CERTAIN JOHN DOE COMPANIES AND
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER          **DEFENDANTS**

### DEFENDANTS' MOTION FOR SANCTIONS, INCLUDING TO DISMISS THE AMENDED COMPLAINT, OR ALTERNATIVELY, TO COMPEL STEVE NAWOJCZYK TO COMPLY WITH SUBPOENA DUCES TECUM AND COURT ORDER AND FOR SANCTIONS

Defendants Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla

Cook, Prairie Wings South, LLC, Prairie Wings Lodge, LLC, Christy Adams,

Reliance Health Care Inc., Brandon Adams and Todd Ross (collectively,

"Defendants"), for their motion for sanctions, including to dismiss the amended

complaint, or alternatively, to compel Steve Nawojczyk to comply with the subpoena

duces tecum and court order and for sanctions (the "Motion"), state:



FILED

OCT 2 9 2019

LAFAYETTE WOODS, SR.
Circuit Clerk
JEFFERSON COUNTY, ARKANSAS

1.     On July 22, 2019 Defendants served a subpoena duces tecum ("Subpoena") on Steve Nawojczyk ("Nawojczyk") for production of, among other things, documents, communications, e-mails, and text messages that are in any way related to the death of James Luke Baker, within five (5) business days of service. **Exhibit 1.**

2.     The Subpoena was properly served per affidavit of service. **Exhibit 2.**

3.     Nawojczyk failed to respond or produce any documents.

4.     On July 29, 2019, Luther Sutter for Plaintiff Gena Baker, filed a motion to quash the Subpoena issued by Defendants to Nawojczyk. Defendants' filed a response.

5.     On September 4, 2019 this Court held a hearing on several pending motions, and after argument, orally DENIED Ms. Baker's motion to quash the Subpoena served on Nawojczyk.

6.     On September 23, 2019, in a good faith effort to receive the documents and information without involving the Court, Defendants informed Nawojczyk by letter of the oral ruling denying the motion to quash. Defendants demanded that Nawojczyk comply with the Subpoena and Court's oral ruling by providing copies of the requested documents and information no later than September 30, 2019. **Exhibit 3.**

7.     On October 16, 2019, the Court confirmed the oral bench ruling by entry of a written order denying Ms. Baker's motion to quash. **Exhibit 4, ¶2.**

2

8.    On October 16, 2019, Defendants made another good faith attempt to obtain the requested records and information by sending another letter to Nawojczyk to notify him of the entry of the Court's order and to request that he comply with the Subpoena and court order by providing copies of the requested documents and information by October 18, 5:00 p.m. **Exhibit 5 (without exhibits to correspondence).** A copy of the court order was provided to Nawojczyk. *Id.*

9.    In response to receiving Exhibit 5, on October 16, 2019 at 9:16 p.m., Nawojczyk sent email correspondence to Sutter asking him, "Mr. S[utter]- What do you advise? S[teve Nawojczyk]/". **Exhibit 6,** see Exhibit A (arrow added) to Gena Baker's motion to alter or amend dated October 18, 2019.

10.    On the following day, October 17, 2019, and for the first time, Nawojczyk acknowledged the Subpoena and order. Nawojczyk stated that he was "currently awaiting direction from [his] client" and "will be sending you links to satisfy your requests..." set out in the Subpoena and as ordered produced by the Court. **Exhibit 7** (arrow added). Nawojczyk copied only Greg Stephens with his correspondence. *Id.*

11.    Instead of providing a link containing the responsive documents as promised, at 4:01 p.m. on October 18, 2019, Nawojczyk sent email correspondence that he was refusing to comply with the order to produce the responsive documents based on instructions he received at 4:00 p.m. from Luther Sutter ("Sutter"). **Exhibit 8.**

3

12.    Minutes later, on October 18, 2019, Sutter sent email correspondence
confirming that he had instructed Nawojczyk not to comply with the court order.
**Exhibit 9.**

13.    For the continued discovery abuses of plaintiffs and their counsel as
outlined in the accompanying brief and as set out in other pleadings and in hearings
before this Court, and based on the Rules and other cited authorities in the
accompanying brief, Defendants seek a sanction of dismissal with prejudice of the
amended complaint against them, and for their costs and fees incurred in this case.

14.    Alternatively, Defendants request that Nawojczyk be held in contempt
of court for evading the Subpoena and court order and that the Court compel
Nawojczyk to immediately produce the requested documents and ordered to pay
Defendants' fees and costs.

15.    Defendants also seek an order directing the plaintiffs and their counsel
to stop interfering with Defendants' discovery in this case, awarding Defendants
their fees and costs and granting Defendants all other relief the Court determines is
appropriate under the facts and circumstances of this case.

16.    The Motion is supported by the accompanying brief incorporated here
and the following exhibits:

- **Exhibit 1** - Subpoena to Nawojczyk;

- **Exhibit 2** - Affidavit of service;

- **Exhibit 3** - September 23, 2019 good faith letter of Defendants;

**4**

- **Exhibit 4 -** October 16, 2019 order denying motion to quash as to Nawojczyk;

- **Exhibit 5 -** October 16, 2019 good faith letter to Nawojczyk with court order;

- **Exhibit 6 -** Gena Baker's Exhibit A to motion to alter or amend (arrow added); Nawojczyk seeking direction from Sutter;

- **Exhibit 7 -** October 17, 2019 initial Nawojczyk letter response confirming links to documents and information to be provided;

- **Exhibit 8 -** October 18, 2019 Nawojczyk letter response refusing to comply with order per instructions from Luther Sutter; and

- **Exhibit 9 -** October 18, 2019 letter response of Sutter confirming direction to Nawojczyk not to comply with court order.

WHEREFORE, Defendants respectfully request the entry of an order of dismissal of the amended complaint with prejudice and for sanctions, fees and costs, as outlined above and in the accompanying brief, or alternatively, the Defendants request that Nawojczyk be held in contempt of court for evading the Subpoena and court order and that the Court compel Nawojczyk to immediately produce the requested documents and pay fees and costs, and for sanctions, fees and costs as to plaintiffs and their counsel, all as outlined above and in the accompanying brief, and awarding all other relief to which Defendants are entitled.

