IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

SUTTER & GILLHAM, PLLC, et al.                                      PLAINTIFFS

v.                              Case No: 4:23CV-78-BSM

JUDY SIMMONS HENRY, et al.                                         DEFENDANTS

**BRIEF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED
<u>RESPONSE TO ALL MOTIONS TO DISMISS</u>**

Plaintiffs, pro se and the through counsel, state as follows:

**INTRODUCTION**

Plaintiffs bring this action for to redress a violation of their Federal Constitutional Rights pursuant to 42 USC §1983. Plaintiffs also bring a litany of state law claims against varying Defendants pursuant to 42 USC §1983. These claims share the common nucleus of operative fact as all Defendants carried out their tortious actions to further a conspiracy to damage the Plaintiffs. The basis for these claims arises out of the Plaintiffs' representation of Gena Downey Baker before the Jefferson County Circuit Court in case number 35CV-18-1077. Defendants Burks, Haubert, and WH Law, PLC (hereinafter "Burks Defendants") represented one of Plaintiffs former clients, David Westbrook. Burks Defendants hatched a plan in connection with the other Defendants to target the Plaintiffs with frivolous claims for legal malpractice to accomplish insidious aims. Plaintiffs bring this lawsuit to clear their name as the law allows them to do so.

**<u>FACTUAL SUMMARY RELATING TO ATTORNEY DEFENDANTS</u>**

Plaintiffs represented Gena Baker, the mother of Luke Baker, in a lawsuit against Separate Defendants Bryan Adams, Brandon Adams, and Skylar Wilson (hereinafter "Adams"). They were represented by Separate Defendants Efrem Neely, Eric Bell, Judy Simmons Henry, Thomas Williams, Jacob Fair, Scott Irby, and Wright Lindsey Jennings, LLP (hereinafter "Adams Lawyers"). Rather than defend the lawsuit against the Adams on the merits, the Adams first hired Efrem Neely, the presiding judge's former law partner to represent them.   Then, the Adams' lawyers hatched an illegal and nefarious plot to destroy the Plaintiffs.

1

As part of their plan, the Adams lawyers recruited David Westbrook, a former client of Plaintiffs to make false allegations against the Plaintiffs for the specific purpose of creating a conflict. So, Efrem Neely who was an acquaintance of Mr. Westbrook[1] approached Mr. Westbrook to discuss the case against the coroner. Para. 60. This conversation led to Neely inviting Westbrook to downtown Little Rock at the WLJ offices to meet with all of the Adams lawyers. Para. 61. In the meeting at WLJ, the Adams lawyers convinced Mr. Westbrook that Plaintiffs had sold him out to benefit Ms. Gena Baker. Para. 62. Bell and the Adams lawyers recruited the Burks Defendants to make spurious allegations against the Plaintiffs, thereby committing barratry, champerty, and maintenance. Para. 57. These allegations were used by the Adams and the Adams lawyers to created a conflict for the Plaintiffs forcing him to withdraw. Para. 58. Eric Bell arranged for Chris Burks to represent David Westbrook for free. Para. 62. The Burks Defendants filing of the frivolous counterclaim was a substantial step towards the overall conspiracy to destroy the Plaintiffs. Para. 68. Without the counterclaim, there would have been no conflict of interest.  Had there been no conflict of interest, Plaintiffs would not have had to withdraw. Had Plaintiffs not withdrawn, there would have been no Order sanctioning the Plaintiffs, which is one basis for the federal claims in this case.[2]

The Adams lawyers procured the Jefferson County Order without giving Plaintiffs due process. Para. 68. Plaintiffs' due process rights were violated because of the Burks Defendants role in the conspiracy as had the Burks Defendants not filed the counterclaim the result would have been different. Para. 68. Bell, acting through Neely, had referred David Westbrook to Burks Defendants, who then sued Plaintiffs for malpractice and breach of fiduciary duty without a factual basis for free, even though there was no reasonable basis in fact or law for the lawsuit.

---

[1] Mr. Westbrook had hired Plaintiffs to sue the Jefferson County Coroner, his former employer. Plaintiffs favorably settled that lawsuit against the Coroner for Mr. Westbrook. The facts were unimportant to the Adams lawyers because they were intent on winning no matter the cost nor the ethical pitfalls.

[2] The Court should take judicial notice of the Order granting summary judgment in Sutter v. Westbrook, 35CV-22-965.  See Exs. A & B.

Para. 72. Not one but two Courts have decided this matter. See Attached Orders as **Exhibit A & B**. The Attorney's Motions should be denied.

### LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Alleruzzo v. SuperValu, Inc.* (In re SuperValu, Inc.), 925 F. 3d 955, 962 (8th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A pleading must provide "a short and plain statement of the claim that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012).

In addition, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Thus, the Court may dismiss a complaint "only if it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations." *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001) (citing *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)) see also *Ill. v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) ("In addressing a motion to dismiss, '[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record.'").

The Court is free to "ignore legal conclusions . . . in the form of factual allegations." *Wiles v. Capitol Indem. Corp.,* 280 F.3d 868, 870 (8th Cir. 2002). The Court can consider the attached exhibits to the complaint. When the exhibit contradicts the allegations in the complaint, the

exhibit controls. *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998).

## ARGUMENT

**I.     The Court should not abstain under any doctrine.**

The doctrine of abstention establishes a framework for when a federal district court that has jurisdiction over a matter may exercise its discretion and decline to hear the case. The Supreme Court has identified three categories where abstention is appropriate: when (1) a constitutional issue "might be mooted or presented in a different posture by a state court determination of pertinent state law," *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959); (2) there is a difficult question of state law that bears on policy problems of substantial public import, and its importance goes beyond the result in the instant case, *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); and (3) federal jurisdiction is being invoked to restrain state criminal proceedings, statute nuisance proceedings connected to a state criminal proceeding, or collection of state taxes. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943). Principles of federalism and comity underlie these categories. Younger does not apply to the case at bar because monetary damages are sought. *Bishop v. State Bar of Tex.*, 736 F.2d 292, 295 (5th Cir. 1984).

The only argument to be taken seriously here is based on *Colorado River* abstention, but abstention is not merited.  *Younger* does not apply because no important state interest is implicated and the state is not a party.  *Rooker-Feldman* does not apply, because Plaintiffs were not parties to the original *Baker v Adams* case, and this lawsuit could not have been brought in the original *Baker v Adams* case.

**A.     Defendants have not met their burden of proof under *Colorado River***

*Colorado River* only permits federal courts to decline to exercise jurisdiction over cases where "parallel" state court litigation is pending, meaning that there is "a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir.2013), quoting *Fru–Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 535 (8th Cir.2009). "The party seeking a stay or dismissal of the federal case in the event of concurrent state and federal suits bears the burden of establishing the propriety of abstention under *Colorado River*." *Turner v. Pavlicek*, No. H–10–00749, 2011 WL 4458757, at *4 (S.D. Tex. Sept. 22, 2011) (Rosenthal, J.). The Eighth Circuit has described the burden of establishing abstention as appropriate as follows:

> the extraordinary conditions required by *Colorado River*  for a federal court to disregard its "virtually unflagging obligation ... to exercise the jurisdiction" it is given even when there is also pending a state court action involving the same subject matter.

*Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 540 (8th Cir. 2009).

Abstention under the *Colorado River* doctrine can only apply "when suits are parallel, having the same parties and the same issues." *Stewart v. W. Heritage Ins. Co.*, 438 F.3d 488, 491 (5th Cir. 2006) (citing *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 540 (5th Cir. 2002)). However, "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River*, 424 U.S. at 813.  Thus, even if the parties and the issues are the same, one must look at the six factors for *Colorado River* abstention to decide if it should apply.

Here, while some parties are the same, there are a number of differences.   Henry, Fair, Neely, and Burks for example, are all defendants in this case, and are not in state court cases. In the Faulkner County case, Greg Stevens, Gena Baker, Kerry Baker, and Savannah Baker are all Defendants.  They are not here. Some of the fact issues may be the same,  but there are a number of additional claims and facts asserted.  Accordingly, *Colorado River* abstention should not apply.

If it gets to the six factors, the Court should consider that the rule is based on "considerations of wise judicial administration, giving regard to conservation of judicial resources

and comprehensive disposition of litigation." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 at 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)(internal quotation marks and alterations omitted). Nevertheless, federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," *id*., which "does not evaporate simply because there is a pending state court action involving the same subject matter." *Federated Rural Elec. Ins. Corp. v. Ark. Elec. Coops., Inc*., 48 F.3d 294, 297 (8th Cir.1995). Rather, Colorado River abstention is appropriate only in "exceptional circumstances" where the surrender of federal jurisdiction is supported by "the clearest of justifications." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25–26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). As a result, the general rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colo. River*, 424 U.S. at 817, 96 S.Ct. 1236, quoting *McClellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501, 54 L.Ed. 762 (1910); *id*. at 818, 96 S.Ct. 1236 ("[D]ismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention."). "[T]he Supreme Court has clearly instructed that Colorado River may not be invoked as a means of getting rid of cases that properly belong in federal court." *Hoai v. Sun Ref. & Mktg. Co*., 866 F.2d 1515, 1520 (D.C.Cir.1989).

The Court must examine six factors to determine whether exceptional circumstances exist warranting abstention:

> (1) whether there is a res over which one court has established jurisdiction, (2) the inconvenience of the federal forum, (3) whether maintaining separate actions may result in piecemeal litigation, unless the relevant law would require piecemeal litigation and the federal court issue is easily severed, (4) which case has priority—not necessarily which case was filed first but a greater emphasis on the relative progress made in the cases, (5) whether state or federal law controls, especially favoring the exercise of jurisdiction where federal law controls, and (6) the adequacy of the state forum to protect the federal plaintiff's rights.

*Federated Rural*, 48 F.3d at 297. The Court does not apply these factors as a "mechanical checklist," but instead weigh these factors "in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone*, 460 U.S. at 16, 21, 103 S.Ct. 927.

Here, the first two factors are irrelevant in this case because there is no res at issue, and the state and federal fora are equally convenient. See *Federated Rural*, 48 F.3d at 297.