1975546-v1

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
(501) 376-9442 FAX
jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com

By: /s/ Judy S. Henry
      Judy Simmons Henry (84069)
      Scott A. Irby (99192)
      Jacob P. Fair (2015167)

      *Attorneys for Bryan Adams,*
      *Skylar Wilson, Travis Jones,*
      *Carson Cook, Karla Cook,*
      *Prairie Wings South, LLC,*
      *Prairie Wings Lodge, LLC,*
      *Christy Adams, Reliance Healthcare, Inc.,*
      *Brandon Adams, Todd Ross and*
      *Joel Whicker*


NEELY LAW FIRM
10515 W. Markham, Suite J2
Little Rock, AR 72205
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr.
      Efrem B. Neely, Sr. (2008047)
      *Attorneys for Bryan Adams,*
      *Skylar Wilson, Travis Jones,*
      *Carson Cook, Karla Cook,*
      *Prairie Wings South, LLC,*
      *Prairie Wings Lodge, LLC,*
      *Christy Adams,*
      *Reliance Healthcare, Inc.,*
      *Brandon Adams, Todd Ross and*
      *Joel Whicker*

6

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR  72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com


By: /s/ Thomas G. Williams
        Thomas G. Williams, Bar I.D. #88186

*Attorneys for Prairie Wings South, LLC*



FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3522
(501) 376-2011
(501) 376-2147 FAX
wilson@fridayfirm.com
mkasten@fridayfirm.com

By:/s/ David D. Wilson
        David D. Wilson (90112)
        Martin A. Kasten (99100)

*Attorneys for Prairie Wings South, LLC and*
*Prairie Wings Lodge, LLC*

7

MUNSON, ROWLETT, MOORE AND BOONE, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR 72201
501-374-6535
501-374-5906 Fax
john.moore@mrmblaw.com
emily.runyon@mrmblaw.com

By: /s/ Emily M. Runyon
    JOHN E. MOORE (82111)
    EMILY M. RUNYON (2005172)

    *Attorneys for Karla Cook and
    Carson Cook*


FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
501-374-0200
EMAIL: bhendrix@fc-lawyers.com
       adepper@fc-lawyers.com

By: /s/ Blake Hendrix
    Blake Hendrix (86066)
    Annie Depper (2009267)

    *Attorneys for Skylar Wilson*


TURNER LAW FIRM, P.A.
P.O. BOX 1225
Cabot, AR 72023-1225
(501) 941-2210
(501) 941-0010 (Fax)
andy@turnerlawfirmpa.com

By: /s/ Andy L. Turner
    Andy L. Turner (97145)
    Kaleb M. Jones (16210)

    *Attorneys for Todd Ross*

8

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2019, a copy of the foregoing was served by first class United States mail, postage prepaid, upon the following:

Eric S. Buchanan
P.O. Box 166643
Little Rock, AR 72216
eric.buchanan@thebuchananfirm.com

*Attorneys for Estate and Kerry Baker*

Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205
marionhumphreysr@gmail.com

*Attorney for Savannah Case*

Luther Sutter
Lucien Gillham
310 W. Conway Street
Benton, AR 72015
luther.sutterlaw@gmail.com
lucien.gillham@gmail.com

*Attorneys for Gena Baker*

Mel Sayes
Jay Sayes
825 West 3rd St
Little Rock, AR 72201

*Attorneys for John Tate and Austin Tate*

9

Greg Stephens
The Stephens Firm
415 North McKinley, Suite 490
Little Rock, AR 72205

Steve Nawojczyk
P.O. Box 1932
North Little Rock, AR 72115

/s/ Judy S. Henry
Judy Simmons Henry

10

**Issued by the**

CIRCUIT _____ **COURT**

Jefferson _____ **County, Arkansas**

Kerry Baker, as Administrator of the Estate of James Luke
Baker, and Kerry Baker Individually, and Savannah Baker
Case Individually, and Gena Downey Baker Individually

v.

Bryan Adams; Skyler Wilson; Travis Jones; Carson Cook; Kacie Cook; Prairie Wings South, LLC; Austin Tate; John Tate; and Certain John Doe Companies; and Individual John and Jane Does to be Determined and Prairie Wings Lodge, LLC; Christie (sic) Adams; Mary Tate, Reliance Health Care, Inc.; Brandon Adams; Todd Ross; and Joe (sic) Wischer

# SUBPOENA IN A CIVIL CASE

**CASE NUMBER** 35CV-18-1077

TO: Steve Nawojczyk _____

☐ YOU ARE COMMANDED to appear in the _____ Court of _____ County, Arkansas, at the place, date, and time specified below to testify in the above case.

| Place of Testimony | Courtroom |
|---|---|
|  | Date and Time |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the taking of a deposition in the above case. This is a deposition by video.

| Place of Deposition | Date and Time |
|---|---|

☐ YOU ARE COMMANDED, at the time of the trial, hearing or deposition described above, to produce and permit inspection and copying of the following documents or objects (list documents or objects):

_____

☑ YOU ARE COMMANDED, no more than __5__ business days after receiving this subpoena, to produce and permit inspection and copying of the following documents or objects (list documents or objects):
See attached "Exhibit A".

_____

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Arkansas Rules of Civil Procedure 30(b)(6).

**EXHIBIT**

__/__

_(signature)_ July 11, 2019

Issuing Officer Signature and Title (Indicate if Attorney for Plaintiff or Defendant)        Date

Judy Simmons Henry (84066), Scott I. Irby (99192), and Jacob P. Fair (2015167), Wright, Lindsey & Jennings LLP
200 W. Capitol Ave., Ste. 2300, Little Rock, AR 72201 (501) 371-0808

Issuing Officer's Name, Address, and Phone Number

## PROOF OF SERVICE

SERVED                    Date            Place

Served on (Print name)                Manner of Service

Served by (Print name)                Title

## DECLARATION OF SERVER

I declare, under penalty of perjury under the laws of the State of Arkansas that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                 Date                    _____
                                         Signature of Server

                                         _____
                                         Address of Server

### NOTICE TO PERSONS SUBJECT TO SUBPOENAS

Regardless of his or her county of residence, a witness subpoenaed for examination at a trial or hearing must be properly served with a subpoena at least two days prior to the trial or hearing, or within a shorter time if the court so orders. The subpoena must be accompanied by a witness fee calculated at the rate of $30.00 per day for attendance and $0.25 per mile for travel from the witness' residence to the place of the trial or hearing. Rule 45(d), Ark. R. Civ. P.

A witness subpoenaed in connection with a deposition must be properly served with a subpoena at least five business days prior to a deposition, or within a shorter time if the court so orders. The witness is required to attend a deposition at any place within 100 miles of where he or she resides, is employed, or transacts business in person, or at such other convenient place set by court order. The subpoena must be accompanied by a witness fee calculated at the rate of $30.00 per day for attendance and $0.25 per mile for travel from the witness' residence to the place of the deposition. Rule 45(e), Ark. R. Civ. P.