The third factor, the risk of piecemeal litigation, is the "predominant factor". *Id*.; *Mountain Pure, LLC v. Turner Holdings, LLC*, 439 F.3d 920, 926–27 (8th Cir.2006).   The problem for Defendants is that Plaintiff brings claims under 42 U.S.C. 1983.  Those claims militate against abstention in regard to this factor:

> The defendant claims that this Court should dismiss or stay the federal action in order to avoid piecemeal litigation arising from one series of acts. Although some duplicative litigation may occur, it is the "unavoidable price of preserving access to federal relief that § 1983 assures," *Tovar, supra* at 1293. *See Caplinger v. Carter*, 541 F. Supp. 716 (D. Kansas 1982). Duplication is the usual, not the exceptional circumstance in section 1983 litigation. Although judicial efficiency is to be desired, it is not to be worshipped. Judicial efficiency alone cannot outweigh the right of access to federal court assured by section 1983. *Compare Colorado River* 47 L. Ed. 2d at 499 (the purpose of the McCarran amendment was to avoid piecemeal litigation) *with Monroe v. Pape* 5 L. Ed. 2d at 498 (the purpose of section 1983 was to provide access to a federal forum).

*Tucker v. Callahan*, 663 F.Supp. 375, 380 (M.D.Tenn. 1987). Furthermore,  Eighth Circuit "cases have advanced [the policies underlying *Colorado River*] by favoring the most complete action." *Federated Rural*, 48 F.3d at 298; see also *Employers Ins. of Wausau*, 23 F.3d at 1375; *U.S. Fid. & Guar. Co. v. Murphy Oil USA, Inc.*, 21 F.3d 259, 263 (8th Cir.1994).

Here, the state and federal cases involve similar factual issues, but the legal issues remain distinct. The 1983 claims mandate jurisdiction. The Burks Defendants correctly remark that the state litigation has been entirely piecemeal up until this point.[3] Abstention will not accomplish the goal of reducing piecemeal litigation. In fact, this litigation is the most complete as it contains the most parties with the most legal issues pled. Regardless, the issues presented in each litigation contains distinct questions of law. In this situation, the federal and state courts would not reach conflicting opinions on the same issues, which would not "cause unwarranted friction between state and federal courts, a result which is obviously undesirable and avoidable in this instance." *Employers Ins. of Wausau v. Missouri Elec. Works, Inc.*, 23 F.3d 1372, 1375

---

[3] There have been at least 7 other lawsuits filed connected to the present litigation. At present only *Adams v. Sutter* Case No. 23CV-21-403 is ongoing as Summary Judgment in favor of the Plaintiffs was granted in *Sutter v. Westbrook* 35CV-22-965.

(8th Cir.1994), abrogated on other grounds by *Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

The Plaintiffs' federal claims are "easily severable from the merits of the underlying disputes." *Moses H. Cone*, 460 U.S. at 21, 103 S.Ct. 927. Accordingly, the "resolution of these suits necessarily requires piecemeal litigation" and therefore the Court should conclude that this factor is insignificant here. *Gov't Employees Ins. Co. v. Simon*, 917 F.2d 1144, 1149 (8th Cir.1990). Burks Defendants have made no argument regarding the severability of the Plaintiffs' federal claim.

Furthermore, this action contains the most defendants relevant to Plaintiffs' claim, and is thus, "the most complete action", meaning the Court should not abstain pursuant to *Federated Rural*, 48 F.3d at 298; see also *Employers Ins. of Wausau*, 23 F.3d at 1375; *U.S. Fid. & Guar. Co. v. Murphy Oil USA, Inc.*, 21 F.3d 259, 263 (8th Cir.1994). The Court should conclude that the third factor is against abstention.

The fourth factor likely does favor abstention because the state litigation was filed first, and the state court was thus the first to obtain jurisdiction over the parties. See *Colorado River*, 424 U.S. at 818, 96 S.Ct. 1236. That being said, the State Court action 23CV-21-403 has only just completed the Motion to Dismiss stage and is on appeal to the Arkansas Court of Appeals on issues relating to Attorney Immunity. Compare *Mountain Pure*, 439 F.3d at 927. Nevertheless, "[n]o one factor is necessarily determinative" in assessing whether abstention is appropriate. *Colorado River*, 424 U.S. at 818, 96 S.Ct. 1236.   The attorney-immunity  statute does not apply to 42 U.S.C. 1983 claims.

The fifth factor clearly weighs against abstention because "the presence of federal-law issues must always be a major consideration weighing against surrender [of federal jurisdiction]." *Moses H. Cone*, 460 U.S. at 26, 103 S.Ct. 927. Here, the federal litigation involves a federal question regarding a violation of Civil Rights pursuant to 42 USC §1983. The state court cannot resolve all of Plaintiffs' federal claims. See *Wolfson v. Mut. Ben. Life Ins. Co.*, 51

F.3d 141, 146 (8th Cir.1995), abrogated on other grounds by *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

Further, the sixth Colorado River factor does not favor abstention because the state court cannot adequately protect Plaintiffs' interests. See, e.g., U.S. *Fid. & Guar. Co.*, 21 F.3d at 263. Here, the Faulkner County Circuit Judge has failed to recuse despite being sued personally by the Plaintiffs on behalf of a client for actions he took during his time as the Conway City Attorney, as well as  the fact that his brother, Spencer Clawson, is also being sued in that same lawsuit.   *See Fraser v. City of Conway,* 23CV-20-587.   Additionally, in Jefferson County, the Court took the unheard of step of denying a Motion to Dismiss Without Prejudice, where there was no service issue.    *See e.g., Beverly Enterprises-Arkansas, Inc. v. Hillier*, 341 Ark. 1, 4 (2000) (stating that a plaintiff has an "absolute right to voluntarily dismiss his claim.").

### B.        Defendants have not met their burden under *Rooker-Feldman*

*Rooker-Feldman* does not require federal courts to abstain from hearing cases pending in state court, but instead deems that federal courts lack jurisdiction to hear cases already fully decided in state courts.   The general idea is only the United States Supreme Court has been given jurisdiction to review a state court decision, and that the statutes establishing federal subject-matter jurisdiction do not include an appeal from a state court judgment.   *District Court of Columbia Court of Appeals v. Feldman*, 103 S.Ct. 1303 (1983).

Thus, subject matter jurisdiction is not defeated as to matters that could not have been decided by the state court in an earlier proceeding.  *Sheehan v. Marr*, 207. F.3d 35, 39-42 & n. 5 (1st Cir. 2000).   Subject matter jurisdiction is not defeated where a non-party is bringing suit. *Gross v. Weingarten*, 217 F.3d 208, 218 n.6 (4th Cir. 2000); *Bennett v. Yoshina*, 140 F.3d 1218, 1223-1224 (9th Cir. 1998) (holding that *Rooker-Feldman* only applies "when the federal plaintiff was a party the state suit" although the defendant had been a party to the state court suit), cert. den'd 119 S.Ct. 868; *E.B. v. Vernier*, 119 F.3d 1077, 1092 (3rd Cir. 1997); *U.S. v. Owens*, 54 F.3d 271, 274 (6th Cir. 1995); *Marks v. Stinson*, 19 F.3d 873 885-886 n.11 (3rd Cir. 1994).

Thus, Defendants' own arguments in other portions of their brief doom this argument. Here is what the various Defendants have said:

> . . . the judgment/sanctions order takes no action against plaintiffs; indeed, it does not make any direct reference to plaintiffs or even use their names at any point. (See generally Ex. C to Compl., Sanctions Order.) The judgment/sanctions order simply dismiss plaintiffs' former client's complaint with prejudice.

D.E. 30, p. 12 (Neely).  Thus, Neely argues that Plaintiffs in this case have no standing to sue over that Order because "Counsel have standing [related to] orders issued directly against them, but not from orders applicable only to their clients."   D.E. 30, p.11.   The Adams Defendants argue identically:

> . . . the Jefferson County sanctions order takes no action against the plaintiffs, makes no direct reference to any of the plaintiffs, and does not even use their names at any point. (See generally Ex. C to Compl., Sanctions Order.) The sanctions order simply dismiss plaintiffs' former client's complaint with prejudice. As such, the Jefferson County sanctions order is not an adverse action against these plaintiffs."

D.E. 33, p. 28.  According to the Adams Defendants, that Order merely dismissed with prejudice the Complaint of Plaintiffs' former client, and did not deprive them of their right to practice law, pursue their profession, or deprive them of any property right.   D.E. 39, p. 29.   The Adams Defendants state that because Plaintiffs had withdrawn they were not:

> entitled to any notice or opportunity to be heard on a sanctions motion that neither sought nor obtained relief from the attorneys. Again, plaintiffs here are conflating their former client's interests with their own. . . . Plaintiffs had no constitutional right to participate in an action where they no longer represented a party.

D.E. 33, p. 30.  The Adams Defendants expressly state who the parties to the Baker case were, and the Plaintiffs in this case are not included in the parties to the Baker case.  D.E. 33, p. 2-3 (citing Ex. A to Compl, Jefferson County Compl.; Ex. B to Motion, Jefferson County Am. Compl.).

Essentially the same statements and arguments are made in the WLJ Defendants briefing. D.E. 39, p. 3, 17-18,

Notably, Ex. C, the Order imposing sanctions, cited by all Defendants, does not show the Plaintiffs in this case to be parties in that case.  Plaintiffs never were parties in that case.  If Plaintiffs were not, and never were, parties to the Baker case, then their claims cannot be barred by *Rooker-Feldman.*

10

Furthermore, the claims here arise out of a different set of facts than Baker.  Baker was a wrongful death action for the death of Luke Baker in October 2015.  It was filed in 2018.  Sutter & Gillham did not enter an appearance until after suit was filed.  The events in which Defendants conspired to bribe and influence a Judge improperly, and to get David Westbrook to falsely claim Sutter & Gillham had sold him out to influence the coroner, and sue them to create a conflict causing their withdrawal, all occurred from Spring 2019  to Spring 2021, and could not have been brought.

### C.      Defendants have not met their burden under *Younger*

*Younger* abstention, named for *Younger v. Harris*, 401 U.S. 37 (1971),    is less permissive to the federal courts, barring them from hearing civil rights torts brought by person currently being prosecuted for a matter arising from that claim in state court.  *Younger* arose out of an attempt to sue in federal court to stop a criminal prosecution in state court.  Eventually, it was determined that: "[t]he policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved."  *Middlesex County Ethics Committee v. Garden State Bar Ass'n*,  102. S.Ct. 2515 (1982). The Court determined that there were three questions to be answered in that situation:   (1) is there an ongoing state judicial proceeding; (2) does that proceeding implicate important state interests; and (3) is there an adequate opportunity in the state proceedings to raise constitutional challenges.   *Id.*, 2521. Once again though, this involved a proceeding brought by a governmental institution.     In *Pennzoil Co. v. Texaco, Inc.*, 107 S.Ct.  1519 (1987), *Younger* was allowed to be applied in a case between two private parties, rather than a case where the state itself is a litigant.   The decision was based on the idea of comity:

> This concern mandates application of *Younger* abstention not only when the pending state proceedings are criminal, but also when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government.