A subpoena may command the person to whom it is directed to produce for inspection any books, papers, documents, or tangible things designated in the subpoena. The person subpoenaed may ask the court to quash or modify the subpoena if it is unreasonable or oppressive or to require that the person on whose behalf the subpoena is issued pay the reasonable cost of such production. Rule 45(b), Ark. R. Civ. P. The person subpoenaed may also object in writing to inspection or copying of any or all of the designated materials or seek a protective order from the court. If a written objection is made within ten days of service of the subpoena or on or before the time specified for compliance if such time is less than ten days, the party causing the subpoena to be issued is not entitled to inspect the materials unless the court so orders. Rule 45(e), Ark. R. Civ. P.

When a witness fails to attend in obedience to a subpoena or intentionally evades the service of a subpoena by concealment or otherwise, the court may issue a warrant for arresting and bringing the witness before the court to give testimony and answer for contempt. Rule 45(g), Ark. R. Civ. P.

## EXHIBIT A

You are hereby directed to produce the following documents to counsel for
defendants:

1)  any documents, electronic information audio and video recordings,
photographs, recorded information, papers, models, diagrams, items,
reports, drafts of reports, summaries, opinions, correspondence or
materials of any kind that you have or your company has received from
or provided to any person or company that is in any way related to
your work related to James Luke Baker, deceased, the Prairie Wings
Lodge, the accident on October 24, 2015, or to the extent you are
aware, the allegations in the complaint and the allegations in the
amended complaint;

2)  your and your company's engagement letter and billing file that will
reflect the terms of your engagement and any compensation you have
or your company has received or has agreed to receive in the future in
relation to your work in connection with Luke Baker, deceased, and in
connection with this case, including your and your company's billing
file(s);

3)  any communications between you and your company and one or more
of the plaintiffs since October 24, 2015;

4)  any communications between you and your company and one or more
of the plaintiffs' counsel (whether Greg Stephens, Luther Sutter,

Lucien Gillham, Tona DeMers, Marion Humphrey, Eric Buchanan or other counsel) since October 24, 2015;

5)    any communications between you or your company and any person or company that is any way related to Luke Baker, deceased, and/or to the extent you are aware, the allegations in the complaint and amended complaint in this case;

6)    any communications and documents your or your company received from or sent to one or more of the plaintiffs since October 24, 2015; and

7)    any communications and documents your or your company received from or sent to the plaintiffs' counsel since October 24, 2015.

2

Fax Server          8/18/2019 11:48:23 AM  PAGE   2/002   Fax Server

## AFFIDAVIT OF SERVICE

**State of Arkansas**                **County of JEFFERSON**                **Circuit Court**

Case Number: 35CV-18-1077

Plaintiff:
KERRY BAKER, AS ADMINISTRATOR OF THE ESTATE OF JAMES LUKE BAKER, AND
KERRY BAKER INDIVIDUALLY, AND SAVANNAH BAKER CASE INDIVIDUALLY, AND
GENA DOWNEY BAKER INDIVIDUALLY
vs.
Defendant:
BRYAN ADAMS; SKYLAR WILSON; ET AL.,

For: Ms. Judy Simmons Henry
    WRIGHT LINDSEY & JENNINGS LLP

Received by MYERS ATTORNEY'S SERVICE to be served on STEVEN NAWOJCZYK, 823 W 33RD ST, NORTH LITTLE ROCK, AR
72118. I, *Richard Gray*, being duly sworn, depose and say that on the *21* day of *July*, 20*19* at
*5:06* __.m., executed service by delivering a true copy of the SUBPOENA IN A CIVIL CASE, EXHIBIT A in accordance with state
statutes in the manner marked below:

(✓) INDIVIDUAL SERVICE: Served the within-named person.
( ) SUBSTITUTE SERVICE: I left the documents listed at the individual's dwelling house or usual place of abode with
_____, a family member at least 18 years of age.
( ) POSTED SERVICE: After attempting service on ___/___ at ____ and on ___/___ at ____ to a conspicuous place on the property
described herein.
( ) PROXIMITY: I left the documents in the individual's proximity by_____ after he/she refused to receive
the documents when I offered them to him/her.
( ) OTHER SERVICE: As described in the Comments below by serving _____.
( ) NON SERVICE: For the reason detailed in the Comments below.
Service Completed At: ( ✓ )ADDRESS ABOVE  ( ) OTHER:_____

COMMENTS: *Served personally at address provided*
*above*
_____
_____
_____

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service
was made.

FILED
AUG 1 5 2019

LAFAYETTE WOODS, SR.
Circuit Clerk
JEFFERSON COUNTY, ARKANSAS

_____
PROCESS SERVER # _____
Appointed in accordance with State Statutes

MYERS ATTORNEY'S SERVICE
323 Center Street
Suite 1425
Little Rock, AR 72201
(501) 376-6286

Our Job Serial Number: 2019009524

Subscribed and Sworn to before me on
*7-22-19*_____ by the affiant who
is personally known to me.

[Notary Seal:
STEPHANIE MYERS
COMM. EXP.
7-8-2021
No. 12383058
SALINE
COUNTY
NOTARY PUBLIC]

_____
NOTARY PUBLIC

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.0h

EXHIBIT
**2**
_____

# W

## WRIGHT LINDSEY JENNINGS

200 West Capitol Avenue, Suite 2300  Little Rock, AR 72201-3699  Main 501.371.0808  Fax 501.376.9442  wlj.com

Judy Simmons Henry
**ATTORNEY**

Direct: 501.212.1391 | jhenry@wlj.com

September 23, 2019

**VIA EMAIL: nawojczyk@me.com**
**U.S. MAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Mr. Steven Nawojczyk
823 W. 33rd St.
North Little Rock, AR 72118

Re:    Kerry Baker, as Administrator of the Estate of James Luke Baker, and Kerry
       Baker Individually, and Savannah Baker Case, Individually, and Gena
       Downey Baker, Individually vs. Bryan Adams, Skylar Wilson, Travis Jones,
       Carson Cook, Karla Cook, Prairie Wings South LLC, Austin Tate, John Tate
       and Certain John Doe Companies and Individual John and Jane Does to be
       determined and Prairie Wings Lodge, LLC; Christie (sic) Adams, Mary Tate,
       Reliance Health Care, Inc., Brandon Adams, Todd Ross and Joe (sic) Whicker
       Jefferson County Circuit Court, Case No. 35CV-18-1077

Dear Mr. Nawojczyk:

Our firm and other attorneys represent defendants Bryan Adams, Skylar Wilson,
Travis Jones, Carson Cook, Karla Cook, Prairie Wings South LLC, Prairie Wings
Lodge LLC, Christy Adams, Reliance Health Care Inc., Brandon Adams and Todd
Ross (collectively "Defendants") in the above-referenced case.

On July 22, 2019, you were served with a subpoena duces tecums requiring you to
provide documents to Defendants within five (5) business days. A true and correct
copy of the subpoena and proof of service are attached as Exhibit 1.