107 S.Ct., at 1526.  The reason that *Younger* abstention was appropriate in this case was that Texaco had suffered an $11 billion verdict, and, under Texas law, the only way to prevent

enforcement of the judgment while on appeal was to post a bond of $13 billion, which it could not do.    So Texaco brought a federal action in the Southern District of New York to prevent enforcement of that rule by the Texas Courts on due process and equal protection grounds. Abstention occurred because the federal issues could be raised in state courts and because the lawsuit was an attack on and impaired the ability of the States to enforce "the judgments and orders of their Courts" on "grounds that challenge the very processes by which those judgments were obtained." 107 S.Ct. at 1527.

Thus, *Younger* abstention has been denied where the state curt action was merely a private action between private parties in which the state had no interest other than as adjudicator of private disputes.  *First Alabama Bank of Montgomery, N.A. v. Parsons Steel, Inc.*, 825 F.2d 1475, 1482-83 (11th Cir. 1987).  Furthermore, even where the state is a litigant, where it is only seeking money damages or to collect money, that is not the sort of "important state interest" that is "vital to the operation of state government" such that abstention is not mandated. *Mobil Oil Corp. v. City of Long Beach*, 772 F.2d 534, 542 (9th Cir. 1985)

Here there is no criminal prosecution.   There is no civil action brought by the State. There is no challenge to important state interests, such as the general rules by which the State enforces judgment and Orders of the Court.   It is simply a dispute between private parties. Defendants have not met their burden for *Younger* abstention.

**II.      Judicial Estoppel, raised by the Burks Defendants, does not apply to Plaintiffs, but it surely estops defendants from some of the arguments they now make.**

"The doctrine of judicial estoppel prevents a party who assumes a certain position in a legal proceeding, and succeeds in maintaining that position, from later assuming a contrary position." *Scudder v. Dolgencorp, LLC*, 900 F.3d 1000, 1006 (8th Cir. 2018) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)) (cleaned up). In determining whether judicial estoppel applies, courts consider three factors: "(1) whether a party's later position is clearly inconsistent with its earlier position, (2) whether the party has

12

succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*. (quoting *New Hampshire*, 532 U.S. at 750–51, 121 S.Ct. 1808) (cleaned up). At bottom, judicial estoppel is a discretionary equitable doctrine intended to prevent abuses of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749–50, 121 S.Ct. 1808 (quotation omitted).

Here, the judicial estoppel argument by Burks Defendants fails because the Plaintiffs were unsuccessful arguing attorney immunity in Faulkner County. There, the Faulkner County Circuit Court rejected Plaintiffs' attorney immunity arguments. Thus, the second element of judicial estoppel has not been met. This is not what judicial estoppel was meant to stop. In fact, the Order in Faulkner County provides persuasive authority for this Court. The Court should take judicial notice of the Complaint in Faulkner County, Arkansas. These Plaintiffs' Motion to Dismiss was denied after making many of the same arguments. If the Faulkner County complaint states a claim, so does the complaint at bar.

If Plaintiffs prevail on their appeal of the Faulkner County case on attorney-immunity grounds, these circumstances may change.

Now, on to judicial estoppel of the Defendants. When the sanctions order was entered in *Baker v. Adams*, Case No. 35cv-18-1077, Luther Sutter, a Plaintiff in this case, sought to intervene. The Adams Defendants, through the WLJ and Neely Defendants opposed this, taking this position:

> To intervene, Mr. Sutter must satisfy the requirement that he "claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." Ark. R. Civ. P. 24(a). It is a well-recognized general rule that strangers to the record have no standing on which to base an application to vacate a judgment, unless so authorized by statute. *Weill v. Weill*, 226 Ark. 206, 288 S.W.2d 946 (1956).

> Here, the property/transaction is a wrongful death case, and Mr. Sutter is neither an heir nor personal representative of the deceased. For this reason, he has no personal interest in this case, and the motion to intervene should be denied.
>
> Mr. Sutter also claims he is seeking to intervene to file a motion to vacate or set aside the final order dismissing this case with prejudice. Because Mr. Sutter was only counsel of record before he voluntarily withdrew as counsel, he has no standing to set aside an order where he was not a party, but rather, an officer of the court.

Ex. C, Rsp. To Mot. Intervene, *Baker v. Adams*, Case No. 35cv-18-1077 (Jeff. Co. Cir. Ct. 7/15/21).  They then obtained relief based on that position.  Ex. D, Order, *Baker v. Adams*, Case No. 35cv-18-1077 (Jeff. Co. Cir. Ct. 8/2/21).   All Defendants have repeatedly made statements in their brief, such as:

> . . . the sanctions order takes no action against plaintiffs; indeed, it does not make any direct reference to plaintiffs or even use their names at any point. The sanctions order simply dismisses plaintiffs" former client's complaint with prejudice.

D.E. 27, p. 15; D.E. 33, p. 16; D.E. 34, p. 15; D.E. 34, p. 14; D.E. 39, p. 18.

On that basis Defendants argue that Plaintiffs lack standing to sue, making statements such as: "Counsel have standing [related to] orders issued directly against them, but not from *orders applicable only to their clients*."   D.E. 27, p. 14; D.E. 33, p. 15; D.E. 39, p. 18.   As Defendants have noted, the motion for sanctions was not filed, and the sanctions Order was not entered, until after they had long withdrawn ("The plaintiffs here voluntarily withdrew from representing Ms. Baker before the sanctions motion was filed.").  D.E. 27, p. 4, 15; D.E. 33, p. 3, 16; D.E. 34, p. 3-4, 14; D.E. 39, p. 4, 18.

On that basis, Defendants argue that no liberty or property interest of the Plaintiffs is injured by the sanctions Order of June 2021:

> Plaintiffs have not adequately alleged that the Jefferson County sanctions order deprived them of any property or liberty interest. As noted elsewhere, the sanctions order simply dismissed with prejudice the Jefferson County complaint filed by these plaintiffs' former client. (Ex. C to Compl., Jefferson County Sanctions Order). The sanctions order did not deprive plaintiffs of their right to practice law or pursue their profession. (Doc. 1, Compl. ¶¶ 112, 113). Nor did the sanctions order deprive plaintiffs of any property right by virtue of contingency-

14

fee contract or attorneys' lien. (*Id.* ¶¶ 90–92). To that end, before the sanctions order was entered, plaintiffs had already voluntarily withdrawn from the Jefferson County action, giving up any ability they had to control the outcome of that matter, and their client had already elected to dismiss her lawsuit.

D.E. 27, p. 28-29; D.E. 33, p. 29; D.E. 34, p. 28; D.E. 39, p. 32.  Thus, they argue that:

Again, plaintiffs here are conflating their former client's interests with their own. The sanctions order was against plaintiffs' former client, and plaintiffs' former client was provided with both notice and took her opportunity to be heard. Plaintiffs had no constitutional right to participate in an action where they no longer represented a party.

D.E. 27, p. 29; D.E. 33, p. 30; D.E. 34, p. 29; D.E. 39, p. 33.

Having taken these positions and prevailed, having made these admissions, ALL Defendants are now stuck with them.  It should be remembered, that Burks and WH law firm were part and parcel to this conspiracy and obtaining the withdrawal and the Order of June 2021. Accordingly, they are bound by the judicial actions of the Adams.

As will be explained in the next section, taking these positions, both in *Baker v. Adams*, and this case, is fatal to the Defendants' arguments on collateral estoppel and res judicata (as well as to arguments based on *Rooker-Feldman* in the preceding section).

## III.    Res Judicata and Collateral Estoppel

Res Judicata and collateral estoppel are affirmative defenses to be pled and proved by the Defendant.  Fed. R. Civ. Proc. 8(c)(1).    The elements of res judicata are: (1) the prior judgment was rendered by a court of competent jurisdiction; (2) the prior judgment was a final judgment on the merits; and (3) the same cause of action and the same parties or their privies were involved in both cases.  *Cardona v. Holder*, 754 F.3d 528, 529-530 (8th Cir. 2014).    The elements of collateral estoppel are: (1) party sought to be precluded in the second suit must have been a party, or in privity with a party to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue  must have been determined by a valid and final judgment; and (5)  the determination in the prior action must

been essential to the prior judgment.  *Ginters v. Frazier*, 614 F.3d 822, 826 (8th Cir. 2010).

There are numerous problems with applying these doctrines to Plaintiffs.

First, under res judicata or collateral estoppel defenses, defendants must show that the same cause of action and the same parties or their privies were involved in both cases.  The problem is that Defendants have obtained relief in *Baker v. Adams*, by getting the Motion to Intervene denied, claiming that Plaintiffs had no interest in that case, and were not entitled to notice or a hearing.  In this case, they have admitted that the Order "takes no action against plaintiffs; indeed, it does not make any direct reference to plaintiffs or even use their names at any point . . . ."  The Defendants acknowledge it was a former client, and that both the Motion for Sanctions, and the subsequent Order were entered after Plaintiffs had withdrawn, and thus that it does not deprive them of "any property or liberty interest."  They argue that its improper for Plaintiffs to be "conflating their former client's interests with their own."  If Plaintiffs' property and liberty interests are not impacted by this Order, if they have no right to intervene, if Gena Baker is not their client, if Plaintiffs' interests cannot be conflated with those of their former client, then it is not proper for Gena Baker and the Plaintiffs to be considered the same party or a privy.

Second, "Two causes of action are the same if they arise 'out of the same nucleus of operative fact,' and if 'proof of the same facts will support both actions, or . . . the wrong for which redress is sought is the same in both actions,'" *Cardona,* 754 F.3d at 529-530 (citations omitted).  Here, the events complained of occurred well after the original cause of action accrued to the Bakers.  Here, the injuries complained of are the Plainiffs' own, not the Bakers.  Here, the facts leading to those injuries are for misconduct entirely different than what led to the death of Luke Baker.  This is not the same cause of action.