Plaintiffs filed a motion to quash the subpoena served on you, and the motion to
quash the subpoena was denied by Judge Guynn on September 4, 2019. As such, I
am hereby demanding that you comply with the subpoena duces tecum and provide
me copies of the requested documents no later than September 30, 2019. You may
e-mail the responsive documents to me at jhenry@wlj.com or mail those documents
to our firm address listed above. I appreciate your cooperation and prompt
attention to this matter.

If you are represented by counsel, please advise.

**EXHIBIT**
**3**

WRIGHT LINDSEY JENNINGS

September 23, 2019
Page 2

Sincerely,

WRIGHT, LINDSEY & JENNINGS LLP

Judy Simmons Henry

JSH:jpf
Enclosures
cc:     Eric Buchanan (via email: eric.buchanan@thebuchananfirm.com)
        Marion Humphrey (via email: marionhumphreysr@mail.com)
        Luther O'Neal Sutter II (via email: lsutter@sglaws.com)
        Lucien Gillham (via email: lgillham@sglaws.com)
        Mel Sayes (via email: msayes@msslawfirm.com)
        Jay Sayes (via email: jsayes@mslawfirm.com)
        Thomas G. Williams (via email: twilliams@qgtlaw.com)
        John E. Moore (john.moore@mrmblaw.com)
        Emily Runyon (emily.runyon@mrmblaw.com)
        David D. Wilson (wilson@fridayfirm.com)
        Martin A. Kasten (mkaster@fridayfirm.com)
        J. Carter Fairley (cfairley@barberlawfirm.com)
        Blake Hendrix (bhendrix@fc-lawyers.com)
        Annie Depper (adepper@fc-lawyers.com)
        Andy Turner (andy@turnerlawfirmpa.com)
        Kaleb Jones (kaleb@turnerlawfirmpa.com)
        Efrem Neely (ebneely@neelylaw.net)
        Eric Bell (ebell@reliancehealthcare.com)
        Scott Irby (Firm)
        Jacob P. Fair (Firm)

1945653-v1

**Issued by the**

_____ CIRCUIT _____ **COURT**

_____ Jefferson _____ **County, Arkansas**

Kerry Baker, as Administrator of the Estate of James Luke
Baker, and Kerry Baker individually, and Savannah Baker
Case individually, and Gena Downey Baker individually    **SUBPOENA IN A CIVIL CASE**

v.
Bryan Adams; Skyler Wilson; Travis Jones; Carson Cook; Karla Cook; Prairie Wings South, LLC; Austin Tate; John Tate;
and Certain John Doe Companies; and Individual John and Jane Does to be Determined and Prairie Wings Lodge, LLC;
Chrissie (sic) Adams; Mary Tate; Reliance Health Care, Inc.; Brandon Adams; Todd Ross; and Joe (sic) Whicker    **CASE NUMBER** 35CV-18-1077

TO:  Steve Nawojczyk

☐  YOU ARE COMMANDED to appear in the _____ Court of _____ County, Arkansas, at the place, date, and
time specified below to testify in the above case.

| Place of Testimony | Courtroom |
|---|---|
| | |
| | Date and Time |
| | |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the taking of a deposition in
the above case. This is a deposition by video.

| Place of Deposition | Date and Time |
|---|---|
| | |
| | |

☐  YOU ARE COMMANDED, at the time of the trial, hearing or deposition described above, to produce and permit inspection
and copying of the following documents or objects (list documents or objects):

_____

_____

☑  YOU ARE COMMANDED, no more than ___5___ business days after receiving this subpoena, to produce and permit
inspection and copying of the following documents or objects (list documents or objects):
See attached "Exhibit A".

_____

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Arkansas Rules of Civil Procedure 30(b)(6).

_Judy S. Henry_ _attorney for_                                July 11, 2019

Issuing Officer Signature and Title (Indicate if Attorney for Plaintiff or Defendant)    Date

Judy Simmons Henry (84068), Scott I. Irby (99192), and Jacob P. Fair (2015167), Wright, Lindsey & Jennings LLP
200 W. Capitol Ave., Ste. 2300, Little Rock, AR 72201 (501) 371-0808

Issuing Officer's Name, Address, and Phone Number

---

## PROOF OF SERVICE

| SERVED | Date | Place |
|--------|------|-------|
|        |      |       |

| Served on (Print name) | Manner of Service |
|------------------------|-------------------|

| Served by (Print name) | Title |
|------------------------|-------|

---

## DECLARATION OF SERVER

I declare, under penalty of perjury under the laws of the State of Arkansas that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
          Date
                                  Signature of Server

                                  Address of Server

---

### NOTICE TO PERSONS SUBJECT TO SUBPOENAS

Regardless of his or her county of residence, a witness subpoenaed for examination at a trial or hearing must be properly served with a subpoena at least two days prior to the trial or hearing, or within a shorter time if the court so orders. The subpoena must be accompanied by a witness fee calculated at the rate of $30.00 per day for attendance and $0.25 per mile for travel from the witness' residence to the place of the trial or hearing. Rule 45(d), Ark. R. Civ. P.

A witness subpoenaed in connection with a deposition must be properly served with a subpoena at least five business days prior to a deposition, or within a shorter time if the court so orders. The witness is required to attend a deposition at any place within 100 miles of where he or she resides, is employed, or transacts business in person, or at such other convenient place set by court order. The subpoena must be accompanied by a witness fee calculated at the rate of $30.00 per day for attendance and $0.25 per mile for travel from the witness' residence to the place of the deposition. Rule 45(e), Ark. R. Civ. P.

A subpoena may command the person to whom it is directed to produce for inspection any books, papers, documents, or tangible things designated in the subpoena. The person subpoenaed may ask the court to quash or modify the subpoena if it is unreasonable or oppressive or to require that the person on whose behalf the subpoena is issued pay the reasonable cost of such production. Rule 45(b), Ark. R. Civ. P. The person subpoenaed may also object in writing to inspection or copying of any or all of the designated materials or seek a protective order from the court. If a written objection is made within ten days of service of the subpoena or on or before the time specified for compliance if such time is less than ten days, the party causing the subpoena to be issued is not entitled to inspect the materials unless the court so orders. Rule 45(e), Ark. R. Civ. P.

When a witness fails to attend in obedience to a subpoena or intentionally evades the service of a subpoena by concealment or otherwise, the court may issue a warrant for arresting and bringing the witness before the court to give testimony and answer for contempt. Rule 45(g), Ark. R. Civ. P.