Third, there is the issue of jurisdiction.  There is no dispute that after Plaintiffs had withdrawn, the Bakers and their remaining lawyers repeatedly sought to dismiss without

prejudice, which was denied, with no reason stated.  The case had not been dismissed withouttt

prejudice before, and service was not an issue.  The Arkansas Courts have held:

> plaintiff has an absolute right, pursuant to Ark. R. Civ. P. 41(a), to voluntarily
> nonsuit a claim without prejudice. *Whetstone v. Chadduck*, 316 Ark. 330, 332, 871
> S.W.2d 583, 584 (1994). Rule 41(a) provides that "an action may be dismissed
> without prejudice to a future action by the plaintiff before the final submission of
> the case to the jury, or to the court … [and] such a dismissal is a matter of right."
> We have consistently [***5]  upheld this provision. *See Whetstone*, 316 Ark. at
> 332, 871 S.W.2d at 584.

*Beverly Enterprises-Arkansas, Inc. v. Hillier*, 341 Ark. 1, *3-4 (2000). It was error to grant a

motion for summary judgment after it refused to grant the alleged victim's nonsuit pursuant to

subsection (a) of this rule, where the alleged victim's submission of his voluntary nonsuit motion

prior to the time argument had closed and the case had been submitted to the court meant that

the trial court had no choice but to grant the motion. *Coombs v. Hot Springs Vill. Prop. Owners

Ass'n,* 75 Ark. App. 364, 57 S.W.3d 772, 2001 Ark. App. LEXIS 744 (2001).   When a case is

dismissed without prejudice the Circuit court loses jurisdiction over it. *Crews v. Deere & Co.*,

2013 Ark. 67, 2013 Ark. LEXIS 81 (2013).  Accordingly, given that Judge Guynn had no choice

but to dismiss Baker v. Adams, he did not properly have jurisdiction.

Fourth, the issue sought to be precluded must have been actually litigated in the prior

action.  Here, it is pled that the remaining lawyers, Buchanan and Humphries presented no

evidence and called no witnesses, and miraculously, were not sued, even though they were

involved in the case, and Humphries attended the TacAir meeting.  The only defense they

presented was that their motion to dismiss without prejudice should be granted.

Fifth, the issue  must have been determined by a valid and final judgment.  The case is

on appeal, and there is no basis to affirm a dismissl with prejudice.

Furtherrmore, although the Burks Defendants try to argue res judicata and collateral

estoppel, they should think about it.  On the first summary judgment Order against their client,

Westbrook, the Court found that no reasonable person could possibly conclude that Sutter &

Gillham had breached any duty or done anything wrong.  On the second summary judgment

Order, the Court found that Westbrook, now the Burks Defendants' former client had committed various torts.  If this rule is to be applied to Plaintiffs, it must also be applied to the Burks Defendants.

Furthermore, the sanctions Order would not end this case.  This case is about whether or not Defendants committed various intentional torts.  The sanctions order did not address that.

**IV.     The Attorney Defendants are not immune from Plaintiff's Claims.**

Generally, Arkansas law requires that there be privity of contract in order for an attorney to be liable to an individual for professional malpractice. See A.C.A. § 16-22-310; *Jackson v. Ivory*, 353 Ark. 847, 858-861, 120 S.W.3d 587, 594-595 (2003). Section 16-22-310 provides as follows:

> (a) No person licensed to practice law in Arkansas and no partnership or corporation of Arkansas licensed attorneys or any of its employees, partners, members, officers, or shareholders shall be liable to persons not in privity of contract with the person, partnership, or corporation for civil damages resulting from acts, omissions, decisions, or other conduct in connection with professional services performed by the person, partnership, or corporation . . .

The statute provides exceptions in cases of "fraud or intentional misrepresentations." The elements of a fraud claim under Arkansas law are "(1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as  [*18] a result of the reliance." *Roach v. Concord Boat Corp*., 317 Ark. 474, 476, 880 S.W.2d 305, 306 (1994). Although a misrepresentation is generally required for a fraud claim to lie, a duty to speak may arise "where one person is in a position to have or to exercise influence over another who reposes confidence in him whether a fiduciary relationship in the strict sense of the term exists between them or not." *Camp v. First Fed'l Sav. & Loan*, 12 Ark.App. 150, 155, 671 S.W.2d 213, 216 (1984) (quoting *Hanson Motor Co. v. Young*, 223 Ark. 191, 265 S.W.2d 501 (1954)). The Bankruptcy Court in this District has held that the attorney immunity statute also includes an

exception for intentional torts. *Almand v. Benton Cnty.*, 145 B.R. 608, 617 (W.D. Ark. 1992) ("Rather, the attorney is held liable only for conduct constituting fraud, intentional misrepresentations, or intentional torts."). Accordingly, the Motion should be denied as fraud and intentional torts have been adequately pled.

Additionally, the Burks Defendants argue that they should be granted absolute immunity for the actions they have taken. Neither State nor Federal law provide such a broad stroke. The law that is cited by the Burks Defendants is inapplicable to the case at bar. Here, the Burks Defendants conspired with the Adams lawyers to violate Plaintiffs' constitutional rights. Further, if the proposition asserted by the Burks Defendants was true, then no malicious prosecution claim would lie. Such an idea is untenable given the Supreme Court's holding in *Thompson v. Clark*. Additionally, the Eighth Circuit has held that attorneys can be sued under 1983 for actions taken on behalf of their clients. See *Dubose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999). Accordingly, the Motion should be denied.

**V.    A claim is stated under 42 U.S.C. 1983**

**A.    The Defendants are State Actors because they colluded with Judge Guynn to Deprive Plaintiffs of their Clearly Established Constitutional Rights.**

To state a claim under Section 1983, the Plaintiff must plead that Defendants were state actors. Section 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . , subjects, or causes to be subjected, any citizen of the United States of any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. Therefore, to state a claim for relief under §1983, Plaintiff must demonstrate both that Defendants were acting under color of state law and that a constitutional violation was directly caused by Defendants' conduct. *Piecknick v. Commonw. of Pa.*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Where a plaintiff in a Section 1983 claim alleges a procedural due process violation, his claim is predicated upon the denial of a constitutionally protected property or liberty

interest. *Id*. at 1256 (citing U.S. Const. amend. XIV, §1; *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Carter v. City of Phila*., 989 F.2d 117, 119-20 (3d Cir. 1993)). Here, Defendants maintains that because the Complaint fails to allege any conduct on his part that violated Plaintiff's constitutional rights or any facts to establish that he is a state actor, the Complaint against him should be dismissed. For the reasons stated herein, the Motions should be denied.

Plaintiffs bear the burden of establishing that the defendant is a state actor for purposes of Section 1983. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1994) (citing *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)). Recovery is available under section 1983 only for violations of federal rights committed by persons acting "under color of state law." Private conduct is actionable under section 1983 under two conditions. First, the constitutional deprivation at issue "must be caused by the exercise of some right or privilege created by the State . . ." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982) (describing the right to seek a garnishment or attachment as qualifying). Second, the private party must have "acted together with or . . . obtained significant aid from state officials" or engaged in conduct that is "otherwise chargeable to the State." Id.; Wyatt v. Cole, 504 U.S. 158, 162, 118 L. Ed. 2d 504, 112 S. Ct. 1827 (1992). The second element requires more than the private misuse of a state statute (as alleged in the taking of the personal property in this case); a plaintiff must show that the private party acted in concert with or obtained significant aid from state officials who were themselves involved in a constitutional violation. See Hassett v. LeMay Bank & Trust Co., 851 F.2d 1127, 1129-30 (8th Cir. 1988); Apostol v. Landau, 957 F.2d 339, 343 (7th Cir. 1992). Otherwise stated, there must be a "meeting of the minds" or a "mutual understanding" between a private party and public officials to engage in conduct that violates the plaintiff's federal rights. Miller v. Compton, 122 F.3d 1094, 1098 (8th Cir. 1997). Thus, it is well settled that a private party may be held liable on a § 1983 claim if "he is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27, 66 L. Ed. 2d 185, 101 S. Ct. 183 (1980). In construing that test in

20

terms of the allegations necessary to survive a motion to dismiss, the Eighth Circuit has held that a plaintiff seeking to hold a private party liable under § 1983 must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor. See, e.g., *Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983) (*per curiam*); see also *Holbird v. Armstrong-Wright*, 949 F.2d 1019, 1020 (8th Cir. 1991) (*per curiam*); *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985) (*per curiam*); and *White v. Walsh*, 649 F.2d 560, 562 (8th Cir. 1981). The Eighth Circuit has held that to survive a Motion to Dismiss a complaint "must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir. 1997).

The Eighth Circuit in *Deck v. Leftridge* held that the conspiracy must be pleaded with "sufficient specificity and factual support." *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985). An allusion to a conspiracy is inadequate. *Holbird v. Armstrong-Wright*, 949 F.2d 1019, 1020 (8th Cir. 1991) (affirming dismissal of § 1983 claim against defendant attorney premised on a conspiracy between defendant attorney and prosecutor). Plaintiffs argue that this part of the decision conflicts with the Supreme Court's holding in Twombly and Iqbal. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(The Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.")(citations omitted). Given the Supreme Court's notice pleading, the standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Thus, the Court may dismiss a complaint "only if it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations." *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001) (citing *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995))

The United State Supreme Court has recognized that "the requirements of procedural due process must be met before a State can exclude a person from practicing law." *Willner v. Comm. on Character and Fitness*, 373 U.S. 96, 102, 83 S. Ct. 1175, 10 L. Ed. 2d 224 (1963).

21

Furthermore, in *Arnold v. Kemp*, 306 Ark. 294, 813 S.W.2d 770 (1991), this court cited with approval to the Kansas Supreme Court.

> Attorneys are licensed by the state to practice their profession; but so are other professionals, such as architects, engineers, and physicians. One who practices his profession has a property interest in that pursuit which may not be taken from him or her at the whim of the government without due process.

*Arnold*, 306 Ark. at 301, 813 S.W.2d at 774 (quoting *State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816 (1987)). This court has recognized that the practice of law is a privilege and not a right, but one cannot summarily restrict a lawyer's ability to exercise the privilege. *Donovan v. Sup. Ct. Comm. on Prof'l Conduct*, 375 Ark. 350, 290 S.W.3d 599 (2009). Nevertheless, it is well settled that any protections to a law license are "subject to the very lowest of review under the Due Process and Equal Protections Clauses to the Constitution." *Cambiano v. Neal*, 342 Ark. 691, 703, 35 S.W.3d 792, 799 (2000).