## EXHIBIT A

You are hereby directed to produce the following documents to counsel for

defendants:

1)      any documents, electronic information audio and video recordings,

photographs, recorded information, papers, models, diagrams, items,

reports, drafts of reports, summaries, opinions, correspondence or

materials of any kind that you have or your company has received from

or provided to any person or company that is in any way related to

your work related to James Luke Baker, deceased, the Prairie Wings

Lodge, the accident on October 24, 2015, or to the extent you are

aware, the allegations in the complaint and the allegations in the

amended complaint;

2)      your and your company's engagement letter and billing file that will

reflect the terms of your engagement and any compensation you have

or your company has received or has agreed to receive in the future in

relation to your work in connection with Luke Baker, deceased, and in

connection with this case, including your and your company's billing

file(s);

3)      any communications between you and your company and one or more

of the plaintiffs since October 24, 2015;

4)      any communications between you and your company and one or more

of the plaintiffs' counsel (whether Greg Stephens, Luther Sutter,

1893156-v1

Lucien Gillham, Tona DeMers, Marion Humphrey, Eric Buchanan or other counsel) since October 24, 2015;

5)      any communications between you or your company and any person or company that is any way related to Luke Baker, deceased, and/or to the extent you are aware, the allegations in the complaint and amended complaint in this case;

6)      any communications and documents your or your company received from or sent to one or more of the plaintiffs since October 24, 2015; and

7)      any communications and documents your or your company received from or sent to the plaintiffs' counsel since October 24, 2015.

2

## AFFIDAVIT OF SERVICE

State of Arkansas                    County of JEFFERSON                    Circuit Court

Case Number: 35CV-18-1077

Plaintiff:
**KERRY BAKER, AS ADMINISTRATOR OF THE ESTATE OF JAMES LUKE BAKER, AND
KERRY BAKER INDIVIDUALLY, AND SAVANNAH BAKER CASE INDIVIDUALLY, AND
GENA DOWNEY BAKER INDIVIDUALLY**
vs.
Defendant:
**BRYAN ADAMS; SKYLAR WILSON; ET AL.,**

For: Ms. Judy Simmons Henry
   WRIGHT LINDSEY & JENNINGS LLP

Received by MYERS ATTORNEY'S SERVICE to be served on STEVEN NAWOJCZYK, 823 W 33RD ST, NORTH LITTLE ROCK, AR
72118. I, _Richard Gray_, being duly sworn, depose and say that on the _22_ day of _July_, 20_19_ at
_5:06_ p.m., executed service by delivering a true copy of the **SUBPOENA IN A CIVIL CASE, EXHIBIT A** in accordance with state
statutes in the manner marked below:

( ✓ ) INDIVIDUAL SERVICE: Served the within-named person.
( ) SUBSTITUTE SERVICE: I left the documents listed at the individual's dwelling house or usual place of abode with
_____, a family member at least 18 years of age.
( ) POSTED SERVICE: After attempting service on __/__ at _____ and on __/__ at _____ to a conspicuous place on the property
described herein.
( ) PROXIMITY: I left the documents in the individual's proximity by_____ after he/she refused to receive
the documents when I offered them to him/her.
( ) OTHER SERVICE: As described in the Comments below by serving _____.
( ) NON SERVICE: For the reason detailed in the Comments below.
Service Completed At: ( ✓ ) ADDRESS ABOVE ( ) OTHER:_____

COMMENTS: _Served personally at address provided
above._
_____
_____
_____

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service
was made.

Subscribed and Sworn to before me on
_7-22-19_ by the affiant who
is personally known to me.

PROCESS SERVER # _____
Appointed in accordance with State Statutes

**MYERS ATTORNEY'S SERVICE**
323 Center Street
Suite 1425
Little Rock, AR 72201
(501) 376-6266

Our Job Serial Number: 2019009524

_Stephanie Myers_
NOTARY PUBLIC

[Notary Seal: STEPHANIE MYERS, COMM. EXP. 7-8-2021, No. 12383058, SALINE COUNTY, NOTARY PUBLIC - ARKANSAS]

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.0n



IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
1ST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER,
AND KERRY BAKER INDIVIDUALLY, AND
SAVANNAH BAKER CASE INDIVIDUALLY,
AND GENA DOWNEY BAKER INDIVIDUALLY                    **PLAINTIFFS**

VS.                          NO. 85CV-18-1077

FILED

OCT 1 6 2019

BRYAN ADAMS, SKYLAR WILSON,
TRAVIS JONES, CARSON COOK, KARLA COOK,
PRAIRIE WINGS SOUTH LLC, AUSTIN TATE, JOHN TATE,     LAFAYETTE WOODS, SR.
AND CERTAIN JOHN DOE COMPANIES AND                   CIRCUIT CLERK
INDIVIDUAL JOHN AND JANE DOES TO BE DETERMINED       JEFFERSON COUNTY, ARKANSAS
AND PRAIRIE WINGS LODGE, LLC, CHRISTIE (SIC) ADAMS,
MARY TATE, RELIANCE HEALTH CARE, INC.
BRANDON ADAMS, TODD ROSS,
AND JOE (SIC) WHICKER                                 **DEFENDANTS**


ORDER ON CERTAIN MOTIONS FROM
HEARING ON SEPTEMBER 4, 2019 (JULY 1 MOTION TO COMPEL, JULY
29 MOTION TO QUASH, AUGUST 8 MOTION TO QUASH, AUGUST 8
MOTION FOR PROTECTIVE ORDER, AUGUST 9 OBJECTION AND
SECOND MOTION TO QUASH AND AUGUST 27 MOTION TO QUASH)


(FILED UNDER SEAL)


Before the Court are the various motions filed by plaintiffs, collectively or

individually, and responses filed by defendants[1] and in some instances, replies.

---

[1] "Defendants" as used in this order refer to Bryan Adams, Skylar Wilson, Travis Jones, Carson Cook, Karla Cook, Prairie Wings South LLC, Prairie Wings Lodge, LLC, Christy Adams, Reliance Health Care, Inc., Brandon Adams and Todd Ross.

1940860-v1

EXHIBIT

4

Upon consideration of the motions, responses, replies, briefing, arguments of

counsel, other evidence and proof, and for the reasons stated on the record during

the September 4, 2019 hearing which are incorporated herein, the Court being fully

advised FINDS AND ORDERS as follows:

1.      The motion to compel discovery responses and for protective order filed

on July 1, 2019 by plaintiffs Kerry Baker, as administrator of the Estate of James

Luke Baker, and Savannah Baker Case is hereby DENIED.

2.      The objection and memorandum motion to quash the noticed

depositions and subpoenas duces tecum issued by defendants to Frank Peretti, M.D.

and to Steve Nawojczyk and to unseal the record filed on July 29, 2019 by plaintiff

Gena Baker is hereby DENIED as the motion relates to the request to quash the

subpoenas duces tecum served on Dr. Peretti and Mr. Nawojczyk.  A separate order

will be entered on the request to unseal the record.