B**. The manner in which Judge Guynn applied Rule 37 violated due process**

**if the sanctions order applies to plaintiffs and has res judicata or collateral**

**estoppel effect**

Due process requires at a minimum that a person be given notice and a reasonable opportunity for a hearing before he or she is deprived of property by state action. *State of Wash. v. Thompson*, 339 Ark. 417, 6 S.W.3d 82 (1999). In that regard, the concept of due process requires neither an inflexible procedure universally applicable to every situation nor a technical concept with a fixed content unrelated to time, place, and circumstance. *Id*. Instead, what process must be afforded is determined by context, dependent upon the nature  [*11]  of the matter or interest involved. *Id*.

In *Chandler v. Martin*, 2014 Ark. 219, 10-12, a Rule provided no due process prior to a lawyer's license being suspended. The Rule stated that "[f]ailure to pay the annual license fee provided in subsection A of this Section shall automatically suspend the delinquent lawyer from the practice of law in Arkansas." The Court found that Rule VII(C) is unconstitutional to the extent that it provides for an automatic suspension of a lawyer's license without procedural due process, and we affirm the circuit court's ruling on this issue.  Here, the way in which Guynn

22

applied Rule 37 did not provide notice. It is undisputed that plaintiff's license to practice law, which has been in place for decades, is a property interest sufficient to invoke due process protections. *See Barry v. Barchi*, 443 U.S. 55, 64, 61 L. Ed. 2d 365, 99 S. Ct. 2642 (1979); *Mackey v. Montrym*, 443 U.S. 1, 10 n.7, 61 L. Ed. 2d 321, 99 S. Ct. 2612 (1979). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972).

Due process is flexible and calls for such procedural protections as the particular situation demands. *Hewitt v. Helms*, 459 U.S. 460, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983). Resolution of this inquiry requires consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). The first proposition that emerges from the application of these factors is that the imposition of sanctions against the Plaintiffs without notice is unconstitutional. The case law is clear that where the state has an important interest to protect and probable cause to believe that the plaintiff poses a real and immediate danger to that protected interest, interim or temporary emergency deprivation of a property right "pending a prompt judicial or administrative hearing that would definitively determine the issues" is constitutional. *Barry v. Barchi, supra* at 64. The guarantee of a prompt dispositional post-deprivation hearing, however, is a critical factor in determining the constitutional validity of the previously invoked interim or temporary deprivation processes. *See Parratt v. Taylor*, 451 U.S. 527, 540, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981) (state can only take property interest without pre-deprivation hearing if "meaningful" opportunity for post-deprivation hearing is afforded); *Mackey v. Montrym*, 443 U.S. 1, 12, 61 [**15] L. Ed. 2d 321, 99 S. Ct. 2612 (1979) (duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the impact of official action on private interest involved); *Barchi, supra.* See also *Ritter v. Cohen*, 797 F.2d 119 (3d Cir. 1986), where

concerning this very issue Judge Adams stated, "The existence of post-termination procedures is relevant to the necessary scope of pre-termination procedures." at 124 (*quoting Cleveland Board of Education v. Loudermill*, 470 U.S. 532 n.12, 105 S. Ct. 1487, 1495, 84 L. Ed. 2d 494 (1985)).   But, here, the presiding Judge denied Plaintiffs even a post-deprivation hearing.   As Justice Brennan accurately reflected in *Barchi*:

> The District Court found that, in harness racing, even a temporary suspension can irreparably damage a trainer's livelihood. Not only does a trainer lose the income from races during the suspension, but also, even more harmful, *he is likely to lose the clients he has collected over the span of his career*. (Footnote omitted). Where, as here, even a short temporary suspension threatens to inflict substantial and irreparable harm, an "initial" deprivation quickly becomes "final," and the procedures afforded either before or immediately after suspension are *de facto* the final procedures. A final full hearing and determination after Barchi had been barred from racing his horses and had lost his clients to other trainers was aptly described by the District Court as an "exercise in futility," 436 F. Supp., at 782, and would certainly not qualify as a "meaningful opportunity to be heard at a meaningful time." To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided -- i.e., either before or immediately after suspension.   443 U.S. at 73-74 (Brennan, J., concurring in part). *See also Ritter v. Cohen*, 797 F.2d 119, slip op. at 9-11 (3d Cir. 1986) (unreasonable delay in providing post-deprivation hearing to individual deprived of livelihood violates due process).

*Barchi*, 443 U.S. 55, 64, 61 L. Ed. 2d 365, 99 S. Ct. 2642

C. **Predetermination is a denial of Due Process**

In *DuBose v. Kelly*, the Eighth Circuit Court of Appeals held that a plaintiff had presented prima facie evidence of a "mutual understanding" where the private attorneys and the judge in plaintiff's state court proceeding allegedly made specific ex parte statements and those specific statements supported the inference that there was an agreement between the private attorneys and the judge to "fix" the trial. 187 F.3d 999, 1003 (8th Cir. 1999). But, in reaching its conclusion, the Eighth Circuit Court of Appeals noted that a "meeting of minds" cannot be inferred from mere "display[s] of cordiality" and "ex parte contact" between a private attorney and a judge, unless such acts are truly "serious." *Id*. Here, the Complaint alleges that the presiding judge's former law partner acted as a conduit between the Adams and the presiding judge. Paragraphs 46-51.

24

The Complaint has alleged, which the Court must accept as true, that the Defendants used Efrem Neely's relationship with Judge Guynn to further the plot against the Plaintiffs. In particular, the Defendants hired Neely to create a direct line of communication with Judge Guynn. Plaintiff concedes that ex parte contact alone is insufficient but that's not the case here. Rather, Plaintiff has alleged that Defendants used Efrem Neely's relationship with Judge Guynn to fix the result against these Plaintiffs and their clients. The Defendants would craft their actions in the Jefferson County litigation because they knew what the result was going to be. Therefore, these facts as pled transforms the actions of the Defendants into state action.

Additionally, Judge Guynn denied a Motion to Nonsuit contrary to well settled Arkansas law to allow the Defendants to conduct one-sided discovery then present the "evidence" to Judge Guynn, receive a favorable order drafted by WLJ Defendants, so that they can then use it to estop Plaintiffs from defending themselves in Faulkner County. These are the "serious" circumstances that the Eighth Circuit contemplated in *Dubose v. Kelly*. Pleading standards are inherently liberal, so the Court should deny the Defendants' Motions to Dismiss. Here as with *Dubose*, the results were predetermined prior to the Plaintiffs arrival in Jefferson County. After denying the First Motion to Nonsuit, Defendants continued appearance before Judge Guynn evinces their acquiescence in the corrupt agreement. *DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999)("The lawyers' continued appearance before the judge with the knowledge that such an assurance had been given would justify an inference that they had acquiesced in this corrupt agreement."). In Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, 245 F.3d 721, 739-740, the 8th Circuit held that Audio Odyssey a reasonable jury could find a "meeting of the minds" between Bank's loan officer and vice-president Bradley and attorney Hofmann, on one hand, and Sergeant Barton and Deputy Norris, on the other, to seize Audio Odyssey's real estate even though the state court ordered no such thing, even though the idea appeared to have been Bradley's to begin with. The relevant allegations of the Complaint are:

44.  Although Judge Guynn had recused on every other case in which Neely appeared, Neely appeared as counsel of record in the Jefferson County case nonetheless.

45.  Neely has no significant experience prosecuting complex civil cases such as the case in Exhibit "A."

46.   Plaintiffs trusted Judge Guynn to be impartial, so Sutter recommended to his client that any conflict caused by Neely's entry into the case be waived. That was a mistake.

47.   Neely's appearance in the case was another substantial step in a conspiracy to deny Plaintiffs, the Nobles, and Stephens their constitutional rights.

48.   Neely was hired simply to provide a conduit of information between himself and Judge Guynn and because Neely was black.

49.   Neely and Guynn met after hours at Neely's law office during the pendency of the Jefferson County litigation.

50.   Neely was paid tens of thousands of dollars by the Adamses.

51.   Neely was hired on the recommendation of WLJ.

52.   During the course of the Baker case, Neely and Judge Guynn communicated about the case *ex parte*.

53.   The Adamses also communicated directly with sitting, and long-time friend, Circuit Judge David Clark in Faulkner County, Arkansas.  Clark visited with the Adamses regularly, but he failed to disclose this fact to the parties to the Probate.

54.   The Adamses and Bell knew what the respective judges would do on several occasions before the Plaintiffs and their client, Gina Baker.

55.   On occasion, Judge Guynn discussed the case with Neely at Neely's office after hours, and Neely then would contact Eric Bell or the Adamses and report what the Judge's decisions would be.

56.   The lawyer defendants would then craft their representation of the Adamses based upon the "inside" information they had but that Plaintiffs and their clients did not.

57.   Bell, Henry, Neely, and Williams then recruited other lawyers like Chris Burks, who then associated BRANDON HAUBERT, to make spurious allegations against the Plaintiffs, thereby committing barratry, champerty, and maintenance.

Taken as true, these allegations fall well within *Dubose* and *Audio Odyssey*. Accordingly, the Motion should be denied.

The Due Process Clause of the Fourteenth Amendment "requires that action by a state through any of its agencies must be consistent with the fundamental principles of liberty and justice which lie at the base of our civil and political institutions, which not infrequently are designated as 'the law of the land.'" *Buchalter v. New York*, 319 U.S. 427, 429, 87 L. Ed. 1492, 63 S. Ct. 1129 (1943) (quoting *Hebert v. Louisiana*, 272 U.S. 312, 316-17, 71 L. Ed. 270, 47 S. Ct. 103 (1926)). In his argument before the Supreme Court in the Dartmouth College Case, Daniel Webster gave what is perhaps the most often quoted definition of the phrase "law of the land." *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 4 Wheat. 518, 4 L. Ed. 629 (1819). "By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." *Id*.

In this case, with the allegations of the complaint accepted as true, the proceedings in Jefferson County were meaningless and the judgment was predetermined. The law did not hear until after it had condemned. Consequently, the Motion should be denied.