3.      The motion to quash filed on August 8, 2019 by plaintiff Gena Baker

relating to the deposition subpoena served upon Kim Phillips is hereby DENIED as

moot.

4.      The motion for protective order filed on August 8, 2019 by plaintiff

Gena Baker requesting that the Court preclude the defendants from inquiring

about Gena Baker's psychological history and to limit her deposition to seven (7)

hours is hereby DENIED.

2

5.     The objection and second memorandum motion to quash filed on August 9, 2019 by plaintiff Gena Baker requesting that the Court quash the deposition subpoena duces tecum of Mike Noble is hereby DENIED.

6.     The motion to quash subpoena duces tecum to AT&T Mobility, LLC issued on August 27, 2019 by defendants relating to the cellular phone records of Jordan Case is hereby DENIED.  However, defendants are instructed at this time to limit the production period from July 24, 2015 through October 24, 2015.

7.     The Court entered an order on September 4, 2019, ordering that Verizon Wireless, LLC identify, protect and preserve everything responsive to the subpoena duces tecum issued by defendants to it that relates to Chad Kelley.

8.     The remaining motions that were not decided by the Court on September 4, 2019 shall be heard by subsequent notice to the parties.

IT IS SO ORDERED.

_____
HONORABLE ALEX GUYNN

10/16/19
_____
Date

Approved by:

Sutter & Gillham, P.L.L.C.
310 W. Conway
Benton, AR 72015
(501) 315-1910
EMAIL: luther.sutterlaw@gmail.com
          lucien.gillham@gmail.com

By: _____

        Luther O. Sutter (95031)
        Lucien Gillham (99199)

    *Attorneys for Gena Baker*


Hon. Marion Humphrey
108 South Rodney Parham
Little Rock, AR 72205
(501) 801-7612
EMAIL: marionhumphreysr@gmail.com


By: _____

        Hon. Marion Humphrey (80066)

    *Attorney for Savannah Case*


The Buchanan Firm, P.A.
P.O. Box 166643
Little Rock, AR 72216
(501) 376-7540
EMAIL: eric.buchanan@thebuchananfirm.com


By: _____
        Eric Spencer Buchanan (94151)

    *Attorney for the Estate and Kerry Baker*


4

1940860-v1

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL: jhenry@wlj.com
         sirby@wlj.com
         jfair@wlj.com

By: /s/ Judy S. Henry
    Judy Simmons Henry (84069)
    Scott A. Irby (99192)
    Jacob P. Fair (2015167)

    *Attorneys for Bryan Adams, Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook, Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC, Christy Adams, Reliance Healthcare, Inc.,*
    *Brandon Adams and Todd Ross*

NEELY LAW FIRM
10515 W. Markham, Suite J2
Little Rock, AR 72205
(501) 823-0621
(870) 619-1690 FAX
ebneely@neelylaw.net

By: /s/ Efrem B. Neely, Sr.
    Efrem B. Neely, Sr. (2008047)

    *Attorneys for Bryan Adams, Skylar Wilson, Travis Jones,*
    *Carson Cook, Karla Cook, Prairie Wings South, LLC,*
    *Prairie Wings Lodge, LLC, Christy Adams,*
    *Reliance Healthcare, Inc., Brandon Adams, Todd Ross and*
    *Joel Whicker*

5

1940860-v1

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street | Suite 1900
Little Rock, AR 72201
(501) 379-1700
(501) 379-1701 FAX
twilliams@qgtlaw.com

By: /s/ Thomas G. Williams
    Thomas G. Williams (88186)

    *Attorneys for Prairie Wings South, LLC*

FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3522
(501) 376-2011
(501) 376-2147 FAX
wilson@fridayfirm.com
mkasten@fridayfirm.com

By: /s/ David D. Wilson
    David D. Wilson (90112)
    Martin A. Kasten (99100)

    *Attorneys for Prairie Wings South, LLC and
    Prairie Wings Lodge, LLC*

MUNSON, ROWLETT, MOORE AND BOONE, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR 72201
501-374-6535
501-374-5906 Fax
john.moore@mrmblaw.com
emily.runyon@mrmblaw.com

By: /s/ Emily M. Runyon
    JOHN E. MOORE (82111)
    EMILY M. RUNYON (2005172)

    *Attorneys for Karla Cook and Carson Cook*

FUQUA CAMPBELL, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
501-374-0200
EMAIL: bhendrix@fc-lawyers.com
adepper@fc-lawyers.com

By: /s/ Blake Hendrix
Blake Hendrix (86066)
Annie Depper (2009267)

*Attorneys for Skylar Wilson*

TURNER LAW FIRM, P.A.
P.O. BOX 1225
Cabot, AR 72023-1225
(501) 941-2210
(501) 941-0010 (Fax)
andy@turnerlawfirmpa.com

By: /s/ Andy L. Turner
Andy L. Turner (97145)
Kaleb M. Jones (16210)

*Attorneys for Todd Ross*

7

**Judy Simmons Henry**

| | |
|---|---|
| **From:** | Judy Simmons Henry |
| **Sent:** | Wednesday, October 16, 2019 9:05 PM |
| **To:** | nawojczyk@me.com |
| **Cc:** | Dylan Potts; eric.buchanan@thebuchananfirm.com; marionhumphreysr@gmail.com; lsutter@sglaws.com; Lucien Gillham (lucien.gillham@gmail.com); msayes@msslawfirm.com; jsayes@msslawfirm.com; Tommy Williams; John Moore; Emily Runyon; David Wilson; Martin Kasten; J. Carter Fairley (cfairley@barberlawfirm.com); Blake Hendrix; Annie Depper; Andy Turner; Kaleb Jones; Efrem Neely; Eric Bell; Scott A. Irby; Jacob P. Fair |
| **Subject:** | ADAMS et al: Bakers vs - Letter to Steve Nawojczyk, order and demand for compliance with subpoena/judicial process |
| **Attachments:** | 1945823-ADAMS Baker - Letter to Steve Nawojczyk re Subpoena.PDF; Order on Certain Motions from Hearing on Sep 4 2019.pdf |
| **Importance:** | High |

Mr. Nawojczyk:

I previously sent the attached September 23, 2019 letter to you about producing the documents that were requested in a subpoena duces tecum previously issued on July 22, 2019 to you by my client defendants in the referenced case. You have failed to comply with the subpoena deadline and the new time for your production as provided in my letter.

This is to notify you that today, the oral ruling about which I previously informed you in my attached letter was entered in the form or a written order. Attached is a copy of Judge Guynn's order. *See* ¶ 2 denying plaintiffs' motion to quash the subpoena issued to you.