**D.      Injury**

Additionally, "[d]amage to reputation alone, however, is not sufficient to invoke the procedural protections of the due process clause." *Gunderson v. Hvass*, 339 F.3d 639, 644 (8th Cir. 2003) (citing *Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)). Instead, "[t]he loss of reputation must be coupled with some other tangible element to rise to the level of a protectible property interest." *Id*. This is referred to as the "stigma plus" test. *Id*. The Plaintiffs have clearly alleged defamatory damage to their reputation as well as a tangible loss. Defendants are even now attempting to give res judicata and collateral estoppel effect to the June sanctions Order against these Plaintiffs.  This is not the only case where they will attempt that.  They will attempt in Faulkner County Court, where they have sued these Plaintiffs.  The result of that would be a judgment.  Such a judgment would have to be reported to any state where admission was sought under pro hac vice or general admission.  It would be an issue if Plaintiffs seek to be class counsel, as they have in the past.  It would be something that would have to be reported when seeking general admission to other federal courts.  It has already caused losses in terms of attorney's fees and costs.  These losses would include a loss of the right to practice law, tortious interference, malicious prosecution, abuse of process, as well as the infringement of the fundamental right to be heard. The Motion should be denied.

**E.      Consenting to Judge Guynn continuing as Judge after Neely's appearance is not a waiver.**

The idea that Plaintiffs consent to Neely appearing is a waiver is ludicrous.  The Judge expressly stated that he could be fair and act appropriately.  Ex Parte contacts between the Judge and Neely where the case was discussed, decisions were agreed on in advance, allowing Defendants to form their strategies and bribes were not part of that consent.  Plaintiffs

27

and their clients had every. Right to assume that Neely and Judge Guynn would comply with the applicable Rules of Ethics, judicial canons, the law, and rules of procedure as to such conduct.

F.      **Plaintiffs have stated a claim for retaliation.**

To successfully plead a First Amendment retaliation claim, a plaintiff must plausibly plead that he/she "engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [them] that would  chill a person of ordinary firmness from engaging in that activity." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007). The Eighth Circuit has noted that "[i]n some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim." *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002). However, since "'[c]riticism of public officials lies at the very core of speech protected by the First Amendment,'" *Id*. at 927 (quoting *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999)), "it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id*. at 928 (quotation omitted).

Here, Plaintiffs have alleged that the Defendants took their action because Plaintiffs filed a lawsuit. Filing a lawsuit is protected activity under First Amendment. The actions taken by the Defendants in conspiracy with Judge Guynn and Judge Clark would chill a person of ordinary firmness from filing a lawsuit.

Certainly rights in the Courtroom under the First Amendment are less than out in public. Lawyers have to abide by the rules of ethics, or they may suffer sanctions that an ordinary citizen, who is subject only to the rules of evidence and procedure would not.  However, that does not mean tthere are no First Amendment rights in a judicial proceeding, or for lawyers, at all. In *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 149 L. Ed. 2d 63, 121 S. Ct. 1043 (2001), the Supreme Court upheld a First Amendment challenge to a congressional statute allocating federal funds to local organizations for the purpose of providing legal representation to poor people in non-criminal    proceedings, but with a condition prohibiting "legal representation . . . involving an effort to amend or otherwise challenge existing welfare law." *Id.*

at 536-37. "The Court interpreted this condition as "preventing an attorney from arguing to a court" that a state statute conflicts with a federal statute or that either a state or federal statute violates the Constitution. *Id.* at 537. The Court characterized the congressional funding scheme as a limited public forum, and thus found its viewpoint-discriminatory condition constitutionally impermissible." *Mezibow v. Allen*, 411 F.3d 712, 720 (6th Cir. 2005).

So, it appears that the rule is that where an act would be directed at preventing or deterring any access at all, or for having accessed the judicial system at all, such behavior is actionable.    As the Mezibow court noted: "the instant case involves only speech in the courtroom, which as a nonpublic forum is less conducive to free speech rights . . . ." Id., at 720. And that is what happened here.   Notably, Mr. Williams told Mr. Sutter to withdraw, or that he would be destroyed.   Defendants have now taken steps to atttack Plaintiffs' law licenses and ruin them financially, as welll as disrupting client relationships.   As *Mezibow* noted: "*Velazquez* forbade both in-court argument by the attorney and out-of-court consultation between attorney and client regarding the restricted issues, *Velazquez*, 531 U.S. at 544." So this case involves an effort to interfere in any representatiton at all, as in Velazquez. Furthermore, in *Mezibow*, it was an action for out of court, defamatory statements, and nothing more.   Plaintiffs have alleged far more substantive injury than that.   Actions that create personal liability for attorneys have also been held to violate the First Amendment right to petition.   *Miller v. Bonta*, 2022 U.S.Dist.LEXIS 228197 (S.D. Cal. 2022); *see also In Re Foster*, 253 P.3d 1244 (Colo. 2011).   A right of association has also been recognized in seeking and representing clients:

> We hold that the First and Fourteenth Amendments protect the right of the members through their Brotherhood to maintain and carry out their plan for advising workers who are injured to obtain legal advice and for recommending specific lawyers. Since the part of the decree to which the Brotherhood objects infringes those rights, it cannot stand; and to the extent any other part of the decree forbids these activities it too must fall. And, of course, lawyers accepting employment under this constitutionally protected plan have a like protection which the State cannot abridge.

*Brotherhood of Railroad Trainmen v. Virginia*, 377 U.S. 1, 8 (1964).   Furthermore, as the dissent in Mezibow stated:

While the Supreme Court and others have, on several occasions, upheld restrictions on courtroom speech, they have done so, not because First Amendment rights do not exist in the courtroom, but rather because such restrictions served to protect a defendant's constitutional right to a fair trial and to preserve the dignity of the courts. **1** [**31] *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1081-82, 115 L. Ed. 2d 888, 111 S. Ct. 2720 (1991) (O'Connor, J., concurring) ("Lawyers are officers of the court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech. *This does not mean, of course, that lawyers forfeit* [**29] *their First Amendment rights, only that a less demanding standard applies*.") (emphasis added, citation omitted); *United States v. Gurney*, 558 F.2d 1202, 1209-10 (5th Cir. 1977) (in affirming limitations on media access to court proceedings, explaining that, "It is the trial judge's primary responsibility to govern judicial proceedings so as to ensure that the accused receives a fair, orderly trial comporting with fundamental due process. The trial judge  is therefore granted broad discretion in ordering the daily activities of his court . . . . Within this discretion, therefore, the district judge can place restrictions on parties, jurors, lawyers, and others involved with the proceedings *despite the fact that such restrictions might affect First Amendment considerations*. Sixth Amendment rights of the accused must be protected always.") (emphasis added, citations omitted). By stating that the First Amendment has no place in the courtroom, the majority also betrays the historical role of litigation as providing a forum for the expression of core political speech, *see In re Primus*, 436 U.S. 412, 428, 56 L. Ed. 2d 417, 98 S. Ct. 1893 (1978) (holding unconstitutional [**30] restrictions on non-profit organization's solicitation of prospective litigants, explaining that "for the ACLU, as for the NAACP, 'litigation is not a technique of resolving private differences'; it is 'a form of political expression' and 'political association'") (quoting *NAACP v. Button*, 371 U.S. 415, 429, 431, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963)), instead relegating attorney speech to a level heretofore occupied only by such speech as obscenity and fighting words.

*Mezibow*, 411 F.3d at 723-724 (dissent).

It should also be noted that the First Amendment rights of lawyers are restricted by the states, which have an interest in controlling their judicial processes.  All Defendants in this case, but for their collusion with a public official, would be private actors, not government officials. They have no interest in or right to restrict the First Amendment activities of a lawyer.  And corrupt collusion between a public official and parties to a lawsuit certainly implicate no significant state interests in restricting the speech of their opponents.

Accordingly, Plaintiffs did have First Amendment rights at issue here, and were well within by consenting to represent a Plaintiff, and refusing to stop doing so despite threats of destruction.

### G.      Plaintiffs have stated a Substantive Due Process Claim

30

The Supreme Court has recognized that "notions of substantive due process contained within the Fourteenth Amendment safeguard individuals from unwarranted governmental intrusions into their personal lives." *Whalen v. Roe*, 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847-849, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). "The substantive component of the due process clause protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and are implicit in the concept of ordered liberty...." *Singleton v. Cecil*, 176 F.3d 419, 425 (8th Cir. 1999) (internal quotations omitted).

"To establish a substantive due process violation, [the plaintiff] must demonstrate that a fundamental right was violated and that [the defendant's] conduct shocks the conscience." *Folkerts v. City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013). Conduct that "shocks the conscience" requires more than showing "that the government official's behavior meets the lowest common denominator of customary tort liability. ... Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to this level." *White v. Smith*, 696 F.3d 740, 757-58 (8th Cir. 2012) (citation and internal quotation marks omitted). Whether conduct is conscience-shocking is a question of law. *Folkerts*, 707 F.3d at 980. Additionally, Plaintiff alleges that Defendant's conduct violated her right to privacy.

In *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir.2001), the plaintiff alleged that his due process rights were violated by the defendants' failure to investigate potential leads in a homicide case, resulting in his wrongful imprisonment. There, the Eighth Circuit recognized that "[t]he general test of whether executive action denying a liberty interest is egregious enough to violate due process is whether it shocks the conscience." *Id*. at 956 (footnote omitted). This determination turns on whether the state actor had the opportunity to deliberate before selecting a course of conduct; if so, the plaintiff may prevail where the actor was deliberately indifferent to

31

a fundamental right held by the plaintiff. *Id*.; *Terrell v. Larson*, 396 F.3d 975, 978 n. 1 (8th Cir.2005) (en banc). Thus, the Eighth Circuit held that the plaintiff in *Wilson* could go forward on his failure-to-investigate claim brought pursuant to the Due Process Clause if he could show that the actions of the investigating officers "shock[ed] the conscience." *Wilson*, 260 F.3d at 956. In *Scheeler v. City of St. Cloud, Minn*., 402 F.3d 826, 831 (8th Cir. 2005), the Eighth Circuit held that the right to access the Courts is a fundamental right. See also *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). If manufacturing false evidence shocks the conscience, then the conduct here does so too. *White v. Smith*, 696 F.3d 740 (8th Cir. 2012). Access to the Courts is a fundamental right as well as the right to heard. Defendants' actions restricted that right. Accordingly, the Motion should be denied.

Notably, Mr. Willliams asserts no jurisdiction.   Plaintiffs have stated a federal claim, so there is federal question jurisdiction.