Please produce the documents and information identified in your subpoena by 5:00 p.m., Friday, October 18, 2019. You are welcome to email the information, send a link/password or produce in paper/photo/video format to me at the address below. If you fail again to comply with the subpoena by close of business on Friday, defendants intend to move to compel your compliance with the subpoena served on you.

Again, if you are represented by counsel, please let me know so I can communicate directly with your attorney. Thank you for your attention to this matter.

By copy, I am notifying the attorneys of record of my communication with you. I am also copying Dylan Potts who represents Dr. Peretti in connection with the subpoena duces tecum defendants issued to him.

**WLJ**
**WRIGHT**
**LINDSEY**
**JENNINGS**

**Judy Simmons Henry**
ATTORNEY
501.212.1391 | JHenry@wlj.com

Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300 | Little Rock, AR 72201
Main 501.371.0808 | Fax 501.376.9442 | wlj.com



EXHIBIT
5

1

To ensure compliance with requirements imposed by the IRS, we advise you that if any U.S. federal tax advice is contained in this communication (including any attachments) it is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. This advice may not be forwarded (other than within the organization to which it has been sent) without our express written consent.

Confidentiality Notice
This message and the accompanying documents may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this e-mail in error, please notify the sender immediately and destroy the original transmission. Thank you.

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
FIRST DIVISION

KERRY BAKER, AS ADMINISTRATOR OF
THE ESTATE OF JAMES LUKE BAKER, *et al*                    PLAINTIFFS


V.                          CASE NO. 35CV-18-1077


BRYAN ADAMS, *et al*                                      DEFENDANTS

### MOTION TO ALTER OR AMEND

COMES the Plaintiff, GENA BAKER, by and through counsel, SUTTER & GILLHAM,

P.L.LC.; and, for this Motion, she states:

1. The Court denied the Motion to Quash, but did not specifically address whether the

Plaintiff could interpose privilege objections.   By email correspondence attached hereto as

**Exhibit A**, Ms. Henry continues to press for privilege material.

2. At the hearing, the Court indicated that the Plaintiff would be able to make privilege

objections. See **Exhibit B** (9/4/19 hearing) attached hereto at page 121-123, 167.11-168.14.

3. Furthermore, defense counsel has misled the Court and abused the process by

representing that they did not intend to seek expert witness testimony. Attached as **Exhibit C**, is

the deposition transcript of Frank Perretti.   Dr. Perretti was obviously asked expert witness

opinions but Defendants did not pay him for his opinions.    Clearly, Ms. Henry has

misrepresented her motivation(s) to the Court. See **Exhibit C**, 16-20, 26-27, 35-37, 41, 52-60,

73, 89, 94, 102, 124, 135-136, 139-146, 158-160, 163-165, 176-181, 184, 186-194, 200.

Page 1 of 4



4.  Plaintiff has filed a "claw-back" motion, which is incorporated by reference herein.  The items Plaintiff has identified as privileged are in fact privileged, and one (1) Defendant has complied.  See email received from Sanders and Sayes Law Firm, attached hereto as **Exhibit D**.  This stands in stark contrast to the remainder of the lawyers in this case.  This Court should take appropriate action under Rule 37, to maintain the integrity of the discovery process.

**WHEREFORE,** Plaintiff prays for an Order altering or amending the Order(s) of this Court to reflect that Plaintiff is entitled to assert privilege and that the identified documents asserted are in fact privileged.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910  Office
501-315-1916  Facsimile

By:   /s/ Luther Oneal Sutter
Luther Oneal Sutter, ARBN 99-199
luther.sutterlaw@gmail.com

Page 2 of 4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was served upon all counsel this _18_ th day of _Octobr_, 2019 by U.S. Mail and via email as indicated below:

Mel Sayes
Matthews, Sanders & Sayes, P.A.
825 West Third Street
Little Rock, AR 72201
Email: msayes@msslawfirm.com

Judy Simmons Henry
Scott A. Irby
Jacob P. Fair
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Emails: jhenry@wlj.com
sirby@wlj.com
jfair@wlj.com

J. Carter Fairley
Barber Law Firm PLLC
425 West Capital, Suite 3400
Little Rock, AR 72201
Email: cfairley@barberlawfirm.com

David D. Wilson
Martin A. Kasten
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3522
Email: wilson@fridayfirm.com
mkasten@fridayfirm.com

Thomas G. Williams
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
Email: twilliams@qgtlaw.com

John E. Moore
Emily M. Runyon
Munson, Rowlett, Moore and Boone, P.A.
Regions Center
400 W. Capitol, Suite 1900
Little Rock, AR 72201
Emails: john.moore@mrmblaw.com
emily.runyon@mrmblaw.com

Efrem Neely
1514 South Poplar Street
Pine Bluff, AR 71601
Email: ebneely@neelylaw.net

Andy Turner
Kaleb Jones
Turner Law Firm, PA
Cabot, AR 72023
Emails: andy@turnerlawfirmpa.com
kaleb@turnerlawfirmpa.com

Blake Hendrix
Annie Depper
Fuqua Campbell, P.A.
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
Emails: bhendrix@fc-lawyers.com
adepper@fc-lawyers.com

Terry F. Wynne
Attorney at Law
415 West 6th Ave, Ste A
Pine Bluff, AR 71601
tfwynne@cablelynx.com

Marion Humphrey

Eric Buchanan

By:  /s/ Luther Oneal Sutter
     Luther Oneal Sutter, ARBN 99-199
     luther.sutterlaw@gmail.com

Page 4 of 4

# M Gmail

## Re: ADAMS et al: Bakers vs - Letter to Steve Nawojczyk, order and demand for compliance with subpoena/judicial process

On Oct 16, 2019, at 9:16 PM, Steven Nawojczyk <nawojczyk@me.com> wrote:



Mr S-
What do you advise?
S/

stevenawojczyk.com/about-steve

Begin forwarded message:

**From:** Judy Simmons Henry <JHenry@wlj.com>
**Date:** October 16, 2019 at 9:05:23 PM CDT
**To:** "nawojczyk@me.com" <nawojczyk@me.com>
**Cc:** Dylan Potts <dpotts@gill-law.com>, "eric.buchanan@thebuchananfirm.com" <eric.buchanan@thebuchananfirm.com>, "marionhumphreysr@gmail.com" <marionhumphreysr@gmail.com>, "lsutter@sglaws.com" <lsutter@sglaws.com>, "Lucien Gillham (lucien.gillham@gmail.com)" <lucien.gillham@gmail.com>, "msayes@msslawfirm.com" <msayes@msslawfirm.com>, "jsayes@msslawfirm.com" <jsayes@msslawfirm.com>, Tommy Williams <twilliams@qgtlaw.com>, John Moore <john.moore@mrmblaw.com>, Emily Runyon <emily.runyon@mrmblaw.com>, David Wilson <Wilson@fridayfirm.com>, Martin Kasten <MKasten@fridayfirm.com>, "J. Carter Fairley (cfairley@barberlawfirm.com)" <cfairley@barberlawfirm.com>, Blake Hendrix <bhendrix@fc-lawyers.com>, Annie Depper <adepper@fc-lawyers.com>, Andy Turner <andy@turnerlawfirmpa.com>, Kaleb Jones <kaleb@turnerlawfirmpa.com>, Efrem Neely <ebneely@neelylaw.net>, Eric Bell <ebell@reliancehealthcare.com>, "Scott A. Irby" <SIrby@wlj.com>, "Jacob P. Fair" <JFair@wlj.com>
**Subject:** ADAMS et al: Bakers vs - Letter to Steve Nawojczyk, order and demand for compliance with subpoena/judicial process