## VI.      Plaintiffs have stated a claim for abuse of process.

"Abuse of process is a narrow tort." *Nat'l Bank of Arkansas v. River Crossing Partner, LLC*, 2011 Ark. 475, 385 S.W.3d 754, 761. In Arkansas, abuse of process claim includes three elements: (1) a legal procedure set in motion in proper form, even with probable cause, and even with ultimate success, but (2) perverted to accomplish an ulterior purpose for which it was not designed, and (3) a willful act in the use of process not proper in the regular conduct of the proceeding. *Union Nat'l Bank v. Kutait*, 312 Ark. 14, 16, 846 S.W.2d 652 (1993). "[A]buse of process is somewhat in the nature of extortion or coercion. The key is improper use of process after issuance, even when issuance has been properly obtained." *Id.* The filing of a vexatious action is insufficient to state a claim for abuse of process. *See id.* (compiling cases).

The test of abuse of process is whether a judicial process is used to extort or coerce. *Id*. To satisfy the "ulterior purpose" element of a claim abuse of process, the plaintiff must allege that a judicial process is used to extort or coerce. *S. Arkansas Petroleum Co*., supra. The complaint contains numerous factual allegations that satisfy the "ulterior purpose" element. Specifically, the amended complaint alleges that the Defendants set in motion judicial processes

to extort or coerce Plaintiffs to withdraw from representing Gina Baker in Jefferson County. The malicious prosecution of a case, improperly continued, may also constitute an abuse of process. *Routh Wrecker Serv., Inc. v. Washington*, 335 Ark. 232 (1998).

Examples of misuse of process that have been found to constitute the tort of abuse of process are the service of an arrest warrant; delivery of an order to a sheriff for execution; personal service procured by fraud; or attachment or garnishment for a greatly excessive amount. *Carmical v. McAfee*, 68 Ark. App. 313 (1999). Judicial process has been defined as a comprehensive term which includes all writs, rules, orders, executions, warrants, or mandates issued by a court during the progress of a cause of action. See *Henderson v. Dudley*, 264 Ark. 697 (1978); *Smith v. Smith*, 28 Ark. App. 56 (1989). Here, Defendants used the judicial processes in numerous ways to secure the corrupt Jefferson County Order.

Having corrupted David Westbrook, convincing him to give false testimony that Plaintiffs had used settlement of his case as a means of bribing Chad Kelly, Defendants issued a subpoena for him to appear at a hearing in September 2019. The scheme was for him to appear, give false testimony, which would force Plaintiffs to withdraw due to a conflict. Then, in February 2020, Westbrook actually sued as part of that scheme, which did force the withdrawal. Subsequent to that the Bakers' and their lawyers moved to dismiss without prejudice, multiple times. That is an absolute right and denial of such a motion is unheard of in state court. Yet that is what Judge Guynn did, without offering any reason, as part of this scheme. Defendants then moved for sanctions in the Jefferson County Court, and obtained them against the Bakers, while providing no notice and opportunity to be heard to Plaintiffs. They have now sued Plaintiffs in Faulkner County, and while that case is on appeal, are now claiming that the June 2021 sanctions Order has res judicata and collateral estoppel effect on Plaintiffs. When Plaintiffs attempted to intervene, Defendants opposed it stating Plaintiffs had no interest, and therefore no right to notice or to be heard, and obtained relief on that. Basic constitutional law requires that if such a ruling is going impact Plaintiffs, they are entitled to notice and an opportunity to be heard, which Defendants have deprived us of. If Defendants prevail on the Faulkner County

appeal, they will make the same res judicata and collateral estoppel arguments there, in order to gain uncontested liability and to deprive Plaintiffs of the right to a jury trial.

Those facts demonstrate the use of legal process to accomplish an ulterior, improper purpose, for which the process was not designed, as well as multiple, willful, improper subsequent uses of process.

**VII.    Plaintiffs have stated a claim for malicious prosecution.**

To establish a claim for malicious prosecution, a plaintiff must prove five elements: (1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages. *Sundeen v. Kroger*, 355 Ark. 138 at 142, 133 S.W.3d 393, 395 (2003)*.* The failure of one element renders a malicious-prosecution case defunct. *Jones v. McLemore*, 2014 Ark. App. 147, 432 S.W.3d 668.

Probable cause for prosecution must be based on the existence of facts or credible information that would induce the person of ordinary caution to believe the accused person to be guilty of the crime for which he is charged. *Wal-Mart Stores, Inc. v. Binns*, 341 Ark. 157, 163, 15 S.W.3d 320, 324 (2000). The test for determining probable cause is an objective one. *Wal-Mart Stores, Inc. v. Yarbrough*, 284 Ark. 345, 681 S.W.2d 359 (1984). Ordinary caution is a standard of reasonableness. See *McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 15-16, 454 S.W.3d 200, 210. In making a probable-cause determination in the context of a malicious-prosecution suit, the court generally "concentrates on the facts before the action commenced." *Sundeen*, 355 Ark. at 145, 133 S.W.3d at 397; see also *Coombs v. Hot Springs Vill. Prop. Owners Ass'n*, 98 Ark. App. 226, 233, 254 S.W.3d 5, 11 (2007). Malice has been defined as any improper or sinister motive for instituting the suit. *Sundeen*, *supra*. Malice can be inferred from the lack of probable cause. *Wal-Mart Stores, Inc. v. Williams*, 71 Ark. App. 211, 29 S.W.3d 754 (2000). When, however, probable cause exists and there is no strong evidence of malice, a charge of malicious prosecution cannot succeed. *Sundeen*, *supra*.

34

Here, the underlying counterclaim that was filed by Burks Defendants at the behest of the Adams Defendants, Neely, Williams, Bell, and WLJ Defendants was favorably terminated in favor of Plaintiffs. The complaint lacked probable cause of which malice can be inferred.   This has been established by not one, but two Orders, granting summary judgment against Westbrook.  The facts establishing malice have clearly been pled - suborning and giving false testimony and lawsuits to force attorneys to withdraw from a case, under the shield of a Judge who is secretly working with opposing counsel behind the scenes.   The damages are that because Plaintiffs had to withdraw, they lost their fee, as well as pay attorney's fees. Furthermore, they have since been sued as a further effort in this scheme. Accordingly, the Motion should be denied.  There is also the complaint to the ethics committee filed by one of the Defendants. Cplt., 117.

## VIII.    Plaintiffs have stated a claim for civil conspiracy.

To recover for a conspiracy to violate Plaintiffs' civil rights, Plaintiffs must prove four elements: (1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive them either directly or indirectly of their civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to person or property or the deprivation of a civil right. See *Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999). While a lawyer cannot generally conspire with their client, such is not applicable here.

The members of the conspiracy are composed of three groups: (1) the Adams Defendants, their in-house counsel Eric Bell, Ephrem Neely, Tommy Williams, and their lawyers at WLJ; (2) Judge Guynn; and (3) David Westbrook and the Burks Defendants.  Neely was hired to influence and act as a conduit to the Judge.   The Judge promised he could be fair and no improper behavior would occur.  It did, in the form of ex parte communications with the Judge about the case in which they told the Judge what they wanted and he said what he would do so they could craft their actions.  Then, Neely approached David Westbrook to get him to say with no factual basis that Plaintiffs (Westbrook's former lawyers) had used his case to bribe the

coroner, Chad Kelly.   He was subpoenaed to testify, and then brought suit against Plaintiffs. This forced Plaintiffs to withdraw as counsel in the Baker case.   The Adams Defendants then took the opportunity to get Judge Guynn to deny an absolute right to non-suit, for no reason, repeatedly, so that they could could obtain an Order sanctioning the Bakers, without notice or a hearing, which they would then use to sue the Bakers' counsel, denying them a right to a jury trial by  claiming it had a res judicata / collateral estoppel type effect.

These actions took place began in the Spring of 2019 with the hiring of Neely, the Spring/Summer of 2019 with the coopting of Westbrook and Judge Guynn, extended to February 2020, when Westbrook sued and withdrawal was forced, continued through June of 2021 when Judge Guynn repeatedly denied motions to nonsuit, a motion for sanctions was filed, and an Order entered, as well as further defamation by David Westbrook to various people on social media.   The torts sued for include 42 U.S.C. 1983, abuse of process, malicious prosecution, barratry, maintenance, champerty, tortious interference, felony-tort, and defamation.

This is all pled, so, when and how the conspiracy was formed, what each person's role in it was, what torts were committed, who committed them, what acts they took, it is all in the Complaint, and the motion should be denied.

IX.     **Defendants engaged in barratry/champerty/ maintenance when they recruited David  Westbrook to make frivolous claims against Plaintiffs, and he did so in February 2020.**

Pursuant to Arkansas Code Annotated, Sec. 1-2-119, in pertinent part, "The common law of England, so far as it is applicable and of a general nature . . . shall be the rule of decision in this state unless altered or repealed by the General Assembly of this state."  Historically, under English common law, a party who was injured by a groundless or speculative lawsuit could sue by asserting claims of "maintenance" and "champerty." Am. Jur. 2d Champerty, Maintenance, and Barratry § 1 (2009). The United States Supreme Court has stated that, "put simply, maintenance is helping another prosecute a suit. Champerty is maintaining a suit in return for

36

financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty." *In re Primus*, 436 U.S. 412, 424, 98 S. Ct. 1893, 56 L. Ed. 2d 417 (1978).

Under English common law, a party who was injured by a groundless or speculative lawsuit could sue by asserting claims of maintenance and champerty. "Maintenance is defined as an officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or assisting either party to the action, with money or otherwise to prosecute or defend it." *Kraft v. Mason*, 668 So. 2d 679, 682 (Fla. 4th DCA 1996) (quoting 9 Fla. Jur. 2d. Champerty and Maintenance § 1 (1979)). Champerty, meanwhile, "is a form of maintenance wherein one will carry on a suit in which he has no subject-matter interest at his own expense or will aid in doing so in consideration of receiving, if successful, some part of the benefits recovered." *Id*. (quoting 14 C.J.S. Champerty and Maintenance § 1a (1991)). "Historically, the common-law doctrines of champerty and maintenance arose in England from causes unique to society as it then existed. *Id*. (quoting 14 Am. Jur. 2d. Champerty and Maintenance § 1 (1964)). "The power of influential persons to whom rights of action were transferred in order to obtain their support and favor in suits brought to assert those rights was the cause of the rigid doctrines . . . and as civilization and law progressed, the need for these strict rules decreased." *Id*. (quoting 14 C.J.S. Champerty and Maintenance § 3 (1991) and 14 Am. Jur. 2d, supra, § 1). The need for these doctrines is present here as the Adams Defendants acted as Feudal Nobility to manufacture frivolous claims against Plaintiffs to prevent the lawsuits against them.