Mr. Nawojczyk:



I previously sent the attached September 23, 2019 letter to you about producing the documents that were requested in a subpoena duces tecum previously issued on

July 22, 2019 to you by my client defendants in the referenced case. You have failed to comply with the subpoena deadline and the new time for your production as provided in my letter.

This is to notify you that today, the oral ruling about which I previously informed you in my attached letter was entered in the form or a written order. Attached is a copy of Judge Guynn's order. *See* ¶ 2 denying plaintiffs' motion to quash the subpoena issued to you.

Please produce the documents and information identified in your subpoena by 5:00 p.m., Friday, October 18, 2019. You are welcome to email the information, send a link/password or produce in paper/photo/video format to me at the address below. If you fail again to comply with the subpoena by close of business on Friday, defendants intend to move to compel your compliance with the subpoena served on you.

Again, if you are represented by counsel, please let me know so I can communicate directly with your attorney. Thank you for your attention to this matter.

By copy, I am notifying the attorneys of record of my communication with you. I am also copying Dylan Potts who represents Dr. Peretti in connection with the subpoena duces tecum defendants issued to him.



**WRIGHT LINDSEY JENNINGS**

### Judy Simmons Henry
ATTORNEY
501.212.1391 | JHenry@wlj.com

Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300 | Little Rock, AR 72201
Main 501.371.0808 | Fax 501.376.9442 | wlj.com

To ensure compliance with requirements imposed by the IRS, we advise you that if any U.S. federal tax advice is contained in this communication (including any attachments) it is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. This advice may not be forwarded (other than within the organization to which it has been sent) without our express written consent.

Gmail - Re: ADAMS et al: Bakers vs - Letter to Steve Nawojczyk, order and demand for compliance with subpoena/judicial process          10/18/19, 2:34 PM

Confidentiality Notice

This message and the accompanying documents may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this e-mail in error, please notify the sender immediately and destroy the original transmission. Thank you.


<1945823-ADAMS Baker - Letter to Steve Nawojczyk re Subpoena.PDF>
<Order on Certain Motions from Hearing on Sep 4 2019.pdf>

## Judy Simmons Henry

| | |
|---|---|
| **From:** | Steven Nawojczyk <nawojczyk@me.com> |
| **Sent:** | Thursday, October 17, 2019 4:17 AM |
| **To:** | Judy Simmons Henry |
| **Cc:** | Greg Stephens |
| **Subject:** | <EXTERNAL>Your letter of demand |

Hello:

I am in receipt of your letter of demand. I am currently awaiting direction from my client.
I will be sending you links to satisfy your request as soon as I can. I was not working on this matter
until the last week of August 2018 so I have no documents or information beyond that.

In the interest of full disclosure I would like to advise you that I was not engaged as an expert witness
and did not expect to testify or that my emails would be available. Mr. Stephens asked me to review
a death case to determine if proper procedures and protocols were followed and what procedure is
used to perform an exhumation. He also requested that I review and provide him factual information
relevant to gunshot wounds. I'll also include those links to you if you wish. I was asked to provide to
him guidance and suggestions as an advisor/consultant not a witness. I was not aware he had listed
me as an expert until I was served with your initial records request.

I have known Mr. Stephens on a professional basis for nearly 40 years so some of my emails to him
contain personal and private HIPAA information relevant to my health. I did not redact any of that info
to avoid any controversy about what I redacted. I do expect you to follow the law relevant my
personal HIPAA information. Subsequently I am only including you in this response.

As far as billing records and so forth, I do not bill hourly. I assess a consultation fee that will include
the services I was requested to perform. My fee on a non-natural death case is $3000.00 which Mr.
Stephens paid in full. There will be no further work done on this matter by me since the Jefferson
County Coroner recalled the faulty death certificate and followed protocol in production of a new one.
This re-examination of the case by the coroner effectively ended any further involvement in the matter
by me.

There has been no final report written by me since it became moot once the coroner resumed his
investigation. I will be sending you links as soon as I get everything uploaded.

And as a matter of record, please send any correspondence to my P.O. Box 1932, North Little Rock,
AR. 72115. The mail to my street address is frequently pilfered by kids. Thank you.

Kind regards,

SteveNawojczyk.com
501.940.4264



**EXHIBIT**
7

1

Fax Server    10/29/2019 11:22:35 AM  PAGE  127013  Fax Server

**Judy Simmons Henry**

| | |
|---|---|
| **From:** | Steven Nawojczyk <nawojczyk@me.com> |
| **Sent:** | Friday, October 18, 2019 4:01 PM |
| **To:** | Judy Simmons Henry |
| **Cc:** | Sutter Luther |
| **Subject:** | <EXTERNAL>Materials |

Ms. Henry-
I spoke to Mr. Sutter at 4 PM and he has instructed me to advise you that I am a consulting expert witness and will not be called to testify, therefore, as instructed, I am not responding to this order for documents. Thank you.

Steve Nawojczyk



1

**Judy Simmons Henry**

| | |
|---|---|
| **From:** | Luther Sutter <luther.sutterlaw@gmail.com> |
| **Sent:** | Friday, October 18, 2019 4:04 PM |
| **To:** | Steven Nawojczyk |
| **Cc:** | Judy Simmons Henry; lucien.gillham@gmail.com; Marion Humphrey; Eric Buchanan |
| **Subject:** | <EXTERNAL>Re: Materials |

That is correct.  Please refrain from communicating with my consultants directly, Ms Henry.

Sent from my iPhone

> On Oct 18, 2019, at 4:01 PM, Steven Nawojczyk <nawojczyk@me.com> wrote:
>
> Ms. Henry-
> I spoke to Mr. Sutter at 4 PM and he has instructed me to advise you that I am a consulting expert witness and will not be called to testify, therefore, as instructed, I am not responding to this order for documents. Thank you.
>
> Steve Nawojczyk
>
>
>

EXHIBIT
9