The Territorial Court in Arkansas defined maintenance as "an officious intermeddling in a suit depending in a court, with which the person so intermeddling has nothing to do, by assisting the plaintiff or defendant in the prosecution of such suit." *Fletcher v. Ellis*, 9 F. Cas. 266, 266 (Super. Ark. Terr. 1836). In *Fletcher*, the Arkansas Court found that an action for maintenance exists in Arkansas. The reception statute provides that "[t]he common law of England, so far as it is applicable and of a general nature, and all statutes of the British Parliament in aid of or to supply the defects of the common law made prior to March 24, 1606, which are applicable to our own form of government, of a general nature and not local to that kingdom, and not

37

inconsistent with the United States Constitution and the laws of the United States or the Arkansas Constitution and laws of this state, shall be the rule of decision in this state unless altered or repealed by the General Assembly of this state." Ark. Code Ann. § 1-2-119.

Defendants argue Ark. Code Ann. 16-22-208, but that statute says nowhere that it repeals the common law actions for maintenance, barratry, or champerty. It simply defines one form of barratry, so those causes of action continue to exist in Arkansas.  Defendants rely upon Bennett v. NAACP, 236 Ark. 750 (1963), but that simply ruled that statutes passed to attack the NAACP were unconstitutionally vague and were violations of First Amendment rights.

While Defendants cite *Lytle*, it is inapplicable to the case at bar. *Lytle* dealt with the compensation of lawyers in this state. The holding in *Lytle* is merely that an "attorney at law may purchase of his client an interest in the subject matter of the suit, in consideration of services rendered and to be rendered in the prosecution of the suit, and become bound for the costs in the prosecution of his own and client's rights, without the violation of any law of champerty in this State." *Lytle v. State*, 17 Ark. 608, 609 (1857), *aff'd*, 63 U.S. 193 (1859). The Supreme Court held that the compensation of lawyers in the United States was inconsistent with that of England. Consequently, the Arkansas Supreme Court held that champerty was inconsistent with the American legal system, but this does not abolish a claim for maintenance. *Lytle v. State*, 17 Ark. 608, 680 (1857), *aff'd*, 63 U.S. 193 (1859)("We conclude, then, upon the objection of champerty, that it cannot be sustained, and affords no answer to the relief sought by the complainants.").  Thus, while a champerty claim may not proceed against Burks, Neely or the WLJ Defendants, who are all lawyers, that defense could not be applicable to the Adams Defendants themselves.

Furthermore, the Court in *Lytle* concedes that champerty is merely an appendant or variety of a claim of maintenance. While the Arkansas Supreme Court surmises that an action for maintenance might be legislated out of existence due to the advent of statute of limitations, such is merely dicta that does not overrule the Court's holding in *Fletcher*. *See Lytle* at 678("The truth is, this whole law of maintenance, with its appendant law of champerty, has been in a very

38

great degree displaced in modern times by the invention of statutes of limitation, which the States, generally, have adopted, as well as the English people, of which our ancestors had no knowledge.").

Here, Defendants' contacted David Westbrook, convinced him that Plaintiffs had sold him out, connected him with the Burks Defendants who provided free legal services, and filed a frivolous counterclaim. This activity is the precise conduct that an action for maintenance is meant to protect against. Consequently, the Defendants' Motions should be denied.

**X.      Plaintiffs have stated a claim under the civil action by crime victim statute.**

Plaintiffs' claim for bribery of Judge Guynn and Judge Clark is brought pursuant to the Arkansas crime victim statute, Ark. Code Ann. § 16-118-107. That statute provides, "Any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct. Ark. Code Ann. § 16-118-107(a). Plaintiffs are the victim of efforts "to bribe or illegally influence a state judicial officer" which culminated in the sanction order dismissing the wrongful death claim with prejudice. The Defendants each participated in the conspiracy to bribe or wrongfully influence Judge Guynn and Judge Clark which is a felony under the laws of Arkansas. Accordingly, the Motions to Dismiss should be denied.

**XI.     Plaintiffs have stated a claim for tortious interference with contract.**

The elements of tortious interference are: (Plaintiff) claims damages from (defendant) and has the burden of proving each of the following five essential propositions: (1) a valid contractual relationship or business expectancy; (2) defendant's knowledge of that relationship or expectancy; (3) intentional and improper interference; (4) that disruption or interference was a proximate cause; of (5) damages. Baptist Health v. Murphy, 2010 Ark. 358, at 15. The formulation of bad faith in Arkansas is affirmative misconduct that is "dishonest, malicious, or oppressive." *Stevenson v. Union Standard Ins. Co.*, 294 Ark. 651, 654, 746 S.W.2d 39, 41 (1988). "[I]n an action for this type of tort, actual malice is that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge." *Id.* at 654, 746 S.W.2d

39

at 41..  There is liability where defendant's unlawful conduct prevented the claiming party from performing his contractual obligations owed to a third party. *United Bilt Homes, Inc. v. Sampson*, 310 Ark. 47, 52–53, 832 S.W.2d 502, 504 (1992). "no actual repudiation of contract is necessary for liability, and it is enough that the contract performance is partly or wholly prevented, or made less valuable, or more burdensome by the defendant's unjustified conduct." *United Bilt*, 310 Ark. at 52, 832 S.W.2d at 504.he defendant may assert an affirmative defense of privilege. Arkansas courts recognize a privilege to compete. *See Kinco, Inc. v. Schueck Steel, Inc.*, 283 Ark. 72, 77–78, 671 S.W.2d 178, 181–82 (1984).

The comments to AMI 404, state: "The Comment to this section of the Restatement characterizes the nature of the tortfeasor's conduct as involving the threats of physical violence, fraudulent misrepresentation, threat of wrongful prosecution (civil or criminal), conduct independently unlawful, offensive economic pressure, or violation of recognized ethical codes or established business customs. In *Baptist Health v. Murphy*, 2010 Ark. 358, at 15–16, 373 S.W.3d 269, 282, the court added consideration of the social interests in protecting the contractual interests of the plaintiff as the fifth factor to be considered in determining whether the interference was improper."

"Defamatory statements and false statements have been recognized as improper actions giving rise to a cause of action for interference with contractual relations." *Mason v. Funderburk*, 247 Ark. 521, 530 (1969).

Here, the contract or expectancy, was the attorney-client relationship with Gena Baker, and the lien on that case.  Defendants were clearly aware of that relationship as they  were litigating against plaintiffs.   It is clearly alleged here that the Adams should be liable to the Bakers because either Skylar killed Luke, or on a premises liability theory.  For the purpose of defeating those claims,   Defendants suborned a Judge, and Plaintiff's former client, Mr. Westbrook, to force Plaintiffs to withdraw from the case, so that they could.  The Complaint is replete with evidence of malice, improper motives, and improper methods - Mr. Williams' threat to destroy Plaintiffs, and, for example: bribery, illegal ex parte contacts with a judge, getting a

former client to claim that his case was used to bribe a coroner, and suborning false testimony. It is clearly stated that the allegations of misconduct against the Plaintiffs, the specious claim of using another client's case to bribe the coroner, caused the withdrawal and disruption of the contract.

## XII.   Defamation

Defendants argue absolute privilege on defamation for statements made inside the pleadings.   Paragraph 121 of the complaint states: "Defendants made defamatory statements outside the pleadings in order to destroy S&G."

Defendants argue qualified privilege. That would apply to the complaint to the ethics committee filed by one of the Defendants. Cplt. 117. To defeat privilege, Plaintiffs must establish one of the following: (a) the statement was not reasonably related to the subject matter of the proceeding; (b) the statement was not made for the purpose of furthering defendant's interest in the *proceeding*; (c) the content of the statement and extent of publication was more than necessary; (d) defendant, in publishing the statement, acted out of hatred, ill will, or a spirit of revenge; *or* (e) defendant published the statement with a lack of belief in its truthfulness. AMI 409.

Without waiving the opportunity to pursue other means, it is pled that Tommy Williams that he and the Adams would destroy Sutter if he did not withdraw.   Cplt., par. 16, 37. Henry made false allegations against Sutter.   Cplt., para. 39.   It is pled that her way of defending a case is to attack the lawyer.   Cplt., para. 40.   That is all hatred, ill will, and revenge.   The thrust of the Complaint is that in order to get Sutter & Gillham off the case the Adams bribed a Judge and acted in concert with David Westbrook, to get him to make false statements and sue, forcing Sutter & Gillham to withdraw due to a conflict.     That also merits part (d).   But not only that given that the claims of bribery and other were false, and that Defendants knew it was their own creation and nothing more, part (e) is satisfied.   Given the statements were false, they were not reasonably related to the proceeding and were not related to any legitimate interest of the

defendants, and making the statements at all was by definition more than necessary as they were false.

That leaves the elements.   Plaintiffs allege that WLJ went to Arkansas Business, an entity they have an established relationship with and got the allegations in the lawsuit against Sutter & Gillham published throughout the state.   Cplt., 73-75.   This was also pursued around the same time through other avenues, when WLJ got Mr. Westbrook and Kim Phillips to publish false allegations to a blogger that Plaintiffs had bribed he coroner.   Id.   These are false statements reflecting negatively on Plaintiffs' professional reputation that were published throughout the State.   That is textbook defamation.   Plaintiffs have alleged this was part of a conspiracy of all the Defendants.   So, while not all Defendants made these statements, they are responsible.

## XIII.    Standing

Standing has been raised repeatedly, in a variety of contexts, on for example, issues of abstention and lack of an injury.   These arguments have been addressed the arguments on absention or on whether or not the various Counts state a claim.   Defendants have set up straw men to knock down, such as arguing that Plaintiffs do not have standing to challenge an Order directed at their clients, not them.

WHEREFORE, PLAINTIFFS pray for an Order denying the Motion to Dismiss.

Respectfully submitted,

**SUTTER& GILLHAM, P.L.L.C**.
Attorneys at Law
Post Office Box 2012
Benton, Arkansas 72018
(501) 315-1910 -  Office
(501) 315-1916 – Facsimile
*Counsel for the Plaintiff(s)*

By:     */s/ Luther Oneal Sutter*
             Luther Oneal Sutter, Ark. Bar #95031

By:     */s/ Lucien Gillham*
             Lucien Gillham, Ark. Bar #99199

42

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served on 1st day of November, 2022, via ECF, upon **_ALL_** counsel of record:

By:   _/s/ Luther Oneal Sutter_
Luther Oneal Sutter, Ark. Bar #95031

By:   _/s/ Lucien Gillham_
Lucien Gillham, Ark. Bar #99199